**In The Matter Of:**

*Burton v.*
*Jones*

---

*Shalena Cook Jones*
*December 18, 2023*
*Video Deposition*

---

*Regency-Brentano, Inc.*
*13 Corporate Square*
*Suite 140*
*Atlanta, Georgia 30329*
*404.321.3333*



**REGENCY-BRENTANO, INC.**
*Certified Court Reporters*

Min-U-Script® with Word Index

1              UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF GEORGIA
2                  SAVANNAH DIVISION

3

4

   BURT ANTHONY BURTON,
5
           Plaintiff,
6      vs.                        CIVIL ACTION NO:
                                  4:23-cv-00111-RSB-CLR
7

   SHALENA COOK JONES, in her
8  individual and official
   capacities; CHATHAM COUNTY,
9  GEORGIA,

10         Defendants.
   ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

11

12              The remote video deposition of

13              SHALENA COOK JONES, taken via Zoom

14              videoconference on the 18th day of

15              December, 2023, commencing at

16              approximately 10:00 a.m. EST.

17

18              REGENCY-BRENTANO, INC.
                Certified Court Reporters
19               13 Corporate Square
                     Suite 140
20               Atlanta, Georgia 30329

21                 (404) 321-3333

22

23

24

25

Video Deposition                                    2

```
1                    A P P E A R A N C E S

2    FOR THE PLAINTIFF:

3             BUCKLEY BALA WILSON MEW, LLP
              600 Peachtree Street NE, Suite 3900
4             Atlanta, Georgia  30308
              BY:  Anita K. Balasubramanian, Esquire
5                  Abala@bbwmlaw.com

6    FOR THE DEFENDANT SHALENA COOK JONES:

7              BROWN, READDICK, BUMGARTNER, CARTER,
              STRICKLAND & WATKINS, LLP
8             5 Glynn Avenue
              Brunswick, Georgia 31520
9             BY:  G. Todd Carter, Esquire
                   Tcarter@brbcsw.com
10

11   FOR THE DEFENDANT CHATHAM COUNTY:
              LAW OFFICE OF REGINALD C. MARTIN, LLC
12            508 North Main Street
              Hinesville, Georgia  31313
13            BY:  Reginald C. Martin, Esquire
                   Reginald@rcmartinlaw.com
14

15

16

17

18   VIDEOGRAPHER:

19            Tyrah Hammonds
              Legal Tech Services
20
     ALSO PRESENT:
21
              Anthony Burton
22

23

24

25            JILLIAN DOCTOR, RPR, CRR
```

Regency-Brentano, Inc.

1                         I N D E X
  EXAMINATION                                    PAGE
2
  By Ms. Balasubramanian                            5
3
  By Mr. Carter                                   255
4                         * * * * * *

5   EXHIBITS

6   Deposition Exhibit 2                           11

7      Defendant's Response to Interrogatories

8   Deposition Exhibit 5                           75

9      2016 Employee Handbook

10  Deposition Exhibit 4                           79

11     2021 Employee Handbook

12  Deposition Exhibit 32                          90

13     State Bar Rule

14  Deposition Exhibit 13                          97

15     Text Chain

16  Deposition Exhibit 14                         127

17     Burton Term letter

18  Deposition Exhibit 6                          140

19     SCJ Abbot Emails

20  Deposition Exhibit 15                         140

21     Confidentiality Agreement

22  Deposition Exhibit 27                         175

23     SCJ 162-163 DAO Org Memo

24  Deposition Exhibit 28                         227

25     SCJ1992

```
 1   EXHIBITS CONTINUED

 2   Deposition Exhibit 24                    230

 3      Stole Step Up July 2022

 4   Deposition Exhibit 23                    233

 5      Stolfe Employment History

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1   THE VIDEOGRAPHER:

 2              We are now on the video record.  Today

 3   is December 18th, 2023.  The time is 10:01 a.m.

 4   and this is the beginning of Media File Number 1.

 5   Will the court reporter please swear in the

 6   witness.

 7                   SHALENA COOK JONES,

 8              having been first duly sworn,

 9         was examined and testified as follows:

10                     EXAMINATION

11   BY MS. BALASUBRAMANIAN:

12   Q        Good morning, Ms. Cook Jones.  How are

13   you doing this morning?

14   A          I'm doing well.  My last name is just

15   Jones.

16   Q        It's just Jones.  All right.  Thank

17   you.  My name is Anita Bala.  I am counsel for

18   Anthony Burton in the matter of Anthony Burton

19   versus Shalena Jones, in her individual and

20   official capacities in Chatham County, Georgia.

21              This deposition is being taken pursuant

22   to the federal rules of civil procedure for all

23   purposes permitted by those rules in connection

24   with this matter.

25              Ms. Jones, you are under oath as you
```

1   know.   And this is your deposition.   And you are

2   a party to this case; correct?

3   A        Yes.

4   Q        Okay.   Have you ever been deposed

5   before?

6   MR. CARTER:

7          Anita, I just want to -- before we get

8   too far into this, I want to put on the record --

9   I want to make sure no one else is recording this

10  other than the court reporter.

11  MS. BALASUBRAMANIAN:

12         The videographer, yeah, as far as I'm

13  aware.

14  MR. CARTER:

15         Okay.   And I just want to make clear

16  that, you know, no one is recording and none of

17  the information will be released prior to the

18  deposition being completed and filed with the

19  court and pursuant to the terms of the federal

20  rules and the court rules regarding that.

21  MS. BALASUBRAMANIAN:

22         I mean, I'm not sure I follow.   I don't

23  think there is a protective order or anything in

24  place that would --

25

```
 1   MR. CARTER:

 2            There is not a protective order, but

 3   you can't release information in Federal Court

 4   about a deposition until it is completed and

 5   filed with the court and becomes evidence in the

 6   court.

 7   MS. BALASUBRAMANIAN:

 8            Okay.  Well, if you have a rule or some

 9   case law or something that supports that, I'm

10   happy to look at it.

11   MR. CARTER:

12            Well, I just want to make sure that

13   before it's released that you give me time to

14   seek a protective order.  I don't want anyone

15   going out of here talking about -- just like

16   we're not talking about what Mr. Burton said in

17   his deposition.  I don't want that information

18   released until the deposition is completed,

19   Shalena has time to read and sign the deposition

20   and the testimony is complete.

21   MS. BALASUBRAMANIAN:

22            I understand your position.  And if

23   that becomes an issue, I will -- if I'm aware of

24   any kind of disclosure, I will let you know.

25
```

```
 1  MR. CARTER:
 2            Okay.  And I would assume that you
 3  would be aware of any disclosure your client may
 4  intend to make.  I just want to make that clear
 5  on the record.
 6  MS. BALASUBRAMANIAN:
 7            I'll have a conversation with him.  I
 8  mean, if you have a rule that supports your
 9  position, I'm happy to look at it and I'll have a
10  conversation with him.
11  MR. CARTER:
12            It's basic federal rules that you don't
13  release evidence, you know, until it is filed
14  with the court.  So there is nothing to be
15  released prior to that occurring.
16            And it's my understanding that you may
17  want to continue this deposition without the
18  charts that we're looking to see if we have.  And
19  so it won't be complete.  It won't be complete
20  until she reads and signs.
21            So as long as we're in agreement on
22  that and that you will not release anything until
23  you consult with me and allow me time to get a
24  protective order, then we're fine.
25
```

```
 1   MS. BALASUBRAMANIAN:

 2           I mean, my understanding is that a

 3   protective order would govern release of that

 4   information.  Obviously, information that is

 5   sensitive and confidential statutorily and under

 6   the rules cannot be released even as a matter of

 7   public record as in this filing.  But I don't --

 8   I'm not aware of any, you know, disclosure that's

 9   going to be made.

10           I'll have a conversation with

11   Mr. Burton.  But, I mean, you can seek a

12   protective order whenever you seek a protective

13   order, but I don't think we're bound by one at

14   this time.

15   MR. CARTER:

16           Well --

17   MS. BALASUBRAMANIAN:

18           And I'm happy to talk to you about that

19   after the deposition.

20   MR. CARTER:

21           That's fine.  I want to make it clear

22   that if anything is released by anyone prior to

23   the deposition being filed with the court, I

24   would seek sanctions.  So go ahead.

25
```

1  MS. BALASUBRAMANIAN:

2          I mean, knowing that we're not aware of

3  any protective order in place, you're welcome to

4  ask for that release, but obviously I don't -- I

5  don't know of any legal basis for that at this

6  point.

7  MR. CARTER:

8          Well, I'm not going to argue the law

9  with you.  I'm just putting you on notice.  You

10  and your client.

11  MS. BALASUBRAMANIAN:

12          Okay.  All right.  So let's get

13  started.

14  Q          Ms. Jones, what did you do in

15  preparation for your deposition today?

16  A          I attended Mr. Burton's deposition last

17  week.  And that was about it.

18  Q          Did you look at any documents in

19  preparation for your deposition?

20  A          I looked at -- I took some notes during

21  his deposition.  I haven't reviewed them since

22  Friday.  And I did pull a copy of the complaint

23  just in case you referenced it, but I did not

24  review that.

25  Q          Okay.  Did you -- did you -- do you

```
 1   recall responding to interrogatories in this

 2   case?

 3   A        Yes.

 4   Q        Okay.  And you saw a copy of the

 5   interrogatories and you provided responses to

 6   those interrogatories specifically?

 7   A        I did.

 8   Q        Okay.  And I don't believe we received

 9   a verification of those interrogatories as

10   required by Rule 33.  If I -- can we pull up

11   Exhibit 2, please.

12            (DEPOSITION EXHIBIT NUMBER 2

13            WAS MARKED FOR IDENTIFICATION.)

14   BY MS. BALASUBRAMANIAN:

15   Q        All right.  Have you seen this

16   document, Ms. Jones?

17   A        I'm sure I have.

18   Q        Okay.  You don't know with certainty

19   whether you've seen it?

20   A        I said I'm sure I have.

21   Q        You have.  Okay.  Did you review it

22   before it was served on plaintiff?

23   A        I'm sure I did.

24   Q        Okay.  And if you want to leaf through

25   it, you're welcome to.  But were you being honest
```

1    and complete when you were responding to these

2    interrogatories?

3    A        Sure.  Absolutely.

4    Q        Okay.  And do you want to -- you're

5    welcome to leaf through it.  Do you have any

6    dispute as to any information that was provided

7    in response to these interrogatories?

8    A        Not at the present time.

9    Q        Okay.

10   MS. BALASUBRAMANIAN:

11            We can take that down for the moment.

12   BY MS. BALASUBRAMANIAN:

13   Q        And since we don't have a verification,

14   you provided all those responses under oath and

15   we can assume they are true; correct?

16   A        I've indicated that I've answered them

17   truthfully, so yes.

18   Q        Okay.  So moving back to what you did

19   in preparation for your deposition today.  Did

20   you meet with your attorney?

21   A        Yes, I did have a conversation with my

22   lawyer.

23   Q        Okay.  And when was that meeting?

24   A        It may have been Friday.

25   Q        Okay.  And how long was that -- Friday,

1   you mean this past Friday the 15th?

2   A        Yes.

3   Q        Okay.  And how long did you meet with

4   him for?

5   A        Less than an hour.  Maybe an hour or

6   so.

7   Q        Okay.  And regarding the documents that

8   you reviewed, you said that you pulled the

9   complaint, but didn't look at it.  You took notes

10  during Mr. Burton's deposition.  Any other

11  documents that you looked at in preparation for

12  your deposition today?

13  A        No.

14  Q        Did you read any deposition transcripts

15  from Skye Musson's case to prepare for today?

16  A        I have not.

17  Q        So you didn't read Michael Edwards'

18  transcript of his deposition prior to today?

19  A        As I said, I've read no transcripts in

20  this case or in the companion case regarding

21  Ms. Musson.

22  Q        Okay.  Have you spoken to anybody else

23  other than your attorneys in preparation for your

24  deposition today?

25  A        I would have spoken to or with my

1   office manager, Ms. Anitra Hodge-Wilder.  We were

2   under the impression that she was going to be

3   deposed today.  So she was a part of the meeting

4   that I had with my lawyer last week.

5   Q        You were under the impression that

6   Ms. Hodge-Wilder was going to be deposed today?

7   A        Can you repeat the question?

8   Q        You were under the impression that

9   Ms. Hodge-Wilder was going to be deposed today

10  you said?

11  A        Yeah.  I was under that impression that

12  she could be.

13  Q        Okay.  But did you receive a copy of

14  the deposition notice in this case for you today?

15  A        I'm pretty certain that my lawyer

16  received a copy of that because I spoke with him.

17  Q        Okay.

18  A        So I would have been provided a copy of

19  that through my attorney.

20  Q        Okay.  And I think I asked this, but

21  we -- I was interrupted with another matter.  But

22  have you ever been deposed before?

23  A        I have.

24  Q        Okay.  When were you deposed?  How many

25  times have you been deposed?

```
 1   A          At least once.  Once that I can think
 2   of.
 3   Q          Was that in a civil matter?
 4   A          Yes.
 5   Q          Okay.  And what was that matter in
 6   regards to?
 7   A          When I worked in the District
 8   Attorney's office previously as an ADA, I was
 9   sued by a person who alleged that they did not --
10   that there was some kind of misconduct on my
11   part.  His case was ultimately dismissed.  But I
12   was deposed in the context of that case.
13   Q          What kind of -- what was the allegation
14   of misconduct?
15   A          He -- this is a while ago.  He was in a
16   relationship with someone that I knew who was a
17   friends of mine.  And he called me at work saying
18   that he wanted to file a claim against her
19   because she stole his bike rack.  They were in a
20   relationship.  She was my personal trainer and a
21   friend of mine.  And I explained to him that if
22   he wanted to pursue action against her that he
23   would have to file a police report in the
24   customary way.  He wanted me to get involved in
25   the intimate details of their relationship and
```

```
 1   the breakup.  I explained to him that my job was

 2   not the correct platform to do what it is that he

 3   wanted me to do.

 4           So he sued me.  His name is Marvin

 5   Bryant.  Even though I had prosecutorial

 6   immunity, he was allowed to take my deposition.

 7   And that was the context of that.  I think it

 8   ultimately got dismissed.

 9   Q       What was the -- do you know what the

10   cause of action was against you?

11   A       I don't know.  I had counsel.  I was

12   represented by John Hart and Jennifer Davenport

13   at the time.  And I think his allegation was

14   that -- I can't recall what his allegation was.

15   He was a pro se.  He was a pro se plaintiff.

16   Q       Did he accuse you of any kind of

17   discrimination or civil rights violation?

18   A       No.

19   Q       What court was that in?

20   A       Superior Court of Chatham County.

21   Q       Any other matters in which you've been

22   deposed?

23   A       No.

24   Q       Where do you currently reside?

25   A       ███████████████, Savannah, Georgia
```

```
 1   31419.

 2   Q          And is that a piece of real estate that

 3   you own?

 4   A          No.  I rent that home.  I just moved

 5   there within the past week.

 6   Q          Is there any real estate that you own

 7   in title or are you a co-owner of any real estate

 8   in title?

 9   A          No, I'm not.

10   Q          Are you married?

11   A          No, I'm not.

12   Q          Have you ever been divorced?

13   A          Yes, I have.

14   Q          Okay.  Who is your ex-spouse?

15   A          My former -- my most immediate former

16   spouse is Mr. Drevon Markeith Jones.

17   Q          Can you spell his name, please?

18   A          D-R-E-V-O-N.  Middle name

19   M-A-R-K-E-I-T-H.  Last name Jones.

20   Q          And when did you divorce Mr. Jones?

21   A          July 28th, 2023.

22   Q          And was that in Chatham County Superior

23   Court?

24   A          Yes.

25   Q          Okay.  Do you have any minor children?
```

```
1    A          I do.

2    Q          Okay.  How many children?

3    A          Two.

4    Q          Okay.  And do you have custody of those

5    children?

6    A          We have joint custody of the children.

7    Q          Has there been an order of child

8    support --

9    A          No.

10   Q          -- made against you?

11              Okay.  Are there any proceedings

12   pending for child support payments?

13   A          No.

14   Q          Have you ever declared bankruptcy?

15   A          Yes.

16   Q          Okay.  When did you declare bankruptcy?

17   A          2012.

18   Q          Okay.  That's Chapter 7, Chapter 11?

19   A          I believe it's Chapter 7.

20   Q          Okay.  Any other time that you've

21   declared bankruptcy?

22   A          No.

23   Q          Were you married at the time?

24   A          Yes, I was.

25   Q          Okay.  To Mr. Jones?
```

```
 1   A          Yes.

 2   Q          And any other individuals to whom

 3   you've been married?

 4   A          Yes.

 5   Q          Okay.  How long were you married to

 6   Mr. Jones?

 7   A          16 years.

 8   Q          And prior to Mr. Jones, who were you

 9   married to?

10   A          I was married to a Reginald Judge

11   Archibald.

12   Q          Judge you said is his middle name?

13   A          Mm-hmm.

14   Q          Okay.  And how long were you married to

15   Mr. Archibald?

16   A          About two years.

17   Q          And that ended in divorce?

18   A          It did.

19   Q          Okay.  What year was the divorce?

20   A          2003.

21   Q          Was that -- what jurisdiction was that

22   divorce in?

23   A          As best I can recall, it was in Clayton

24   County.

25   Q          Okay.  Georgia?
```

Shalena Cook Jones - December 18, 2023
Video Deposition
20

```
1   A          Yes.
2   Q          All right.  Have you ever -- have you
3   ever been married any other time?
4   A          No.
5   Q          Where did you go to undergraduate?
6   Where did you get your undergraduate education?
7   A          I attended Spelman College from 1991 --
8   excuse me.  From 1995 to 1999.  Sorry.  The years
9   are catching up with me.
10  Q          I understand.  '95 to '99 you said;
11  right?  Spelman?
12  A          Yes.
13  Q          Okay.  And then where did you attend
14  law school?
15  A          The University of Georgia.
16  Q          Okay.  And what year did you graduate?
17  A          2002.
18  MS. BALASUBRAMANIAN:
19             Can we pull Exhibit 2 back up, please.
20  And I think we need to go to Interrogatory 22.
21  And I can tell you what page number that is.  Can
22  we go to Page 18, please?  Ms. Hammonds?
23  Ms. Hammonds?
24  THE VIDEOGRAPHER:
25             My apologies.  My internet connection
```

1   went out.  I'm back now.

2   MS. BALASUBRAMANIAN:

3            Okay.  Can you please turn to Page 18.

4   BY MS. BALASUBRAMANIAN:

5   Q        All right.  Ms. Jones, do you recall

6   seeing this Interrogatory Number 20?

7   A        It's been a while since I've seen that

8   document.  So --

9   Q        You're welcome to read it and refresh

10  your recollection.

11  A        I think I'm refreshed.  I'm ready for

12  your question.  If I need to refer to it, then I

13  can.

14  Q        Okay.  Well, it basically just asks you

15  for your employment history from 2001 to present.

16  And I think this captures all of the prior

17  positions you've occupied.  Does that -- is that

18  accurate?

19  A        It's not complete.

20  Q        Okay.  Can you tell me what part of it

21  is incomplete?

22  A        Before right out of law school I would

23  have worked for a law firm named Carter & Ansley.

24  Q        Okay.

25  A        I worked for Carter & Ansley from 2002

```
 1   to about 2005.
 2   Q        Okay.
 3   A        And then I went to Cruser, Mitchell,
 4   Novitz, Sanchez & Gaston the first time.  That
 5   would have been about from 2005 to 2008.
 6   Q        Okay.
 7   A        And you would pick out the US
 8   Attorney's Office between 2008 and 2010.  That is
 9   correct.  Then Chatham County District Attorney's
10   Office from 2010 to 2014.
11   Q        Mm-hmm.
12   A        And then Cruser, Mitchell again from
13   2014 to 2017.  I opened up their Savannah
14   practice here.
15   Q        Mm-hmm.
16   A        And then from 2017 to 2020, I had my
17   own practice.
18   Q        Okay.  So let me just go down this list
19   and ask you some questions.  So 2001 -- well, so
20   from 2002 to '05, you said you work at Carter &
21   Ansley.  What kind of law did you practice or
22   what type of matters were you handling with
23   Carter & Ansley?
24   A        I did insurance defense litigation with
25   them.
```

1   Q        Mm-hmm.

2   A        I mainly did motor vehicle accidents

3   and trucking cases through various insurance

4   carriers.

5   Q        Was that in Georgia?

6   A        Yes.  It was in Atlanta.  That firm has

7   now been bought by another firm called Smith,

8   Moore.

9   Q        Mm-hmm.

10  A        I don't know the full firm name.  But

11  that acquisition happened after I left.

12  Q        Mm-hmm.  Did you voluntarily resign

13  that position or were you -- did you

14  involuntarily have to leave that position?

15  A        No.  I left there voluntarily to go to

16  Cruser and Mitchell to handle a different type of

17  case, different types of cases.

18  Q        Okay.  What kind of cases did you

19  handle at Cruser, Mitchell the first time, '05 to

20  '08?

21  A        I did a lot of 1983 litigation defense

22  work on the defense side.  I represented the City

23  Riverdale.  I represented East Point Police

24  Department.  I represented various cities,

25  counties, governments and sheriff's departments

1   in lawsuits.

2   Q        So did you appear as counsel of record

3   in any First Amendment retaliation cases under

4   Section 1983?

5   A        Yep.  That's been a long time ago.  I

6   don't remember handling -- I remember handling

7   maybe one or two First Amendment claims, but

8   primarily I was doing excessive force cases.  I

9   did products liability with them.  They had a

10  very wide practice, which is why I left my first

11  firm to come to them.

12  Q        So you -- you recall being counsel in

13  one or two First Amendment cases?

14  A        I believe so.

15  Q        But the majority were excessive force

16  you're saying?

17  A        I would say it was a pretty varied

18  practice.

19  Q        Did you do other types of employment

20  law claims?

21  A        I did.

22  Q        What other kinds of employment law

23  claims did you handle on the defense side?

24  A        Most employment law claims that I

25  handled were Title VII cases.  Sexual harassment,

1  racial discrimination, gender discrimination, et

2  cetera.

3  Q        Did you regularly handle a significant

4  number of Title VII cases?

5  A        I would say so.  Yes.

6  Q        And did you file position statements

7  with the EEOC on a regular basis?

8  A        Yes.

9  Q        Okay.  Did you advise your clients

10 regarding Title VII compliance?

11 A        Yes, I did.

12 Q        And did you file summary judgment

13 motions under title -- for Title VII claims?

14 A        Yes, I did.

15 Q        Do you recall if you've done any

16 summary judgment motions related to First

17 Amendment claims?

18 A        That would be really specific and I

19 don't recall.

20 Q        And so after -- after your employment

21 at Cruser, Mitchell -- the first employment at

22 Cruser, Mitchell, you went to the US Attorney's

23 Office?

24 A        I did.

25 Q        In Texas.  So the Cruser, Mitchell, you

1   know, round one, that was in Atlanta.  Is that

2   right?

3   A          Yes.

4   Q          Or was that in Texas?

5   A          That was in Atlanta.  So the 2014 to

6   the 2017 that you see --

7   Q          Mm-hmm.

8   A          -- there should be -- that might be a

9   typo.  So I was with them maybe 2004 to 2017.

10  Regardless of that, yeah, that doesn't get to

11  your question.

12             So the first time that I practiced with

13  Cruser, Mitchell, I practiced with them in

14  Atlanta.  And then when I moved to Texas, I

15  worked for them remotely until I took the job at

16  the US Attorney's Office.

17  Q          And how did you end up in Texas?

18  A          I got married to my former spouse

19  Drevon Jones.  And he was stationed in the

20  military at the time in El Paso, Texas.

21  Q          And so what kind of matters did you

22  handle at the US Attorney's Office?  Were they

23  civil or criminal?

24  A          They were all criminal matters.  I was

25  initially assigned to the border unit where I

1   would prosecute a lot of removal cases.  So I had

2   border security.  I would process drug smuggling

3   and alien smuggling.  And later that turned into

4   prosecuting cases for workers' compensation fraud

5   and different types of fraud cases.

6   Q          Did you occupy a supervisory role in

7   that position at any point?

8   A          At the US Attorney's Office?

9   Q          Mm-hmm.

10  A          I did not.

11  Q          Okay.  What about prior to the US

12  Attorney's Office.  I meant to ask for the

13  employment that proceeded that.  Were you ever a

14  supervisor?

15  A          No.  At Cruser, Mitchell the first time

16  I would say no.

17  Q          Okay.  Not in a position where you

18  would be responsible for setting policies or, you

19  know, or workplace policies or managing

20  employees?

21  A          Definitely not.

22  Q          And so at the US Attorney's Office, you

23  were just an AUSA handling or prosecuting cases?

24  A          Yes.  That's correct.

25  Q          Okay.  And not a supervisor at the US

1   Attorney's Office either?

2   A        No.

3   Q        Okay.  And then at some point it looks

4   like you transitioned back to Savannah to the

5   Chatham County DA's Office.  Is that correct?

6   A        That's correct.

7   Q        Okay.  Did you leave the US Attorney's

8   Office voluntarily or involuntarily?

9   A        Voluntarily.

10  Q        And had anybody ever filed a complaint

11  against you in any prior employment from, you

12  know, between '02 and -- or 2010?

13  A        No.

14  Q        Okay.  And then so you transitioned to

15  the Chatham County DA's Office.  Your current

16  office; correct?

17  A        Yes.

18  Q        Okay.  And who was the DA during that

19  time?

20  A        Mr. Larry Chisolm.

21  Q        Okay.  And were you hired -- what, I

22  guess, ADA level were you hired to when you

23  became employed in 2010 by the Chatham County

24  DA's Office?

25  A        I don't recall what my ADA level was.

1   I can tell you what my assignment was.

2   Q        Okay.  Sure.  Why don't you tell me

3   that.

4   A        I was assigned to handle all

5   misdemeanor domestic violence cases in Chatham

6   County.  So I was assigned as an attachment to

7   the special victim's unit.

8   Q        And was Mr. Chisolm the DA for that

9   entire period of time from 2010 to 2014?

10  A        He was not.

11  Q        Okay.  When did he end his term of

12  office?

13  A        I believe it ended in 2012.  So I would

14  think that -- yeah.  I believe his term ended in

15  2012.

16  Q        Okay.  And then --

17  A        And then --

18  Q        Got it.  And then Meg Heap was elected;

19  right?

20  A        Yes.  After him.

21  Q        In 2012?  Or I guess to begin in 2013?

22  A        She was probably elected in 2012 with

23  her term to begin in 2013.

24  Q        Right.  Okay.

25           And what position were you in at the

```
 1   time that -- were you a supervisor or a lead

 2   attorney or in any kind of, you know, supervisory

 3   position when Mr. Chisolm left office?

 4   A        I think when Mr. Chisolm left office, I

 5   had been moved from the Recorder's Court and

 6   State Court handling misdemeanor special victim's

 7   to Superior Court where I was handling felony

 8   special victim's cases and domestic violence

 9   matters.

10   Q        I'm sorry.  Just so I understand.  When

11   did that transition happen?  When did you move

12   from Recorder's Court to the Superior Court?

13   A        I don't recall.

14   Q        Okay.  Was it -- okay.  So when

15   Ms. Heap took office, were you in any kind of

16   supervisory role?

17   A        No.  My assignment had changed, but I

18   wasn't a supervisor.

19   Q        Okay.  And then during the rest of

20   Ms. Heap's tenure, were you ever promoted?

21   A        I don't know that you would -- when you

22   use the term promoted in our office, as is true

23   now as was then, the term promotion has a very

24   nuance meaning.  What I will say is when Ms. Heap

25   came aboard, she made me be elder abuse
```

1   prosecutor for Chatham County.  And so my -- my

2   course work and case load was specifically

3   devoted to -- primarily devoted to elder abuse

4   cases in Chatham County.

5   Q        And I think you bring up a good point

6   because I do want to make that distinction.

7   There is a differential; right, between getting a

8   promotion based on seniority or years of service.

9   So you start as an ADA-I and then each year you

10  can, you know, go up a pay grade.  That's one

11  type of promotion; right?

12  A        Well, let me think about that.  As it

13  relates to the change in position, I don't know

14  that I would necessarily consider moving to elder

15  abuse a promotion.  It was a specialized and

16  unique position, but I didn't get paid any more

17  money for that.

18           I do think that I was promoted in that

19  role and before I left the DA's office, but I

20  cannot tell you if that was a merit based pay

21  increase.

22  Q        I understand what you're saying.

23  A        And promote -- or a -- or a promotion

24  that's tied to performance.

25  Q        I understand what you're saying.  And

1   my question is a little even simpler than that.

2   Let's draw a distinction when you move pay grades

3   from ADA-I to ADA-II based on years of service,

4   that is technically a promotion on the county's

5   pay scale from one pay grade to the next; right?

6   Forgetting -- leaving merit and everything aside.

7   Just years of service ADAs are entitled to move

8   up pay grades or be promoted up pay grades based

9   on years of service.  Is that accurate?

10   A          You are correct.  That would be a

11   promotion based on tenure.

12   Q          Correct.  Okay.  I understand.  And

13   there is a different -- I guess, and maybe

14   promotion is maybe not the right word, but an

15   increase in prestige may result based on

16   specialized assignments in certain areas of

17   cases.  Is that -- is that a fair statement?

18   Like in elder law cases or, you know, like the

19   guns and gangs position.  Like is there -- there

20   are certain specialized categories of crimes and

21   cases where attorneys might be assigned based

22   on -- based on particular skill in that area.  Is

23   that a fair statement?

24   MR. CARTER:

25              Object to form.  Go ahead and answer.

```
 1   A          I'd like you to clarify your question.
 2   I don't understand your question.
 3   BY MS. BALASUBRAMANIAN:
 4   Q          Okay.  I guess let's talk about this
 5   elder law position that you were asked to.  Was
 6   that -- you know, would you or would you not call
 7   that a promotion?
 8   A          I wouldn't call that a promotion.
 9   Q          Okay.  Were brand new ADAs assigned to
10   sort of specialized positions involving
11   particular types of cases?  ADA Is?
12   A          I don't know.  I don't know how
13   management made those choices at the time.
14   Q          Okay.
15   A          Into the conversations that led up to
16   that.
17   Q          Okay.  Well, in your experience and
18   based on your observations of who held positions
19   with sort of a specialized type of case, was it
20   ADA Is who didn't have any trial experience who
21   were generally assigned to those cases?
22   A          If you're asking me about this relevant
23   to the time that I was promoted to that position,
24   I couldn't tell you because I don't know what
25   rubric they used.  I don't know what their
```

1    reasoning was.

2    Q        Okay.

3    A        I cannot tell you what happened with

4    other ADAs and who they chose because that was

5    not my business.  I had no reason to know that.

6    Q        Okay.  And, you know, that's fine.  I

7    understand that.  We can get more into that, you

8    know, as it related or to your own management

9    practices when you were -- when you became the

10   DA.  But I will -- I will ask you about that a

11   little bit later.

12             But just coming back to your employment

13   history, you were at some point given a special

14   assignment, I guess, or especially assigned to do

15   elder law cases; correct?

16   A        That's right.

17   Q        Okay.  And what -- do you remember at

18   what point in time between 2010 and 2014 that you

19   were assigned to work on those specific types of

20   cases?

21   A        That would have been a proposal that

22   she made to me the first week she came in office.

23   Q        Okay.  Did she make --

24   A        And honestly she might not have been in

25   office yet.  She might have just been conducting

1   interviews with the staff.  She might not have

2   taken office yet.  It might -- I can't recall if

3   that conversation took place before she assumed

4   office as she was taking over or shortly

5   thereafter.

6   Q        Okay.  Did she -- was there -- was

7   there some sort of -- or do you recall how the

8   office was organized, you know, when she -- when

9   she first took office in terms of, you know, sort

10  of the organizational structure generally?

11  A        I don't recall.

12  Q        You don't recall.  Okay.  That's fine.

13  Did you work in teams?  Were you assigned to a

14  specific courtroom?

15  A        Are you referring -- at what point of

16  the employment are you referring to?  Under

17  Mr. Chisolm or under Ms. Heap?

18  Q        Ms. Heap.

19  A        Okay.  I was assigned to the special

20  victim's unit.  And we had a team that consisted

21  of one ADA who did crimes against children, one

22  ADA who did sexual assault and one ADA who did

23  domestic violence.  And we would meet regularly

24  as a special victim's unit.

25  Q        Okay.  And I might have asked you this

```
1   already, but were you part of the management --
2   were you part of management at the time that
3   Ms. Heap was in office before you left the
4   office?
5   A        I was not responsible for managing ADAs
6   because no one else in my office -- in the office
7   had my particular case load.  I was responsible
8   for managing or coordinating out of the office
9   events and meetings that pertain to my practice
10  area.
11  Q        Got it.  Was there an executive team at
12  the point when Ms. Heap took office?
13  A        I don't remember there being an
14  executive team as much as the office being run by
15  Meg and her Second Chief Greg McConnell.  But as
16  I was not part of that executive, the executive
17  staff in any way, I could not be certain.
18  Q        Okay.  And who was your supervisor?
19  A        At what point in time?
20  Q        Between -- well, from the time Ms. Heap
21  took office until you left the -- the DA's office
22  in 2014?
23  A        My direct supervisor would have been a
24  woman named Ann Elmore.  She was responsible for
25  the special victim's unit.  And then above her,
```

1   my supervisor would have been Greg McConnell.

2   And then Meg would have been above him.

3   Q        And you and Mr. Burton did not overlap

4   when you first -- in your first stint at the DA's

5   office -- you know, he did not start his

6   employment there while you still worked there the

7   first time.  Is that accurate?

8   A        That's accurate.  I did not meet

9   Mr. Burton until I took office as DA in January

10  of 2021.

11  Q        Got it.  And so after the DA's office,

12  I note that you went to go work at Cruser,

13  Mitchell again as a managing partner for their

14  Savannah office; right?

15  A        That's correct.

16  Q        Okay.  So that was from 2014 to 2017?

17  A        Yes.  That's correct.

18  Q        How many employees were in the Savannah

19  office at Cruser, Mitchell?

20  A        I would say during that entire period,

21  maybe six.

22  Q        So how did that -- how did it happen?

23  Did you offer to start a Savannah office?  Did

24  you approach Cruser, Mitchell and offer to start

25  the office or did they approach you and ask if

```
 1   you would be interested?  How did that transition

 2   happen?

 3   A          No.  I didn't approach them at all.  I

 4   had not had any intentions of leaving the DA's

 5   office.  But they were interested.  That was

 6   around the time that a lot of Atlanta based firms

 7   were looking to establish a hub in the Savannah

 8   area because of industry.  And they -- you know,

 9   when I left them, we still had a very good

10   professional relationship.  And they had reached

11   out to me on several occasions to ask if I'd be

12   interested in starting their flagship, their

13   office in Savannah.

14   Q          Okay.

15   A          Which I later accepted and agreed to.

16   Q          And, you know, as the managing partner,

17   were you responsible for implementing their

18   employment policies with respect to personnel in

19   the Savannah office?

20   A          As the managing partner, I was running

21   the show for that office here.  So yes.

22   Q          Did you have --

23   A          Whatever policies I implemented in the

24   Savannah office would have been a replica of what

25   they had in their office.  They had several
```

```
 1    offices.  They have several offices around the
 2    nation.  So whatever I implemented in Savannah
 3    would have been by proxy based on what they had
 4    implemented in their home office.
 5    Q         You didn't create any of your own
 6    employment policies that deviated from their
 7    central, you know, organization wide implemented
 8    policies?
 9    A         No, I didn't.
10    Q         And, again, did you -- did you
11    represent clients in that role or were you mostly
12    just a manager of other attorneys who handled,
13    you know, the case loads?
14    A         I had my own case load.  I represented
15    clients, handled EEOC claims and was responsible
16    for generating business for our office in our
17    region.
18    Q         Did you do any employment litigation in
19    that role?
20    A         Yes.
21    Q         And did you take any depositions in
22    employment cases?
23    A         I did.
24    Q         Okay.  Did you represent public
25    entities at Cruser, Mitchell the second time
```

1   around?

2   A          I really am trying to remember.  By

3   public entities are you referring to government

4   agencies?

5   Q          Yes.  The State of Georgia government

6   agencies.

7   A          I believe that --

8   Q          Go ahead.  I'm sorry.

9   A          I believe I represented a sheriff's

10  office or two.  And beyond that, I just really

11  can't recall.  It's too long ago.  I apologize.

12  Q          That's okay.  And did you -- did you

13  provide general counsel to employment departments

14  or was it -- you know, were you retained in

15  discreet employment litigation matters at Cruser,

16  Mitchell?

17  A          Would you repeat the question, please?

18  Q          Yeah.  And I want to, I guess, ask you

19  in regards to both experiences at Cruser,

20  Mitchell.  So forgive me.  Let's back up a minute

21  and then go back to the first time you worked at

22  Cruser, Mitchell and you indicated that you had

23  represented several public entities.  Were you

24  functioning in a general counsel role where you

25  would provide just general, you know, employment

1   law advice to these public entities or were you,

2   you know, retained as litigation counsel in

3   specific matters?

4   A        The second time with Cruser, Mitchell I

5   was retained specifically in litigation matters

6   through their insurance carriers.  I did provide

7   general counsel and training for other entities

8   once I opened my -- my own private practice.

9   Q        Okay.  So we'll get to that.  So in the

10  first instance when you worked at Cruser,

11  Mitchell I think from '05 to '08, if I'm not

12  mistaken, did you -- did you -- were you

13  providing general counsel to public entities

14  regarding, you know, compliance with laws

15  affecting those entities or were you retained in

16  specific litigation matters through insurance?

17  A        Both.

18  Q        Okay.  And I guess in the -- in the

19  instances when you are providing general counsel

20  to these entities, the first time you worked at

21  Cruser, Mitchell, was there ever occasions when

22  there were open records requests that you were --

23  that you had to provide guidance on?

24  A        Yes.

25  Q        Okay.  So are you familiar with the

```
 1   Open Records Act?

 2   A        I am.

 3   Q        Okay.  And you've -- you've reviewed it

 4   and are familiar with the subjects that are

 5   subject to disclosure and then, you know, the

 6   exceptions that may apply?

 7   A        Yes.

 8   MR. CARTER:

 9            I assume you're talking about the

10   Georgia Open Records Act?

11   MS. BALASUBRAMANIAN:

12            Yes.  The Georgia Open Records Act.

13   That's correct.

14   BY MS. BALASUBRAMANIAN:

15   Q        You said you're familiar with it and

16   have provided legal advice to clients regarding

17   compliance with the Open Records Act, the Georgia

18   Open Records Act?

19   A        Yes.

20   Q        And that was in your role at the first

21   time between '05 and '08 that you worked at

22   Cruser, Mitchell?

23   A        Yes.

24   Q        Okay.  And then the second time you

25   worked at Cruser, Mitchell between '14 to '17,
```

```
 1  did you provide legal advice to clients regarding
 2  compliance with the Open Records Act?
 3  A        I don't recall.
 4  Q        Okay.  And then when you opened the Law
 5  Office of Shalena Jones 2017 to 2020, what kind
 6  of matters did you handle that time?
 7  A        I primarily did civil litigation.  I
 8  did do some training on Title VII for certain
 9  governmental entities.  I acted as general
10  counsel for a local corporation here.
11  Q        Not a public entity?
12  A        Not a public entity.
13  Q        Okay.  Why did you leave Cruser,
14  Mitchell in 2017?  Was that voluntary or
15  involuntary?
16  A        It was voluntary.  I had a great
17  relationship with Cruser and Mitchell, but I
18  found that since my stay in Savannah was going to
19  be permanent, I felt like my -- oh, excuse me.
20  Sorry about that.  My screen times out after a
21  certain -- at a certain point.  I don't know why
22  it does it.
23  Q        That's okay.
24  A        I felt like Savannah is a very
25  interesting market legally speaking.  And I felt
```

```
 1    like my expertise and skill set was worth more to

 2    me as a practitioner than it was to them as they

 3    were really wanting to market nationally and

 4    bring a lot of work into their office for all of

 5    their offices.  I felt like I could devote

 6    better -- I could have more control over the

 7    kinds of work I wanted to do and build a better

 8    practice for myself by working for myself.

 9    Q        Okay.  And so you voluntarily left

10    Cruser, Mitchell?  You were not asked to leave?

11    A        No.

12    Q        Okay.  And then so in your practice

13    that you -- that you began in 2017, you said you

14    represented a local corporation as general

15    counsel, you provided training on Title VII

16    matters.  You said you represented clients in

17    civil litigation?

18    A        Yes.

19    Q        Okay.  And what kind of -- was it

20    plaintiff's side or defense side civil

21    litigation?

22    A        A little of both.

23    Q        Okay.  So you've represented -- have

24    you represented plaintiffs in employment law

25    litigation?  Employment litigation?
```

```
 1   A          Yes.
 2   Q          Okay.  And in what type of causes of
 3   action?  Discrimination cases?
 4   A          Yes.
 5   Q          Okay.  Sex discrimination cases?
 6   A          Yes.
 7   Q          How many times have you represented
 8   clients in sex discrimination cases over your
 9   career?  Just a ballpark.  Like 10, 20?
10   A          Less than five.
11   Q          And what about race discrimination?
12   A          Yes.
13   Q          Okay.  How many of those have you done?
14   A          One.
15   Q          Okay.  And what about Georgia
16   Whistleblower Act?
17   A          None.
18   Q          You haven't defended any entity -- have
19   you defended any entities in a Georgia
20   Whistleblower Act case?
21   A          Yes.
22   Q          Okay.  How many times?
23   A          About three, four.
24   Q          Which entity was that that you
25   defended?
```

```
 1   A          That was a corporation.
 2   Q          And under the Georgia Whistleblower
 3   Act?
 4   A          It was -- I can't recall exactly what
 5   the claims were.  I handled several employment
 6   discrimination cases for the Grainger Honda
 7   Company.  And I don't -- I can't remember exactly
 8   what the claims were.  Sorry.
 9   Q          Okay.  Because are you familiar with
10   the Georgia Whistleblower Act?
11   A          Vaguely.
12   Q          Okay.  Were you aware that it only
13   applies to public entities?
14   A          Yeah.  I'm answering your questions as
15   best I can recall.  I just -- I remember handling
16   one and I can't remember if it was for --
17   Q          Okay.  So you --
18   A          For --
19   Q          Go ahead.
20   A          I think I've done work with Bryan
21   County before.  And I just don't remember which
22   claims are attached to which cases.  Sorry.
23   Q          Okay.  But you are familiar with the
24   Georgia Whistleblower Act specifically just --
25   you know, in general?  Not as litigation counsel?
```

```
 1   A          In general, yeah.  Sure.
 2   Q          Okay.  And you're aware that it
 3   protects whistlers -- whistleblowers --
 4   whistlers -- whistleblowers who report fraud,
 5   waste and abuse?
 6   A          I don't know how to -- yes.  Generally
 7   speaking.
 8   Q          Okay.  Have you received any training
 9   since taking office as the AD regarding
10   employment discrimination claims or personnel
11   management?
12   A          Personnel management, yes.  And
13   discrimination claims, generally, yeah.
14   Q          When was that training?
15   A          I could not tell you.  It was offered
16   through -- it would have been offered through --
17   I took one course that was offered -- that was a
18   three-series course that was offered by a course
19   through PAC.
20              I could also say that DAs have to
21   attend boot camp when they begin their terms.  I
22   think that information was also included in
23   there.  That would have been a service that was
24   offered through PAC.  I would like to say that
25   I've received that kind of training through
```

1    different organizations that -- DA based

2    organizations that I'm affiliated with, but I'm

3    sure that would have been the extent of the

4    training.

5    Q          Did the DA -- so you said PAC offered a

6    three-series training.  And that was on the topic

7    of personnel management?

8    A          Leadership, yes.  And managing

9    personnel.

10   Q          Do you have any -- do you still -- did

11   you retain any copies of any training materials

12   that you received in connection with the PAC

13   training?

14   A          Yes.  I think I do have handwritten

15   notes somewhere.

16   Q          Okay.  And you've maintained those?

17   You can produce them to your attorney?

18   A          I can try.

19   Q          Okay.  Did the training -- do you

20   recall if the training -- were there any written

21   materials that PAC provided to you to use as

22   guidance in developing your internal workplace

23   policies?

24   A          Not that I'm aware of, no.

25   Q          Did PAC -- did PAC's training cover

```
 1   confidentiality and what topics may be, you know,

 2   the subject of confidentiality within the office?

 3   A         I don't recall.

 4   Q         And I just want to be clear.  There

 5   were no written materials distributed by PAC?  No

 6   written training materials as part of this

 7   three-series training that were distributed by

 8   PAC to you that you have?

 9   A         PAC set up the training.  The materials

10   would have been produced by the facilitator and

11   not PAC I believe.

12   Q         Do you recall who the facilitator was?

13   A         His name was David Snidely.

14   Q         Is he employed by PAC?

15   A         I don't know.  I don't think so.  I

16   think he's a contractor.  And I could not tell

17   you what the relationship is.

18   Q         Do you recall Mr. Snidely providing

19   written materials in connection with those

20   trainings?

21   A         He provided us with books to read.

22   Most of those books were based on leadership and

23   managing staff.  And I think he would have

24   provided handouts that we took notes on.

25   Q         And did you retain a copy of those
```

1　handouts?

2　A　　　　As I said, I don't know.  I'd have to

3　check.

4　Q　　　　Okay.  Do you recall what books he

5　recommended reading?

6　A　　　　Off the top of my head, I do not.  I'm

7　sorry.

8　Q　　　　Did you read any of the books that he

9　recommended?

10　A　　　　I'm sure I've skimmed them and

11　referenced them during particular ET meetings

12　that we've had.

13　Q　　　　Did the trainings that PAC provided

14　relate to compliance with Title VII or were they

15　on other topics?

16　A　　　　Most of the training pertained to

17　leadership training and personnel management.  If

18　he -- it's possible that he referenced Title VII

19　during one of the three presentations.  I can't

20　recall.  I think I took those in the year 2022.

21　Q　　　　Was there any part of this training

22　that related to, you know, the Open Records Act

23　and the First Amendment in employee speech?

24　A　　　　I don't think so.

25　Q　　　　We have been going for about an hour.

```
 1   And I should have said this in the beginning, but
 2   if at any point you need to take a bathroom
 3   break, you're welcome to just say so.  You know,
 4   it's going to be a good long day.  So breaks are
 5   okay.  And if you need one, we can take a break.
 6   So if you need one, let me know.  Otherwise we
 7   can keep going.
 8   A        We can keep going.
 9   Q        Okay.  Have you ever received training
10   in the First Amendment separate from just acting
11   as litigation in general counsel to your clients?
12   A        What about the First Amendment?
13   Q        Just the, you know, what it says, you
14   know, how it applies, those kinds of things in
15   connection with the management role that you have
16   had?
17   A        No.
18   Q        Are you familiar with the First
19   Amendment?
20   A        I've heard of it once or twice.
21   Q        Once or twice.  Have you read it?  Are
22   you familiar with, you know, the case law that
23   applies it in this circuit?
24   A        Fairly familiar.  I think there are
25   different levels of familiarity.  If you're
```

```
 1   asking me if I generally know what they are, I
 2   think generally speaking, yes.  If you're asking
 3   about specific cases, I'd have to see them.  So I
 4   have a general awareness of them, yes.
 5   Q        Okay.  All right.  Let's go to -- let's
 6   go to -- so at the point when you took -- so you
 7   were elected in November of 2021; correct?  I'm
 8   sorry.  2020.  You won the November of 2020
 9   election.  And then your first day of office was
10   January 1st, 2021.  Is that correct?
11   A        January 4th, 2021.
12   Q        January 4th, 2021.  Okay.  Prior --
13   between your election in November of 2020 and
14   January 4th, 2021, what, if anything, did you do
15   to prepare to assume the role of DA in terms of
16   transitioning to your leadership in the office?
17   A        There was a -- I got sworn in, which
18   would have been on December 28th, by Judge Tom
19   Bordeaux.  I prepared for the inauguration.
20   Prior to winning the election and taking office,
21   I did reach out to the office to see if I could
22   speak with certain attorneys.  And that would
23   have been about it.  I sent some open records
24   requests to this office to gather information
25   about the staff, which was denied.  And we were
```

```
 1   not allowed to come into the building or have
 2   very much conversation with the staff that worked
 3   here.  So that would have been the extent of it.
 4   Q        Okay.
 5   A        I also talked to Chatham County HR to
 6   see who was in the office, who was remaining,
 7   where they were placed, et cetera.
 8   Q        Do you still have -- did Chatham County
 9   HR provide you any documents in response to that
10   inquiry?
11   A        They did.
12   Q        Okay.  What kind of documents?
13   A        They provided me a list of employees
14   who either were on paper -- who were on payroll
15   still as of December 2020.
16   Q        Okay.  What did you do with that list?
17   Did you try to -- did you start to envision some
18   kind of reorganization or what did you do with
19   that list?
20   A        I was primarily using that list to get
21   a feel for who I knew, who was in leadership, who
22   had the most responsibility to try to, you know,
23   identify the people I needed to talk to first.  I
24   was really concerned about who was leaving
25   because there were a number of people who left
```

```
1    before my arrival.  And I wanted to figure out,

2    you know, how to -- who to put where.

3              One of the things I recall at that time

4    was that the office was primarily not reporting

5    to the courthouse because of COVID.  There were

6    several vacancies and the county was under a

7    hiring freeze at the time.

8              So I think I was just using that

9    document to get a layout of the land and figure

10   out who was who and what they were doing, what

11   their roles were.

12   Q         Was that document an organizational

13   chart of some sort that allowed you to see who

14   was in what position?

15   A         No, it wasn't.

16   Q         What information was on the document

17   other than just a list of employees?  Was there

18   any other information on this document?

19   A         It was a computer generated list that

20   really had their names, their levels, their

21   position numbers, employee numbers, things like

22   that.  It did not have their pay.

23   Q         And didn't tell you where they were,

24   you know, in terms of seniority or, you know,

25   what positions they held other than maybe their
```

```
 1   pay grade.  Did it give any information about the

 2   positions held or assignments other than pay

 3   grade?

 4   A         No.  I believe the document had their

 5   position number, which is not the same as their

 6   position or assignment in the office.  So I did

 7   not have any information about their -- about the

 8   positions they held specifically and what they

 9   did in their roles.

10   Q         Okay.  Did you meet with -- who did you

11   meet with prior to taking office that was -- that

12   was working in the office and was going to

13   continue working there?

14   A         I met with Greg McConnell.

15   Q         Mm-hmm.

16   A         Tim Ruffini.

17   Q         Mm-hmm.

18   A         Brad Thompson.  Kitty Parker.  Nancy

19   Gray Smith.  And I believe that was it.

20   Q         Okay.  And why did you identify these

21   people to meet with?

22   A         I met with Greg McConnell because he

23   was Meg's First Chief and I wanted to see if he

24   had any willingness to stay on.  Typically when

25   DAs come on, they get rid of everybody.  And I
```

1   did not want to take that approach for a number

2   of reasons.  And everyone else, I had reached out

3   to them because I either knew them from when I

4   used to work here before or I didn't know them

5   and a judge or someone else around the courthouse

6   mentioned or suggested that I speak with them.

7           So, for example, Brad Thompson.  Judge

8   Abbot thought that he should have been -- he was

9   First Chief material.  And at that time I was

10  picking my cabinet.  And so I met with him even

11  though I didn't know him.  I also probably -- I

12  also would have met with Andre Pretorius, who is

13  still in the office at the time.

14  Q       Was he a supervisor?

15  A       Was he a supervisor?

16  Q       Mm-hmm.

17  A       Yes.  He was over State Court.

18  Q       Were you aware that all these people

19  were supervisors when you -- when you identified

20  them for meetings?

21  A       No.  I didn't know that they were

22  supervisors and they didn't indicate that they

23  were supervisors to me.  So Greg McConnell would

24  have been -- Greg McConnell and Andre Pretorius

25  would have been the only two who were -- who had

```
 1  a supervisory role.  I had worked with both of
 2  them when I was in the office previously.  And
 3  everyone else I did not know -- I -- they weren't
 4  supervisors.  And to my awareness, I just reached
 5  out to them because I knew them or because I was
 6  recommended to reach out to them.
 7  Q        Okay.  And Abbot recommended Brad
 8  Thompson.  Did she recommend or did somebody
 9  recommend Tim Ruffini or why did you pick him to
10  meet?
11  A        As I stated, they were either referred
12  to me like Brad Thompson or I knew them and had a
13  preexisting relationship with them because we
14  served with each other in the DA's office before.
15  Q        Right.  My question is with
16  Mr. Ruffini.
17  A        Yes.  So Mr. --
18  Q        Did you know him before or did somebody
19  recommend him?
20  MR. CARTER:
21           Let her finish her answer, Anita.  I'm
22  not sure she was finished, but don't try and
23  speak over her.
24  MS. BALASUBRAMANIAN:
25           I'm not speaking over her.  I thought
```

1   she was finished.  I was clarifying my question

2   because I don't think she responded to my first

3   questions.

4   Q          But go ahead.

5   A          I was going to say, before being

6   interrupted, that Tim Ruffini and I had worked in

7   the office together when I was there prior

8   between 2010 and 2014.

9   Q          Okay.  So you knew -- you had a

10  relationship with him previously in terms of, you

11  know, knowing who he was and then reaching out to

12  him because you knew him; right?

13  A          Right.  Mm-hmm.

14  Q          Okay.  And then what about Ms. Parker?

15  Did you know her beforehand or did somebody

16  recommend her?

17  A          I knew her beforehand.

18  Q          Okay.  And what about Ms. Gray Smith?

19  A          I knew her beforehand.

20  Q          Okay.  Okay.  And so Ms. Parker and

21  Ms. Gray Smith were not in a supervisory role at

22  the time -- to your knowledge at the time that

23  you asked to meet with them?

24  A          They were not.

25  Q          What did you discuss with Ms. Parker?

```
 1   A          I discussed -- I asked Ms. Parker
 2   whether or not she would be interested in staying
 3   on and whether she would be interested in serving
 4   in an executive capacity.
 5   Q          Did you know anybody else at the office
 6   before -- you know, at the time you were --
 7   before January 4th, 2021, did you know anybody
 8   else other than the folks on this list who were
 9   working there at the time?
10   A          Not that I can recall.  If you had a
11   name -- a list and could read it off to me, I
12   could tell you.  There may have been some people
13   in other departments.  Like, I know that Diane
14   McLeod was in Juvenile Court along with Kim
15   Rowden.  Ana Allen was here prior.  But, you
16   know, the office -- there are a hundred -- there
17   are more than 100 people in the office at that
18   time.  And I just couldn't tell you.  But the
19   ones I've listed for you are the ones who really
20   stand out to me.
21   Q          And you said Ana Allen.  And you said
22   one other name.  Do you recall whose name you
23   said?  Donna or --
24   A          Oh, yeah.  I knew Donna Sims.  I did
25   know -- I did know Donna Sims.  Ana Allen.  And
```

```
 1   Diane Morrell McLeod.

 2   Q         And you chose not to meet with Ana

 3   Allen at that time?

 4   A         At that time, yeah.

 5   Q         Okay.  And then -- or same with

 6   Ms. Sims and Ms. McLeod.  You didn't have a

 7   pre-meeting with them before taking office in

 8   January 4th?

 9   A         No.  I don't believe so.

10   Q         And had you worked with Jenny Parker at

11   the time you offered her the position of being on

12   the executive team before?

13   A         Yes.  I've worked with her extensively

14   before then.  Before -- I was hired as Jenny's

15   replacement in 2010.  So we worked together

16   closely.  Because when the Recorder's Court

17   position was vacated, I took that.  So with every

18   position or every time she moved, I usually ended

19   up assuming the role that she had vacated.  So I

20   was very familiar with her and her work.

21   Q         Had you worked with Greg McConnell

22   directly before?

23   A         Yes.  He was my supervisor, as I had

24   stated.

25   Q         Right.  Okay.  And then -- and so he
```

```
 1   was Meg's First Chief; right?  Is that -- that
 2   was what you said?
 3   A        Yes.
 4   Q        And then Tim Ruffini, had you worked
 5   with him directly before?
 6   A        I think at one point we were assigned
 7   to the same State Court team.  But in other
 8   words, if we were both assigned to Judge Sapp, he
 9   would have had a different case load than I had.
10   Maybe thefts or other types of crimes; whereas,
11   my case load was specifically special victims and
12   DV.
13   Q        So you have not -- you have not -- you
14   didn't ever try any cases with Mr. Ruffini or
15   work on the same case at the same time with him?
16   A        No.
17   Q        And what about Brad Thompson.  You
18   testified that you didn't know him beforehand,
19   but Judge Abbot recommended that you meet with
20   him?
21   A        Yes.
22   Q        Did you ask Judge Abbot to recommend
23   others or did she approach you and specifically
24   recommend Brad Thompson?
25   A        Well, judges see a lot.  And so, you
```

```
 1   know, I wanted to meet with the judges beforehand
 2   for a few reasons.  To hear from them and have
 3   listening sessions about what changes they
 4   thought needed to be made.  Of course I was open
 5   to hearing their recommendations.  So she would
 6   have been one of several judges that I met with
 7   during the time.
 8   Q        Okay.  Did she -- okay.  Did she
 9   recommend anybody else that you should talk to
10   prior to taking office or was Brad the only
11   person she recommended?
12   A        Brad was the only person she
13   recommended.
14   Q        And then what about Nancy Gray Smith.
15   Why did you -- why did you ask to meet with her
16   directly?
17   A        Nancy Gray Smith had a lot of
18   institutional knowledge.  She was in the office
19   when I was working here before.  I've had an
20   opportunity to observe her in court.  And she was
21   one of the first people who started the special
22   victim's unit in the office.  So at the time that
23   she -- when I was coming aboard, she was doing
24   Accountability Court.  I respected her opinion
25   and her work and just wanted to get her thoughts
```

```
 1   about -- about, you know, how things were looking
 2   in the office and what she thought I needed to
 3   focus on.
 4   Q        What was her position?  Was she some
 5   kind of administrator?  Was she an attorney or --
 6   A        She was an attorney handling
 7   Accountability Court cases.
 8   Q        Okay.  And forgive me.  I don't know
 9   exactly how matters are divided down there.  Is
10   there a separate court for, like, accountability
11   cases, a separate court for SVU cases?  Like, how
12   is that division made down there?
13   A        Well, it depends on when you ask.  That
14   division was different -- the division of courts
15   was different when I took office than it is now.
16   But if you're asking specifically about
17   Accountability Courts, we have Veterans Court,
18   Mental Health Court, Drug Court, and I think I
19   said Veterans Court here at the main courthouse.
20   We also have other Accountability Court programs
21   here at the Juvenile Court.  And some of those
22   cases are presided over by a Superior Court
23   judge.  And sometimes those judges change.  But
24   those kinds of cases are typically handled on
25   their own dockets and usually are not mixed in
```

1   with the traditional kinds of cases we have at

2   the Superior Court.

3   Q        Got it.  Was she -- so Ms. Gray Smith

4   was responsible for all cases that fell under the

5   umbrella of accountability?  Like, she was the

6   supervisor that managed Veterans Court, Mental

7   Health Court, Drug Court, you know, the Juvenile

8   Court accountability cases?  Was she over all of

9   those?

10  A        I would say neither.  She wasn't a

11  supervisor.  She wasn't over all of them.  Some

12  of the other courts were handled by ADAs as in --

13  and assigned out to different -- to different

14  prosecutors.  So neither of those is true.

15  Q        So when you testified earlier that she

16  was over accountability, I guess I'm just trying

17  to understand what you meant by that.

18  A        She was handling the major

19  Accountability Courts.  I think she was handling

20  the Drug Court, the Mental Health Court and the

21  Competency Court.

22  Q        And when you say handling those courts,

23  do you mean she was supervising all the cases in

24  those courts or she was litigating those cases?

25  Her entire case load was just that type of case?

1   A          She was responsible for handling all

2   the cases that were assigned to those three

3   courts.

4   Q          Got it.  Was she assigning those cases

5   to other attorneys or she was responsible for

6   handling those cases?

7   A          She was solely responsible for those

8   cases.  She was not supervising anyone else.

9   Q          Okay.  I understand.  All right.  So in

10  coming -- did you get some kind of org chart or

11  an organizational structure for everybody who was

12  in the office or employed by the office, you

13  know, on January 4th, 2021?  Were you -- were you

14  given some kind of org chart to show sort of the

15  chain of command?

16  A          I wasn't given any documents when I

17  started and I took office in 2021.

18  Q          At some point you hired Michael

19  Edwards; right?

20  A          Yes.

21  Q          Okay.  Why did you hire Michael Edwards

22  or why did you feel you needed to hire Michael

23  Edwards?

24  A          Because I felt like he would be the

25  best choice to serve and assist me as First

1    Chief.

2    Q        Okay.  And so I guess you didn't -- you

3    didn't want to hire Greg McConnell or Brad

4    Thompson to that role?

5    A        No.  There is literature that's been

6    published by several agencies and social science

7    studies that has suggested that having a

8    prosecutor as well as a former defense attorney

9    on leading the helm of prosecutor's offices made

10   for a balanced -- a balanced approach to

11   prosecution.  And so I was looking for somebody

12   who was both familiar with court, was familiar

13   with running an office.  And he had been since he

14   was the first public defender assigned to run the

15   public defender's office across the street in the

16   circuit.  And so he had the managerial experience

17   as well as the substantive defense experience

18   that brought a good balance to our team.

19   Q        Okay.  And so when you assumed the role

20   on January 4th, 2021, what, if anything, did you

21   do to review the organization -- the

22   organizational structure of the -- of personnel?

23   A        When you say review the organizational

24   structure, I'm not sure I know what you mean.

25   There were no documents in place.  There was

1    nothing here.  The prior administration had

2    destroyed every organizational document that

3    there was.  And so I set about the business of

4    designing an organizational structure that I

5    thought would be suitable for where we were at

6    the time.  And we went from there.

7    Q        Okay.  And when you say the prior

8    administration destroyed documents, how do you

9    know that?

10   A        That's information that I received from

11   other staff members who were here.  And that's

12   also coupled by the fact that there were no

13   organizational documents here to speak of.  Org

14   charts, personnel files were missing.  There was

15   just -- county policy and information handbooks

16   and updates, things of that sort were -- were not

17   here.

18   Q        So there were no handbooks onsite at

19   the office -- your testimony is that you were

20   told that the handbooks were destroyed when you

21   took office?

22   A        I was told that there were various

23   organizational documents that had been destroyed

24   in the weeks before my taking office.

25   Q        And that includes handbooks?

```
 1   A          I was told that there were various

 2   organizational documents that were destroyed

 3   prior to my taking office.

 4   Q          I know.  But you mentioned handbooks in

 5   your prior testimony.  Were you specifically told

 6   that handbooks were among those documents that

 7   were destroyed?

 8   A          I think I've answered the question.  I

 9   was told that various organizational documents

10   were destroyed before I took office.  And they

11   were not physically here when I arrived.  So if

12   you're asking if handbooks would be among them, I

13   would say so, yes.

14   Q          And who told you that?

15   A          Various employees who worked here at

16   the time.

17   Q          What are their names?

18   A          That was three years ago.  I'm sorry.

19   I don't recall.  I mean, I could guess.  Judith

20   Hudson, Shannon Bazemore.

21   Q          Who would have been the custodians of

22   those documents?

23   MR. CARTER:

24          I'm not sure she was finished, Anita.

25   Were you finished, Shalena?
```

```
 1    BY MS. BALASUBRAMANIAN:

 2    Q        Go ahead.

 3    A        Yeah.  I'm thinking of other people, I

 4    mean, who would have said that.

 5    Q        But you're guessing?  You don't know

 6    their names?

 7    A        I'm giving you --

 8    Q        You can't say with certainty?

 9    A        If you'll allow me to finish, I'm

10    giving you my best recollection and I'm trying to

11    remember.

12    Q        Okay.  Go ahead.

13    A        I have listed Judith Hudson, Marella

14    Eaton.

15    Q        Marella Eaton you said?

16    A        Marella Eaton.  Judith Hudson.

17    Q        Sorry.  Marella Eaton, and then you

18    broke up.  What was the next name you gave after

19    Marella Eaton?

20    A        Judith Hudson.

21    Q        Judith Hudson, Shannon Bazemore,

22    Marella Eaton.

23    A        And that seems to be about all the

24    names I can recall right now.

25    Q        No problem.  Okay.  And who would have
```

```
 1   been -- what was Ms. Hudson's position?  Do you
 2   recall what was her -- what was her position in
 3   the office?
 4   A          Ms. Hudson was a legal assistant when I
 5   arrived.
 6   THE VIDEOGRAPHER:
 7             My apologies.  This is the
 8   videographer.  There are about 10 minutes
 9   remaining on this media file.
10   MS. BALASUBRAMANIAN:
11             Okay.  We can take a quick break if you
12   want to switch that out, Ms. Hammonds.  Bathroom
13   break or whatnot.  I mean, I don't have a
14   question on the table, but I can resume this line
15   of questioning once we come back if you want to
16   switch it out.
17   THE VIDEOGRAPHER:
18             Thank you so much if it's a good time.
19   MS. BALASUBRAMANIAN:
20             Is that okay, Ms. Jones?
21   A          What's -- what are we doing?  Was what
22   okay?
23   MS. BALASUBRAMANIAN:
24             How much time do you need,
25   Ms. Hammonds?  Five minutes, 10 minutes?
```

```
 1   THE VIDEOGRAPHER:

 2          Yes.

 3   MS. BALASUBRAMANIAN:

 4          Okay.  We're just going to take a

 5   10-minute break so she can switch the tape out

 6   for her video recording.

 7   A          Okay.  So we come back at 11:38?

 8   MS. BALASUBRAMANIAN:

 9          Yes.  That's fine.

10   MR. CARTER:

11          Okay.  Thank you.

12   THE VIDEOGRAPHER:

13          Going off the video record at

14   11:29 a.m.

15          (OFF THE RECORD AT 11:29 a.m.)

16          (ON THE RECORD AT 11:38 a.m.)

17   THE VIDEOGRAPHER:

18          We are back on the video record at

19   11:38 a.m.  This is the beginning of Media File

20   Number 2.

21   BY MS. BALASUBRAMANIAN:

22   Q          Ms. Jones, are you -- do you --

23   following the break, is there any of your prior

24   testimony that you wish to change or correct?

25   A          No, not at this time.
```

1   Q          Okay.  Well, when we left off, I was

2   asking you about organizational documents that

3   you were told were not available or were

4   destroyed upon you taking office.  And you

5   mentioned three individuals.  Judith Hudson,

6   Shannon Bazemore and Marella Eaton.  Is that

7   correct?

8   A          Yes.

9   Q          Okay.  Who would have been the

10  custodian of the handbooks that were applicable

11  to employees, you know, when you took office in

12  the --

13  A          Sorry.  I didn't give you a chance to

14  finish your question.

15  Q          Who would have been the custodian of

16  the employee handbook that -- the office copy of

17  the employee handbook at the time that you took

18  office?

19  A          I wouldn't know anything -- I wouldn't

20  know how to answer that question as it relates to

21  the prior administration because I don't know how

22  the administration was set up.  In my

23  administration, the custodian of the office

24  handbook is the office manager.

25  Q          Who is that?  Who was that at the time

```
 1   you took office?

 2   A          Barbara Baucum.

 3   Q          Okay.  Was she -- did you hire her or

 4   was she employed before you got there?

 5   A          I did not hire her.  I made an offer to

 6   her for employment.  And -- which she rejected.

 7   Q          Okay.  At what point did she become

 8   office -- so was she the office manager when you

 9   took office or before you took office?

10   A          She was the office manager before I

11   took office.

12   Q          Okay.  I understand.  All right.  So

13   who -- so after you took office, did you make any

14   effort to locate the employee handbook that was

15   in place from the prior administration?

16   A          Yes, I did.

17   Q          Okay.  What did you do to locate that

18   document?

19   A          I looked in the -- researched the

20   office manager's office to see what was there and

21   what was in place.  And nothing was left behind.

22   The handbook was not there.

23              We ultimately end up -- ended up

24   getting a copy of the handbook from -- the next

25   thing we did I think was to search the
```

```
 1    organizational documents and search on the drive,
 2    the communal drive to see if there were copies of
 3    the handbook that were available.  And if I am
 4    not mistaken, there were some prior earlier
 5    versions of it.
 6              We ultimately ended up getting a copy
 7    of the handbook from Ms. Carolyn Smalls who had
 8    assisted Barbara Baucum and the former district
 9    attorney in drafting the updated version of their
10    handbook.  So that's where we got it from.
11    Q         Okay.  I think you implicated
12    several -- I think you implicated a few documents
13    and, you know, actions.  So I need to break that
14    down a little bit.  So upon taking office, you
15    said you searched the office manager Ms. Baucum's
16    office for a physical copy of the handbook.  Is
17    that correct?
18    A         That's correct.  I didn't search it.  A
19    search was done by my office staff.
20    Q         Okay.  Did you ascertain what -- did
21    you -- withdrawn.
22    MS. BALASUBRAMANIAN:
23              Let's pull up -- can we pull up
24    Exhibit 5, please.
25
```

```
 1              (DEPOSITION EXHIBIT NUMBER 5
 2              WAS MARKED FOR IDENTIFICATION.)
 3    BY MS. BALASUBRAMANIAN:
 4    Q         Okay.  Is this the document you're
 5    referring to that was the handbook that you at
 6    some point located upon taking office?
 7    A         We located several copies of the
 8    handbook.  There was a 2014 version, a 2016
 9    version and what I believe would have been
10    another version after that.  Regardless, all of
11    the versions of the handbook that we had have
12    been produced in discovery.  I think the 2016
13    version is one -- is just one of the three.
14    Q         All right.  Which one -- I mean, were
15    they -- okay.
16              So which one was the applicable --
17    okay.  There was a 2014 version and a 2016
18    version.  Is it your testimony that they were
19    both applicable or the one later in time was
20    applicable?  Which one was applicable?
21    A         I would imagine that the one most --
22    created most -- most recently was the one that
23    was applicable.
24    Q         Okay.  And are you aware of a version
25    that was created after 2016?
```

```
 1   A          All the versions we have are provided
 2   in the discovery.  I believe there were three.
 3   2014, 2016 and there may have been a 2019.  But
 4   whatever we had we provided in discovery.
 5   Q          Okay.  I'm aware of what you provided
 6   in discovery.  I'm asking just in your role as
 7   the leader of the office, which one was the
 8   applicable handbook to the employees in the
 9   office?
10   A          The one that was issued by the prior
11   administration.
12   Q          And is that this one from 2016?
13   A          I can't tell you.  I don't know.
14   Q          And this one is DA Meg Heap, Eastern
15   Judicial Circuit of State of Georgia.  Is that
16   correct?  That's what this says?
17   A          That's what the document says.
18   Q          Okay.  And was this the version or was
19   this a handbook that you adopted for use in your
20   own administration?
21   A          Again, and if I'm recalling correctly,
22   there would have been a later version than the
23   2016 version.
24   Q          Okay.  So you did not -- so the later
25   version --
```

```
 1   A          I --
 2   Q          I'm sorry.  Go ahead.
 3   A          It's my recollection that we took a
 4   later version of the 2016 version.  I think it
 5   might have been the 2019 version and then adopted
 6   that one.
 7   Q          Okay.  So this was not -- from your
 8   recollection, this was not the handbook that you
 9   made effective at the point when you took office?
10   A          I don't recall.
11   Q          Okay.  Did you organize and provide a
12   training to staff regarding the workplace
13   expectations, you know, as derived from the
14   handbook upon taking office?
15   A          Yes.
16   Q          Okay.  Do you recall when that training
17   was?
18   A          I don't.
19   Q          Was it within a week, a month?
20   Generally do you recall what the timeframe would
21   have been when you would have delivered that
22   training?
23   A          I don't recall.
24   Q          Did you provide any handouts during
25   that training regarding your specific
```

1   interpretation of certain policies?

2   A          I don't think so.

3   Q          Did you provide employees with examples

4   under different policies of actions that would

5   violate those policies?

6   A          No, I didn't.

7   Q          Okay.  During the trainings that you

8   provided staff regarding your workplace

9   expectations, did you discuss the confidentiality

10  policy specifically?

11  A          No.  It would have been in the

12  handbook.  There would have been a staff meeting.

13  It would have been conducted by Michael Edwards

14  and/or in conjunction with Marcus Thompson, who

15  was the office manager at the time, issuing a new

16  version of the handbook and that we gave out that

17  was adopted from the previous versions.

18  Q          Okay.

19  A          And all the employees were asked to

20  review and sign it during that -- to review and

21  sign it or I believe the office manager either

22  collected the signature pages and put them in

23  people's personnel file or he was instructed to

24  either collect the signature pages and put them

25  in people's personnel file or gather a list of

1   everyone who had signed to indicate they reviewed

2   a new version of the handbook.

3   MS. BALASUBRAMANIAN:

4           Okay.  Can we pull up Exhibit 4,

5   please.

6           (DEPOSITION EXHIBIT NUMBER 4

7           WAS MARKED FOR IDENTIFICATION.)

8   MS. BALASUBRAMANIAN:

9           Ms. Hammonds, are you with us?

10  THE VIDEOGRAPHER:

11          Yes, ma'am.  My apologies.  I didn't

12  hear you.

13  MS. BALASUBRAMANIAN:

14          I'm sorry.  Can you pull up Exhibit 4,

15  please.

16  BY MS. BALASUBRAMANIAN:

17  Q       Have you seen this document before,

18  Ms. Jones?

19  A       Yes, I have.

20  Q       Okay.  Is this the document that you're

21  referring to as the subsequently passed handbook

22  after the November 2016 version?

23  A       No.  The Chatham County Employee

24  Handbook and the District Attorney's Employee

25  Handbook are different.  Two separate documents.

```
 1   Q         Okay.  Well, I'll represent that we
 2   have not received a different handbook subsequent
 3   to November 2016 in discovery.  So if you're
 4   saying that one exists from 2019, that has not
 5   been produced.
 6             So are you aware with certainty that
 7   there was one developed in 2019?
 8   A         As I said, all the documents and
 9   employee handbooks that we have have been
10   provided in discovery.
11   Q         Okay.  Well, there was no document from
12   2019 provided in discovery.  We have the 2016
13   handbook, which was Exhibit 5, and then we have
14   this.
15   A         Okay.
16   Q         Are you aware of something else that
17   exists?
18   MR. CARTER:
19             I believe, Anita, we also produced the
20   2014.
21   MS. BALASUBRAMANIAN:
22             Yes.  You did produce, but I guess I'm
23   trying to look for a document that was
24   established after 2016.  And I don't believe that
25   that one has been produced.
```

1  Q        And if you have a different

2  understanding, can you let us know, Ms. Jones?

3  A        I think I already did.  If you -- if

4  you don't have a 2018 or 2019, then there wasn't

5  one.

6  Q        Okay.

7  A        Then it would be 2016.

8  Q        And so was this a document that your

9  office -- so if you see the Bates stamp on the

10  bottom, this was produced by your office.  Do you

11  dispute that?

12  A        No.

13  Q        Okay.

14  A        I don't know anything about those date

15  stamps, but I'm pretty sure that I'm certain we

16  would have provided it if it was asked for.

17  Q        Yeah.  I mean, all I'm saying is in

18  connection with this Bates number provided by

19  Mr. Carter, this was produced by your office in

20  response to a discovery request we interposed.

21  So I guess my question is, was this a document

22  that you made applicable to the employees in your

23  office?

24  A        The handbooks that have -- that are

25  issued by the county as well as the handbooks

```
 1    that are issued by the ADA's office are to be
 2    read side by side.
 3    Q         Okay.  So these policies would be
 4    applicable to your employees as well; correct?
 5    A         Correct.
 6    Q         All right.  And did you provide a
 7    separate training on these policies in the County
 8    Handbook?
 9    A         I think the employees were separately
10    trained on the Chatham County Employee Handbook
11    by the county because they authored and issued
12    that document.
13    Q         Okay.  Do you know when that training
14    was?
15    A         I do not.
16    Q         Was it during your term of office?
17    A         I believe that at least one training
18    session had been offered during my tenure.  But I
19    do not recall when.
20    Q         And did you provide training on how to
21    interpret the Chatham County Handbook -- well,
22    your testimony was that this -- the Chatham
23    County Handbook and the DA's Office Handbook were
24    to be read in conjunction with each other;
25    correct?
```

```
 1   A          That's correct.
 2   Q          Okay.  Did you provide training on, you
 3   know -- is any provision of the Chatham County
 4   Handbook in conflict with the DA's Office
 5   Handbook to your knowledge?
 6   A          Not that I'm aware of.
 7   Q          Okay.  So you don't read any provision
 8   of the County Handbook to be in conflict with the
 9   DA's Office November 2016 Handbook?
10   A          No.
11   Q          And you didn't provide any specific
12   guidance about specific expectations that, you
13   know, that would have been in conflict and how to
14   interpret, you know, what to do if those
15   provisions were in conflict?
16   A          I didn't see them as being in conflict
17   as I said.  So I would not have provided any
18   training on that.
19   MS. BALASUBRAMANIAN:
20              You can pull this down.  I'm sorry.
21   Can we pull that up one more time for a quick
22   second.  Exhibit 5.  Or I'm sorry.  It's
23   Exhibit 4.
24   BY MS. BALASUBRAMANIAN:
25   Q          And you see the effective date of this
```

1    document is January 1st, 2021; correct?

2    A        I do.

3    Q        Okay.  And are you aware of how this

4    document was distributed to the employees in your

5    office?

6    A        I am not.

7    Q        Okay.

8    A        Likely by -- there are several hard

9    copies of that handbook available in our office.

10   One is in the office manager's office.  I have a

11   copy.  I assume that it would have been

12   disseminated to the employees by -- by email.

13   Q        Was a copy of this document also in --

14   made available in common areas in the office?  A

15   physical copy.

16   A        I'm not exactly sure.  I don't know.

17   Q        Okay.  Okay.  And, you know, not to be

18   repetitive, but so coming back to the training

19   that you provided --

20   MS. BALASUBRAMANIAN:

21            We can pull this exhibit down.

22   BY MS. BALASUBRAMANIAN:

23   Q        Coming back to the training that you

24   provided upon taking office regarding your

25   workplace expectations, you said you didn't --

1  did you specifically discuss confidentiality of

2  information and what topics were covered by that

3  expectation?

4  A        I -- that meeting, again, would have

5  been covered by Michael Edwards, who was the

6  First Chief, and Marcus Thompson, who was the

7  office manager.  I don't recall attending that

8  meeting.  But I would have instructed them to go

9  over the handbook to see if anybody had any

10  questions.

11  Q        Did you provide them any specific

12  guidance regarding the confidentiality policy and

13  what topics were that they should specifically

14  instruct employees were covered by that policy?

15  A        I did not.  The confidentiality policy

16  that was in place in our version of the handbook

17  or the standing version of the handbook was the

18  same one that was in place in the earlier

19  version.  So if there was special emphasis placed

20  on that, I wouldn't know because I wasn't there.

21  But I believe that it would not have been

22  unfamiliar to the staff because that's the

23  version that's always -- had always -- always

24  existed up until that point.

25  Q        Okay.  And so you relied on any

1  previous training that they had received under

2  the prior administration regarding the

3  expectations under that policy?

4  A         No, I did not.  I would have relied on

5  their -- the instruction that they were to review

6  the handbook and whatever handbook it was that we

7  were using and either sign for it and let us know

8  if they had any questions.

9  Q         Okay.  But in terms of a specific

10 training regarding your expectations as they

11 might differ from the prior administration, you

12 did not provide any guidance to them about how

13 your expectations might be different from the

14 prior administration's under any of those

15 policies, did you?

16 MR. CARTER:

17         Object to form.

18 A         I was --

19 MR. CARTER:

20         Object to form.  And also asked and

21 answered.  But go ahead.

22 A         I would say that's a false statement.

23 I directed my staff to review the handbook.  I

24 directed my leaders to review the handbook with

25 our staff.  And I couldn't tell you -- I

1   couldn't -- I couldn't tell you what the previous

2   administration instructed them.  They were

3   ordered to review the handbook as it stands and

4   indicate -- and let us know if they have any

5   questions.  And that's -- that's what was done.

6   Q          So you're not aware of whether they had

7   prior training about the interpretation of those

8   policies under the handbook; right?  You didn't

9   research whether that occurred?

10  A          There would have been no -- I -- I

11  don't know anything that the prior administration

12  did.  So I was covering our bases in terms of

13  introducing them to the handbook that we were

14  using to see if they had any questions.

15  Q          Okay.  And so to the extent that they

16  were trained on what topics were covered by the

17  confidentiality provision in the prior handbook,

18  you have no knowledge of what they were told by

19  the prior administration about what those

20  expectations were.  Is that correct?

21  A          That's correct.  I don't see how I

22  would have known that.  I wasn't here.

23  Q          Okay.  And so you didn't make any

24  effort to make specific what your expectations

25  were under those -- the policies as they were

```
 1   written in that handbook as they might have
 2   differed from the prior administration?
 3   A          I would say no because the entire
 4   handbook is a handbook.  I would not have
 5   specified -- I don't know that I would have given
 6   instruction to place emphasis on any one version
 7   or any one part of the handbook more than the
 8   other.  That was the purpose of the review.  To
 9   review it from beginning to end.  And so if
10   you're asking me if I placed special emphasis or
11   my staff placed special emphasis on
12   confidentiality, the answer would have been no.
13   Q          Okay.  And as a prosecutor there are --
14   one second.
15   MS. BALASUBRAMANIAN:
16              Can we look at Exhibit 4 again.  Can we
17   go to Page 28, please.  Or actually it's 29 of
18   the PDF.
19   BY MS. BALASUBRAMANIAN:
20   Q          And you testified that -- so this is
21   the Chatham County Handbook again.  You testified
22   that this is a document that you reviewed and did
23   not view as in conflict with your own internal
24   workplace policies; correct?
25   A          Correct.
```

```
 1   Q        Okay.  So looking at their
 2   confidentiality policy here, it says, you know,
 3   seems to mirror in the first paragraph what your
 4   policy indicates.  And then it says, "This policy
 5   is intended to alert employees to the need for
 6   discretion and is not intended to inhibit normal
 7   business communications.  Most county business
 8   records are subject to the Georgia Open Records
 9   Act, and requests for records subject to the Act
10   should be submitted to the appropriate official
11   in accordance with the provisions of the Act."
12   Have you seen this paragraph in this policy?
13   A        At some point, yes.
14   Q        Okay.  Did you give it -- did you give
15   your employees any instruction that information
16   subject to the Open Records -- any information
17   subject to the Open Records might still be
18   confidential in terms of your own office
19   information?  Let me withdraw that.  That was a
20   bad question.  That was a bad question.  Let me
21   re-ask that question for you.
22            Did you give your office personnel any
23   specific instruction about not disclosing
24   information that might be subject to Open
25   Records?
```

1    A          Repeat the question, please.

2    Q          Yeah.  At any point did you instruct

3    your staff that personnel matters, even if they

4    could be subject to an Open Records Act request,

5    were still subject to the confidentiality

6    expectations of your office?

7    A          Not in relation to this policy, no.

8    Q          Okay.  Did you have any agreements with

9    the county regarding nondisclosure of personnel

10   information from your office?

11   A          Did I have any -- did my office have

12   any agreements with the county?  Would you repeat

13   the question?

14   Q          Has your office ever had any agreements

15   with the county not to disclose personnel

16   information of attorneys in your office?

17   A          No.

18   Q          Okay.

19   MS. BALASUBRAMANIAN:

20              We can pull that down, Tyrah.  Okay.

21              Can we pull up Exhibit 32.

22              (DEPOSITION EXHIBIT NUMBER 32

23              WAS MARKED FOR IDENTIFICATION.)

24   BY MS. BALASUBRAMANIAN:

25   Q          Ms. Jones, this is a printout of a

```
 1   State Bar Rule.  Have you ever seen this State
 2   Bar Rule?
 3   A          Yes.
 4   Q          Okay.  And you're familiar with it, I
 5   assume, as a prosecutor?
 6   A          Yes.
 7   Q          Okay.  And this -- this rule is
 8   specific to prosecutors in the State of Georgia
 9   and covers, you know, special ethical
10   responsibilities that prosecutors have; correct?
11   A          Yes.
12   Q          Okay.  And do you receive training on
13   this particular rule from PAC or any other entity
14   that provides trainings to prosecutors?
15   A          I'm sure that -- I can't recall any
16   specific training that I would have received from
17   PAC.  I think prosecutors have a duty to know and
18   understand what these rules mean.
19   Q          Okay.  Does this rule prohibit or does
20   this rule prohibit in Section G, you know,
21   statements to the public except that are
22   necessary that might -- I'll just read it.
23   "Except for statements that are necessary to
24   inform the public of the nature and extent of the
25   prosecutor's action and that serve a legitimate
```

1    law enforcement purpose, refrain from making

2    extrajudicial comments that have a substantial

3    likelihood of heightening public condemnation of

4    the accused."

5           So if I'm reading that correctly, it

6    prohibits the prosecutors from making, you know,

7    unnecessary public statements that might heighten

8    public condemnation of the accused; correct?

9    A       If that's your interpretation, yes.

10   Q       Well, I'm asking you if that's a

11   correct interpretation, I guess, is what I'm

12   trying to understand.

13   A       I think the document speaks for itself

14   and it says what it does.

15   Q       Well, you're familiar with your own

16   ethical obligations as a prosecutor, I assume?

17   A       Sure.

18   Q       Right.  And you -- you have a

19   responsibility to ensure the employees who report

20   to you abide by this rule; correct?

21   A       Yes.

22   Q       And the business operations of your

23   office?

24           Okay.  So how do you interpret this

25   part of the ethical rule?  What kind of

1   information is prohibited from disclosure?

2   A          My prosecutor -- I ensure that my

3   prosecutors -- that they are prohibited from

4   making public statements about pending criminal

5   actions or making any other statements or

6   engaging in any behavior that might target the

7   accused or lead to -- that might be prejudicial

8   in the context of any pending litigation.

9   Q          Okay.  And so that's an instruction

10  that you provide the employees in your office

11  just in the course of trainings or other business

12  interactions; correct?  Well, let me rephrase

13  that.

14             It's just an instruction that you

15  provide your staff, you know, in the course of

16  running the office and ensuring they are trained

17  to complete the responsibilities of the job;

18  correct?

19  A          My staff is prohibited from making

20  public statements about pending litigation.

21  Q          Okay.

22  A          There are a select number of people in

23  my office who are allowed to be spokespersons for

24  the office as it relates to pending cases.  And

25  so they would be instructed to inform us of any

1    request for state -- for a statement from them.

2    And then they would handle that accordingly.  But

3    in reference to my office has been internally

4    trained on the issue of the prosecutorial roles

5    in 3.8.  And so they would be familiar with this

6    particular subsection as well.

7    Q        Well, I guess all I'm trying to

8    understand is if your -- if the confidentiality

9    policies were broader than this rule that your

10   office applied in this -- to the staff in the

11   office from the handbook -- you know, whether the

12   handbook policies were broader than the types of

13   disclosures that are prohibited by this rule?

14   A        I don't know.  The documents, as I

15   said, speak for themselves.  I did not author the

16   confidentiality provisions in the County Handbook

17   or in the previous versions of the DA's Office's

18   Handbook.  So I can't speak to that.

19   Q        Well, you have used the confidentiality

20   policy as a basis for terminating at least two

21   people, have you not?

22   A        I have.

23   Q        Okay.  So you do engage in some

24   interpretation of the confidentiality policy and

25   apply it to your staff; correct?  You have on at

1  least two instances.

2  A        I don't necessarily know that it --

3  with respect to the two employees that you're

4  referring to, Mr. Burton and Ms. DeFusco, they

5  were terminated based on the confidentiality

6  provisions that they signed for in the handbook.

7  I'm not sure why you're asking me to make a

8  correlation between the State Bar's Rules and

9  those.  And I didn't cite those rules.  I'm not

10 sure what you're asking me to do.

11 Q        Well, I'm just trying to determine --

12 I'm just trying to establish that there are

13 specific topics that prosecutors ethically are

14 prohibited from discussing.  And I'm trying to

15 understand if -- you know, I'm trying to

16 understand if there is a relationship between

17 this Bar Rule and the disclosures that you

18 believe they made that resulted in the

19 termination.

20 MR. CARTER:

21          Is there a question on the table?  I

22 don't hear a question.

23 MS. BALASUBRAMANIAN:

24          Yeah.  I'm explaining -- she said she

25 didn't understand my question.  So I explained it

1    to her.

2    MR. CARTER:

3         Whatever question you have, ask her.

4    BY MS. BALASUBRAMANIAN:

5    Q       Okay.  Is the confidentiality policy

6    that you used to terminate Mr. Burton and

7    Ms. DeFusco, is that broader than this State Bar

8    Rule in your interpretation of it?

9    A       Broader than?  I would say it's

10   different from.

11   Q       Okay.

12   A       This has to do with public statements

13   about pending criminal actions.

14   Q       And you're not saying that the

15   disclosures that Mr. Burton made were of that

16   nature, are you?

17   A       No.

18   Q       Okay.

19   A       He made a -- he made a public

20   disclosure about a private personnel action.

21   Q       Okay.  Let's go to --

22   A       (Inaudible.)

23   MS. BALASUBRAMANIAN:

24         Can you pull this exhibit down, Tyrah.

25   Thank you.  Can you go to Exhibit 13, please.

```
 1              (DEPOSITION EXHIBIT NUMBER 13

 2              WAS MARKED FOR IDENTIFICATION.)

 3   BY MS. BALASUBRAMANIAN:

 4   Q         Do you recognize this document,

 5   Ms. Jones?

 6   A         Vaguely.  Is that all there is to it?

 7   Q         No.  There is a second page.

 8   MS. BALASUBRAMANIAN:

 9              Can you scroll, Tyrah?  Thank you.

10   BY MS. BALASUBRAMANIAN:

11   Q         Have you seen this document before?

12   A         I've seen part of that document.  Where

13   is the -- do you have the rest of it?

14   Q         This is what we have.  Page 1 of 2.

15   A         I've seen that document before.  That

16   looks to be a portion of the text message that

17   was exchanged between Ms. DeFusco and her

18   colleagues, her friends.

19   Q         Okay.  When did you see this document?

20   A         I saw it on the day that Mr. Burton and

21   Ms. DeFusco were terminated.  And, as I said, I

22   saw portions of that document.  That's not the

23   full document.

24   Q         How did you see the document?  Was it

25   on a screenshot, a printout?  How did you see it?
```

```
 1   A          I saw it on Ms. DeFusco's phone.
 2   Q          Did you scroll through the rest of the
 3   chain or did you see some portion, a limited
 4   portion of the exchange?
 5   A          Ms. DeFusco showed me screenshots of a
 6   limited portion of that conversation and refused
 7   to show the entire chain.
 8   Q          And this was her personal phone; right?
 9   A          It was.
10   Q          How did you know that there was -- or
11   how did it come to your attention that there was
12   a text exchange between these people on that day?
13   A          She admitted it.
14   Q          How did it come up?
15   A          Prior to that, it came up during a
16   special called leadership meeting because it come
17   to my attention that the content of the message
18   had been -- that confidential information about a
19   particular employee had been shared.
20   Q          How did that come to your attention?
21   Who told you about it?
22   A          Initially the employee reported it to
23   me.  The subject employee.  Ms. Roberts.
24   Q          So Ms. Roberts told you that somebody
25   was texting about her departure?
```

```
 1   A          No.   That's not how it happened.   On
 2   the weekend before this incident arose,
 3   Ms. Roberts called me frantic because some --
 4   because something had happened with her adult
 5   daughters in Atlanta involving a mental health
 6   issue and perhaps a criminal issue that
 7   instigated the custody of her grandchildren.   So
 8   she called me that weekend and explained the
 9   situation to me.   She was crying.   She was
10   hysterical.
11          She asked me if I would help her get
12   relocated to another DA's office in the Atlanta
13   area.   And I -- because I have colleagues there,
14   I explained to her that I would try.   That was on
15   a Saturday or a Sunday.
16          On that Monday, that following Monday
17   at 4:30, I met with my leadership team and
18   explained to them in confidence what Ms. Roberts
19   had told me only because we would have needed to
20   replace a trial partner and fill a slot in that
21   courtroom.   And everyone knew at the table then
22   that that was supposed to be confidential.
23          On Tuesday afternoon at 3:30,
24   Ms. Roberts came to my office and confronted me
25   about the fact that I had spread her personal
```

1   business and compromised her.  She was

2   particularly concerned about the fact that there

3   was a mental health issue involved and that it

4   had involved her adult daughters.

5   Q        What did she say --

6   A        I had to --

7   Q        Go ahead.

8   A        Your question?

9   Q        You can finish what you were saying and

10  then I have a follow-up question.  Go ahead.

11  MR. CARTER:

12           Thank you.

13  A        I had to -- I had to admit to

14  Ms. Roberts that I did disclose it, but only with

15  a select few members in my leadership team only

16  for the purpose of figuring out how we were going

17  to handle her departure.  And she became angry

18  with me.

19           Immediately after that, I called my

20  team into my office.  Because -- to confront them

21  about how that information -- that specific

22  information got out.

23  BY MS. BALASUBRAMANIAN:

24  Q        Was Mr. Burton in the initial meeting

25  where you disclosed that Ms. Roberts needed to

1  leave and, you know, take another job because of

2  a mental health issue with her grandchildren?

3  A          No, he was not.  He was not part of the

4  leadership team ever.

5  Q          Okay.  Who was in that meeting where

6  you disclosed that information?

7  A          Michael Edwards, Anitra Hodge-Wilder,

8  Brian DeBlassis, Jenny Parker and Marie DeFusco

9  and myself.

10 Q          Did you specifically tell people in

11 that meeting that Ms. Roberts' grandchild had a

12 mental health issue?

13 A          In the first meeting that I had with

14 them, I did.

15 Q          And Ms. DeFusco was there when you made

16 that statement?

17 A          She was.  That was about -- yes.  That

18 was that Monday afternoon.

19 Q          Did you make a copy of the text chain

20 that you saw from Ms. DeFusco's phone?

21 A          No, I didn't.  She would not allow me

22 to.

23 Q          What did Ms. DeFusco tell you

24 regarding -- or what did you ask your team in the

25 second meeting when you asked who made the

1  disclosure?  What did you say?

2  A        I explained to them what Ms. Roberts

3  told me, which was that when she had gone to

4  court that Tuesday afternoon, members from the

5  public defender's office and other attorneys who

6  were in her courtroom -- she was before Judge

7  Morse -- said to her, Hey, short timer, we know

8  that you're leaving.  We hope that everything is

9  okay with you and your kids.  And at that point

10  she hadn't even told the judge that she was in

11  front of.

12        My question at that time for my team

13  was, how did that information get out of this

14  executive team meeting and all the way across the

15  street to the public defender's office in less

16  than 24 hours and they felt confident enough to

17  confront her about it in court.  Because

18  Ms. Roberts had begged me not to -- had indicated

19  to me that she wanted that information to be

20  confidential.

21        So I called the same people back into

22  the room and I explained to them that that

23  information left this room and that I was going

24  to go around the table to find out -- that I'm

25  going to give everybody an opportunity to tell me

1  who they told and who else they told.  And so we

2  went around the table.

3         And when we got to Ms. DeFusco, she

4  admitted that she was the one -- that she had

5  told Anthony about it and Mr. Burton about it in

6  conversation and that there had been a separate

7  text thread about it.

8  Q       All right.  If we scroll -- so here it

9  says Anthony is the one who is saying, "So Tim

10 and Rene are going to Cobb County."  Do you see

11 that right here at the bottom?

12 A       Yes, I see that.

13 Q       Okay.  Did you ever give Mr. Burton any

14 instruction that that information was

15 confidential?

16 A       It was information -- prior to, it was

17 information that he was not supposed to have.  It

18 was personal.  So the answer to your question is

19 no.

20 Q       Do you know if he was made aware that

21 any part of that information was confidential

22 when it was disclosed to him?

23 A       Ms. DeFusco indicated that it was --

24 that it was a confidential conversation.  So to

25 some degree I would say that he knew that.

```
1   Q          You were not present when Ms.
2   DeFusco -- when allegedly told Mr. Burton that
3   Renee was going to Cobb County; correct?
4   A          No.  I wasn't present.
5   Q          Okay.  And so you don't know what
6   Ms. DeFusco told Mr. Burton regarding this
7   information; correct?
8   A          Other than what she admitted to telling
9   him, no, I don't.
10  Q          Well, nothing in this text message --
11  and you can see both Page 1 and Page 2 mentions
12  Renee's grandchildren or their mental health,
13  does it?
14  A          I'm not sure what the reference is
15  about counseling or who even made that statement.
16  It seems like it could have been referring to
17  Renee.  But as for Mr. Burton, I don't see
18  anything on this particular page referencing her
19  grandchildren or her mental health.
20  Q          Well, Mr. Burton's text entries are in
21  gray.  So somebody else is texting in blue.  Is
22  that a fair statement?  That's just how these
23  text chains work I assume.  I mean, the
24  indication in blue is a different speaker than
25  Mr. Burton who is indicated in gray.  Is that not
```

1    a fair statement?

2    A          I think that's fair.  I wouldn't

3    disagree with that.

4    Q          Okay.  So somebody other than

5    Mr. Burton is making the statement wondering if

6    she started her counseling yet; correct?

7    A          I don't know.  I didn't author this

8    statement.

9    Q          Well, but it is a fair statement that

10   it's probably a different speaker than

11   Mr. Burton; correct?

12   A          As is presented on the first page of

13   this exhibit, I would say yes.

14   Q          Okay.  Can you go to the next page?

15              Okay.  So do you know some of -- I know

16   you know Skye Musson.  Do you know Kurtis

17   Bronston?

18   A          Yes.

19   Q          Who is that?

20   A          Kurtis Bronston is the ADA who used to

21   work in CNT.  He left the District Attorney's

22   Office before I arrived.

23   Q          And that person doesn't know Renee.  It

24   appears he's asking, "Who's Renee?"  Is that

25   correct?

```
 1   A          I don't know who -- I don't know.
 2   That's what the document says.  It speaks for
 3   itself.  I don't know.
 4   Q          You don't know.  Okay.  Is anywhere in
 5   this document that you see any discussion of
 6   Renee's grandchildren or her particular mental
 7   health other than the blue statement, which you
 8   don't know what that's referring to?
 9   A          Not in the document that you've
10   presented.  I will say it's not the complete
11   document that I saw.  There are some others --
12   other individuals who were in this particular
13   chain.  So you're not -- this particular text
14   message does not reflect the full text thread.
15   Q          What other statements do you remember
16   from the text thread that you believe are
17   relevant to the termination decisions, if any?
18   A          I can't remember the -- I can't
19   remember the specific texts and messages other
20   than the fact that she was leaving.  I can't
21   remember the specific content of the texts as
22   much as the speaker.
23   Q          And your testimony is that Ms. DeFusco
24   specifically admitted to you that she told
25   Mr. Burton that Renee was leaving, going to Cobb
```

1  County because of her grandchildren having mental

2  health concerns?  She specifically admitted all

3  of that information to you?

4  A          My question to her and the rest of the

5  room was who gave information out about Renee and

6  her departure.  And she did not use those

7  specific words, but she did admit to telling

8  Mr. Burton that.  And to also discussing with

9  others on this partial text that you see.

10 Q          What did she admit that she told

11 Mr. Burton specifically?  That Renee was leaving,

12 that she was going to Cobb County or more than

13 that?

14 A          She admitted that Renee was leaving.

15 That she was going to Cobb County.  That it had

16 something to do with a mental issue or with her

17 daughters.  And that she admitted to the text

18 thread as far as I can recall.  As best I can

19 recall.

20 Q          And were others present when she

21 admitted that to you?

22 A          Yes.

23 Q          Was Jenny Parker present?

24 A          She was.

25 Q          And Michael Edwards?

```
1   A          Yes.

2   Q          And Brian DeBlassis?

3   A          Yes.

4   Q          Anybody else?

5   A          Anitra Hodge-Wilder.

6   Q          Okay.  Were there any people in the

7   office that that team was authorized to tell

8   about Renee -- Renee leaving and going to Cobb

9   County?

10  A          They were all specifically

11  authorized -- they were all specifically informed

12  that they were not to tell anyone at this point

13  about her departure and the reason for her

14  departure.  That we were only to focus on who

15  could replace her and what our backup plan would

16  be.  And the only reason that I shared it with

17  them is to let them know the urgency of the

18  situation and to let them know that that change

19  could take place any minute virtually.

20  Q          Did you give Renee a leave of absence

21  or time off to collect her -- you know, or to

22  organize her situation?

23  A          She didn't ask for that.  So, no, I did

24  not give her that.  And I don't think we got that

25  far.  She was extremely irate.  And I think she
```

```
 1   had threatened to quit at that time because she
 2   was embarrassed about the breach of
 3   confidentiality as it related to her.  And I know
 4   she was particularly concerned that the comments
 5   were made in open court and that she had not even
 6   had an opportunity to explain it to her judge.
 7   And he asked her about it.
 8   Q        Okay.  Do you know how that judge found
 9   out?  Who told the judge?
10   A        The judge found out when the comment
11   was made across the courtroom to Renee in open
12   court.
13   Q        Who made the comment, if you know, to
14   Renee in open court?
15   A        A member of the public defender's
16   office.
17   Q        Okay.  Did you investigate who told
18   that member of the public defender's office?
19   A        I knew at one time.  I don't recall.  I
20   do -- I get them confused.  It might have been
21   Katie Kelly or Kaitlyn Walker.  But I got it
22   through secondhand information that they got that
23   information from Anthony Burton.
24   Q        So you don't have personal knowledge of
25   how they got that information?
```

```
1    A          No.  I don't talk to them unless it's
2    work related.
3    Q          So you're speculating that it was
4    Mr. Burton who told them?
5    A          What I'm saying is based on information
6    that I received, that he relayed that information
7    to either -- either or or both Kaitlyn Walker or
8    Katie Kelly.  I can't remember which of them was
9    assigned to Judge Morris's courtroom at the time.
10   Q          And who told you that?  That he gave
11   that information to Katie Kelly or Kaitlyn
12   Walker?
13   A          Jenny Parker, my Second Chief at the
14   time.
15   Q          And Ms. Parker told you that Burton was
16   the one that shared that information with those
17   people?
18   A          Yes.  That there were other employees
19   around the office who were talking about it.
20   That he was spreading that information.  At that
21   time Mr. Burton had a reputation for being a mole
22   and spreading information around that was going
23   on in the DA's office.  And he would use his
24   relationships with people on the executive team
25   and people in other offices to get that
```

```
 1    information and talk about it with judges and
 2    other people around the courthouse.
 3    Q         Can you give me an example of another
 4    instance when he was active, as you say, like a
 5    mole and spreading information outside of the
 6    office?
 7    A         Yes.  He was -- there was a case before
 8    Judge Abbot where a discovery issue came up.  He
 9    was telling people that I had a relationship with
10    Savannah PR and all of this stemming from a case
11    involving a victim named Edward Gresham.  He was
12    telling people that I was being biassed and only
13    prosecuting that case because Eddie Gresham was
14    black and because he was my friend and that I had
15    worked on his campaign.  He was telling people
16    that I paid Savannah PR $67,000 a month to -- to
17    work for the office, which wasn't true.
18              But that has been -- that has been the
19    case with Mr. Burton both before he left the
20    office and after -- and after.
21    Q         So he was --
22    A         So I'll tell --
23    Q         So he had a record of -- prior to his
24    termination, he had a record of making statements
25    that were critical of you, your decision making
```

1   and things like that publicly.  Is that what

2   you're describing?

3   A          No.  I'm saying that -- I'm saying that

4   he had a reputation of saying things about the

5   office that were false and spreading that

6   information to public defender's office and

7   anybody who would listen.  And that --

8   Q          When did you learn about that?  When

9   did you learn about that?

10  A          Excuse me.

11  MR. CARTER:

12             She wasn't finished, Anita.  Please let

13  her finish.

14  MS. BALASUBRAMANIAN:

15             Well, I'm letting her finish, Todd.  If

16  somebody accidentally starts the question, it

17  doesn't mean we're talking over each other.

18  BY MS. BALASUBRAMANIAN:

19  Q          All right.  Tell me when you learned

20  about his reputation for saying things about the

21  office.

22  A          Very early on after meeting him, people

23  would tell me things that he did and said about

24  me and about the office, about how I ran the

25  office.  And there are just too many things to

1    enumerate.  I could give you some examples.  But

2    I learned that about him very early on.  But I

3    didn't hear him say them.  And I know that as far

4    as I was concerned, he and I had a good

5    relationship.  So I didn't know -- I've learned

6    working in the courthouse to take the things that

7    people say in the courthouse rumor mill with a

8    grain of salt.  So he hadn't shown me anything

9    that was insidious at the time.  So I didn't --

10   but I learned that pretty on -- pretty early on

11   that he was just saying derogatory or

12   undermining, derogatory things.

13   Q        Okay.  Was the things that he was

14   saying items that should have been confidential

15   under the confidentiality policy?

16   A        I don't think so.  I mean, most of the

17   things that came to me secondhand I guess he had

18   a right to say.  If that's his opinion.  I don't

19   really -- I don't -- yeah.  He had a right to

20   say.  And I didn't have any proof that he had

21   said them.  And I didn't think it was worth my

22   time to follow up with him on every rumor that

23   got back to me.  I really just treated him

24   accordingly based on what he showed me and based

25   on his work product.

1  Q        Okay.  And you didn't take any issue

2  with his work product?

3  A        No.  Not particularly.

4  Q        Okay.  And so had he ever been

5  disciplined for, you know, running his mouth or,

6  you know, perpetuating rumors or anything like

7  that before he was fired?

8  A        No.  Absolutely not.  I'd have to

9  probably discipline everybody if that was the

10 case.  But, no, he wasn't.

11 Q        So office gossip was not anything that

12 you could really control outside the office.  Is

13 that fair to say?

14 A        Yeah.  I mean, I've worked in that

15 office before.  I'm less concerned about the

16 things people say.  I'm primarily concerned about

17 their work and their professionalism.  And, you

18 know, I was -- I came into that office at a time

19 that -- that was very hostile.  I knew that, you

20 know, a lot of the people that I would be leading

21 were not happy about me being there.  I -- but I

22 think that's par for the course.  And the only

23 thing I expected of them was that they did their

24 work to a professional standard.  So I tried to

25 minimize and ignore the gossip as much as I

```
 1   could.
 2   Q          Mm-hmm.  Okay.  And you were aware --
 3   well, at some point you became aware that
 4   Mr. Burton was a friend of Skye Musson's;
 5   correct?
 6   A          At some point.  At some point, yes.
 7   Q          And he was her assigned trial partner
 8   at some point during your -- after you assumed
 9   office; correct?
10   A          Yes.  I believe so.  I didn't become
11   aware of the nature of their friendship until the
12   coat rack scandal.
13   Q          The coat rack scandal?
14   A          Yes.
15   Q          Okay.  And you're referring to, I
16   guess, a dispute in the office about who owned a
17   coat rack.  When was that, I guess, dispute?
18   A          Let's see.  I got in the office in
19   January.  Skye quit in April.  So it probably
20   would have been about May or June of 2021.
21   Q          So as of May or June, 2021, you knew
22   they were friends and trial partners before Skye
23   left?
24   A          I knew -- yes.  I knew they were trial
25   partners, but I knew that their relationship was
```

1    something more than work related as a result of

2    the coat rack incident.

3    Q        You mean they were friends?

4    A        Yes.

5    Q        You knew they were friends?

6    A        Excuse me?

7    Q        You mean you knew they were friends.

8    Is that what you're saying?

9    A        I became aware of that.

10   Q        And were you aware that Mr. Burton is

11   gay?

12   A        At what point?

13   Q        At any point after you assumed office,

14   did you become aware that he was gay?

15   A        No.  I mean, I know now obviously.  At

16   the point that I assumed office, I didn't know

17   Mr. Burton.  And I don't make it a custom to ask

18   people about their marriages, relationships.  I

19   think at one point during a chat or two or a

20   conversation in my office, he had used the term

21   partner, but he didn't indicate that his partner

22   was male.  I didn't know anything about

23   Mr. Burton.  He didn't tell me he was gay and I

24   didn't know.

25   Q        Did anybody else ever mention that he

1   was gay?

2   A        No.  I mean, no.

3   Q        Do you know of any other trial partners

4   that Ms. Musson had in the four months between

5   when you took office and when she left from

6   January to April of 2021?

7   A        I don't.

8   Q        We've been going for, I guess, about

9   another hour and a half or another hour.  If

10  folks want to take a break for lunch for

11  30 minutes or so, we can do that.  Is that

12  something you want to do or do you want to keep

13  going?

14  A        I'd like to finish, but I'd like to get

15  this over with as soon as possible.

16  Q        I understand.

17  MS. BALASUBRAMANIAN:

18           Todd, do you want to take a short lunch

19  break?

20  MR. CARTER:

21           I'm fine.  I'm fine either way.  It's

22  actually snack week at our office.  So there is

23  food downstairs that I can pick up real quick.

24  MS. BALASUBRAMANIAN:

25           I want snack week.

```
 1   MR. CARTER:

 2           I'm sorry?

 3   MS. BALASUBRAMANIAN:

 4           I want a snack week.  That's amazing.

 5   MR. CARTER:

 6           Well, you should come to our office.

 7   If we had done it here, we have every secretary

 8   or person in the office bring something every day

 9   of the week and they write down what they're

10   bringing.  So by Friday, we're all stuffed.  So

11   I'm glad we're doing this on a Monday.  But we

12   can take 15 minutes just to, you know, grab a

13   snack and restroom, if that's agreeable with

14   everyone.

15   MS. BALASUBRAMANIAN:

16           Yeah.  I mean, if we can make it 20.  I

17   have to leave my office to grab something.  So if

18   we can make it 20 minutes, that would be great.

19   MR. CARTER:

20           Is that okay, Shalena?

21   A       Sure.

22   MS. BALASUBRAMANIAN:

23           Thank you.

24   THE VIDEOGRAPHER:

25           Going off the record at 12:41 p.m.
```

```
 1              (OFF THE RECORD AT 12:41 p.m.)

 2              (ON THE RECORD AT 1:04 p.m.)

 3   THE VIDEOGRAPHER:

 4              We are back on the video record at

 5   1:04 p.m.  This is the beginning of Media File

 6   Number 3.

 7   BY MS. BALASUBRAMANIAN:

 8   Q       Ms. Jones, is there any part of your

 9   prior testimony that you wish to change following

10   that break that we just took?

11   A       Nope.  Not at this time.

12   Q       Okay.  Thanks.

13   MS. BALASUBRAMANIAN:

14              Can we pull Exhibit 13 back up.

15   BY MS. BALASUBRAMANIAN:

16   Q       Okay.  Ms. Jones, I believe you

17   previously testified that you saw, I guess, all

18   of these messages.  And you contend there might

19   have been more messages, but this and then the

20   next page is what you saw from Ms. DeFusco's

21   phone when you made the termination decision?

22   A       Yes.  I might have seen a little bit of

23   what's before it and a little bit of what was

24   after it.

25   Q       And do you recall any other statements
```

1  about Renee from this chain that you saw?

2  A          As I said before, the entire

3  conversation was about Renee.  And I gave you the

4  general gist of the conversation.  I know that

5  there was more to the conversation because there

6  are speakers that I took note of that are not

7  represented in Exhibit 13.

8  Q          Well, I think the -- on top there

9  are -- there are -- I guess it identifies the

10 initials.  Do you recall what other speakers that

11 you -- whose statements that you observed?

12 A          In addition to Ms. DeFusco and

13 Mr. Burton; Skye Musson, as you indicated; Andre

14 Pretorius; Kyle Lankhorst was on the chat as well

15 as Katie Fite-Magyar.  I believe that's who KF

16 is.

17 Q          What was the name you said before Katie

18 Fite-Magyar?

19 A          Kyle Lankhorst.

20 Q          Is he one of the bubbles on top with

21 initials?

22 A          I don't -- I don't see his initials.  I

23 don't know what -- I don't even know who

24 generated this text or whose phone it came from.

25 I'm telling you that on the text message that I

```
 1   saw.  The names that were on the text message
 2   that I saw.
 3   Q        Okay.  So --
 4   A        I don't know whose phone this came
 5   from.
 6   Q        Is this not -- does this -- what I'm
 7   showing -- what you're seeing on the screen now,
 8   does this not reflect the same conversation that
 9   you saw at least in part?
10   A        What I'm saying to you is that some of
11   the content reflected here I recall seeing.  But
12   because it was a group chat, I don't know whose
13   phone you took this from.  I just know that it is
14   different from what I saw in -- because, A, there
15   was more to the conversation.  And, B, there were
16   speakers in that conversation that -- whose
17   voices and identities are not reflected in
18   Exhibit 13.
19   Q        Okay.  So -- and I'm sorry if I've
20   asked this, but I don't think it's clear to me.
21   Were there any statements that were made by
22   Mr. Burton other than what you see at the bottom
23   here that you believed violated the
24   confidentiality policy from the chain that you
25   saw?
```

```
 1    A         Yes.  You'd have to show me the rest of
 2    the text message to verify -- to verify that.
 3    Q         Okay.
 4    MS. BALASUBRAMANIAN:
 5              Can you scroll down, Tyrah?
 6    BY MS. BALASUBRAMANIAN:
 7    Q         Okay.  This is what we have.  Do you
 8    recall any other statements that you observed
 9    when you made the termination decision that you
10    based your termination decision on?
11    A         I think I've answered that question
12    already.
13    Q         I'm asking what you recall that
14    Mr. Burton said other than what's reflected in
15    this document.
16    A         I can tell you that the entire
17    conversation was about Renee and that Mr. Burton
18    was included on the chain.
19    Q         And you -- and it's your testimony that
20    it specifically referenced her grandchildren and
21    their mental health?
22    A         I didn't say that.  I said the entire
23    conversation was about Renee and her departure.
24    I think there was some reference to her being on
25    her meds.  I don't think there was a reference to
```

```
 1    her grandchildren, but there was definitely a
 2    reference to her going to Cobb County and her
 3    being on her meds.
 4    Q        So I see the reference to Cobb County.
 5    MS. BALASUBRAMANIAN:
 6             And can you scroll up, Tyrah.
 7    BY MS. BALASUBRAMANIAN:
 8    Q        Are you saying -- so you're saying that
 9    there was another statement that's not on this
10    document that referred to Renee being on her
11    meds?
12    A        Yes.
13    Q        And was Renee being on meds information
14    that you shared in confidence with Ms. DeFusco?
15    A        That was part of the conversation --
16    Ms. Roberts never indicated to me that she was on
17    meds.  I think that that was just an offhanded
18    comment that was made about her.
19    Q        And you believe Mr. Burton made that
20    comment?
21    A        I don't know who made the comment.
22    Like I said, there were a number of people on the
23    text thread, so ...
24    Q        Okay.  But if somebody other than
25    Mr. Burton made the comment, you would not have
```

1  terminated Mr. Burton for the comment.  Is that

2  fair to say?

3  A        Mr. --

4  Q        No.  Answer that question.  Yes or no.

5  If Mr. Burton was not the speaker who discussed

6  Renee being on her meds, would you -- would that

7  be a basis for Mr. Burton's termination?

8  A        I don't understand the question.  He

9  was terminated for being a part of the

10  discussion.

11  Q        So even if he wasn't the speaker or

12  responsible for a specific statement, he was

13  terminated for just being on this text chain with

14  other people who were discussing Renee?

15  A        He was terminated for participating in

16  the discussion of a private personnel matter.

17  Q        And so even if he didn't personally

18  discuss Renee's private, you know, personnel

19  information, he was terminated for being part of

20  this conversation.  Is that fair to say?

21  MR. CARTER:

22          Object to the form.

23  BY MS. BALASUBRAMANIAN:

24  Q        You can answer.  If that was the reason

25  for his termination.

```
 1  A          The reason for his termination is
 2  stated in his termination letter.
 3  Q          Right.  And I'm trying to -- and you
 4  stated it's because he violated the
 5  confidentiality policy.  But we can go ahead and
 6  look at that policy.  But if I'm understanding
 7  you correctly, even if he did not make a comment
 8  directly about Renee, because he was a
 9  participant in this conversation, he was
10  terminated.  That's what your testimony is;
11  correct?
12  A          No, it's not.  You'd be asking me to
13  speculate.  And I don't know what I would have
14  done if things turned out differently.
15             What I can tell you is that I
16  terminated him for participating in a
17  conversation about a personal matter that was
18  confidential that had nothing to do with his job
19  and which breached the confidentiality of the
20  office and another personnel member.  That's why
21  he was terminated.  So --
22  Q          Well, I'm just trying to -- okay.  Go
23  ahead.  Finish.  Finish what you're saying.
24  A          I can't speculate as to what would have
25  happened if he would or would not have said
```

1   something in another text.

2   Q        I'm not asking you to speculate.  I'm

3   asking you was he terminated for -- when you say

4   he participated in a conversation, is it because

5   he made statements or because he was a party to a

6   conversation where somebody else was discussing

7   personnel information about Renee?

8   A        I think I've already told you why I

9   terminated him.

10   Q        No.  You haven't answered that specific

11   question.  And I'm asking for more specific

12   information about what you mean by participated

13   in the conversation.  Was it because of a

14   statement that Mr. Burton specifically made or a

15   statement that somebody else made that he was

16   privy to?

17   MR. CARTER:

18            She's already -- asked and answered.

19   She's already answered that question several

20   times and she's referred to conversations --

21   MS. BALASUBRAMANIAN:

22            No, she hasn't.  She hasn't answered

23   the specific --

24   MR. CARTER:

25            Let me finish, please.  Let me finish.

1   Asked and answered.  She's already explained why

2   she terminated him.  She referred to the

3   termination letter and she's pointed to specific

4   statements in this exhibit and she said that

5   there is also --

6   MS. BALASUBRAMANIAN:

7           I think you're coaching, Todd.  I think

8   you're coaching her at this point.  This is a

9   speaking objection that you're making.

10  MR. CARTER:

11          She's also said that there are other

12  comments in here that are not on your exhibit.

13  MS. BALASUBRAMANIAN:

14          Okay.  And so you're speaking -- I'm

15  going to ask that you not make speaking

16  objections.  It's against the rules.  And I

17  understand your objection of asked and answered.

18  And I don't agree that she's answered the

19  question.  My question specifically.

20          And we can look at his termination

21  letter.  Let's pull that up.  It's Exhibit 14.

22  Can we pull that up.  All right.  Can we blow up

23  the paragraph that starts, "You are terminated

24  for."

25

```
 1              (DEPOSITION EXHIBIT NUMBER 14

 2                 WAS MARKED FOR IDENTIFICATION.)

 3   BY MS. BALASUBRAMANIAN:

 4   Q         And you recall writing this letter,

 5   Ms. Jones, don't you?

 6   A         I do.

 7   Q         Okay.  And so in this statement you

 8   say, "You were terminated for sharing the

 9   confidential personnel information of DAO

10   employees with members of the public, former

11   employees, a county attorney and others without

12   having express authorization to do so."  So if I

13   understand this correctly, it was Mr. Burton --

14   it was the information Mr. Burton specifically

15   shared that you contend violated the policy.  Is

16   that what this says?

17   A         It says what it says.  That's why I

18   terminated him.

19   Q         Okay.  So it was for the information

20   that he shared specifically.  Not for anything

21   anybody else shared.  Is that correct?

22   A         It was for information -- he was

23   terminated for sharing the confidential

24   information of DAO employees without

25   authorization.
```

1   Q        Okay.  And what specifically did he

2   share?

3   A        He shared that Tim and Renee were going

4   to Cobb County.  I have a good faith basis for

5   believing that he shared information about what

6   was going on with her mentally and her mental

7   health and what was going on with her daughters,

8   so ...

9   Q        And what is your good faith -- okay.

10  So let's take that one statement at a time.  The

11  fact that Tim and Renee are going to Cobb County.

12  Would that statement on its own violate the

13  confidentiality policy?

14  A        The fact that Tim and -- which

15  confidentiality policy are you referring to, A.

16  And B --

17  Q        You said that they can all be read in

18  conjunction with each other.  So any

19  applicable -- so the confidentiality policy that

20  you cite here on Page 1 of Exhibit 14, which

21  appears to be the employee handbook from 2006 --

22  okay.  I guess it's from 2014 which preceded two

23  other handbooks that have been produced in

24  discovery.  But you have cited to a policy that

25  you contend that he acknowledged receipt of on

1    June 8th, 2015 and January 24th, 2016.  Is it

2    your contention when you terminated him that him

3    sharing -- is the statement that he made that Tim

4    and Renee are going to Cobb County on its own,

5    does that violate this policy?

6    A         The statement that he made about Tim

7    and Renee going to Cobb County would have been

8    personal information that had not been publicized

9    by this office that was discussed in

10   confidentiality between me and those employees.

11   Which, A, didn't refer to any of his business in

12   the courthouse, and he was not authorized to

13   release that information.

14   Q         And did you ask him personally how he

15   learned that information?

16   A         No.

17   Q         So if he disputes your contention about

18   how he learned that information -- well,

19   withdrawn.

20             He didn't have a business duty or

21   business reason for anybody to communicate that

22   to him.  It's not something he would have learned

23   in the course of his job duties, is it?

24   A         I don't know how to answer that

25   question.

1   Q        Well, he didn't supervise Renee

2   Roberts, did he?

3   A        No, he didn't.  He wasn't part of

4   leadership.  It's not relevant to his job duties.

5   Q        But you don't know -- other than what

6   you claim Marie DeFusco told you, you don't know

7   how he learned that information.  It wasn't

8   business information that he received, was it, in

9   the course of his duties?

10  A        I already told you that I know it

11  because Marie told me she shared it with me.

12  Q        You have no -- withdrawn.

13           He would not have a -- he would not

14  have learned that information in the course of

15  fulfilling his job duties; correct?

16  A        He could have learned that -- I don't

17  know how he could have learned that.  It

18  wasn't -- I know that he got it from Marie

19  because Marie admitted that that's where he got

20  it from.

21  Q        Okay.  And, I guess, back to my

22  question.  And I just want to make sure I'm

23  clear.  You're saying that just telling somebody

24  outside the office that Tim and Marie -- I'm

25  sorry.  Tim and Renee are going to Cobb County.

```
 1   That statement alone would violate this
 2   confidentiality policy?
 3   A          No, I'm not saying that that statement
 4   alone would violate the confidentiality policy
 5   because that's not all that Mr. Burton did to my
 6   knowledge.
 7   Q          Okay.  So if that is -- if his
 8   testimony is that that's the only information he
 9   communicated, you would dispute that based on
10   your personal knowledge?
11   A          Yes.
12   Q          Okay.  And you don't have a document
13   that shows that he communicated anything more
14   than that information, do you?
15   A          As I said, if you show me the rest of
16   the text message, it could be in there.  That
17   would be the other document that I was referring
18   to.  But I -- that would be the other document.
19   Q          I'm not -- I'm not asking you -- I'm
20   asking you if you have another document that
21   shows that he communicated anything more than
22   what I showed you in Exhibit 13.
23   A          I do not.
24   Q          Do you have any independent knowledge
25   of whether Renee told Mr. Burton about any of
```

1   that information?

2   A        She told me she didn't.  And as far as

3   I know, Renee and Mr. Burton were not on speaking

4   terms based on the coat rack scandal.

5   Q        Okay.  Other than a text chain, was

6   there any other document that you looked at that

7   you believe reflected a, you know, additional

8   statement between speakers that Marie DeFusco

9   showed you on that day, the date of the

10  termination?

11  A        No.  No other documents.

12  Q        So just the text chain?

13  A        Yes.

14  Q        And you're saying it's a different text

15  chain with additional speakers than what Exhibit

16  13 reflects?

17  A        I didn't say it was different.  I said

18  that what is reflected in Exhibit 13 is part of

19  that conversation.  So the best way to describe

20  it is that your exhibit is incomplete.

21  Q        Okay.  And did Ms. DeFusco make any

22  statements on the text chain that you found

23  objectionable when you looked at it or was it her

24  statement -- was it another statement that she

25  made?

1    A        I found the whole thing objectionable.

2    That they were having conversations not just

3    about employee matters and personnel matters that

4    had not been released and that were private in

5    nature.  I found it objectionable that they were

6    having conversations with people who were no

7    longer employed by this office as well as the

8    county attorney who represents legal matters.  So

9    I found the whole text message thread

10   inappropriate and objectionable, which is why I

11   took the action I did.

12   Q        Okay.  And so, I guess, with respect

13   specifically to statements made by Marie, did she

14   make any statements on the text message that you

15   contend violated the confidentiality policy?

16   A        I'm sure she did.  I can't recall what

17   they are.

18   Q        So you can't say with certainty that

19   she made specific statements that violated the

20   confidentiality policy?

21   A        I said I'm sure she did.  I can't

22   recall that she did make some statements.  And --

23   but I don't recall exactly what those statements

24   were.

25   Q        Okay.  Was anybody else present during

1    your -- during the meeting when -- well, I

2    believe you testified that other supervisors were

3    present when you -- when you made Marie -- you

4    asked Marie to show you -- or when, A, Marie

5    admitted to you allegedly that she, you know,

6    made this disclosure to Mr. Burton.  And, you

7    know, and then you asked to see the rest of the

8    text chain.  Is that correct?

9    A          What's your question?  Are you asking

10   who was available or -- I don't understand the

11   question.

12   Q          Who else was in the meeting?

13   A          I've already testified that the meeting

14   was attended by myself, Michael Edwards, Anitra

15   Hodge-Wilder, Brian DeBlassis, Jenny Parker and

16   Marie DeFusco.

17   Q          And did Ms. Parker and other

18   supervisors, were they witness to Ms. DeFusco

19   admitting to you that she shared information with

20   Mr. Burton about Renee, not only that she was

21   going to Cobb County, but that she -- she had

22   grandchildren with mental health issues?

23   A          Those individuals were present in the

24   room at the time Marie DeFusco admitted to both

25   having a conversation Anthony Burton about Renee

1   as well as being a part of the text message

2   group.

3   Q        Right.  I'm asking if they were

4   present -- you testified earlier that Marie

5   specifically admitted not only that she told

6   Anthony that Renee was leaving, but that Renee --

7   it was related that her grandkids and them having

8   mental health issues.  Was Ms. Parker, for

9   example, present specifically when Ms. DeFusco

10  admitted that she told Anthony all of that

11  information?

12  A        I don't believe I testified that that's

13  exactly what she said.  But I can tell you that

14  Ms. Parker would have been present for the

15  conversation.

16  Q        Okay.  Thank you.  What exactly did she

17  say?

18  A        I think I've already testified to what

19  she said.

20  Q        It's not clear.  So please tell me

21  exactly what Ms. DeFusco said because it's

22  obviously what led to the next chain of events.

23  So tell me exactly what she said so it's clear

24  for the record.

25  A        Okay.  I think I'm --

1  MR. CARTER:

2          Asked and answered.

3  A       I think I've testified several times

4  now that Ms. DeFusco admitted to telling

5  Mr. Burton that Renee was leaving and that there

6  was some mental health issue involved and that

7  she had to take care of her daughters.  That is

8  what she admitted to.  She admitted to talking to

9  Anthony Burton about that.  When I probed her

10 further to see who else she had spoken to, she

11 explained to me that there was a text message

12 thread where we discussed those things.  I then

13 probed her and asked her about the text message.

14 And that's when -- although she was reluctant to

15 show it to me initially, she did take screenshots

16 of a portion of it.  The portion she was

17 comfortable showing me and that's what she showed

18 me.

19 Q       And I guess I just want to make sure

20 it's clear.  Was it her daughters or her

21 granddaughters with the -- with the issue?

22 A       I'm not -- assuming that was relevant,

23 I don't even remember if it was -- I don't

24 remember whose mental issue it was.  I don't -- I

25 don't -- I don't know if it was her daughters.

1  What I testified to you earlier today was that it

2  triggered custody.  The issue of custody for

3  Renee as to who was going to care for her

4  granddaughters at the time.  I don't believe I

5  said anything about her granddaughters having

6  mental issues.

7  Q          Okay.  Sorry.  That was not clear to

8  me.  But thank you for clarifying.  All right.

9  And so -- and, you know, I noticed there was

10 another employee of your office that was also on

11 the text chain.  Ms. Fite-Magyar; correct?

12 A          Yes.  Correct.

13 Q          Okay.  Was she fired in connection with

14 being on the text chain?

15 A          She wasn't terminated.  She was

16 counseled and disciplined, yes.

17 Q          Okay.  Are there records of her

18 discipline that were put in her personnel file?

19 I don't think I've seen those.

20 A          I don't know what you've seen.  As to

21 whether or not there was a record and whether or

22 not she was counseled, there likely -- there

23 likely was.  I'm pretty sure we produced it.  If

24 not, I'll take a look and see.

25 Q          Okay.  What was it?  A letter of

1    warning or something?

2    A          Typically when -- I think she might

3    have been counseled by Michael Edwards initially.

4    And I think he might have talked to her about it

5    and perhaps sent me a memo of what their

6    conversation entailed.  I talked to her about it.

7    And typically if I counsel someone, I might write

8    my own notes or I might prepare notes and have

9    the person sign it and say they understood.  In

10   the case of Ms. Fite-Magyar, I think I counseled

11   her about it because it was pretty serious.

12              Of course, the greater import is that

13   conversations like these impact my ability to run

14   my office and it interferes with trust of my

15   staff.  And I think she indicated that she

16   understood that.  I believe that statement might

17   have been produced in discovery.  If not, I have

18   to get it to you.  I don't recall.

19   Q          All right.  Yeah.  I can represent that

20   we haven't seen any disciplinary documents of any

21   employees other than -- other than Mr. Burton and

22   possibly Ms. DeFusco regarding the

23   confidentiality policy.  So if you can search for

24   that, I appreciate it.

25              I'd like to switch gears and -- well,

```
 1   before we move topics.
 2   MS. BALASUBRAMANIAN:
 3           Can we pull up Exhibit 6, please.
 4           (DEPOSITION EXHIBIT NUMBER 6
 5           WAS MARKED FOR IDENTIFICATION.)
 6   MS. BALASUBRAMANIAN:
 7           We can pull that down.  Can we pull up
 8   Exhibit 15, please.
 9           (DEPOSITION EXHIBIT NUMBER 15
10           WAS MARKED FOR IDENTIFICATION.)
11   BY MS. BALASUBRAMANIAN:
12   Q       Do you recognize this document,
13   Ms. Jones?
14   A       Yes, I do.
15   Q       Okay.  And this is the confidentiality
16   agreement that you put in place after you
17   terminated Ms. DeFusco and Mr. Burton.  Is that
18   accurate?
19   A       Yes.
20   Q       Okay.  And you directed all your
21   employees to sign this as a condition of
22   employment?
23   A       Yeah.  No.  Not as a condition of
24   employment.  I just directed -- I directed them
25   to review it and sign it.
```

1   Q        Right.  And if they refused to sign it,

2   were they subject to termination?

3   A        I didn't have anybody who refused to

4   sign it.  And I can't say that they would have

5   been subject to termination if they didn't.  The

6   situation never arose.

7   Q        Okay.  Well, was it your expectation

8   that they sign it?

9   A        Yeah.

10  Q        Okay.

11  A        They could have refused to sign it if

12  they wanted to I presume.

13  Q        Right.  And was there any consequence

14  articulated to them for refusing to sign it?

15  A        No.

16  Q        So I'm seeing here that the sort of --

17  you go through here the specific topics that

18  you -- you consider confidential information.  Is

19  that accurate?

20  A        Yes.

21  Q        Okay.  And this was the first time you

22  sort of bulleted it out for people in your office

23  in terms of, you know, as a result of the, you

24  know, the incident with Anthony and Marie on

25  March 22nd.  Is that fair?

```
 1    A          Repeat the question, please.
 2    Q          This is the first document that you --
 3    where you bulleted out specific categories of
 4    information that you considered part of the
 5    confidential information not subject to
 6    disclosure from the office.  Is that a fair
 7    statement?
 8    A          Yes.
 9    Q          Okay.  And this was done after -- or in
10    response to the situation with Anthony and Marie
11    and the text chain.  Is that a correct statement?
12    A          It was done after they were terminated.
13    Q          Okay.  Thank you.  And so when -- the
14    first bullet, "Any and all personnel matters."
15    What, if any, communication -- did you train
16    people on -- on this document and this agreement
17    and how it was to be interpreted in addition to
18    this document?
19    A          During the meeting when we went over
20    it?  Likely so.
21    Q          Okay.  Did you make any exceptions in
22    this agreement or this policy for legally
23    protected activity?  You know, under federal
24    civil rights laws?
25    A          Can you give me an example?
```

```
 1   Q          For example, personnel matters.  If

 2   somebody was concerned about another employee's

 3   workplace treatment and they went and reported it

 4   outside of the office, would that have been a

 5   violation of this policy?

 6   A          It wouldn't have been a violation of

 7   the policy because they would be allowed to do

 8   that under the reporting requirements and other

 9   areas of the handbook.  So they were specifically

10   told that personnel matters like the personnel

11   matters that Ms. DeFusco and Mr. Burton were

12   terminated for were off limits.

13   Q          Where in this document is there an

14   exception for -- for reporting on personnel

15   matters that are protected by law?

16   A          Let's see.  I don't know.  Did you read

17   it?  Can you refer me to it?

18   MS. BALASUBRAMANIAN:

19              Can you pull down the bubble and let

20   her scroll through, please?  Or you -- I don't

21   know if you can give her control of the document

22   to scroll through.

23   THE VIDEOGRAPHER:

24              I should be able to.

25   A          I can't scroll.
```

1    MS. BALASUBRAMANIAN:

2              Tyrah, can you scroll down for her so

3    she can review the entire document?

4    A         Again.

5    Q         Okay.  And so you understood at the

6    point when you directed your employees to sign

7    this document that there were certain exceptions,

8    you know, for legally protected activity or

9    communications that, you know, that might relate

10   to workplace or, you know, treatment or anything

11   like that -- communications that are protected

12   under law.  You understood that you couldn't

13   prohibit those types of communications; correct?

14   A         Sure.  I wasn't trying to.

15   Q         Okay.  Did you do any investigation

16   regarding the reasons Mr. Burton had for

17   communicating whatever he communicated about

18   Renee to third parties?

19   A         Based on the information I had, you're

20   asking me if I did any investigation to see if he

21   had a reason or a business reason to communicate

22   that information?

23   Q         Not a business reason.  A legally

24   protected reason for discussing Renee outside of

25   the office?

```
 1   A          No, I did not.

 2   Q          Okay.  And you don't know -- you have

 3   no information about the context or the reasons

 4   he had for discussing Renee outside of the

 5   office?

 6   A          I did not.

 7   Q          Okay.  And you would agree there would

 8   be certain circumstances where he or any other

 9   employee could discuss personnel matters outside

10   the office if they're legally protected; correct?

11   A          Yes.  Those -- but that kind of

12   information should be presented to management

13   before it's released because -- so that we can

14   discuss the legalities of it.  And I don't

15   believe Mr. Burton ever came to me to say he did

16   have a legally protected reason to be discussing

17   Mrs. Roberts for any reason.

18   Q          Are you saying that they have to have

19   your permission if they have a concern about a

20   hostile work environment or somebody's treatment

21   in the office before they go discuss it with

22   third parties?

23   A          No.  I'm saying that if they have an

24   issue in the office, employees are instructed to

25   go to a member of the management team to report
```

1    that with them.  They don't have to get

2    permission, but that's what the guidance is.

3    That's what it's always been.

4    Q        Where was that guidance listed?

5    A        It's in the handbook.

6    Q        What provision of the handbook directs

7    them that they have to notify management of the

8    concern about the workplace related to another

9    employee?

10   A        If you read the handbook, both the

11   County Handbook as well as the District

12   Attorney's Handbook, it tells them how to make

13   complaints if they have issues related to any

14   discrimination or anything having to do with

15   personnel.  That those issues are raised with

16   management first.  It's a multipage document.  I

17   think it's 42 pages.  If you want to pull it up

18   and go through it, I would invite you to.  But I

19   haven't memorized both handbooks chapter and

20   verse by page.

21   Q        Okay.  Well, that's fine.  And, I mean,

22   tell me this though, is that your exclusive

23   remedy?  Like, is it your testimony that they're

24   not allowed to tell third parties about a concern

25   about workplace treatment or the work environment

1  unless they have followed the grievance

2  procedure.  Is that your testimony?

3  A          No.  It's not my testimony nor is it my

4  practice.  That's what their guidance is.  But

5  the county also advises them.  I think the county

6  HR department.  And so they can go to a member of

7  the county to report workplace treatment,

8  workplace misconduct.  It's in both handbooks.

9  That's the benefit of having a dual office.

10  Q          Yeah.  I'm aware of -- I'm aware that

11  there is a grievance procedure.  I guess I'm just

12  trying to confirm my understanding that that's

13  not the exclusive remedy any employee has for,

14  you know, discussing a concern about the

15  workplace with a third party.

16  A          What's your question?

17  MR. CARTER:

18          Is there a question?

19  MS. BALASUBRAMANIAN:

20          Right.  I'm just trying to clarify.  My

21  question is whether that's intended as an

22  exclusive remedy to preclude employees from

23  discussing it with third parties.

24  MR. CARTER:

25          And she answered that question.

```
 1   MS. BALASUBRAMANIAN:

 2           If that's the case.

 3   MR. CARTER:

 4           Asked and answered.

 5   MS. BALASUBRAMANIAN:

 6           I don't think so.

 7   BY MS. BALASUBRAMANIAN:

 8   Q       Is that the case or is that not the

 9   case?

10   MR. CARTER:

11           The other thing I would ask, and I've

12   let it go for a long time, please ask her

13   questions instead of ruminating.

14   MS. BALASUBRAMANIAN:

15           I'm not ruminating.  I'm asking for

16   clarification of her testimony.

17   Q       So my question again is, it that your

18   testimony today that the grievance procedure in

19   the handbooks is the exclusive remedy for

20   employees who have a concern about workplace

21   harassment or a work environment either with

22   respect to them or with respect to another

23   employee.  Is that correct?

24   A       I don't understand your question.

25   Which handbook are you referring to?
```

Regency-Brentano, Inc.

1    Q        Does either handbook tell employees

2    that their exclusive remedy to complain or

3    express a concern about workplace -- about the

4    workplace or treatment of employees is in the

5    grievance procedure?

6    A        I don't know what you're asking.  I

7    would say that with respect to the -- well, there

8    is not a question.  So I don't know what you're

9    asking me.

10   Q        Okay.  So is it your understanding

11   under the DA's Handbook that employees are

12   prohibited from expressing concern about the

13   workplace or management treatment of employees

14   unless they utilize the grievance procedure?

15   A        No.  That's not my testimony.  I don't

16   believe I said that.

17   Q        Okay.  That's what I'm trying to

18   clarify.

19            And then with respect to the county's

20   grievance procedure, is it your understanding

21   that employees are prohibited from discussing

22   concerns about the workplace to third parties

23   unless they've exhausted the grievance procedure?

24   A        No.  That's not how I interpret the

25   County Handbook.

1    Q         Okay.  Thank you.  That's all I'm

2    trying to understand.

3    MS. BALASUBRAMANIAN:

4              Let's go back to Exhibit 6 if we could.

5    Q         So I believe this -- do you recognize

6    this document?  It looks like an email you sent

7    on March 30th, 2022.

8    A         Yes, I recognize it.

9    Q         Yeah.  Okay.  And I can have Tyrah

10   scroll it.

11   MS. BALASUBRAMANIAN:

12             Can you scroll through, you know,

13   quickly, Tyrah, so she can see what else was

14   included.

15   BY MS. BALASUBRAMANIAN:

16   Q         So attaching the confidentiality

17   policy?

18   A         Yeah.

19   Q         Okay.  And then there is a string of

20   emails where Judge Abbot reacted to the new

21   policy.  Can you see that?

22   A         I recall that.

23   Q         Okay.

24   MS. BALASUBRAMANIAN:

25             Can you go back to the first page,

1   Tyrah.

2   BY MS. BALASUBRAMANIAN:

3   Q        Okay.  So it looks like you sent this

4   email to all the judges.  Are those all the

5   judges in Chatham Superior Court at the time?

6   A        Yes.  Those are all the judges except

7   for, of course, any guest judges or part-time

8   judges.  Any -- or any other judges that might

9   sit temporarily.

10  Q        Okay.  Will you -- you --

11  A        Superior Court.

12  Q        Okay.  You chose to -- you chose these

13  judges to send this document to; right?

14  A        I did.

15  Q        Okay.  Why did you send them to these

16  judges?  Why did you send this document to these

17  judges?

18  A        I sent it to the judges because it had

19  come to my attention several staff members and

20  particular ADAs were concerned that all -- most,

21  if not all of the judges, some judges more than

22  others, had been asking them questions about the

23  inner workings of our office.  Had been

24  commenting about the office and our leadership in

25  the office.  About myself and Michael Edwards.

1   They had been talking about these personnel

2   issues that were going in our office -- on in our

3   office that had nothing to do with their

4   courtrooms.

5          And this was not normal banter to be

6   taking place between judges and ADAs.  And it was

7   putting my office and my ADA staff under an

8   extreme amount of pressure because, of course,

9   they want to have a good relationship with their

10  judges, but they felt -- they didn't feel

11  comfortable telling judges who were pressing them

12  for information that they are -- that they don't

13  make management decisions.  They are not at

14  liberty to discuss personnel issues and gossip

15  about who was leaving, why they're leaving.  Who

16  was put in management.  Who was selected, why

17  they weren't.  You know, so it was putting

18  pressure on them.

19          And I was trying to make sure, as the

20  letter states, that we could keep the lines of

21  communication clear because there was a lot of

22  political pressure from particularly Judge Abbot

23  and Judge Freesemann about -- about executive

24  decisions being made in my office.

25  Q       Okay.  And so what was your intent?

1    You were telling them, what, that your ADAs, you

2    know, cannot share certain information with them?

3    Is that the purpose of telling them that you had

4    this new policy?

5    A          I think that the document speaks for

6    itself.  It says why I'm sending it to them.  It

7    says, "Please help them honor this agreement by

8    not asking them questions about the inner

9    workings of this office.  This helps us to run

10   our office more effectively and helps our

11   prosecutors to focus on their cases without

12   distraction."  That was the purpose of the

13   letter.

14   Q          Okay.  But this letter was sent in

15   direct response to the -- was this letter sent

16   or -- this letter was created and the

17   confidentiality agreement was created in direct

18   response to the situation with Anthony and Marie.

19   Is that -- isn't that correct?

20   A          I would not say the two are causally

21   related.  I would say it was coincidental.  There

22   were a lot of issues that were going on in our

23   office where the judges overexerted themselves

24   and overextended their boundaries.  And they had

25   a way of exacting or directing my ADAs.  It was

1    my way of reminding them that my ADAs are

2    employed by the District Attorney's office and

3    that they don't work for the judges.

4              And at this particular time in my

5    tenure and as continues, I often have problems

6    with judges overstepping those boundaries.  And

7    this is my effort of making -- this is my way to

8    make that clear.  And also to direct them to talk

9    to me and make sure that they knew that the lines

10   of communication were open between me and them.

11             It says, "If you have any questions,

12   which is entirely understandable, please know

13   that Michael and I are available and willing to

14   discuss these matters with you at any time either

15   collectively or individually."  We've wanted to

16   maintain open connection lines with them.  And I

17   felt like them putting exacting pressure on ADAs

18   about things the ADAs weren't comfortable talking

19   about, as they indicated to me, was

20   inappropriate.  And this is my way of protecting

21   my office and my ADAs.

22   Q        Had you started creating the

23   confidentiality agreement before March 22nd?

24   A        No.  I would say that March was the

25   culmination of a number of different things.

```
 1            In addition, I will say that there was
 2   another conversation -- I had been facing these
 3   issues in -- in -- as early as 2021.
 4            I had made repeated efforts to deal
 5   with it.  I had been instructed by Judge Abbot as
 6   it related to Skye Musson that if she wasn't on a
 7   bench, she would sue me herself.  She was very
 8   overly involved in the issues pertaining to my
 9   office, which I feel showed disrespect for the
10   office and disrespect from and undermining my
11   relationship with my staff.  It was
12   inappropriate.
13            So there were a number of things that
14   kind of led up to this confidentiality agreement.
15   And the issue with Ms. DeFusco and Mr. Burton was
16   kind of the -- was also -- was kind of like the
17   straw that broke the camel's back.
18   Q        Okay.
19   A        This had been going on for a year or
20   more.
21   Q        And you said that Judge Abbot
22   threatened or said to you that she would sue you
23   herself if she wasn't on the bench?
24   A        Yes.  That's exactly what she said.
25   Q        When did she say that?
```

1   A          She said that, I would say, in late

2   April, which would have been a few days after --

3   a day or two after Skye quit.

4   Q          So 2021?

5   A          That's right.  April of 2021.

6   Q          At any point did you tell Judge Abbot

7   that Skye Musson had PTSD?

8   A          I didn't know Skye Musson had PTSD.  So

9   I never would have told her -- I never would have

10  told her that.

11  Q          What was the -- sorry.  Go ahead.  Are

12  you finished?

13  A          I did.  I'm done.

14  Q          Okay.  So it's your testimony that at

15  no point you told Judge Abbot that Skye had PTSD?

16  A          It's my testimony I didn't say that.  I

17  didn't know she had PTSD.  I don't know that to

18  be true to this day.

19  Q          What was the -- what was the context of

20  the conversation where Ms. or Judge Abbot told

21  you that she would sue you herself if she wasn't

22  on the bench?  What had been -- what had you two

23  been talking about in that conversation?

24  A          I went to go see her, as is common for

25  a district attorney, to let her know that there

```
 1   had been a staff change in her courtroom after
 2   Skye quit and that we were doing what we could to
 3   make sure that we filled that position as soon as
 4   possible.  And when I arrived, it was clear to me
 5   that she had already talked to Skye and believed
 6   everything that Skye told her.  In which case --
 7   and because she believes Ms. Skye's version of
 8   events, I think that's what led her to say -- she
 9   said something to the effect of you guys have
10   always had a boys club going on up there even
11   before Meg was there.  And if I wasn't on this
12   bench, I'd sue you myself.
13   Q          And what did you say in response to
14   that?
15   A          I asked her -- I mean, I asked her if
16   she was willing to entertain an alternate set of
17   facts because it was clear to me that she
18   believed what Skye had told her.
19   Q          And did you attempt to have that
20   discussion with her of your alternate set of
21   facts?
22   A          I told her the truth surrounding Skye's
23   voluntary resignation.  But she didn't seem
24   inclined to believe it.
25   Q          And did that upset you?
```

1   A          That she didn't believe me?

2   Q          Whatever -- however the conversation

3   ended, were you upset when you left the

4   conversation?

5   A          I was upset at the fact that she threw

6   me out of her office and told me not to come

7   back, which I thought was a very disrespectful

8   and biassed thing to do considering that I had

9   practiced in front of her before and had not done

10  anything to be considered untrustworthy.  But in

11  her retiring period, she was known to be a

12  little -- to have good days and bad days.  So I

13  just proceeded as best I could.

14  Q          What do you mean she was known to have

15  good days and bad days?

16  A          I can speak for myself.  And I would

17  say that there were a lot of -- in my opinion,

18  there were a lot of days that she blew hot and

19  cold.  But I know that we had a very -- we seemed

20  to have a very contentious relationship after

21  Skye quit that seemed to get worse and worse.

22             And so she was -- she was, in my

23  opinion, ill tempered.  Nice judge, smart,

24  brilliant, but she was ill tempered.  And

25  sometimes she could have good days and sometimes

1  she had bad ones.  Like everyone else I guess.

2  Q        But you noticed -- you believe there

3  was a change after -- you believe the nature of

4  your relationship changed after Skye left your

5  office?

6  A        Yeah.  I'm certain about that.

7  Q        Did you maintain contact with Skye

8  Musson after she left your office?

9  A        No.  I did not.  She was very clear

10  about why she was leaving and why she wanted to

11  leave.  I didn't see that there would be any

12  benefit to reaching out to her.  I believe we

13  have talked in passing about cases.  Specific

14  cases.  But that would have been it.

15  Q        Did your relationships with any other

16  judges change after Skye left your office?

17  A        No.  Every other judge was cordial and

18  respectful and nice to me.  Professional I would

19  say.

20  Q        Did any other judges make a comment to

21  you about Skye Musson after she left your office?

22  A        Not at all.

23  MS. BALASUBRAMANIAN:

24          Tyrah, can you put Exhibit 6 back up,

25  please, Tyrah.  Can we scroll down to the bottom.

```
 1   Well, actually don't scroll all the way to the
 2   bottom.  Hang on.
 3   BY MS. BALASUBRAMANIAN:
 4   Q         After your conversation with -- well,
 5   let's just go to Page 16.  Do you recall getting
 6   this email from her?  From Judge Abbot?
 7   A         Yeah.  I do.
 8   Q         Is that something that you consider
 9   when you developed this policy?  The First
10   Amendment?
11   A         Yeah.
12   Q         Okay.  And did you believe that there
13   was any revision needed to the agreement at the
14   point -- after she pointed this out to you?
15   A         No.  I was explaining to her that the
16   confidentiality agreement does not apply to
17   information that is discussed in this office with
18   defense counsel or with the judges as normal and
19   those we have a need to know information.
20             Judge Abbot didn't have a need to know
21   information about -- need to know information
22   about the inner workings and the personnel issues
23   of our office, which she seemed to be very
24   involved in.  But you'll see that in my response
25   to her.
```

```
 1   MS. BALASUBRAMANIAN:

 2            Can we go to Page 17?

 3   BY MS. BALASUBRAMANIAN:

 4   Q        It looks like she sent this to you.  Do

 5   you recall seeing that?

 6   A        I recall seeing that.  But that is a

 7   message in response to another message.  So you'd

 8   be reading them out of order.

 9   MS. BALASUBRAMANIAN:

10            Okay.  Can you scroll down to the next

11   Page 18.

12   BY MS. BALASUBRAMANIAN:

13   Q        Okay.  Do you recall sending her this

14   message?

15   A        I absolutely do.

16   Q        Okay.  And so you believe that when she

17   expressed a concern to you about the First

18   Amendment that it was because she was upset with

19   you regarding what happened with Skye?

20   A        There was several other emails before

21   that exchange that I'm referring to in which I

22   felt her comments to me were snide and pointed.

23   And so my question to her was I wanted to know

24   what the real problem was.  And that's what you

25   see indicated in that email.
```

1    Q        And you believe the real problem was

2    about how things ended with Skye and not any

3    concerns she had about the First Amendment?

4    A        That's reflected in the email.  And

5    that was based on both my conversations with her,

6    her treatment of me, as well as the text messages

7    and email messages that you see back and forth

8    between us.

9              Also, Judge Abbot was not quiet about

10   explaining to other people in the office

11   including Anthony Burton how she felt about me.

12   That she thought I wasn't a good leader.  That

13   she thought I wasn't experienced.

14             So these were things that she said to

15   other people, to defense attorneys, to my ADAs

16   who came back and told me about it.  I just wish

17   that as a professional and as an adult woman, she

18   would have brought those concerns to me directly

19   as opposed to spreading rumors about me to other

20   people and other third parties who didn't have a

21   need to know.

22   Q        You wouldn't disagree that she has a

23   right under the First Amendment to criticize you

24   generally or point out issues of public concern

25   regarding the management of criminal cases in

```
 1  your jurisdiction; right?
 2  A        Do I -- repeat the question, please.
 3  Q        You don't disagree that she has -- even
 4  as a judge, she has a First Amendment right to
 5  criticize your management of the criminal cases
 6  prosecuted by your office.  You agree she has
 7  that right under the First Amendment; right?
 8  A        Yeah.  I believe that she absolutely
 9  does.  What she doesn't -- what I don't believe
10  she does have a right to do is dictate how cases
11  are handled in my office, undermine my leadership
12  and say things to the ADAs that are assigned to
13  my office that they don't -- to undermine me by
14  saying that they don't have to follow my
15  direction.  That's what I take issue with.
16  Q        Is there an example of her telling ADAs
17  that they don't have to follow your direction?
18  Do you have one?
19  A        There -- there are several examples of
20  that.  They're not documented.  They would be
21  based on things that were told to me and things
22  that she either said or did in judge meetings,
23  which are in the Wednesday judge meetings in the
24  few times that I have (inaudible).
25  Q        Can you think of a single example where
```

```
 1   she told an ADA not to follow a directive that

 2   you gave?

 3   A          Yeah.

 4   MR. CARTER:

 5          Let me just enter an objection here.

 6   How is this whole line of questioning about this

 7   relevant or discoverable in this lawsuit?

 8   MS. BALASUBRAMANIAN:

 9          It's absolutely.  She just -- first of

10   all, relevance is not the standard for discovery.

11   MR. CARTER:

12          Well, how is it discoverable?

13   MS. BALASUBRAMANIAN:

14          It's discoverable because it relates

15   to -- first of all, these are documents that your

16   office also produced.  It relates to --

17   MR. CARTER:

18          You can ask her about those.

19   MS. BALASUBRAMANIAN:

20          Right.  I'm asking -- well, you

21   produced these documents, if I'm -- if I recall

22   correctly.

23   MR. CARTER:

24          And you asked for them and we produced

25   them.  I'm talking about specific examples of
```

```
 1   Judge Abbot and DA Jones.
 2   MS. BALASUBRAMANIAN:
 3             Well, I don't think we need to have
 4   that argument in front of the witness.  But
 5   suffice it to say, it's discoverable because
 6   Judge Abbot is talking to her about a
 7   confidentiality policy.  And after pointing out
 8   that there could be a First Amendment issue, I'm
 9   asking Ms. Jones how she applied this
10   confidentiality policy and how the First
11   Amendment was impacted by it.
12             She has testified that there are
13   specific examples when Judge Abbot has interfered
14   with her operations internally.  And I'm trying
15   to evaluate what that's about.  So it's perfectly
16   discoverable, Todd.  And you know that.
17   BY MS. BALASUBRAMANIAN:
18   Q       So why don't you tell me specific
19   examples.
20   MR. CARTER:
21             Well, let me just say that I understand
22   what you're saying there.  But you're leading her
23   into all of this.  And it's just -- I'm not sure
24   it's discoverable.
25
```

1   MS. BALASUBRAMANIAN:

2            That's because you made a speaking

3   objection, Todd.  I mean, you're forcing me to

4   explain the relevance of this.  This literally

5   was not supposed to happen.

6   MR. CARTER:

7            Go ahead.

8   MS. BALASUBRAMANIAN:

9            So let me -- if you could let me

10  continue, you know, we could move on.

11  BY MS. BALASUBRAMANIAN:

12  Q        So, Ms. Jones, sitting here today, can

13  you provide any examples specifically of Judge

14  Abbot telling attorneys in your office not to

15  follow your directives?

16  A        Yes.

17  Q        Can you provide me -- can you provide

18  me an example or two?

19  MR. CARTER:

20           You can answer, Shalena.

21  A        Yes.

22  BY MS. BALASUBRAMANIAN:

23  Q        Okay.  Please do so.

24  A        She has instructed ADAs that she can

25  talk about whatever she wants to talk about even

```
 1   if it is personnel -- even if it is personnel
 2   issues that don't pertain to her courtroom.
 3   Q        Judge Abbot?
 4   A        She has -- that was a question; right?
 5   About Judge Abbot?
 6   Q        The question was where has she
 7   instructed your ADAs that they do not have to
 8   comply with your instructions to them?
 9   A        She's given -- she's given several ADAs
10   that instruction all the time.
11   Q        Right.  And my question is, can you
12   give me some examples, specific examples with
13   names and topics?
14   A        I have to get back to you on that and
15   supplement discovery on that.
16   Q        So you can't sitting here today in your
17   deposition testify to any examples specifically
18   where Judge Abbot has instructed your staff not
19   to listen to you or your directions?
20   A        Yes, I can.  I just gave you one.
21   Q        Well, you said that Judge Abbot said
22   that she, meaning Judge Abbot, did not -- could
23   say whatever she wanted.  And that was not
24   responsive to my question.  My question is an
25   example of when Judge Abbot told somebody on your
```

1  staff that they could not -- that they did not

2  have to follow your instructions or policies or

3  whatever the case may be.

4  A        I am telling you that she informed my

5  ADAs that she had no intention of observing the

6  confidentiality agreement and she was going to

7  ask them whatever she wanted to ask them.

8           I have had instances where I had ADAs

9  in my office who did not know how to properly

10 serve discovery.  And they were serving discovery

11 without certificates of service, et cetera.  We

12 put in a method in place that was in keeping with

13 the law and the discovery rules.  And she

14 insisted that she wanted discovery to be handled

15 in the same way.

16          I mean, there are a number of things.

17 Those are two examples.  And if I can think of

18 more, I'll let you know.

19 Q        So in the first example you're saying

20 that Judge Abbot said that Judge Abbot was not

21 bound by your confidentiality policy.  She told

22 your ADAs that.  That's the first example that

23 you just provided?  And then -- is that correct?

24 Judge Abbot told members of your staff that she,

25 meaning Judge Abbot, had no intention of

1  complying with the confidentiality agreement.

2  That was the first example you provided; correct?

3  A          Judge Abbot told them, yes, that she

4  told them she was not going to -- she was going

5  to continue to ask them questions about the inner

6  workings of our office as she saw fit.

7  Q          And can you think -- were you made

8  aware of an instance when she did that and

9  compelled the ADA to respond?

10  A          I can tell you about times that my ADAs

11  told me about that.  I remember Jamie Barrow

12  coming back to me and saying something about

13  that.

14  Q          Okay.

15  A          And there was a time when he was in

16  front of her.  But, you know, my goal in being

17  the district attorney is to -- is to make sure

18  that my office can operate in a professional

19  manner.  The rumor mill and the drama, I try not

20  to remember those things.  I don't record them.

21  I don't write them down.  I can tell you that

22  they happen.

23          But my directive to my staff was to be

24  professional, handle your cases.  And if there is

25  anything that makes you uncomfortable, then to

1   come and report it to me.  I have an office to

2   run.  I'm not interested in what judges do and

3   don't do.  And what the rumor mill is around.

4   Q          And then the next example you provided

5   was your office had, you know, developed a method

6   of serving discovery and she wanted it served in

7   a different way in her courtroom.  Is that your

8   testimony?  That's the second example?

9   A          Yes.

10  Q          Okay.  Anything else?

11  A          Not that I can recall today.

12  MS. BALASUBRAMANIAN:

13             We can pull this down, Tyrah.

14  BY MS. BALASUBRAMANIAN:

15  Q          Have you terminated any other employees

16  since March of 2022?

17  A          Yes.

18  Q          Who else have you terminated?

19  A          I have terminated Rachelle Wallace,

20  Wendy Marin and Tonya Schiff Sanders.

21  Q          Rachelle Wallace.  Was she an attorney?

22  A          No.

23  Q          What was her position?

24  A          She was a paralegal.  A legal

25  secretary.

1  Q         And when was she terminated?

2  A         She would have been terminated within

3  the last 60 to 90 days.

4  Q         Why was she terminated?

5  A         For insubordination, not following

6  instructions, creating a distracting work

7  environment, a hostile work environment for other

8  employees.

9  Q         And was there a specific protective

10 class or category in which she engaged in some

11 sort of insubordination?

12 A         She made several race based comments in

13 the presence of other employees that were not

14 characteristic of the work that we do in this

15 office.  But she didn't follow instructions.  And

16 she did not adhere to the instructions given to

17 her by leadership.

18 Q         What specific instructions did she not

19 adhere to?

20 A         I can't recall at this time.  There

21 were a number of them.

22 Q         Well, this was in the last 60 to

23 90 days and you don't recall?

24 A         I do a lot of work here, Anita.  A lot.

25 You probably can't even imagine.  So I don't

```
 1   recall the details is what I'm saying.
 2   Q          Was it for a violation of the
 3   confidentiality policy?
 4   A          It was not.
 5   Q          What about Wendy Marin.  Am I saying
 6   her name right?  Marin?
 7   A          Yes.  Same.  They were terminated on
 8   the same day for being -- just not following
 9   instructions and being a distraction in the work
10   environment.
11   Q          Did they do something that was
12   distracting to the work environment?
13   A          Over -- on several occasions, yes.
14   Q          Okay.  And what did that behavior
15   entail?
16   A          They were hostile to other employees.
17   They inserted themselves in matters that were
18   outside their main.  They were instructed not to
19   do it.  They continually did it.  They -- I would
20   send out emails about random things.  About how
21   discovery should be done.  How a file should be
22   constructed.  They would say in meetings with
23   other staff members that I didn't know what I was
24   talking about and they didn't have to follow my
25   direction.
```

1           So that was -- that was -- that was

2    more of a show.  Wallace.  Wendy was often out of

3    her work area.  She was often with Rachelle

4    stirring up a lot of distraction in the office.

5    And she got terminated as a result of it.

6    Q          Was Wendy a paralegal or an attorney?

7    A          She was a legal admin.  She worked in

8    the intake division.

9    Q          You said Rachelle made some race based

10   comments.  What comments did she make?

11   A          She made comments about the fact that

12   this office does not prosecute black defendants.

13   She made statements that -- in particular to --

14   in reference to certain defendants and said, you

15   know, made comments to the effect of, of course,

16   that defendant.  The jury will find him not

17   guilty because, you know, he was a big

18   intimidating fat black person, but that's okay

19   because he was going to get his justice on the

20   streets.  And that the next thing we found out

21   that he would end up dead in the alley somewhere.

22   Q          You're saying that Rachelle made that

23   comment?

24   A          Yes.  It was reported to me that she

25   made that comment when she was -- and those types

```
 1   of comments were not unusual for her.
 2   Q         How many employees are employed by your
 3   office?
 4   A         I would say approximately 138.
 5   Q         And can you tell me, like, how many
 6   positions that covers?  That covers attorneys, I
 7   assume, legal assistants.  Are you using legal
 8   assistant and paralegal interchangeably or are
 9   those two different roles?
10   A         Those are two different roles in our
11   office.
12   Q         Okay.  Can you tell me all the
13   positions in your office of the 138 employees?
14   A         We have attorneys, which are all
15   referred to as Assistant District Attorneys on
16   different levels.  We have paralegals.  We have
17   legal secretaries.  We have investigators.
18   Victim witness advocates and victim witness
19   directors.  We have community outreach
20   specialists.  We have two people who serve in the
21   customer service capacity.  They answer the
22   phones and work at the front desk.  And we have
23   child support staff that falls under our
24   division.  And that's it.  But that also
25   includes -- yeah, Juvenile Court division.  So
```

```
 1   but those are the categories of positions that we
 2   have in our office.
 3   Q        Are they all W-2 employees or are some
 4   of them 1099 employees?  Do you know?
 5   A        Everyone who is employed by the
 6   District Attorney's office is a W-2 employee.
 7   Some of them are paid differently.  Some are
 8   state paid.  Some are county paid.
 9   Q        Got it.  W-2.  Okay.  And I'm going to
10   look at -- I'm just looking at the attorneys.
11   MS. BALASUBRAMANIAN:
12            Can we turn to Exhibit 27.
13            (DEPOSITION EXHIBIT NUMBER 27
14            WAS MARKED FOR IDENTIFICATION.)
15   BY MS. BALASUBRAMANIAN:
16   Q        And I understand that you are -- you
17   are conducting a search internally for the org
18   charts that you distributed; correct?
19   A        Yes.
20   Q        Okay.  And so this document was
21   produced to us at some -- at some point in both
22   litigations.  Do you recognize this document?
23   A        Yes.
24   Q        Okay.  Did you approve the
25   dissemination of this document regarding the DAO
```

1   organization?

2   A          I don't know if you -- I don't know

3   that I approved it.  I never approve every

4   document that was created by every employee.

5   But --

6   Q          If it was an interoffice -- if it was a

7   communication to all the DAO staff from Michael

8   Edwards regarding the organization of your

9   office, is that something that you would have had

10  knowledge about?

11  A          Sure.  I didn't object to it.  But I

12  wouldn't say -- you asked me if I approved it.  I

13  didn't object to it.  He was allowed to do that.

14  Q          Okay.  Well, I guess then my -- more

15  specifically if you wanted to scroll through the

16  document, make sure that you agree with the

17  content that he was communicating to the staff

18  regarding what the organization was.

19  MS. BALASUBRAMANIAN:

20          If you can blow it up, Tyrah, and just

21  show her the rest of the document.

22  A          Okay.  I see it.  I've reviewed it.

23  Q          Okay.  So these assignments and, you

24  know, organization -- these assignments and sort

25  of division of the chains of command, is it

```
1   something that you discussed with him before he
2   disseminated this document?
3   A        Yeah.  I'm sure it would have been
4   discussed in that team meeting.
5   Q        Okay.  All I'm trying to understand is
6   whether this document reflects the structure of
7   the organization, you know, at that point in
8   time?
9   A        It did -- I don't know.  At the time --
10  as of the date of that memo, yes.
11  Q        Okay.  Sorry.  Go ahead.
12  A        Yes.  That was the construction at the
13  time of that memo.
14  Q        Okay.  And were there subsequent
15  redivisions of leadership after this memo?
16  A        Yeah.  I -- yes.
17  Q        Okay.
18  MS. BALASUBRAMANIAN:
19           If you could pull down the bubble,
20  Tyrah.
21  BY MS. BALASUBRAMANIAN:
22  Q        Sorry.  Say what you were saying,
23  Ms. Jones.
24  A        Over time our organizational chart
25  changed in a number of different ways for one
```

1    reason or another.

2    Q          As painful as it may be, I'm going to

3    just ask you to go through with me all of the

4    different hierarchies, I guess.  So at the time

5    that you took office or I guess --

6    MS. BALASUBRAMANIAN:

7              Can you scroll to the beginning of this

8    document.

9    BY MS. BALASUBRAMANIAN:

10   Q          Okay.  All right.  At the time that you

11   took office, you have previously referred to an

12   executive team.  So you formed your executive

13   team.  And can you just tell us who the people

14   were on the initial executive team that you

15   formed?

16   A          Sure.  I'd be glad to.  Can you go to

17   Page 2, please.  So at the time of this chart,

18   Michael Edwards would have been my First Chief,

19   the Chief Assistant or First Chief meaning that

20   he was the person right under me.  And he would

21   have been a co-chief, I would say, with Chief

22   Jenny Parker.  They did different things.

23             Chief Vinson Jenkins is the head of the

24   Investigative Division.  He still is.

25             Tracey Erwin was Director of Child

1    Support.  She still is.

2             The Victim Witness Assistant Program

3    Director, that person has changed.  But the

4    structure remains the same.

5             And we also had our COMMs,

6    Communications Director of Diversity and

7    Inclusion on our E team.  That would have been

8    Nathanael Wright.

9             We would have had Jamison Dowd on our E

10   team.  He is over IT and internet systems.

11            And we would have had our office

12   manager on our executive team.  That would have

13   been Marcus Thompson at the time.  And the

14   executive assistant to the DA, which would have

15   been Christy Curry at the time was also on the

16   executive team.

17   Q        Did Christy Curry supervise anybody?

18   A        No.  She was -- no.  She's not a

19   supervisor.

20   Q        Okay.  And Mr. Thompson, the office

21   manager at that time, did he supervise anybody?

22   A        He supervised Shannon Bazemore.

23   Q        Okay.  Anybody else?

24   A        No.

25   Q        Okay.  And then Jamison Dowd -- or

```
 1   sorry.  Backing up.  For Marcus Thompson, was he
 2   employed by the DA's office before you took
 3   office or did you hire him?
 4   A        No.  I hired him.
 5   Q        Okay.  And did you, I guess, post a
 6   vacancy for his position and allow external
 7   applicants or did you know him and offer him the
 8   position?
 9   A        I think we did both.  We posted a
10   vacancy and looked for -- reached out.  Even
11   looked for or posted with the county to let them
12   know whether they did our posting for us at that
13   time.  And Marcus came to us because I knew him
14   and reached out to him and he came on board.
15   Q        Got it.  Did you interview any other
16   candidates for his job?
17   A        Not at that time other than Barbara
18   Baucum.
19   Q        Okay.  But he was -- so did Ms. Baucum
20   quit or did she stay on in another role or what?
21   A        No.  She ultimately declined the
22   position and taken the position as an office
23   manager in another county.
24   Q        Okay.  So she was offered the position
25   first before Mr. Thompson?
```

1   A        She was.

2   Q        Okay.  And then when -- did they apply

3   at the same time or was she offered the position

4   first and then when she declined it, you opened

5   it up to others and posted it and hired

6   Mr. Thompson?

7   A        We interviewed Ms. Baucum and gave her

8   a decision date of December 15th of 2020 and

9   asked her to get back to us before the end of

10  that year so we could start together in January.

11  And December 15th came and went.  We never heard

12  from her.  And so we reached out to Marcus

13  Thompson who happened to be available at that

14  time.

15  Q        Okay.  And then Jamison Dowd, had he

16  been working there or did you hire him?

17  A        He was already here.

18  Q        How -- how long did Mr. Thompson occupy

19  the role of office manager?

20  A        Maybe a year and a half.

21  Q        Was it through the date of Mr. Burton's

22  termination?  I think a year and a half would

23  have been after Mr. Burton was terminated that

24  Mr. Thompson left.

25  A        Mr. -- I believe that Mr. Burton was

```
 1    terminated in or around March of 20 -- March
 2    of 2022.
 3    Q          Correct.
 4    A          And I want to say that -- I want to say
 5    that Marcus Thompson was already gone by that
 6    time.  Because I think that I knew.  And his
 7    replacement, who is our current office manager,
 8    came in on Valentine's Day, February of 2022.  So
 9    that would have been about a month before
10    Mr. Burton's termination.
11    Q          So who was that?  Anitra Hodge-Wilder?
12    A          Yes.
13    Q          So Mr. Thompson resigned his position
14    in February of 2022.  And then Ms. Hodge-Wilder
15    took the position?
16    A          No.  Mr. Thompson likely resigned his
17    position in or around January -- early January
18    of 2022.
19    Q          Mm-hmm.
20    A          At which time I interviewed
21    Ms. Bazemore to be the -- she filled the role as
22    the interim office manager.  And I offered her
23    the position of office manager.  She kept it for
24    about no more than two weeks and then came back
25    and said she had to decline.  And that is when we
```

1  interviewed and hired Ms. Wilder.

2  Q        Okay.  Did you post the position again

3  and then hired Ms. Wilder after receiving

4  applications from other candidates as well or did

5  you know Ms. Wilder?

6  A        We asked HR to post the position.  And

7  I don't recall how many applications we received

8  at that time.

9  Q        Do you recall interviewing anyone other

10  than Ms. Hodge-Wilder?

11  A        No.  Not anyone other than Ms. Bazemore

12  and Wilder.  I think we interviewed Ms. Jacki

13  King, who is -- who currently works for the

14  county as a payroll administrator.  I remember

15  interviewing her.  She had applied for the

16  position.  But those are the only ones I

17  interviewed and made a decision.

18  Q        Okay.  Okay.  And then so Nathanael

19  Wright you mentioned.  He was the communications

20  person.  He was an attorney?

21  A        He is an attorney.  He served three

22  roles really.  But his primary duty was

23  recruitment, diversity and inclusion.  And he

24  also worked as the communications director.

25  Q        And was he working there or did he --

1   was he in that position before you took office or

2   did you appoint him to that position?

3   A          I appointed him to that position.

4   Q          And who -- did you consider anybody

5   else for that position?

6   A          No.  That position did not exist prior

7   to our administration.  And so I created that

8   position and put Mr. Wright in it.

9   Q          Did you know Mr. Wright before taking

10  office?

11  A          I did.  We practiced in the DA's office

12  together here.

13  Q          Okay.  Did you ask anybody else in the

14  DA's office if they were interested in applying

15  for that particular E team role?

16  A          Nope.  I was building my cabinet and

17  took that as, like every leader does, taking an

18  opportunity to build the cabinet that they want

19  and need that's suited to their organizational

20  goals.  And so he was selected for the role he

21  had.

22  Q          Yeah.  And I understand that.  I guess

23  I'm just trying to understand the selection

24  process for building your cabinet.  So just

25  trying to understand if he was -- he was

1  considered with any other candidates or you knew

2  you wanted him and you gave him that job?  Is it

3  the latter?

4  A          No.  I was considering a number of

5  candidates at around the time that my ultimate

6  cabinet was selected, so ...

7  Q          Can you -- do you recall who else was

8  in that pool of candidates that you considered?

9  A          I considered Frank Pennington.

10 Q          Frank Painton you said?

11 A          Pennington.

12 Q          Pennington.  Okay.

13 A          I considered Andre Pretorius.  I

14 considered Kristin Fulford.  I considered Alicia

15 Johnson.  I considered a woman whose name had

16 been given to me by another district attorney.

17 Former district attorney David Cooke.  But I

18 can't remember her name now.

19 Q          Did you interview all of these people?

20 A          I wouldn't -- I spoke to them in some

21 degree about their interest and availability.

22 Q          Okay.  And so Frank Pennington, that's

23 a man I take it?

24 A          Yes.

25 Q          Okay.  And so you had a conversation

1   with him about his interest and availability?

2   A        Yes.

3   Q        Okay.  And did he indicate that he was

4   interested or not interested or what did he tell

5   you?

6   A        He was interested, but not available.

7   Q        Okay.  And what about Andre Pretorius,

8   did he indicate he was interested or available or

9   both?

10  A        He was interested, but wanted to stay

11  in the position that he was in.

12  Q        Which was what?

13  A        He was leading state courts and

14  primarily focused on DUI negotiations at the

15  time.

16  Q        Okay.  What about Kristin Fulford?  Is

17  that a woman?

18  A        Yes.

19  Q        Okay.  And she -- did you -- did she

20  express she was interested or unavailable or

21  available?

22  A        I -- I told you that I considered her

23  for the role because she was the former PIO under

24  Meg's administration and I heard that she was

25  interested.  I considered her for the role, but

```
 1   we were never able to connect and talk about it.
 2   Q          Okay.  And what about Alicia Johnson.
 3   Is she a woman?
 4   A          Yes.
 5   Q          Did you meet with Alicia to talk about
 6   her potential interest in this role?
 7   A          Yeah.  She was not interested.
 8   Q          And then David Cooke's recommendation.
 9   You don't recall the name or you do?
10   A          I don't recall her name.
11   Q          Do you remember meeting with her?
12   A          I did not talk to her at the time in
13   early 2021 when I took office.  I ended up
14   talking to her later, but I did not meet with her
15   at that time about that.
16   Q          Okay.
17   A          I think that she wanted to -- she
18   was -- from what I can recall, I probably spoke
19   to her by phone.  She might have been interested
20   in the role, but had to do it remotely.  In other
21   words, she was in Macon and could not leave to
22   come to Chatham County.  And so that was a very
23   short conversation.
24   Q          Okay.  I understand.  All right.  And
25   so that's everybody you considered for the
```

1    recruitment, diversity and inclusion and

2    communications role?

3    A          No.  I misunderstood your question.

4    Those are people that I considered for membership

5    on the executive team to take a leadership in the

6    cabinet.

7    Q          These are not people -- Pennington,

8    Pretorius, Fulford and Johnson were not

9    specifically considered for the recruitment,

10   diversity and inclusion role but just for the E

11   team generally?

12   A          Yes.  To be part of the leadership of

13   the office.

14   Q          Okay.  So that's the whole universe of

15   people that were considered for your cabinet.  Is

16   that correct?

17   A          Yes.  As best I can recall.

18   Q          Okay.  Well, that helps.  So let's see.

19   VWAP and Victim Witness.  Tell me again what that

20   acronym stands for.  V-W --

21   A          Victim Witness Assistance Program.

22   Q          Victim Witness Assistance Program?

23   A          Yes.

24   Q          Okay.  And that person -- that lead was

25   Cheryl Parker -- Cheryl Rogers?

```
 1   A          Yes.
 2   Q          Okay.  You said that that changed over
 3   time, but the same person is still in the role.
 4   Is that correct?
 5   A          The role -- that changed -- the person
 6   in that role changed over time.  But the role --
 7   Q          Okay.  The role still exists.  Okay.
 8   A          Yeah.
 9   Q          Okay.  When did the leadership change
10   from Cheryl to somebody else?
11   A          I don't recall when Ms. Rogers retired.
12   Cheryl Jones took over after her.  Right now the
13   role is split between two individuals and Victim
14   Witness.
15   Q          Okay.  So Cheryl Rogers was a woman?
16   A          Yes.
17   Q          Okay.  And then, I'm sorry, who was her
18   successor?
19   A          Cheryl Jones.
20   Q          Cheryl Jones.  And Cheryl Jones is also
21   a woman?
22   A          Yes.
23   Q          Okay.  And then you said it's now
24   shared leadership in that role.  Do you know who
25   the other person is that is her fellow leader of
```

1    that division?

2    A        Cheryl Jones is gone.  And so the

3    director position has been split between Jennifer

4    Hare, she is female, and Yukeyveaya Wright, who

5    is female.

6    Q        Arkeyveaya you said?

7    A        Yukeyveaya.  It's spelled Y-U-G-E-A-Y

8    -- I'm not doing that right.  K-E-Y-E-A-V-Y-A.

9    Q        Yukeyveaya Wright you said?

10   A        Yes.

11   Q        How many people do -- well, going back

12   to I guess the -- from Cheryl Rogers' leadership,

13   how many people did she supervise as part of the

14   Victim Witness Assistance Program?

15   A        Between 15 and 20.

16   Q        Were those all attorneys?

17   A        No.  None of them were attorneys.

18   Q        Did they do -- did they engage in

19   litigation?  The -- the people who worked for

20   this program?  Is that -- is that something that

21   involves litigation or is that some other -- is

22   that program designed to provide a different type

23   of service?

24   A        They provide a different type of

25   service.

1  Q        Okay.  Is Ms. Rogers herself was she an

2  attorney?

3  A        No.  She was not.

4  Q        What kind of service -- so I assume

5  it's victim -- victim assistance.  Is it, like,

6  social work related or what kind of service does

7  this provide?

8  A        They assist victims and witnesses with

9  court operations.  They notify victims of when

10  court dates are.  They meet and greet victims and

11  witnesses and assist them in the -- the -- assist

12  them to make them comfortable during trial.  They

13  also do things like victim's compensation.  They

14  make victims aware of what their rights are under

15  the victim -- Crime -- Crime Victims Bill of

16  Rights.  So they do things like that.

17  Q        I got it.  Okay.  So -- but they're not

18  attorneys and they don't perform litigation

19  functions for your office.  Is that -- I mean

20  litigations as appearing on the record in court

21  as an attorney; correct?

22  A        Correct.

23  Q        Okay.  Thank you.  So let's go to the

24  Child Support Recovery Unit directed by Tracey

25  Erwin.  Is that a woman?  Ms. or Mr. Erwin?

```
 1   A          Yes.
 2   Q          Okay.  Is that still the person who is
 3   in that role?
 4   A          Yes.
 5   Q          Okay.  And so both of those programs
 6   still exist.  They existed throughout the
 7   relevant time period in this case?
 8   A          Yes.
 9   Q          Okay.  So Ms. Erwin, was that an
10   attorney?
11   A          She's not.
12   Q          She's not.  Okay.  So how many people
13   does she supervise?
14   A          About 50.  One of whom is a lawyer.
15   And at one point that department had two
16   attorneys and now there is just one attorney.
17   Q          Okay.  And does that attorney perform
18   or do litigation as part of that unit?
19   A          Yes.
20   Q          And who supervises that attorney's
21   legal work?
22   A          I do in tandem with Ms. Erwin, yes.
23   Q          And what does the program do?  They're
24   recovering child support from defendants or
25   convicted people?  Who are they --
```

1    A          They collect child support payments

2    from non-custodial parents.

3    THE VIDEOGRAPHER:

4            Sorry.  This is the videographer.  When

5    we get to a good stopping point, can we go off

6    the record to change media files?

7    MS. BALASUBRAMANIAN:

8            How much time do we have?

9    THE VIDEOGRAPHER:

10           About another five to 10 minutes.

11   MS. BALASUBRAMANIAN:

12           Okay.  We can just do it now then.

13   THE VIDEOGRAPHER:

14           Going off the video record at 2:39 p.m.

15           (OFF THE RECORD AT 2:39 p.m.)

16           (OFF THE RECORD AT 2:40 p.m.)

17   THE VIDEOGRAPHER:

18           We're back on the video record at

19   2:40 p.m.

20   BY MS. BALASUBRAMANIAN:

21   Q          So for the Child Support Recovery Unit,

22   so they're basically collecting child support for

23   non-custodial parents who the non-custodial

24   parents may or may not have criminal charges

25   against them.  It's just is it separate from

1   criminal prosecutions that your office handles?

2   A       It is.

3   Q       Okay.  And can you -- do you recall the

4   specific attorney who was assigned to that unit?

5   A       At what point in time?

6   Q       I guess all of the -- all of the

7   assigned attorneys that you recall starting in, I

8   guess, from March of 2021.

9   A       Sure.  There would have been Carol

10  Branham, B-R-A-N-H-A-M.

11  Q       Mm-hmm.

12  A       There would have been Jasmine -- I

13  can't remember her last name.  Knight,

14  K-N-I-G-H-T.

15  Q       Mm-hmm.

16  A       And John Phillips.  And Ana Allen,

17  A-L-L-E-N.

18  Q       So Carol Branham was a woman; right?

19  A       Yes.

20  Q       And all of them are women other than

21  John Phillips.  Is that correct?

22  A       That's correct.

23  Q       So the 50 employees that fell within

24  that department or the child support unit, what

25  other -- other than the attorneys, what kind of

1    employees -- you know, what kind of professionals

2    were these?  Were they social workers?  What kind

3    of professionals are we talking about in that

4    unit that were not attorneys?

5    A        They were administrative assistants,

6    case managers and child support specialists.

7    Q        Okay.  And so moving on to the Criminal

8    Investigation Division.  The Acting Chief of that

9    was Vinson Jenkins.  Did that change over time?

10   A        No.

11   Q        Okay.  He's still -- he's still in that

12   position?  Mr. --

13   A        Yes.

14   Q        I assume that's a man?  Vinson Jenkins?

15   A        Yes.

16   Q        Okay.  He's still over -- he has been

17   in that position throughout your service?

18   A        Yes.

19   Q        At some point was he made just the

20   Chief instead of the Acting Chief?

21   A        It took us a while to determine when we

22   first came on who would get the actual Chief

23   position.  So he was the Acting Chief when we

24   first came on.  And we looked at other options.

25   Maybe interviewed some other folks, but decided

1   to make him the actual Chief.

2   Q        Mm-hmm.  So I know that -- who does he

3   report to now?

4   A        Me.

5   Q        Okay.  He doesn't report to another E

6   team member before you anymore?

7   A        No.

8   Q        Okay.  And I -- did that change once

9   Jenny Parker left her position?

10  A        It changed before then.

11  Q        Okay.  So at some point prior to Jenny

12  Parker's departure, he -- you just made him a

13  direct report to you?

14  A        Yes.

15  Q        Okay.  And then there are a couple of

16  people under him.  OFD and MCD.  What is OFD?

17  A        OFD is -- stands for Other Felony

18  Divisions.  Those are felonies that are less

19  serious; whereas, Major -- MCD stands for the

20  Major Crime Divisions.  And those are typically

21  serious violent felonies like murders, rapes,

22  armed robberies, et cetera.  Kidnapping.  Those

23  kind of things.

24  Q        Okay.  And at that point in time the

25  leaders of those divisions, Kelvin Bryant and

1   Mike Murphy, they're both men?

2   A        Yes.

3   Q        And Mr. Bryant.  Did you know

4   Mr. Bryant before you took office?

5   A        I did not.

6   Q        Okay.  Was he in that position before

7   you took office?

8   A        He was not.

9   Q        Okay.  And then what about MCD.  Did

10  you know Mike Murphy before you took office?

11  A        I did.

12  Q        Okay.  Was he in that position before

13  you took office?

14  A        No, he was not.

15  Q        Okay.  So were these positions sort of

16  or this organizational chain, was it created by

17  you and you wanted to organize it this way where,

18  you know, Mr. Bryant and Mr. Murphy were in the

19  positions reflected on this document reporting to

20  Mr. Vinson as the Chief of the Criminal

21  Investigation Division?

22  A        Was this organizational structure --

23  was that completed by me?

24  Q        Yes.  That's what I'm trying to ask.

25  Did you create these positions upon taking office

1   as part of an organizational structure that you

2   designed for the office?

3   A          I would say yes.  Let's go with yes.  I

4   would say no because, as I testified, some of

5   these positions existed already.  And so I did

6   not create them as part of my organizational

7   structure.  But what you see might be one of the

8   earlier iterations of what we decided to put in

9   place as a team.

10  Q          Okay.  I just want to make sure I'm

11  clear because at one point you said yes and at

12  one point you said no.  So you're saying some of

13  these positions were already in place.  I

14  understand that.  And some of them you created as

15  an initial version of the organizational

16  structure you wanted in the office.  Is that a

17  fair statement?

18  A          Can you go back to the previous page?

19  Okay.  And then go down to Page 2.  I can say

20  that all of these positions existed in some way,

21  shape or form already.  What was different about

22  them is who we put in place.  So the Assistant DA

23  position someone over State Court and MCD or OCD,

24  that had always been a practice.  Juvenile Court

25  had already been in place.  I don't know who they

1    reported to as far as Number 3, the

2    Administrative Support Division.  I don't know.

3    I don't think that was new in any way.

4    Q        Okay.

5    A        CID wasn't new.  It was just a new

6    person.  Child Support Recovery, the same.

7    Victim Witness were the same.  So this was the --

8    this was the structure -- general structure, but

9    the people were different.

10   Q        Okay.  And I'm sorry, you know.  And I

11   think it would be helpful to know -- so I

12   understand that the structure was the same from

13   the prior administration.  Can you just look on

14   this list and tell me which of these individuals

15   were newly assigned upon you taking office to

16   these positions?  Let's just start with Number 2.

17   I'm sorry.  Go ahead.

18   A        Michael Edwards was newly assigned.

19   Q        Mm-hmm.  And he's a man?

20   A        Yes.

21   Q        Okay.

22   A        Kim Coles and Zoe Green and Bridget

23   Browne were already there.

24   Q        Are all of those attorneys?  Coles,

25   Green and Browne?

```
 1  A          Michael Edwards -- Coles, Green and

 2  Browne are not attorneys.  They are

 3  administrative assistants.

 4  Q          Got it.  Okay.  So the only attorney

 5  leaders on this list are the ones that are next

 6  to that division except for Cheryl Rogers and

 7  Tracey Erwin.  So 2 through 4.  Jenkins, Parker

 8  and Edwards.  They're the only -- are they the

 9  only attorneys on this list?

10  A          No.  I never said they were.

11  Q          I'm sorry.  You're right.  Withdraw

12  that question.  So let's just go.  So 3A through

13  C.  Those are not -- I'm sorry.  Coles, Green and

14  Browne.  Those are not attorneys, but Mr. Edwards

15  is an attorney.  Jenny Parker is an attorney and

16  she was appointed to that position when you took

17  office.  Is that correct?

18  A          That's correct.

19  Q          Okay.  And then State Court Division

20  Supervisor Nathanael Wright.  You already

21  testified he's an attorney; right?

22  A          Yes.

23  Q          How many people do you recall did he

24  supervise in that role?

25  A          Eight.
```

Regency-Brentano, Inc.

1    Q        Okay.

2    A        Well, I would say probably six to eight

3    attorneys and probably another six to eight

4    admins.

5    Q        Okay.  And then Greg McConnell, OFD,

6    which is Other Felony Divisions.  So that's the

7    attorney supervisor for that division.  Is that

8    correct?  Mr. McConnell?

9    A        Yes.

10   Q        How many -- how many attorneys did

11   Mr. McConnell supervise in his role as Division

12   Supervisor for OFD?

13   A        Approximately 10.

14   Q        And then MCD, CNT or EIP.  The Division

15   Supervisor was Jenny Parker?

16   A        Yes.

17   Q        Okay.  So MCD is Major Crimes Division;

18   right?

19   A        Yes.

20   Q        Okay.  And then let's see.  There is

21   CNT.  Is that Counter Narcotics?

22   A        Yes.

23   Q        What's the T stand for?  Counter

24   Narcotics?

25   A        Team.

```
 1   Q          Okay.  How many attorneys did Jenny
 2   supervise as the -- I'm sorry.  Withdrawn.
 3              What is EIP?
 4   A          The Early Intervention Program.
 5   Q          Okay.  And so as supervisor of MCD, CNT
 6   or EIP, how many people did Jenny Parker
 7   supervise in that role?
 8   A          About 10.
 9   Q          Were the attorneys in these different
10   sections or divisions, were they -- was there,
11   you know, a greater level of experience tied to
12   any specific divisions or was there an even
13   distribution in terms of tenure or experience
14   level among all of these divisions?
15   A          Can you repeat the question?
16   Q          Yeah.  And, you know, I'm just trying
17   to understand if more experienced attorneys were
18   assigned to certain divisions over others or
19   whether there was sort of an even distribution in
20   terms of experience level among these divisions?
21   A          Every division that you see there
22   requires a different level of experience because
23   every job is different.  And so whereas the term
24   experience that you're using is vague and overly
25   broad.
```

```
 1              I mean, State Court ADAs tend to have
 2   more experience handling higher case volumes, but
 3   even though they are lower value cases.  And so
 4   they have a completely different number of cases
 5   to handle.  Probably three or four times as many
 6   as our felony ADAs do.  But that's a certain
 7   unique kind of experience.  They probably rely
 8   more on negotiated experience than our felony
 9   lawyers do.
10              CNT, they might have drug experience,
11   but they might not have sexual assault
12   experience.  So I don't know that there is a
13   direct -- everyone we try to slot ADAs based on
14   their experience, taking their experience at and
15   measuring that against the type of case load that
16   was vacant that we needed them to be assigned to.
17   Q         Okay.
18   A         Now, the only exception to that is in
19   Major Crimes Division you are dealing with more
20   serious violent felonies like murders and sexual
21   assaults.  I think I wouldn't say that they were,
22   you know, more experienced.  They had more
23   experience with those types of cases unique to
24   that unit.
25   Q         I mean, but I guess was there -- you
```

```
 1   know, isn't there a certain level of, you know,
 2   sort of sophistication and proficiency and trial
 3   skills or, you know, cross-examination or
 4   anything like that that you sort of, you know,
 5   desired when it came to prosecuting the major
 6   crimes?
 7   A        I mean, sure.  That's a serious
 8   classification and I want to make sure that we
 9   are putting experienced attorneys in there.
10   Q        Okay.  And I guess, you know, I --
11   well, okay.
12            So what about the Accountability and
13   Specialty Courts.  That was overseen by Michael
14   Edwards?
15   A        Yes.
16   Q        Okay.  And how many -- how many
17   attorneys did he supervise in that role?
18   A        About three or four.
19   Q        I'm sorry.  You said Ms. Wright
20   supervised how many attorneys -- oh, that was 10
21   attorneys in those three divisions.
22   A        Correct.
23   Q        Okay.  Is that correct?
24   A        Yes.
25   Q        Okay.  And then Michael Edwards
```

```
 1   supervised how many again?  Sorry.
 2   A          Can you read the record back for the
 3   question or something?  I think I've answered
 4   these questions already.
 5   Q          Well, I mean, it's faster if you just
 6   reiterate how many times or how many employees
 7   that Michael Edwards supervised.  We can go back
 8   and stop and ask her to do that.  But, I mean, it
 9   was going fast.  So I'd like to just confirm how
10   many people he supervised in that role.
11   A          I can't answer that.
12   Q          You don't know?
13   A          Do you want -- Michael was the Chief of
14   programs, policy and personnel.  So what are you
15   asking me specifically?
16   Q          I'm asking about Accountability and
17   Specialty Courts.  The Division Supervisor is
18   Michael Edwards.  I'm just trying to understand
19   how many attorneys specifically did he supervise
20   in that capacity?
21   A          Thank you for clarifying the question.
22   We had about three to four attorneys who were
23   assigned to Accountability Court.
24   Q          Thank you.  All right.  And then
25   Juvenile Court supervised by Ms. McLeod, how many
```

1   attorneys did that include?

2   A          Between three and four.

3   Q          How many attorneys were there total in

4   the office in, you know, at the time that you

5   took office?

6   A          I don't recall.  I do recall that

7   whatever number was assigned to our office, and I

8   want to say it was 38, we were minus -- I took

9   the office with minus seven because there was a

10  hiring freeze for the county at the time.  So 38

11  minus seven is, I don't know, 31.

12  Q          And then, you know, another -- I guess

13  another sort of structure that became apparent

14  was the different courtrooms and assigning

15  attorneys to -- to specific courtrooms.  Do you

16  recall that from Mr. Burton's deposition?

17  A          I recall that from being here.  I

18  wouldn't say that anything he testified to or has

19  knowledge about that was accurate.

20  Q          So you did not assign attorneys to

21  specific courtrooms?

22  A          No, I didn't say that.  I said I

23  assigned attorneys to specific courtrooms based

24  on I have firsthand knowledge about that.  It

25  wouldn't have been from Mr. Burton's deposition.

```
 1    Q          Okay.  Well, tell me about that.  Like,
 2    how did that -- how did you determine which
 3    attorneys were -- I mean, what was the process
 4    for determining which attorneys were assigned to
 5    which courtrooms?  Is that something y'all -- was
 6    that an exercise you did at the time you took
 7    office?
 8    MR. CARTER:
 9              Are you talking about Superior Court?
10    MS. BALASUBRAMANIAN:
11              Yes.
12    A          There are determinations every day
13    about who goes where in Superior Court.  And
14    there are a number of things that can be an
15    impetus for that.  It will depend on staffing,
16    availability, experience, timing.
17              The first big change that we did to
18    Superior Court came in September of 2021.  And
19    that was because the Superior Court decided to do
20    away with the major crimes distinction and assign
21    major crimes cases to all six courtrooms.  And
22    then we did a complete -- complete organizational
23    overhaul to meet the demands of that change.
24    Q          And do you still have records that
25    reflect the organizational overhaul that you
```

1    conducted to meet that Superior Court

2    restructuring?

3    A          I don't know what records you might be

4    referring to.

5    Q          Records that reflect who was assigned

6    to which courtroom or which role.

7    A          No.

8    Q          You don't -- you didn't maintain those

9    records?

10   A          I can't say that I created any records.

11   I think it was something that we -- that was a

12   matter of discussing during E team meetings, but

13   I can't say there were any organizational

14   documents or records that we created around that.

15   Q          So there were no documents that reflect

16   which attorneys were assigned to which

17   courtrooms?

18   A          Attorneys change courtrooms all the

19   time and they change assignments all the time.

20   Q          That's not my question.  My question is

21   whether there were any documents --

22   MR. CARTER:

23          Let her answer.

24   BY MS. BALASUBRAMANIAN:

25   Q          My question was were there any

1  documents created that reflect which attorneys

2  were assigned to which courtrooms.  Let's start

3  with March.  Or I'm sorry.  You said

4  September 2021.  Let's start with September '21.

5  Were there any documents generated that reflect

6  which attorneys were assigned to which courtrooms

7  at that point in time?

8  A          No.  Not that I'm aware of.

9  Q          How was it communicated to attorneys

10 which courtrooms they were assigned to?

11 A          I've already explained to you that we

12 have those conversations during our E team

13 meetings and then we will convey that to the

14 staff.

15 Q          That's not my question.  My question is

16 more nuanced.

17 MR. CARTER:

18          Let her answer the question.  She's

19 trying to answer the question.

20 MS. BALASUBRAMANIAN:

21          I don't think she is.  I think she does

22 not answer the question and then you jump in.

23 BY MS. BALASUBRAMANIAN:

24 Q          But let me ask it again and then I'll

25 give you a chance to respond.  How did you make

```
 1    the determination of which attorneys were

 2    assigned to which courtrooms?  I'm not asking you

 3    when or whether it happened in a meeting.  I'm

 4    asking how you decided that John Doe would be

 5    assigned to Courtroom 1 and why that decision was

 6    made.

 7    A        That's not the question you asked me.

 8    You asked me how I communicated that to my staff.

 9    But if you'd like me to answer the question

10    that's presently on the table, I am telling you

11    that we made the decision in the E team meetings

12    and then they were informed by their supervisors

13    and their Chiefs about what changes would be

14    made.

15    Q        And, again, that's nonresponsive.  My

16    question is how did you decide that, for example,

17    Anthony Burton would be assigned to Courtroom 6

18    or Judge Abbot's courtroom?  How was it

19    determined that he would be assigned to that

20    courtroom?

21    MR. CARTER:

22            Again, that's been asked and answered.

23    MS. BALASUBRAMANIAN:

24            No, it was not.

25
```

```
 1   MR. CARTER:

 2              She told you how it was determined.

 3   BY MS. BALASUBRAMANIAN:

 4   Q        How did you decide which attorney would

 5   go to that courtroom?

 6   A        So that --

 7   Q        There was no other -- there is no other

 8   response other than we did it at an E team

 9   meeting?  That's your response?

10   A        You're asking me how we made that

11   decision.  I'm telling you that we discussed it

12   as an executive team during an E team meeting.

13   And once those decisions were made, we

14   communicated it to the staff.  It's likely that

15   Anthony Burton stayed assigned to Judge Abbot

16   because he was already in that courtroom.

17   Q        Okay.

18   A        So --

19   Q        Okay.  And perhaps the question is why.

20   Why was Anthony Burton assigned to that

21   courtroom?  And it's your -- and I understand

22   your response is because you're saying that it's

23   likely that he was already in that courtroom

24   before.  Is that correct?

25   A        That's likely, yes.
```

```
 1    Q          And what about Christian Stolfe.  Do
 2    you recall at any point assigning him as a lead
 3    attorney in that courtroom?
 4    A          I remember Christian Stolfe being the
 5    lead attorney in J6, yes.
 6    Q          Okay.  When -- do you recall when that
 7    decision was made to assign lead attorneys --
 8    well, generally speaking at some point after you
 9    assumed the leadership, did you assign a lead
10    attorney to each courtroom?
11    A          Yes.
12    Q          Okay.  When was that --
13    A          We did.
14    Q          I'm sorry.  Go ahead.
15    A          Yes.  We did.
16    Q          Okay.  When was that -- when was that
17    decision made?
18    A          That would have -- that decision would
19    have been made in late 2021 after the court
20    issued its structural -- its order that it was
21    going to change its structure.
22    Q          Okay.  And so a lead attorney was
23    identified for the six courtrooms in which --
24    from -- comprising Superior Court.  Is that how
25    many positions we're talking about?
```

1    A          Yes.  Six.

2    Q          And you do recall who the lead

3    attorneys were that were first identified in fall

4    of 2021?

5    A          Yes.

6    Q          Okay.  Who were those six people other

7    than Mr. Stolfe?

8    A          J5 would have been Jenny Parker.  J4

9    would have been Donna Sims.  J3 would have been

10   Laurie Baio.  J2 would have been Brian DeBlassis.

11   J1 would have been Brad Thompson.  Excuse me.

12   I'm not right about.  J2 was not Brian DeBlassis.

13   At the time it was Abigail Long.

14   Q          Okay.  And then who was J1?

15   A          Brad Thompson.

16   Q          At some point did Mr. DeBlassis assume

17   one of these positions?

18   A          Yes, he did.

19   Q          When did he assume -- did he assume

20   Ms. Long's position at some point?

21   A          Yes, he did.

22   Q          Do you recall when that was?

23   A          It would have been after she left.  I

24   don't recall the exact date and time.

25   Q          Okay.  And did your -- did your team

```
 1   open the lead attorney position up for
 2   consideration for anybody in the office who
 3   wanted to apply?
 4   A        No.
 5   Q        So what was the evaluation process for
 6   determining who was best qualified to serve in
 7   the lead attorney positions?
 8   A        Lead attorneys were chosen -- one of
 9   the things that we were trying to do is -- is
10   de-complicate the silos.  Because what we found
11   is that there were a lot of clicks and silos in
12   the office.  We wanted to build teams that had
13   different -- that were assigned to each courtroom
14   so that they could work together as a team.
15   Because it had been our impression that the ADAs
16   worked individually.
17            So we chose people that we thought had
18   a combination of both leadership skills, team
19   building skills, and ability and experience.  And
20   so the lead position was -- the lead attorney in
21   every courtroom was not a supervisor, but that
22   person usually was the person who had the
23   (indiscernible), who would talk to the judge
24   about, you know, making sure that the team was
25   functioning in the way that it was supposed to.
```

```
 1    I would corral the group in terms of getting

 2    ready for upcoming trial dockets, et cetera.

 3           So that's -- we observed the attorneys

 4    that we had in the office.  That's not something

 5    that we were going to bring somebody in from the

 6    outside for.  So we made those leadership

 7    determinations based on the criteria I just laid

 8    out for you.

 9    Q       Well, even internally, was there any

10    invitation to the staff to present, you know, a

11    résumé or reasons why they thought they should be

12    considered for those positions?

13    A       No.  Because we were looking for

14    something specific, those were selections that I

15    made as a matter of district attorney discretion.

16    Q       Okay.  And what --

17    A       Along --

18    Q       I'm sorry.  What did you say?

19    A       Along with input from the E team.

20    Q       Okay.  And did you know Mr. Stolfe,

21    Christian Stolfe before you took office?

22    A       I did not.

23    Q       Did you look at his personnel file

24    before you made the decision to appoint him to

25    that position?
```

```
 1    A          I don't believe that I did.  I think
 2    we -- I probably had some conversation about
 3    their personnel reviews.  Our general
 4    observations of him around the office.  But I
 5    would not have necessarily reviewed their
 6    personnel file per se.  Unless, of course, I
 7    thought there was something bad about them or it
 8    had come to my attention that there was something
 9    bad about them that I needed to explore.
10    Q          Okay.  Were you aware that Mr. Stolfe
11    had failed the Bar at some point prior to
12    becoming a full-time employee at your office?
13    A          No.  I was made aware of that in the
14    context of this lawsuit.  But it's not something
15    that would have made a difference to me.
16    Everyone who was working in the office at the
17    time, I presume that the prior administration
18    would have known they had the necessary
19    credentials to be there.  So, no.  How many times
20    it took them to pass the Bar is not a concern for
21    me.
22    Q          What about how many years of experience
23    they had in your office?  Was that a concern?
24    A          It's a factor.  It's a factor I think.
25    I know some people who are career prosecutors who
```

```
 1    have been in the office for 20 years and suck.

 2    And then I know some people who demonstrate

 3    initiative and are teachable and they have been

 4    practicing a fraction of that time and they're

 5    great.  So the number of years somebody is an

 6    attorney is not dispositive, although it is

 7    something I consider.

 8    Q        What about the number of -- number and

 9    complexity of jury trials or cases that an

10    attorney has handled.  Was that a consideration

11    in determining who would be a lead attorney?

12    A        It's a factor, but, again, not

13    dispositive.

14    Q        Okay.  Is that something that you

15    looked at for Mr. Stolfe?

16    A        I would have looked at that for all the

17    candidates for lead positions, yes.

18    Q        Okay.  Well, how many candidates did

19    you consider for assignment to -- as lead

20    attorney to Courtroom 6?

21    A        I can't remember how many we

22    considered.  I'm sure we would have put -- we

23    would have tossed up some names or the names of a

24    number of people who were in the office at the

25    time and considered all of them because this was,
```

```
 1   you know, an internal decision that we were
 2   making.  Would I have had to say that we had a
 3   conversation about them all and this is the way
 4   it should go.
 5   Q          Did anybody consider Anthony Burton for
 6   lead attorney for any of the courtrooms?
 7   A          I have to say he wasn't recommended by
 8   anybody on the E team, but his name did come up
 9   as part of the consideration, yeah.
10   Q          And he had been with the office since
11   2015.  Were you aware of that?
12   A          I became aware of that in connection
13   with this lawsuit.  But I don't -- I can't say
14   that I was directly concerned about how long he
15   had been with the office at the time I made the
16   decision.  I did -- I was aware that Mr. Burton
17   had not himself tried any felony cases, any
18   murders to speak of or really any OFD cases.  And
19   there is no one who keeps documentation of that.
20   I would have been relying on the word of Greg
21   McConnell who had been here before.  Jenny Parker
22   who was here before.  So he wasn't a standout for
23   any particular reason.
24   Q          Had Mr. Stolfe tried an OFD or a
25   murder -- a major crime or -- sorry.  Had
```

1    Mr. Stolfe tried a major felony or an OFD case?

2    A          To my knowledge, he had second chaired

3    at least one major crimes case.  Perhaps more.  I

4    did know that he had expressed interest in a

5    Major Crimes Division position before I got

6    there.  And had -- I do know that another person

7    was selected for that MCD assignment over him.

8    So I do know that he had demonstrated an interest

9    in having some MCD experience before -- before

10   this issue -- this issue came up.

11   Q          Do you have any knowledge of what kinds

12   of -- or whether Mr. Burton had second chaired

13   any major felony trials?

14   A          To my knowledge he had not.

15   Q          Okay.  Is that something that you

16   researched at the time you were deciding who to

17   assign as a lead attorney?

18   A          When you say researched it, that's

19   something that would have been brought to my

20   attention by the other members on our team.

21   Q          Did you ask whether Mr. Burton had

22   tried any major felonies at the time y'all were

23   considering who to appoint as lead attorneys?

24   A          I'm not sure if we asked about him in

25   particular, but that would have been part of the

1  discussion.  Let me say this.  Let me go back.

2  It was expressly stated to me that he had no

3  felony trial experience.  Yes.

4  Q        Including as a second chair?

5  A        Including as a second chair.

6  Q        And who said that to you?

7  A        Jenny Parker and Greg McConnell.  In

8  fact, Mr. Burton, in my estimation, had a

9  reputation for being the opposite.  For being

10  afraid to try cases.  Resolving cases at the last

11  minute.  Which wasn't unusual for this office.

12  And wasn't -- I didn't think that was a negative

13  against him in any way.  But I think that was par

14  for the course.

15          I mean, before I arrived, a lot of the

16  veteran prosecutors had already left and there

17  were only maybe three left who had a reputation

18  for trying cases, and Mr. Burton was not one of

19  them.

20  Q        You assigned Mr. Burton to work with

21  Mr. Stolfe in Courtroom 6; correct?

22  A        I assigned Mr. Stolfe to Courtroom 6.

23  I believe that Mr. Burton was already there.

24  Q        Okay.  So they were the two attorneys

25  who were assigned to that courtroom.  Was there

1   anybody else?

2   A          Yes.  But at a point in time -- and I

3   think that you probably don't realize that the

4   assignments of attorneys to courtrooms is fluid.

5          So at one point, Mr. Burton was in J6

6   with Skye Musson.  After Skye Musson left, he was

7   in there with, I believe, Laura Trejo.  After

8   Laura Trejo left, I believe he was in there with

9   Renee Roberts.  And after Renee Roberts -- so

10  where Mr. Stolfe came in along those lines, I

11  couldn't tell you exactly when they were

12  together.  But he was in there with at least one

13  other attorney for the majority of the time.  And

14  those are the attorneys he would have been with.

15  Q          And after Mr. Stolfe became lead

16  attorney for that courtroom, did he have

17  discretion regarding how to assign cases that

18  were -- that were part of Judge Abbot's docket?

19  A          No.

20  Q          What would the roles of the lead

21  attorney -- what were their job responsibilities?

22  A          I think I testified to this already.  I

23  think I explained that their job was to liaise

24  with the court.  To make sure that things were

25  going well.  To report back to the office if

```
 1   things weren't going well.  To make sure that
 2   their team was ready for trial on whatever cases
 3   were coming up before any of the Superior Court
 4   judges.  And to corral the team together to make
 5   sure that there was general preparedness.
 6   Q        So if a case was going to trial that
 7   was assigned to a J6 attorney, would the lead
 8   attorney be the first chair or would whatever
 9   attorney who was handling that case be the first
10   chair?  How did that work?
11   A        So at -- it's a combination of two
12   things.  The first thing is that we were changing
13   staff and having to assign ADAs to make sure that
14   somebody could step up and try cases, the more
15   experienced cases.  But we were also -- at the
16   same time, judge's cases were switching
17   courtrooms as well.  And so it was -- it was
18   between the attorneys assigned to the courtroom
19   to decide which cases they -- how they would
20   divide these case loads between them because
21   essentially by the change -- by the time the
22   change came into effect, you had new attorneys,
23   most of whom were in front of new judges that
24   they hadn't been in front of before, and they
25   also had a new case load because the court and
```

1   case managers had changed their case loads.  And

2   so it was the lead attorneys are supposed to, you

3   know -- were supposed to do things like make sure

4   the entire team -- not just them and the

5   attorneys, but their legal assistants, their --

6   their paras, if they had them, and the case

7   managers, et cetera, to make sure that all cases

8   were properly handled.

9             Because the courtrooms were a mess as a

10  result of that change.  You had cases that were

11  in the names of other ADAs.  And so lead

12  attorneys did things like establish that.  Like

13  if it came from J3 and it was this type of case,

14  who did it go to on our team.  It was a

15  collaborative effort.  And then the lead

16  attorneys were supposed to facilitate that

17  conversation.

18  Q        Got it.  So I guess I'm just trying to

19  understand, did the lead attorney have a

20  responsibility to first chair any cases for the

21  other attorneys in that courtroom to be tried

22  together?

23  A        No.  The way that it was is that the

24  two attorneys who were in the courtroom were

25  responsible for co-chairing each other.  Because

1   we were moving to a leadership.  A team -- a team

2   model, so to speak, and moving away from the

3   system where only certain ADAs were qualified to

4   try certain cases.  That was our way of cross

5   training and creating teams.

6           And so if the lead attorney had a case,

7   it was the expectation that the other attorney

8   would co-chair them.  And along those lines if

9   the second attorney, a third attorney had a case

10  going up, the lead attorney was supposed to

11  co-chair them.  So it was a team effort in every

12  courtroom so to speak.

13  Q       At any point did you consider

14  Mr. Burton's friendship with Ms. Musson as a

15  reason why you would not want him to be in the

16  lead attorney position?

17  A       I didn't know anything about the

18  relationship between Ms. Burton -- between --

19  excuse me -- Mr. Burton or Ms. Musson until all

20  this litigation started.  And honestly it wasn't

21  a primary concern of mine.

22  Q       Well, you were aware that Mr. Burton

23  was referenced in Skye's EEOC charge as her trial

24  partner, were you not?

25  A       I was aware of that.

```
1    Q         Did that factor into your decision to
2    not select him for the lead attorney position?
3    A         Not at all.
4    Q         Okay.  Was there a bump in pay that was
5    associated with the lead attorney position?
6    A         There was not.
7    Q         Okay.  At some point did you ask HR for
8    the county to bump up Mr. Stolfe from an ADA-II
9    to an ADA-IV because he assumed the duties of a
10   lead attorney?
11   A         No.  I did ask the county for an
12   increase for Mr. Stolfe based on a combination of
13   things.  Not just that he was a good lead
14   attorney, but more so because he had accepted --
15   so he had accepted a role as being the ADA
16   advocate -- the ADA over the ROCC organization,
17   which was a racketeering and organized crime
18   coalition that we were creating at that time.  So
19   he was responsible for a lot of law enforcement
20   training and other things.  And he was doing
21   something else in addition to that.  I can't
22   remember.
23             But he would have been entitled to an
24   increase in pay as well because they categorized
25   him -- in reviewing his personnel file, they had
```

```
 1    characterized him correctly -- categorized him
 2    incorrectly when he started working with the
 3    county.  So he was rated lower than he was
 4    supposed to be.
 5            I mean, the other thing to note, I
 6    mean, that made Mr. Stolfe different than
 7    Mr. Burton, Mr. Stolfe volunteered.  He
 8    volunteered for the ROCC.  He volunteered for
 9    more responsibility.  Something that Mr. Burton,
10    to my knowledge, never did or expressed interest
11    in.  And so he took a lot more initiative than
12    many of the other ADAs in our office did.
13  Q       You're not aware of any instance where
14    Mr. Burton was actually told that this -- the
15    lead attorney opportunity was made available
16    before you made the decision to assign Mr. Stolfe
17    to that position, are you?
18  A       Mr. Burton never told me that.  And I
19    don't -- and he -- and I never had a discussion
20    with him about it.
21  Q       Okay.  There was not an office wide
22    announcement that can -- that lead attorneys
23    would be selected for and assigned to specific
24    courtrooms by the executive team?
25  A       I don't recall if there was an
```

```
 1    announcement or not.  I just can't remember.  It
 2    had more to do with restructuring the office and
 3    doing a re-org than anything else.  I would have
 4    to imagine -- you know, I know it sounds crazy,
 5    but the district attorney is really part of final
 6    decisions.  Like I had executive staff to carry
 7    out a lot of the messaging that went to lower
 8    staff.  So it's possible that an office wide
 9    announcement could have gone out.  But I don't
10    remember.  I don't remember.
11    Q        Okay.
12    MS. BALASUBRAMANIAN:
13             Can we pull up Exhibit 28, please.
14             (DEPOSITION EXHIBIT NUMBER 28
15             WAS MARKED FOR IDENTIFICATION.)
16    BY MS. BALASUBRAMANIAN:
17    Q        Was this document completed by you?  Do
18    you recognize it?
19    A        It was.
20    Q        Okay.  And so you recall submitting
21    this document on behalf of -- or to request a --
22    I guess a lead classification from ADA-II to
23    ADA-IV for Mr. Stolfe?
24    A        Yes.
25    Q        Now, you were requesting both an
```

1   increase in his pay grade as well as his annual

2   salary; correct?

3   A         That's correct.

4   Q         Okay.  And your reasons were, as you

5   stated in this narrative below, is because he was

6   named team lead prosecutor as a result of the

7   Superior Court re-org; right?  That was one of

8   the reasons you cited?

9   A         Yeah.  Sure.  That's what the document

10  says.

11  Q         And he was also named the gun and gang

12  prosecutor and has added responsibilities with

13  that role.  Is that what that says?

14  A         No.  With the ROCC.

15  Q         ROCC.  Sorry.  ROCC.  What does that

16  stand for again?

17  A         It was called the ROCC.  District

18  Attorney's Racketeering and Organized Crime

19  Coalition.

20  Q         Okay.  And then you said all lead ADAs

21  should have pay equity.  So he made -- were the

22  other lead ADAs in the ADA-IV pay grade?

23  A         They were all ADA-IV.  But they were

24  all -- we were advocating for there to be equity

25  across the office.  And we thought -- our

```
 1   discussion with HR was that there are -- should
 2   be pay grade based on assignment, not necessarily
 3   on tenure.  So that is -- we gave that
 4   justification.  But not every ADA got a pay bump
 5   or pay increase.
 6           I do recall that Mr. Stolfe was grossly
 7   underpaid in comparison to his ADA counterparts.
 8   And so I think he was probably in the 50s.  At
 9   this time in the 60s.  Whereas all of the other
10   lead ADAs were in the 80s.  Around 85.  Around
11   the 85 mark.  And so he was taking on a lot more
12   responsibility and was vastly underpaid than all
13   of his -- his cohorts.
14   Q        His cohorts who were ADA-IVs and who
15   were also -- the other lead attorneys were
16   ADA-IVs.  I believe that was your testimony.  And
17   so you're saying that he was underpaid relative
18   to the ADA-IVs, the other lead attorney
19   positions?
20   A        Yes.  And so those ADA-IVs did not get
21   a pay increase, if I am correct in saying that.
22   But they had all been -- they all made more than
23   he did.
24   Q        But him taking on the lead attorney
25   role is one of the reasons you asked for him to
```

1    be paid as an ADA-IV.  Is that correct?

2    A         Yes.  It was a reflection of the fact

3    that he had taken on a lot more responsibility

4    that wasn't reflected in his compensation.

5    Q         And Mr. Burton was an ADA-IV.  Were you

6    aware of that?

7    A         Yes.

8    Q         Okay.  I think the --

9    A         Mr. Burton --

10   Q         I'm sorry?

11   A         You can strike that.  Go ahead.

12   Q         I'm going to show you Exhibit 24.

13             (DEPOSITION EXHIBIT NUMBER 24

14             WAS MARKED FOR IDENTIFICATION.)

15   BY MS. BALASUBRAMANIAN:

16   Q         Do you recognize this document?

17   A         I know what that document is.  I

18   completed -- it likely would have been completed

19   by -- it was completed by the office manager.

20   Q         Okay.  Well, if you scroll down to the

21   second page, there is a cover letter.  It appears

22   to be from you.  Do you recognize that?

23   A         I recognize that letter, but that

24   doesn't -- that looks like a stamp signature not

25   an original signature, so ...

```
 1   Q         Okay.

 2   A         I don't dispute that it came from my

 3   office.  And that it was -- that whoever would

 4   have sent it would have been authorized to do so

 5   on my behalf.

 6   Q         You don't dispute that the actual

 7   approved pay increase or pay grade increase was

 8   from ADA-II to ADA-III as reflected in this

 9   letter?  Do you dispute that?

10   A         I don't dispute anything about that

11   letter.

12   Q         Okay.  And then if you scroll up to the

13   first page, it looks like he was approved for an

14   increase from -- his annual salary here says

15   80,900, which appears to be different from the

16   salary on the document that you submitted.  This

17   is ADA-II salary.  Do you -- I believe -- and we

18   can flip back to that document.

19   MS. BALASUBRAMANIAN:

20             Can we go back to 28.

21   Q         Here it says that his annual salary as

22   an ADA-II was 65,000.  Are you aware of that

23   difference or the reason for that difference?

24   A         I filled that out.  The document that

25   you're highlighting now, I filled that out in my
```

1   own handwriting, which mean I would have done the

2   research.  So it shows me that -- and typically I

3   provide that to the HR manager because I'm doing

4   an analysis.  So it could be that I authorized

5   him to go from 65 to 80.  And then there was --

6   yes.  So I don't -- I can't -- so I can say that

7   I think that the difference was one of the things

8   that I didn't include in the explanation on the

9   bottom of that exhibit you're referring to is the

10  fact that his classification was wrong.  So he

11  should have been clarified as an ADA-III.

12  Instead where he would have gotten an increase as

13  a matter of right because of the years that he

14  had been practicing.  So he was stuck at ADA-II.

15  Should have been at ADA-III.  And he was moved up

16  to ADA-IV.

17          So on the following page when they

18  increased him from 80,900 to 88, it's probably

19  because they increased him a step also.  So he

20  would have gone up from 65 as an ADA-II to

21  another number as an ADA-III.  And that could be

22  the difference.  But beyond that, I don't know.

23  Q          Are you aware of whether he was

24  actually promoted to an ADA-IV in connection with

25  these requests that were submitted by your

1    office?

2    A          As I sit here today, I'm not aware.

3    I'd have to probably go into the system and

4    check.  That would be a question for Chatham

5    County HR.

6    Q          Okay.

7    MS. BALASUBRAMANIAN:

8               Can we look at Exhibit 20 -- hold on

9    one second.  Can we look at Exhibit 23.  Scroll

10   down.

11              (DEPOSITION EXHIBIT NUMBER 23

12              WAS MARKED FOR IDENTIFICATION.)

13   BY MS. BALASUBRAMANIAN:

14   Q          So this looks like an email dated

15   September 14th, 2022 from Christian Stolfe to

16   Ms. Hodge-Wilder and some other individuals.

17   Carolyn Smalls and some other individuals.  Is

18   that -- does that reflect what you see on the

19   screen?

20   A          That's what it appears -- I'm not on

21   the document, but that's what I -- I'm looking

22   at, yes.

23   Q          Yeah.  Okay.  So here Mr. Stolfe

24   says -- you know, he's describing his, I guess,

25   what's happening.  And that -- whatever he's

```
 1   describing here, that's what he's indicating as

 2   of September 14th, 2022.  Is that fair to say?

 3   A        Yes.

 4   Q        Okay.  So he's saying here, My

 5   classification and pay has been moved from ADA-II

 6   to ADA-III.  New salary at that rate is effective

 7   8/25 or was written on the contract dated 8/25.

 8   Is that what that says?

 9   A        Yep.

10   Q        Okay.  Do you have any reason to

11   dispute that he was an ADA-III effective

12   September 14th, 2022?

13   A        No.  I don't dispute that.

14   Q        Okay.

15   A        I think we did the analysis back then

16   and it checked out.  And we ran it through the

17   compliance person and it seemed to all check out.

18   I don't dispute it.

19   Q        Okay.  And scrolling up to the first

20   page.  If you can take the bubble down.

21   Scrolling up to the first page.  Rusheda Adeshina

22   email dated October 13.  She says, Dear

23   Christian -- Good afternoon, Christian thank you

24   for speaking with me.  Because of the series of

25   movements associated with your tenure, I missed
```

1    the brief period you transitioned after your

2    initial transition.  So he was initially a legal

3    assistant and then became a paralegal and then

4    final a temporary ADA-I.  When is somebody a

5    temporary ADA-I?  What does that term mean?

6    A          I don't know.  Those are

7    classifications and decisions that would have

8    been made before I got here.  I don't know.  I

9    don't know.

10   Q          You haven't heard the term temporary

11   ADA-I?

12   A          I heard about it the other day during

13   Mr. Burton's deposition where he was -- there was

14   some allegation that he might have been hired as

15   something else.  Maybe either a legal assistant

16   or temporary ADA-I.  But I don't have any

17   firsthand knowledge about that.  I don't know

18   anything about it -- about that.

19   Q          You didn't look at his prior positions

20   with the DA's office when you were deciding to

21   make Mr. Stolfe the lead attorney?

22   A          No.  That wasn't important to me.  He

23   was an ADA.  A practicing and licensed ADA in the

24   State of Georgia at the time I made my decisions

25   regarding him.  So whatever happened before I got

1   there in January of 2021 would have been made by

2   somebody else.

3   Q          Okay.  But I guess to the extent that

4   you testified previously that their prior tenure

5   and experience was a factor that you considered,

6   what -- did you actually look at Mr. Stolfe's

7   prior experience?  Did you research it and look

8   at what his -- how long he had been employed as

9   an ADA with the office?

10  A          I don't know that I did, but I'm pretty

11  sure that my office manager did and my First

12  Chief did as they would have been instructed to

13  look at those things and report to me.

14  Q          Did you do that inquiry for Mr. Burton

15  and look at how many years he had been practicing

16  with the office?

17  A          I would not have performed that inquiry

18  myself.  If it were performed, it would have been

19  done by Michael Edwards and/or Marcus Thompson

20  and/or Nathanael Wright.

21  Q          Do you recall instructing one of those

22  individuals to look that up for Mr. Burton and

23  hearing back, you know, whatever they discovered?

24  A          I don't know if I gave them that

25  express discussion -- that express instruction.

1  I would have told them to probably come to the E

2  team meeting to prepare to discuss the

3  backgrounds of Superior Court ADAs.

4  Q          Did you specify any names or did you

5  instruct them to be prepared to discuss the

6  background of every ADA?

7  A          I didn't specify any names.  I think we

8  were primarily looking at Superior Court.  Maybe

9  giving some consideration to any State Court ADAs

10  that might have been ready.  But I didn't give

11  them any specific instructions as to one ADA over

12  the other.

13  Q          And so when you -- when the discussion

14  started during that meeting, did you solicit

15  information about specific ADAs or did you ask

16  them to provide information regarding each

17  Superior Court ADA?

18  A          I did not solicit specific information

19  about any ADAs.

20  Q          Did you look at any documents to

21  evaluate candidates during the meeting when the E

22  team discussed who would be the best fit for the

23  lead attorney positions?

24  A          I myself didn't look at any documents.

25  That's something that I would have relied on

```
 1   Jenny Parker for as the chief of court
 2   operations.  And she would have known the ADA
 3   teams and the members of those teams better than
 4   I did.  So I would have relied on her report or
 5   knowledge and experience with the ADAs that we
 6   were in discussions about.  I did not do that
 7   personally.
 8   Q        Okay.
 9   MS. BALASUBRAMANIAN:
10            We can pull this exhibit down, Tyrah.
11   BY MS. BALASUBRAMANIAN:
12   Q        Can you tell me about whether the DA's
13   office -- and I'm switching gears a bit.  But can
14   you tell me about whether the DA's office owns
15   any assets.  Does it own any property?
16   A        No.
17   Q        Who owns the building in which the DA's
18   office currently sits?
19   A        Excuse me.  Can you repeat the
20   question?
21   Q        Who owns the building where the DA's
22   office currently operates?  Where your DA's
23   office currently operates?  Do you know who owns
24   the building?
25   A        I would imagine it would be the Chatham
```

```
 1   County Board of Commissioners, but I'm not
 2   certain about that.
 3   Q        Does your office pay rent or does it
 4   have a lease?
 5   A        No, we do not.  We do not have a lease
 6   for our main office here in the courthouse, but
 7   we do have several units that are housed offsite
 8   because of space issues.  And we do have
 9   independent leasing with third parties.
10   Q        How many offices or satellite offices
11   does your office have?
12   A        The three departments that are located
13   offsite would be our investigators are located
14   off of Chatham Parkway.  Our Child Support
15   division, which is located at the Pete Liakakis
16   Building.  And our Juvenile Court, which is
17   located on Carl Griffin.  But we also have some
18   investigators that are housed on Barnard Street.
19   Q        And are your leases -- so you don't
20   have a lease for the headquarters building.  Do
21   you have a lease for the Pete Liakakis Building?
22   Is that -- is that how you say it?
23   A        Yes.  Not that I'm aware of.  That
24   would be a question for the county attorney or
25   the Board of Commissioners.
```

1   Q        Well, I guess to the extent any rental

2   payments comes out of your budget, are you aware

3   that you pay rent anywhere for any of those

4   satellite offices?

5   A        Not for the Pete Liakakis Building, no.

6   But we have for others.

7   Q        Okay.  Which buildings do you pay rent

8   for?

9   A        We pay rent for -- we pay rent to house

10  our investigators on Barnard Street.  I don't

11  believe we pay rent -- we may pay a -- something

12  like a -- similar to a HOA fee for our offsite

13  for some of our Juvenile Court staff.  And there

14  is a lease agreement for our Dip and Yip

15  [phonetic] departments.

16  Q        What are those?

17  A        Those fall under the Victim Witness

18  Assistance Program.  They are two community

19  outreach programs that we run pursuant to the

20  Blueprint Grant and their office space is paid

21  for by a lease.

22  Q        Okay.  Does your office own any cars,

23  vehicles?

24  A        No, we do not.

25  Q        Do you have access to a fleet of

```
 1   vehicles that's owned by another organization?
 2   A         Yes, we do.
 3   Q         And who owns the fleet of vehicles?
 4   A         The county.
 5   Q         What about guns.  Does your office own
 6   any guns?
 7   A         Yes.  Our investigators are assigned
 8   firearms.
 9   Q         And are those the property of your
10   office or the county?
11   A         They were purchased by my office.
12   Q         Was that after you took office?
13   A         Yes.  They had weapons before, which
14   needed to be -- their weapons needed to be
15   upgraded.  And so we purchased those through --
16   we purchased that -- firearms for our department.
17   And re-outfitted them with firearms through money
18   that came from a grant.
19   Q         Do you know what was the approximate
20   purchase price for those guns?
21   A         Approximately $5,000.
22   Q         And how many guns are we talking about?
23   A         Maybe between 12 and 15.
24   Q         Okay.  Any other personal property that
25   your office owns?
```

Regency-Brentano, Inc.

```
 1   MR. CARTER:

 2           Anita, let me ask the relevance

 3   question here.  I'm thinking about a 30(b) motion

 4   to terminate or to limit.  I want to know where

 5   you're going with this.

 6   MS. BALASUBRAMANIAN:

 7           I think I have a right to know any

 8   assets that the office maintains.

 9   MR. CARTER:

10           For what?  For what purpose?

11   MS. BALASUBRAMANIAN:

12           For judgment purposes.

13   MR. CARTER:

14           For -- you haven't obtained a judgment

15   in this case and I don't know that you're going

16   to.

17   MS. BALASUBRAMANIAN:

18           We can get discovery.

19   MR. CARTER:

20           I don't want you doing discovery on the

21   Musson case in this case.

22   MS. BALASUBRAMANIAN:

23           Right.  But to the extent that -- it is

24   still discoverable to the extent that it's a

25   possibility.  And there is a personal claim
```

```
 1  against Ms. Jones.  There is a punitive damages
 2  claim.  So I think I am entitled to a little bit
 3  of information about the assets owned by the
 4  office to the extent that there is any judgment
 5  obtained.
 6          There should be a policy limit to the
 7  insurance policy that she has.  Above and beyond
 8  than I might -- you know, I need this information
 9  I guess for our own purposes.  But, you know, I
10  won't foray too widely.  I'm just trying to get a
11  general sense of what assets are owned by the
12  office.
13  BY MS. BALASUBRAMANIAN:
14  Q          So any other -- so you guys own the
15  desks that are -- or are those county property?
16  A          To put it plainly, everything that we
17  use in terms of furniture, office space, all of
18  that is paid for and owned by the county.
19  Q          Okay.  And what about the Asset
20  Forfeiture Program.  Can you explain to me how
21  that works and what the Asset Forfeiture Fund is?
22  A          Usually if someone is arrested or a
23  group of people are arrested and assets are
24  frozen in connection with, let's say, a drug
25  operation, there's a procedure, a civil procedure
```

```
 1   by which we can freeze those assets.  And if they
 2   are proven to be fruits or of the illegal
 3   enterprise, then we can convert those assets and
 4   properties, if either, into money or we can
 5   acquire them as a department.
 6   Q       Okay.  And who is responsible for --
 7   well, are there -- are there records maintained
 8   of the assets that have been seized or are -- or
 9   that have been seized by your office in
10   connection with the Asset Forfeiture Program?
11   A       Yes.
12   Q       Okay.  What kind of records are those?
13   A       Well, each asset forfeiture case or
14   claim turns into a case.  So they would need that
15   information.  We usually receive a police report
16   into our office about -- or from another
17   department, another law enforcement agency about
18   assets that they thought needed to be seized.
19   And there would be case information.  Something
20   would be filed in relation to that asset
21   forfeiture proceeding.  And then depending on how
22   the hearing went, if there was a hearing there
23   would be an order.  So those are the documents
24   that I would expect to see in connection with
25   asset forfeiture cases.
```

1    Q          Is there like a budget or anything
2    where income from the asset forfeiture claims are
3    reflected?
4    A          Yes.
5    Q          Okay.  And who is the custodian of that
6    document?
7    A          The county holds the purse strings for
8    all money that is either collected or spent by
9    the DA's office.  So the county would have the
10   records on that account.
11   Q          So the county is the custodian of money
12   that the DA's office receives in connection with
13   the asset forfeiture claims?
14   A          Yes.
15   Q          Does your office maintain a copy of the
16   income or the -- I don't know if profit is the
17   right word, but the income received or the
18   revenue received from the Asset Forfeiture
19   Program?
20   A          Not typically, no.  We usually
21   update -- we usually get an update or report on
22   that from our budget analyst.  And that's
23   probably information we usually get by phone.
24   But those documents are not housed here about the
25   income.

1   Q        Who is the person -- who is the budget

2   analyst in your office who is responsible for

3   communicating with the county regarding the asset

4   forfeiture revenue?

5   A        Our budget analyst is Mr. Mark Bucalo.

6   He's not in this office.  He works for Chatham

7   County.  He doesn't work in my office.

8   Q        How do you spell his last name?

9   A        B, as in boy, U-C-A-L-O.  Bucalo.

10  Q        I'm sorry.  What was his first name?

11  Mark?

12  A        Yes.

13  Q        And Mr. Bucalo is a Chatham County

14  employee responsible for communicating with your

15  office about revenue from the Asset Forfeiture

16  Program?

17  A        Among other things, yes.

18  Q        When was the last time you received

19  communication from Mr. Bucalo about the -- the

20  amount of money available to your office from

21  the -- from the program?  Asset Forfeiture

22  Program?

23  A        Within the last 60 to 90 days, I guess.

24  Q        How much money was reflected in the

25  income or the revenue from the Asset Forfeiture

1   Program at the last time that he communicated

2   with you?

3   A          I don't recall.

4   Q          Was it in the thousands, the hundred

5   thousands?

6   A          I don't recall.  That would a good

7   question for my office manager.

8   Q          Okay.  And Mr. Burton volunteered to be

9   the -- to be over -- to oversee the Asset

10  Forfeiture, I guess, Program at some point from

11  your office in addition to his ADA

12  responsibilities; correct?

13  A          I didn't talk to Mr. Burton about that

14  and he didn't communicate that to me.

15  Q          So you weren't aware that he was -- he

16  was overseeing the Asset Forfeiture Program on

17  top of his normal ADA duties?

18  A          I was -- yes.  I was made aware of that

19  at some point after his departure because there

20  was $45,000 missing that he didn't account for.

21  But that -- I think that was discussion when that

22  issue came up and we realized that that money was

23  missing is when I learned from Mr. Edwards that

24  Mr. Burton had been working on asset forfeiture

25  cases.

1    Q          So was Mr. -- is it your testimony that

2    Mr. Burton was responsible for accounting for all

3    the money in that -- in the Asset Forfeiture

4    Program?

5    A          No.  He's not responsible for

6    accounting for money at all.  No one -- no one

7    here is.  That's done outside of our office.  He

8    is responsible for taking the complaints and

9    making sure that the proper civil pleadings are

10   filed.  If that was his assignment.

11   Q          Okay.  What was the last thing you

12   said?  Sorry.

13   A          If that was his assignment, he would

14   have been responsible for filing the civil

15   pleadings in order to seize that much in assets

16   or whatever property existed out there.

17   Q          So when you said that he -- there was

18   $45,000 missing that he didn't account for, what

19   do you mean?

20   A          What I mean is that there are $45,000

21   worth of assets that he took no -- or property or

22   money that he took no action on and that were

23   supposedly out of time.  That conversation came

24   up long after he left.

25   Q          Did you -- was there anybody other than

```
 1   Mr. Burton who had any oversight over the Asset

 2   Forfeiture Program or the moneys that were to be

 3   seized as part of that program?

 4   A        Yes.   There was one administrative

 5   support staff member who was responsible for

 6   keeping track of incoming asset forfeiture

 7   complaints.  And there was another attorney on

 8   our staff who was learning how to do asset

 9   forfeiture either in tandem with Mr. Burton

10   before he left or that ended up -- that person

11   ended up replacing him.

12   Q        Who is that person?

13   A        The support staff member I've referred

14   to is Ms. Mary Edwards.  She is still here.  And

15   the ADA who replaced Mr. Burton is Mr. Kristjan

16   Whiteway.

17   Q        Is he still there?

18   A        He is.

19   Q        And he's handling it now?  The Asset

20   Forfeiture Program?

21   A        Yes.

22   Q        And is the -- and I don't -- we might

23   have discussed this.  I don't know.  Is the --

24   are the asset forfeitures moneys reflected on

25   your general operating budget that you receive
```

```
 1   from the county?
 2   A          No.  They're not.
 3   Q          Okay.  It's a separate budget that's
 4   separate of accounting that is maintained outside
 5   of your general operating budget?
 6   A          Yes and no.  It's not a separate
 7   budget.  It's a separate account.
 8   Q          Okay.  Understood.  Okay.  So in your
 9   general operating budget, how frequently is that
10   reviewed and approved by the county?
11   A          We usually have one big meeting to
12   discuss our annual budget once a year.  And then
13   they come around and do maybe a mid year
14   evaluation of our budget.  So I would say at
15   least once a year, sometimes twice.
16   Q          Okay.  And do you have to submit a
17   request for approval for budget items on an
18   annual basis?
19   A          Yes, I do.
20   Q          And that's divided between operating
21   expenses and salary.  Is that correct?
22   A          Generally speaking, yes.
23   Q          And does your office have documents in
24   its possession that reflect the current approved
25   budget from the county?
```

1    A          A county approved budget from the

2    county is -- we access that through a system

3    called Munis.  And so that's where our budget

4    information is kept.

5    Q          And the county has access -- equal

6    access to that documentation?

7    A          It does.  Yeah.  Mr. Bucalo accessed

8    that -- accesses that information for us all the

9    time.

10   Q          Okay.  Can we take a quick break?

11   A          May I ask --

12   THE VIDEOGRAPHER:

13              Go off the record?  Stay on the record

14   or stay off the record?

15   A          Do you anticipate this deposition is

16   going to go beyond 5:00 p.m.?

17   MS. BALASUBRAMANIAN:

18              I don't know yet.  I'm going to look.

19   MR. CARTER:

20              It can't go beyond 5:00 p.m. because

21   that's the seven-hour limit.

22   MS. BALASUBRAMANIAN:

23              I mean, that doesn't include breaks.

24   We took several breaks.

25

```
 1   MR. CARTER:

 2           But you also said -- well, we've had

 3   maybe 30 minutes.

 4   MS. BALASUBRAMANIAN:

 5           I don't know.  Let's ask the court

 6   reporter how many minutes or how many hours have

 7   transpired.

 8   THE VIDEOGRAPHER:

 9           I have five hours and 24 minutes on my

10   audio.

11   MR. CARTER:

12           You said five hours and 36.

13   MS. BALASUBRAMANIAN:

14           Sorry.  Five hours and 36?

15   THE VIDEOGRAPHER:

16           Five hours and 24 minutes.

17   MS. BALASUBRAMANIAN:

18           Okay.  So we can go past 5:00.  But I'm

19   going to review and see what else I've got left.

20   THE VIDEOGRAPHER:

21           Off the video record at 3:58 p.m.

22           (OFF THE RECORD AT 3:58 p.m.)

23           (ON THE RECORD AT 4:04 p.m.)

24   THE VIDEOGRAPHER:

25           We are back on the video record at
```

1   4:04 p.m.  This is the beginning of Media File

2   Number 5.

3   BY MS. BALASUBRAMANIAN:

4   Q          Ms. Jones, just briefly.  The document

5   that we were looking at with the DAO

6   organization, Exhibit 27.  Other than the roles

7   identified just in this general structure in 2

8   through 6, were there other sort of supervisor

9   positions other than what was sort of identified

10  here that you created?

11  A          I don't think so.

12  Q          Okay.  So this is the universe of

13  supervisory positions in the office generally?

14  A          As of this date.  As of the date of

15  this document, yes.

16  Q          So were there other -- so other than

17  the lead attorney positions that were created,

18  were there other supervisors in the office that

19  had the responsibility to supervise employees?

20  A          Lead attorneys were not supervisors.  I

21  testified to that before.

22  Q          Well, they had some level of

23  responsibility that was more than, you know, just

24  ADAs that did not have that position.  Is that a

25  fair statement?

```
1    A          I just want to be fair that supervisory
2    is your term of reference and not mine.
3    Q          Okay.  That's fine.  So other than
4    this -- so were there other supervisory positions
5    created other than those on this list 2 through 6
6    after this date?
7    A          Well, yes, to some degree.  The office
8    manager position is not listed on here.  And the
9    office manager position later at some point did
10   become supervisory because whereas Mr. Edwards
11   was responsible for admins as of the date of this
12   document, we later changed the structure so that
13   admins had to report to the office manager.  That
14   change isn't reflected on here.  In addition to
15   that, there is no information on here about the
16   Juvenile Court.  And other than to say that,
17   yeah, Juvenile Court had to report to Diane
18   McLeod, but in that structure it's still the same
19   although the -- although she's no longer with us.
20   Q          Okay.  But from the Superior Court
21   organization, were there any other supervisors,
22   you know, over Superior Court cases that are not
23   reflected in the positions that are on this page?
24   A          No, ma'am.
25   Q          Okay.
```

```
 1   MS. BALASUBRAMANIAN:

 2           I don't have any more questions, Todd.

 3   MR. CARTER:

 4           Sorry.  I was muted.  Reginald, you got

 5   any questions?

 6   MR. MARTIN:

 7           No questions for the county.

 8                   EXAMINATION

 9   BY MR. CARTER:

10   Q       Okay.  Just a couple for you, Shalena.

11   We'll get you out of here.  I think here just

12   after we came back, you testified that lead

13   attorneys were not supervisors.  Is that right?

14   A       That's correct.  When we use the term

15   supervisor, we mean that that person is their

16   supervisor for the purpose of evaluating their

17   performance.  And lead attorneys didn't have that

18   responsibility.  So among other things.

19   Q       Okay.  Who would have been Mr. Burton's

20   supervisor?

21   A       Greg McConnell.  And Mr. McConnell was

22   the one who signed off on his performance

23   reviews.  And right above Greg McConnell would

24   have been Jenny Parker.  And above Jenny Parker

25   would have been either me or Michael.  So
```

1  Christian Stolfe was never in his chain of
2  command.
3  Q       All right.  And I believe you testified
4  earlier that you did not know Mr. Burton's sexual
5  orientation while he was an Assistant DA?
6  A       I did not.  He never shared that with
7  me and I never asked.
8  Q       To your knowledge, did Mr. Burton ever
9  make any complaint about discrimination to any
10 supervisor or to you?
11 A       No.  He never complained to me and
12 never complained to any member of my staff or any
13 of his supervisors that I just named for you.
14 Q       Okay.  Are you aware of him making any
15 complaints to Chatham County?
16 A       During his employment?  I mean --
17 Q       Yes.
18 A       I've not heard that at all either
19 before his -- at any point up until his actual
20 legal filings with the EEOC and, of course, this
21 litigation.  He made no complaints to them that
22 I'm aware of.
23 Q       Okay.
24 MR. CARTER:
25         That's all I've got.

```
 1   MS. BALASUBRAMANIAN:

 2           I don't have any other questions.

 3   MR. CARTER:

 4           All right.

 5   A       I have a question for -- I have a

 6   question for my attorney.  Can we go off the

 7   record for a second?

 8   THE VIDEOGRAPHER:

 9           Going off the video.

10   MS. BALASUBRAMANIAN:

11           We can end the session and you're

12   welcome to have that discussion off line.

13   THE VIDEOGRAPHER:

14           Going off the record at 4:10 p.m.

15   THE COURT REPORTER:

16           Counsel, can you please state your

17   transcript orders on the record.

18   MR. CARTER:

19           I would like paper and digital.

20   MR. MARTIN:

21           The county would like the paper and

22   digital as well.

23   (Whereupon, the deposition concluded at 4:10 p.m.

24   EST.)

25
```

1             C E R T I F I C A T E

2

3        I do hereby certify that the above and

4 foregoing transcript of proceedings in the matter

5 aforementioned was taken down by me in machine

6 shorthand, and the questions and answers thereto

7 were reduced to writing under my personal

8 supervision, and that the foregoing represents a

9 true and correct transcript of the proceedings

10 given by said witness upon said hearing.

11        I further certify that I am neither of

12 counsel nor of kin to the parties to the action,

13 nor am I in anywise interested in the result of

14 said cause.

15

16

17              *Jillian Doctor*

18        /s:// Jillian Doctor
           JILLIAN DOCTOR, RPR,

19        CERTIFIED REALTIME REPORTER

20

21

22

23

24

25

**Regency-Brentano, Inc.**

Video Deposition

```
1                    COURT REPORTER DISCLOSURE

2

3          Pursuant to Article 10.B of the Rules and
       Regulations of the Board of Court Reporting of the
4      Judicial Council of Georgia, I make the following
       disclosure:
5
           I am a Georgia Certified Court Reporter.  I am
6      here as a representative of Regency-Brentano, Inc.

7          I am not disqualified for a relationship of
       interest under the provisions of O.C.G.A. §9-11-28 ©.
8
           Regency-Brentano, Inc. was contacted by Buckley
9      Bala Wilson Mew, LLP to provide court reporting services
       for this deposition.
10
           Regency-Brentano, Inc. will not be taking this
11     deposition under any contract that is prohibited by
       O.C.G.A. §15-14-37 (a) and (b).
12
           Regency-Brentano, Inc. has no exclusive contract
13     to provide reporting services with any party to the
       case, any counsel in the case, or any reporter or
14     reporting agency from whom a referral might have been
       made to cover this deposition.
15
           Regency-Brentano, Inc. will charge its usual and
16     customary rates to all parties in the case, and a
       financial discount will not be given to any party to
17     this litigation.

18

19

20

21

22                 Jillian Doctor

23         _____

24                 JILLIAN DOCTOR

25
```

Regency-Brentano, Inc.

Case 4:23-cv-00111-RSB-CLR   Document 34   Filed 07/08/24   Page 261 of 413

Burton v.
Jones

Video Deposition

Shalena Cook Jones
December 18, 2023

**$**

**$45,000 (3)**
247:20;248:18,20
**$5,000 (1)**
241:21
**$67,000 (1)**
111:16

**[**

**[phonetic] (1)**
240:15

**A**

**Abbot (31)**
56:8;57:7;61:19,22;
111:8;150:20;152:22;
155:5,21;156:6,15,20;
160:6,20;162:9;
165:1,6,13;166:14;
167:3,5,18,21,22,25;
168:20,20,24,25;
169:3;211:15
**Abbot's (2)**
210:18;221:18
**abide (1)**
92:20
**Abigail (1)**
213:13
**ability (2)**
139:13;214:19
**able (2)**
143:24;187:1
**aboard (2)**
30:25;62:23
**above (5)**
36:25;37:2;243:7;
255:23,24
**absence (1)**
108:20
**Absolutely (5)**
12:3;114:8;161:15;
163:8;164:9
**abuse (4)**
30:25;31:3,15;47:5
**accepted (3)**
38:15;225:14,15
**access (4)**
240:25;251:2,5,6
**accessed (1)**
251:7
**accesses (1)**
251:8
**accidentally (1)**
112:16
**accidents (1)**
23:2
**accordance (1)**
89:11
**accordingly (2)**

94:2;113:24
**account (4)**
245:10;247:20;
248:18;250:7
**Accountability (12)**
62:24;63:7,10,17,
20;64:5,8,16,19;
204:12;205:16,23
**accounting (3)**
248:2,6;250:4
**accurate (7)**
21:18;32:9;37:7,8;
140:18;141:19;
206:19
**accuse (1)**
16:16
**accused (3)**
92:4,8;93:7
**acknowledged (1)**
129:25
**acquire (1)**
244:5
**acquisition (1)**
23:11
**acronym (1)**
188:20
**across (4)**
66:15;102:14;
109:11;228:25
**Act (16)**
42:1,10,12,17,18;
43:2;45:16,20;46:3,
10,24;50:22;89:9,9,
11;90:4
**acted (1)**
43:9
**acting (4)**
51:10;195:8,20,23
**action (7)**
15:22;16:10;45:3;
91:25;96:20;134:11;
248:22
**actions (4)**
74:13;78:4;93:5;
96:13
**active (1)**
111:4
**activity (2)**
142:23;144:8
**actual (4)**
195:22;196:1;
231:6;256:19
**actually (6)**
88:17;117:22;
160:1;226:14;232:24;
236:6
**AD (1)**
47:9
**ADA (26)**
15:8;28:22,25;
33:11,20;35:21,22,22;
105:20;152:7;164:1;
169:9;225:15,16;

94:2;113:24
229:4,7;235:23,23;
236:9;237:6,11,17;
238:2;247:11,17;
249:15
**ADA-I (6)**
31:9;32:3;235:4,5,
11,16
**ADA-II (9)**
32:3;225:8;227:22;
231:8,17,22;232:14,
20;234:5
**ADA-III (6)**
231:8;232:11,15,
21;234:6,11
**ADA-IV (8)**
225:9;227:23;
228:22,23;230:1,5;
232:16,24
**ADA-IVs (4)**
229:14,16,18,20
**ADAs (40)**
32:7;33:9;34:4;
36:5;64:12;151:20;
152:6;153:1,25;
154:1,17,18,21;
162:15;163:12,16;
166:24;167:7,9;
168:5,8,22;169:10;
203:1,6,13;214:15;
222:13;223:11;224:3;
226:12;228:20,22;
229:10;237:3,9,15,19;
238:5;253:24
**ADA's (1)**
82:1
**added (1)**
228:12
**addition (6)**
120:12;142:17;
155:1;225:21;247:11;
254:14
**additional (2)**
133:7,15
**Adeshina (1)**
234:21
**adhere (2)**
171:16,19
**admin (2)**
173:7
**administration (18)**
67:1,8;72:21,22,23;
73:15;76:11,20;86:2,
11;87:2,11,19;88:2;
184:7;186:24;199:13;
216:17
**administration's (1)**
86:14
**administrative (4)**
195:5;199:2;200:3;
249:4
**administrator (2)**
63:5;183:14
**admins (3)**

201:4;254:11,13
**admit (3)**
100:13;107:7,10
**admitted (16)**
98:13;103:4;104:8;
106:24;107:2,14,17,
21;131:19;135:5,24;
136:5,10;137:4,8,8
**admitting (1)**
135:19
**adopted (3)**
76:19;77:5;78:17
**adult (3)**
99:4;100:4;162:17
**advice (3)**
41:1;42:16;43:1
**advise (1)**
25:9
**advises (1)**
147:5
**advocate (1)**
225:16
**advocates (1)**
174:18
**advocating (1)**
228:24
**affecting (1)**
41:15
**affiliated (1)**
48:2
**afraid (1)**
220:10
**afternoon (4)**
99:23;101:18;
102:4;234:23
**again (6)**
22:12;37:13;39:10;
76:21;85:4;88:16,21;
144:4;148:17;183:2;
188:19;205:1;209:24;
210:15,22;217:12;
228:16
**against (11)**
15:18,22;16:10;
18:10;28:11;35:21;
127:16;193:25;
203:15;220:13;243:1
**agencies (3)**
40:4,6;66:6
**agency (1)**
244:17
**ago (4)**
15:15;24:5;40:11;
68:18
**agree (4)**
127:18;145:7;
163:6;176:16
**agreeable (1)**
118:13
**agreed (1)**
38:15
**agreement (13)**
8:21;140:16;

142:16,22;153:7,17;
154:23;155:14;
160:13,16;168:6;
169:1;240:14
**agreements (3)**
90:8,12,14
**ahead (19)**
9:24;32:25;40:8;
46:19;58:4;69:2,12;
77:2;86:21;100:7,10;
125:5,23;156:11;
166:7;177:11;199:17;
212:14;230:11
**alert (1)**
89:5
**Alicia (3)**
185:14;187:2,5
**alien (1)**
27:3
**allegation (4)**
15:13;16:13,14;
235:14
**alleged (1)**
15:9
**allegedly (2)**
104:2;135:5
**Allen (5)**
59:15,21,25;60:3;
194:16
**A-L-L-E-N (1)**
194:17
**alley (1)**
173:21
**allow (4)**
8:23;69:9;101:21;
180:6
**allowed (7)**
16:6;53:1;54:13;
93:23;143:7;146:24;
176:13
**alone (2)**
132:1,4
**along (5)**
59:14;215:17,19;
221:10;224:8
**alternate (2)**
157:16,20
**although (4)**
137:14;217:6;
254:19,19
**always (6)**
85:23,23,23;146:3;
157:10;198:24
**amazing (1)**
118:4
**Amendment (16)**
24:3,7,13;25:17;
50:23;51:10,12,19;
160:10;161:18;162:3,
23;163:4,7;165:8,11
**among (6)**
68:6,12;202:14,20;
246:17;255:18

Case 4:23-cv-00111-RSB-CLR  Document 34  Filed 07/08/24  Page 262 of 413
Burton v.
Jones

Video Deposition

Shalena Cook Jones
December 18, 2023

amount (2)
152:8;246:20
Ana (5)
59:15,21,25;60:2;
194:16
analysis (2)
232:4;234:15
analyst (3)
245:22;246:2,5
and/or (3)
78:14;236:19,20
Andre (5)
56:12,24;120:13;
185:13;186:7
angry (1)
100:17
Anita (8)
5:17;6:7;57:21;
68:24;80:19;112:12;
171:24;242:2
Anitra (5)
14:1;101:7;108:5;
135:14;182:11
Ann (1)
36:24
announcement (3)
226:22;227:1,9
annual (5)
228:1;231:14,21;
250:12,18
Ansley (4)
21:23,25;22:21,23
answered (16)
12:16;68:8;86:21;
122:11;126:10,18,19,
22;127:1,17,18;
137:2;147:25;148:4;
205:3;210:22
Anthony (17)
5:18,18;103:5,9;
109:23;135:25;136:6,
10;137:9;141:24;
142:10;153:18;
162:11;210:17;
211:15,20;218:5
anticipate (1)
251:15
anymore (1)
196:6
apologies (3)
20:25;70:7;79:11
apologize (1)
40:11
apparent (1)
206:13
appear (1)
24:2
appearing (1)
191:20
appears (5)
105:24;129:21;
230:21;231:15;
233:20

applicable (10)
72:10;75:16,19,20,
20,23;76:8;81:22;
82:4;129:19
applicants (1)
180:7
applications (2)
183:4,7
applied (3)
94:10;165:9;183:15
applies (3)
46:13;51:14,23
apply (5)
42:6;94:25;160:16;
181:2;214:3
applying (1)
184:14
appoint (3)
184:2;215:24;
219:23
appointed (2)
184:3;200:16
appreciate (1)
139:24
approach (6)
37:24,25;38:3;56:1;
61:23;66:10
appropriate (1)
89:10
approval (1)
250:17
approve (2)
175:24;176:3
approved (7)
176:3,12;231:7,13;
250:10,24;251:1
approximate (1)
241:19
approximately (3)
174:4;201:13;
241:21
April (4)
115:19;117:6;
156:2,5
Archibald (2)
19:11,15
area (5)
32:22;36:10;38:8;
99:13;173:3
areas (3)
32:16;84:14;143:9
argue (1)
10:8
argument (1)
165:4
Arkeyveaya (1)
190:6
armed (1)
196:22
arose (2)
99:2;141:6
around (18)
38:6;39:1;40:1;

56:5;102:24;103:2;
110:19,22;111:2;
170:3;182:1,17;
185:5;208:14;216:4;
229:10,10;250:13
arrested (2)
243:22,23
arrival (1)
54:1
arrived (5)
68:11;70:5;105:22;
157:4;220:15
articulated (1)
141:14
ascertain (1)
74:20
aside (1)
32:6
assault (2)
35:22;203:11
assaults (1)
203:21
Asset (22)
243:19,21;244:10,
13,20,25;245:2,13,18;
246:3,15,21,25;247:9,
16,24;248:3;249:1,6,
8,19,24
assets (11)
238:15;242:8;
243:3,11,23;244:1,3,
8,18;248:15,21
assign (8)
206:20;207:20;
212:7,9;219:17;
221:17;222:13;
226:16
assigned (47)
26:25;29:4,6;32:21;
33:9,21;34:14,19;
35:13,19;61:6,8;
64:13;65:2;66:14;
110:9;115:7;163:12;
194:4,7;199:15,18;
202:18;203:16;
205:23;206:7,23;
207:4;208:5,16;
209:2,6,10;210:2,5,
17,19;211:15,20;
214:13;220:20,22,25;
222:7,18;226:23;
241:7
assigning (3)
65:4;206:14;212:2
assignment (9)
29:1;30:17;34:14;
55:6;217:19;219:7;
229:2;248:10,13
assignments (6)
32:16;55:2;176:23,
24;208:19;221:4
assist (4)
65:25;191:8,11,11

Assistance (5)
188:21,22;190:14;
191:5;240:18
assistant (10)
70:4;174:8,15;
178:19;179:2,14;
198:22;235:3,15;
256:5
assistants (4)
174:7;195:5;200:3;
223:5
assisted (1)
74:8
associated (2)
225:5;234:25
assume (14)
8:2;12:15;42:9;
52:15;84:11;91:5;
92:16;104:23;174:7;
191:4;195:14;213:16,
19,19
assumed (7)
35:3;66:19;115:8;
116:13,16;212:9;
225:9
assuming (2)
60:19;137:22
Atlanta (7)
23:6;26:1,5,14;
38:6;99:5,12
attached (1)
46:22
attaching (1)
150:16
attachment (1)
29:6
attempt (1)
157:19
attend (2)
20:13;47:21
attended (3)
10:16;20:7;135:14
attending (1)
85:7
attention (6)
98:11,17,20;
151:19;216:8;219:20
attorney (71)
12:20;14:19;30:2;
48:17;63:5,6;66:8;
74:9;128:11;134:8;
156:25;169:17;
170:21;173:6;183:20,
21;185:16,17;191:2,
21;192:10,16,17;
194:4;200:4,15,15,21;
201:7;211:4;212:3,5,
10,22;214:1,7,20;
215:15;217:6,10,11,
20;218:6;219:17;
221:13,16,21;222:7,8,
9;223:19;224:6,7,9,9,
10,16;225:2,5,10,14;

226:15;227:5;229:18,
24;235:21;237:23;
239:24;249:7;253:17;
257:6
attorneys (69)
13:23;32:21;39:12;
52:22;65:5;90:16;
102:5;162:15;166:14;
174:6,14,15;175:10;
190:16,17;191:18;
192:16;194:7,25;
195:4;199:24;200:2,
9,14;201:3,10;202:1,
9,17;204:9,17,20,21;
205:19,22;206:1,3,15,
20,23;207:3,4;208:16,
18;209:1,6,9;210:1;
212:7;213:3;214:8;
215:3;219:23;220:24;
221:4,14;222:18,22;
223:2,5,12,16,21,24;
226:22;229:15;
253:20;255:13,17
Attorney's (18)
15:8;22:8,9;25:22;
26:16,22;27:8,12,22;
28:1,7,79:24;105:21;
146:12;154:2;175:6;
192:20;228:18
audio (1)
252:10
AUSA (1)
27:23
author (2)
94:15;105:7
authored (1)
82:11
authorization (2)
128:12,25
authorized (5)
108:7,11;130:12;
231:4;232:4
availability (3)
185:21;186:1;
207:16
available (12)
72:3;74:3;84:9,14;
135:10;154:13;
181:13;186:6,8,21;
226:15;246:20
aware (46)
6:13;7:23;8:3;9:8;
10:2;46:12;47:2;
48:24;56:18;75:24;
76:5;80:6,16;83:6;
84:3;87:6;103:20;
115:2,3,11;116:9,10,
14;147:10,10;169:8;
191:14;209:8;216:10,
13;218:11,12,16;
224:22,25;226:13;
230:6;231:22;232:23;
233:2;239:23;240:2;

Case 4:23-cv-00111-RSB-CLR Document 34 Filed 07/08/24 Page 263 of 413

Burton v.
Jones

Video Deposition

Shalena Cook Jones
December 18, 2023

247:15,18;256:14,22
**awareness (2)**
52:4;57:4
**away (2)**
207:20;224:2

**B**

**back (41)**
12:18;20:19;21:1;
28:4;34:12;40:20,21;
70:15;71:7,18;84:18,
23;102:21;113:23;
119:4,14;131:21;
150:4,25;155:17;
158:7;159:24;162:7,
16;167:14;169:12;
181:9;182:24;190:11;
193:18;198:18;205:2,
7;220:1;221:25;
231:18,20;234:15;
236:23;252:25;
255:12
**background (1)**
237:6
**backgrounds (1)**
237:3
**Backing (1)**
180:1
**backup (1)**
108:15
**bad (7)**
89:20,20;158:12,
15;159:1;216:7,9
**Baio (1)**
213:10
**Bala (1)**
5:17
**balance (1)**
66:18
**balanced (2)**
66:10,10
**BALASUBRAMANIAN (138)**
5:11;6:11,21;7:7,
21;8:6;9:1,17;10:1,
11;11:14;12:10,12;
20:18;21:2,4;33:3;
42:11,14;57:24;69:1;
70:10,19,23;71:3,8,
21;74:22;75:3;79:3,8,
13,16;80:21;83:19,
24;84:20,22;88:15,
19;90:19,24;95:23;
96:4,23;97:3,8,10;
100:23;112:14,18;
117:17,24;118:3,15,
22;119:7,13,15;122:4,
6;123:5,7;124:23;
126:21;127:6,13;
128:3;140:2,6,11;
143:18;144:1;147:19;
148:1,5,7,14;150:3,
11,15,24;151:2;

159:23;160:3;161:1,
3,9,12;164:8,13,19;
165:2,17;166:1,8,11,
22;170:12,14;175:11,
15;176:19;177:18,21;
178:6,9;193:7,11,20;
207:10;208:24;
209:20,23;210:23;
211:3;227:12,16;
230:15;231:19;233:7,
13;238:9,11;242:6,11,
17,22;243:13;251:17,
22;252:4,13,17;
253:3;255:1;257:1,10
**ballpark (1)**
45:9
**bankruptcy (3)**
18:14,16,21
**banter (1)**
152:5
**Bar (6)**
91:1,2;95:17;96:7;
216:11,20
**Barbara (3)**
73:2;74:8;180:17
**Barnard (2)**
239:18;240:10
**Barrow (1)**
169:11
**Bar's (1)**
95:8
**based (30)**
31:8,20;32:3,8,11,
15,21,22;33:18;38:6;
39:3;48:1;49:22;95:5;
110:5;113:24,24;
122:10;132:9;133:4;
144:19;162:5;163:21;
171:12;173:9;203:13;
206:23;215:7;225:12;
229:2
**bases (1)**
87:12
**basic (1)**
8:12
**basically (2)**
21:14;193:22
**basis (6)**
10:5;25:7;94:20;
124:7;129:4;250:18
**Bates (2)**
81:9,18
**bathroom (2)**
51:2;70:12
**Baucum (5)**
73:2;74:8;180:18,
19;181:7
**Baucum's (1)**
74:15
**Bazemore (6)**
68:20;69:21;72:6;
179:22;182:21;
183:11

**became (9)**
28:23;34:9;100:17;
115:3;116:9;206:13;
218:12;221:15;235:3
**become (4)**
73:7;115:10;
116:14;254:10
**becomes (2)**
7:5,23
**becoming (1)**
216:12
**beforehand (5)**
58:15,17,19;61:18;
62:1
**began (1)**
44:13
**begged (1)**
102:18
**begin (3)**
29:21,23;47:21
**beginning (7)**
5:4;51:1;71:19;
88:9;119:5;178:7;
253:1
**behalf (2)**
227:21;231:5
**behavior (2)**
93:6;172:14
**behind (1)**
73:21
**believes (1)**
157:7
**believing (1)**
129:5
**below (1)**
228:5
**bench (4)**
155:7,23;156:22;
157:12
**benefit (2)**
147:9;159:12
**best (10)**
19:23;46:15;65:25;
69:10;107:18;133:19;
158:13;188:17;214:6;
237:22
**better (3)**
44:6,7;238:3
**beyond (5)**
40:10;232:22;
243:7;251:16,20
**biassed (2)**
111:12;158:8
**big (3)**
173:17;207:17;
250:11
**bike (1)**
15:19
**Bill (1)**
191:15
**bit (6)**
34:11;74:14;
119:22,23;238:13;

243:2
**black (3)**
111:14;173:12,18
**blew (1)**
158:18
**blow (2)**
127:22;176:20
**blue (3)**
104:21,24;106:7
**Blueprint (1)**
240:20
**board (3)**
180:14;239:1,25
**books (4)**
49:21,22;50:4,8
**boot (1)**
47:21
**Bordeaux (1)**
52:19
**border (2)**
26:25;27:2
**both (22)**
40:19;41:17;44:22;
57:1;61:8;66:12;
75:19;104:11;110:7;
111:19;135:24;
146:10,19;147:8;
162:5;175:21;180:9;
186:9;192:5;197:1;
214:18;227:25
**bottom (6)**
81:10;103:11;
121:22;159:25;160:2;
232:9
**bought (1)**
23:7
**bound (2)**
9:13;168:21
**boundaries (2)**
153:24;154:6
**boy (1)**
246:9
**boys (1)**
157:10
**Brad (11)**
55:18;56:7;57:7,12;
61:17,24;62:10,12;
66:3;213:11,15
**brand (1)**
33:9
**Branham (2)**
194:10,18
**B-R-A-N-H-A-M (1)**
194:10
**breach (1)**
109:2
**breached (1)**
125:19
**break (11)**
51:3,5;70:11,13;
71:5,23;74:13;
117:10,19;119:10;
251:10

**breaks (3)**
51:4;251:23,24
**breakup (1)**
16:1
**Brian (5)**
101:8;108:2;
135:15;213:10,12
**Bridget (1)**
199:22
**brief (1)**
235:1
**briefly (1)**
253:4
**brilliant (1)**
158:24
**bring (4)**
31:5;44:4;118:8;
215:5
**bringing (1)**
118:10
**broad (1)**
202:25
**broader (4)**
94:9,12;96:7,9
**broke (2)**
69:18;155:17
**Bronston (2)**
105:17,20
**brought (3)**
66:18;162:18;
219:19
**Browne (4)**
199:23,25;200:2,14
**Bryan (1)**
46:20
**Bryant (5)**
16:5;196:25;197:3,
4,18
**bubble (3)**
143:19;177:19;
234:20
**bubbles (1)**
120:20
**Bucalo (5)**
246:5,9,13,19;
251:7
**budget (16)**
240:2;245:1,22;
246:1,5;249:25;
250:3,5,7,9,12,14,17,
25;251:1,3
**build (3)**
44:7;184:18;214:12
**building (11)**
53:1;184:16,24;
214:19;238:17,21,24;
239:16,20,21;240:5
**buildings (1)**
240:7
**bullet (1)**
142:14
**bulleted (2)**
141:22;142:3

Case 4:23-cv-00111-RSB-CLR Document 34 Filed 07/08/24 Page 264 of 413

Burton v.
Jones

Video Deposition

Shalena Cook Jones
December 18, 2023

**bump (3)**
225:4,8;229:4
**Burton (90)**
5:18,18;7:16;9:11;
37:3,9;95:4;96:6,15;
97:20;100:24;103:5,
13;104:2,6,17,25;
105:5,11;106:25;
107:8,11;109:23;
110:4,15,21;111:19;
115:4;116:10,17,23;
120:13;121:22;
122:14,17;123:19,25;
124:1,5;126:14;
128:13,14;132:5,25;
133:3;135:6,20,25;
137:5,9;139:21;
140:17;143:11;
144:16;145:15;
155:15;162:11;
181:23,25;210:17;
211:15,20;218:5,16;
219:12,21;220:8,18,
20,23;221:5;224:18,
19,22;226:7,9,14,18;
230:5,9;236:14,22;
247:8,13,24;248:2;
249:1,9,15;256:8
**Burton's (12)**
10:16;13:10;
104:20;124:7;181:21;
182:10;206:16,25;
224:14;235:13;
255:19;256:4
**business (14)**
34:5;39:16;67:3;
89:7,7;92:22;93:11;
100:1;130:11,20,21;
131:8;144:21,23

**C**

**cabinet (7)**
56:10;184:16,18,
24;185:6;188:6,15
**call (2)**
33:6,8
**called (9)**
15:17;23:7;98:16;
99:3,8;100:19;
102:21;228:17;251:3
**came (29)**
30:25;34:22;98:15;
99:24;111:8;113:17;
114:18;120:24;121:4;
145:15;162:16;
180:13,14;181:11;
182:8,24;195:22,24;
204:5;207:18;219:10;
221:10;222:22;
223:13;231:2;241:18;
247:22;248:23;
255:12

**camel's (1)**
155:17
**camp (1)**
47:21
**campaign (1)**
111:15
**can (147)**
9:11;11:10;12:11,
15;14:7;15:1;17:17;
19:23;20:19,21,21;
21:3,13,20;29:1;
31:10;34:7;46:15;
48:17,18;51:5,7,8;
59:10;69:24;70:11,
14;71:5;74:23;79:4,
14;81:2;83:20,21;
84:21;88:16,16;
90:20,21;96:24,25;
97:9;100:9;104:11;
105:14;107:18,18;
111:3;117:11,23;
118:12,16,18;119:14;
122:5,16;123:6;
124:24;125:5,15;
127:20,22,22;129:17;
136:13;139:19,23;
140:3,7,7;142:25;
143:17,19,21;144:2,3;
145:13;147:6;150:9,
12,13,21,25;158:16;
159:24,25;161:2,10;
163:25;164:18;
166:12,17,17,20,24;
167:11,20;168:17;
169:7,10,18,21;
170:11,13;174:5,12;
175:12;176:20;178:7,
13,16;185:7;187:18;
188:17;193:5,12;
194:3;198:18,19;
199:13;202:15;205:2,
7;207:14;226:22;
227:13;230:11;
231:18,20;232:6;
233:8,9;234:20;
238:10,12,13,19;
242:18;243:20;244:1,
3,4;251:10;252:18;
257:6,11,16
**candidates (8)**
180:16;183:4;
185:1,5,8;217:17,18;
237:21
**capacities (1)**
5:20
**capacity (3)**
59:4;174:21;205:20
**captures (1)**
21:16
**care (2)**
137:7;138:3
**career (2)**
45:9;216:25

**Carl (1)**
239:17
**Carol (2)**
194:9,18
**Carolyn (2)**
74:7;233:17
**carriers (2)**
23:4;41:6
**carry (1)**
227:6
**cars (1)**
240:22
**CARTER (63)**
6:6,14;7:1,11;8:1,
11;9:15,20;10:7;
21:23,25;22:20,23;
32:24;42:8;57:20;
68:23;71:10;80:18;
81:19;86:16,19;
95:20;96:2;100:11;
112:11;117:20;118:1,
5,19;124:21;126:17,
24;127:10;137:1;
147:17,24;148:3,10;
164:4,11,17,23;
165:20;166:6,19;
207:8;208:22;209:17;
210:21;211:1;242:1,
9,13,19;251:19;252:1,
11;255:3,9;256:24;
257:3,18
**case (56)**
6:2;7:9;10:23;11:2;
13:15,20,20;14:14;
15:11,12;23:17;31:2;
33:19;36:7;39:13,14;
45:20;51:22;61:9,11,
15;64:25,25;111:7,10,
13,19;114:10;139:10;
148:2,8,9;157:6;
168:3;192:7;195:6;
203:2,15;219:1,3;
222:6,9,20,25;223:1,
1,6,13;224:6,9;
242:15,21,21;244:13,
14,19
**cases (75)**
23:3,17,18;24:3,8,
13,25;25:4;27:1,4,5,
23;29:5;30:8;31:4;
32:17,18,21;33:11,21;
34:15,20;39:22;45:3,
5,8;46:6,22;52:3;
61:14;63:7,11,11,22,
24;64:1,4,8,23,24;
65:2,4,6,8;93:24;
153:11;159:13,14;
162:25;163:5,10;
169:24;203:3,4,23;
207:21;217:9;218:17,
18;220:10,10,18;
221:17;222:2,14,15,
16,19;223:7,10,20;

224:4;244:25;247:25;
254:22
**catching (1)**
20:9
**categories (3)**
32:20;142:3;175:1
**categorized (2)**
225:24;226:1
**category (1)**
171:10
**causally (1)**
153:20
**cause (1)**
16:10
**causes (1)**
45:2
**central (1)**
39:7
**certain (21)**
14:15;32:16,20;
36:17;43:8,21,21;
52:22;78:1;81:15;
144:7;145:8;153:2;
159:6;173:14;202:18;
203:6;204:1;224:3,4;
239:2
**certainty (4)**
11:18;69:8;80:6;
134:18
**certificates (1)**
168:11
**cetera (6)**
25:2;53:7;168:11;
196:22;215:2;223:7
**chain (20)**
65:15;98:3,7;
101:19;106:13;120:1;
121:24;122:18;
124:13;133:5,12,15,
22;135:8;136:22;
138:11,14;142:11;
197:16;256:1
**chains (2)**
104:23;176:25
**chair (5)**
220:4,5;222:8,10;
223:20
**chaired (2)**
219:2,12
**chance (2)**
72:13;209:25
**change (21)**
31:13;63:23;71:24;
108:18;119:9;157:1;
159:3,16;189:9;
193:6;195:9;196:8;
207:17,23;208:18,19;
212:21;222:21,22;
223:10;254:14
**changed (10)**
30:17;159:4;
177:25;179:3;189:2,
5,6;196:10;223:1;

254:12
**changes (2)**
62:3;210:13
**changing (1)**
222:12
**Chapter (4)**
18:18,18,19;146:19
**characteristic (1)**
171:14
**characterized (1)**
226:1
**charge (1)**
224:23
**charges (1)**
193:24
**chart (5)**
54:13;65:10,14;
177:24;178:17
**charts (3)**
8:18;67:14;175:18
**chat (3)**
116:19;120:14;
121:12
**Chatham (26)**
5:20;16:20;17:22;
22:9;28:5,15,23;29:5;
31:1,4;53:5,8;79:23;
82:10,21,22;83:3;
88:21;151:5;187:22;
233:4;238:25;239:14;
246:6,13;256:15
**check (3)**
50:3;233:4;234:17
**checked (1)**
234:16
**Cheryl (11)**
188:25,25;189:10,
12,15,19,20,20;190:2,
12;200:6
**Chief (22)**
36:15;55:23;56:9;
61:1;66:1;85:6;
110:13;178:18,19,19,
21,23;195:8,20,20,22,
23;196:1;197:20;
205:13;236:12;238:1
**Chiefs (1)**
210:13
**child (13)**
18:7,12;174:23;
178:25;191:24;
192:24;193:1,21,22;
194:24;195:6;199:6;
239:14
**children (5)**
17:25;18:2,5,6;
35:21
**Chisolm (5)**
28:20;29:8;30:3,4;
35:17
**choice (1)**
65:25
**choices (1)**

Case 4:23-cv-00111-RSB-CLR   Document 34   Filed 07/08/24   Page 265 of 413

Burton v.
Jones

Video Deposition

Shalena Cook Jones
December 18, 2023

33:13
**chose (5)**
34:4;60:2;151:12,
12;214:17
**chosen (1)**
214:8
**Christian (7)**
212:1,4;215:21;
233:15;234:23,23;
256:1
**Christy (2)**
179:15,17
**CID (1)**
199:5
**circuit (3)**
51:23;66:16;76:15
**circumstances (1)**
145:8
**cite (2)**
95:9;129:20
**cited (2)**
129:24;228:8
**cities (1)**
23:24
**City (1)**
23:22
**civil (11)**
5:22;15:3;16:17;
26:23;43:7;44:17,20;
142:24;243:25;248:9,
14
**claim (5)**
15:18;131:6;
242:25;243:2;244:14
**claims (14)**
24:7,20,23,24;
25:13,17;39:15;46:5,
8,22;47:10,13;245:2,
13
**clarification (1)**
148:16
**clarified (1)**
232:11
**clarify (3)**
33:1;147:20;149:18
**clarifying (3)**
58:1;138:8;205:21
**class (1)**
171:10
**classification (4)**
204:8;227:22;
232:10;234:5
**classifications (1)**
235:7
**Clayton (1)**
19:23
**clear (16)**
6:15;8:4;9:21;49:4;
121:20;131:23;
136:20,23;137:20;
138:7;152:21;154:8;
157:4,17;159:9;
198:11

**clicks (1)**
214:11
**client (2)**
8:3;10:10
**clients (8)**
25:9;39:11,15;
42:16;43:1;44:16;
45:8;51:11
**closely (1)**
60:16
**club (1)**
157:10
**CNT (5)**
105:21;201:14,21;
202:5;203:10
**coaching (2)**
127:7,8
**coalition (2)**
225:18;228:19
**coat (5)**
115:12,13,17;
116:2;133:4
**Cobb (14)**
103:10;104:3;
106:25;107:12,15;
108:8;123:2,4;129:4,
11;130:4,7;131:25;
135:21
**co-chair (2)**
224:8,11
**co-chairing (1)**
223:25
**co-chief (1)**
178:21
**cohorts (2)**
229:13,14
**coincidental (1)**
153:21
**cold (1)**
158:19
**Coles (4)**
199:22,24;200:1,13
**collaborative (1)**
223:15
**colleagues (2)**
97:18;99:13
**collect (3)**
78:24;108:21;193:1
**collected (2)**
78:22;245:8
**collecting (1)**
193:22
**collectively (1)**
154:15
**College (1)**
20:7
**combination (3)**
214:18;222:11;
225:12
**comfortable (4)**
137:17;152:11;
154:18;191:12
**coming (7)**

34:12;62:23;65:10;
84:18,23;169:12;
222:3
**command (3)**
65:15;176:25;256:2
**comment (11)**
109:10,13;123:18,
20,21,25;124:1;
125:7;159:20;173:23,
25
**commenting (1)**
151:24
**comments (10)**
92:2;109:4;127:12;
161:22;171:12;
173:10,10,11,15;
174:1
**Commissioners (2)**
239:1,25
**common (2)**
84:14;156:24
**COMMs (1)**
179:5
**communal (1)**
74:2
**communicate (3)**
130:21;144:21;
247:14
**communicated (8)**
132:9,13,21;
144:17;209:9;210:8;
211:14;247:1
**communicating (4)**
144:17;176:17;
246:3,14
**communication (5)**
142:15;152:21;
154:10;176:7;246:19
**communications (3)**
89:7;144:9,11,13;
179:6;183:19,24;
188:2
**community (2)**
174:19;240:18
**companion (1)**
13:20
**Company (1)**
46:7
**comparison (1)**
229:7
**compelled (1)**
169:9
**compensation (3)**
27:4;191:13;230:4
**Competency (1)**
64:21
**complain (1)**
149:2
**complained (2)**
256:11,12
**complaint (4)**
10:22;13:9;28:10;
256:9

**complaints (5)**
146:13;248:8;
249:7;256:15,21
**complete (9)**
7:20;8:19,19;12:1;
21:19;93:17;106:10;
207:22,22
**completed (8)**
6:18;7:4,18;197:23;
227:17;230:18,18,19
**completely (1)**
203:4
**complexity (1)**
217:9
**compliance (6)**
25:10;41:14;42:17;
43:2;50:14;234:17
**comply (1)**
167:8
**complying (1)**
169:1
**comprising (1)**
212:24
**compromised (1)**
100:1
**computer (1)**
54:19
**concern (12)**
145:19;146:8,24;
147:14;148:20;149:3,
12;161:17;162:24;
216:20,23;224:21
**concerned (9)**
53:24;100:2;109:4;
113:4;114:15,16;
143:2;151:20;218:14
**concerns (4)**
107:2;149:22;
162:3,18
**concluded (1)**
257:23
**condemnation (2)**
92:3,8
**condition (2)**
140:21,23
**conducted (2)**
78:13;208:1
**conducting (2)**
34:25;175:17
**confidence (2)**
99:18;123:14
**confident (1)**
102:16
**confidential (14)**
9:5;89:18;98:18;
99:22;102:20;103:15,
21,24;113:14;125:18;
128:9,23;141:18;
142:5
**confidentiality (42)**
49:1,2;79:9;85:1,
12,15;87:17;88:12;
89:2;90:5;94:8,16,19,

24;95:5;96:5;109:3;
113:15;121:24;125:5,
19;129:13,15,19;
130:10;132:2,4;
134:15,20;139:23;
140:15;150:16;
153:17;154:23;
155:14;160:16;165:7,
10;168:6,21;169:1;
172:3
**confirm (2)**
147:12;205:9
**conflict (6)**
83:4,8,13,15,16;
88:23
**confront (2)**
100:20;102:17
**confronted (1)**
99:24
**confused (1)**
109:20
**conjunction (3)**
78:14;82:24;129:18
**connect (1)**
187:1
**connection (14)**
5:23;20:25;48:12;
49:19;51:15;81:18;
138:13;154:16;
218:12;232:24;
243:24;244:10,24;
245:12
**consequence (1)**
141:13
**consider (8)**
31:14;141:18;
160:8;184:4;217:7,
19;218:5;224:13
**consideration (4)**
214:2;217:10;
218:9;237:9
**considered (19)**
142:4;158:10;
185:1,8,9,13,14,14,
15;186:22,25;187:25;
188:4,9,15;215:12;
217:22,25;236:5
**considering (3)**
158:8;185:4;219:23
**consisted (1)**
35:20
**constructed (1)**
172:22
**construction (1)**
177:12
**consult (1)**
8:23
**contact (1)**
159:7
**contend (4)**
119:18;128:15;
129:25;134:15
**content (4)**

Case 4:23-cv-00111-RSB-CLR   Document 34   Filed 07/08/24   Page 266 of 413

Burton v.
Jones

Video Deposition

Shalena Cook Jones
December 18, 2023

98:17;106:21;
121:11;176:17
**contention (2)**
130:2,17
**contentious (1)**
158:20
**context (6)**
15:12;16:7;93:8;
145:3;156:19;216:14
**continually (1)**
172:19
**continue (4)**
8:17;55:13;166:10;
169:5
**continues (1)**
154:5
**contract (1)**
234:7
**contractor (1)**
49:16
**control (3)**
44:6;114:12;143:21
**conversation (41)**
8:7,10;9:10;12:21;
35:3;53:2;98:6;103:6,
24;116:20;120:3,4,5;
121:8,15,16;122:17,
23;123:15;124:20;
125:9,17;126:4,6,13;
133:19;135:25;
136:15;139:6;155:2;
156:20,23;158:2,4;
160:4;185:25;187:23;
216:2;218:3;223:17;
248:23
**conversations (7)**
33:15;126:20;
134:2,6;139:13;
162:5;209:12
**convert (1)**
244:3
**convey (1)**
209:13
**convicted (1)**
192:25
**COOK (2)**
5:7,12
**Cooke (1)**
185:17
**Cooke's (1)**
187:8
**coordinating (1)**
36:8
**co-owner (1)**
17:7
**copies (4)**
48:11;74:2;75:7;
84:9
**copy (15)**
10:22;11:4;14:13,
16,18;49:25;72:16;
73:24;74:6,16;84:11,
13,15;101:19;245:15

**cordial (1)**
159:17
**corporation (3)**
43:10;44:14;46:1
**corral (2)**
215:1;222:4
**correctly (6)**
76:21;92:5;125:7;
128:13;164:22;226:1
**correlation (1)**
95:8
**counsel (17)**
5:17;16:11;24:2,12;
40:13,24;41:2,7,13,
19;43:10;44:15;
46:25;51:11;139:7;
160:18;257:16
**counseled (4)**
138:16,22;139:3,10
**counseling (2)**
104:15;105:6
**Counter (2)**
201:21,23
**counterparts (1)**
229:7
**counties (1)**
23:25
**County (83)**
5:20;16:20;17:22;
19:24;22:9;28:5,15,
23;29:6;31:1,4;46:21;
53:5,8;54:6;67:15;
79:23;81:25;82:7,10,
11,21,23;83:3,8;
88:21;89:7;90:9,12,
15;94:16;103:10;
104:3;107:1,12,15;
108:9;123:2,4;
128:11;129:4,11;
130:4,7;131:25;
134:8;135:21;146:11;
147:5,5,7;149:25;
175:8;180:11,23;
183:14;187:22;
206:10;225:8,11;
226:3;233:5;239:1;
24;241:4;10;243:15,
18;245:7,9,11;246:3,
7,13;250:1,10,25;
251:1,2,5;255:7;
256:15;257:21
**county's (2)**
32:4;149:19
**couple (2)**
196:15;255:10
**coupled (1)**
67:12
**course (18)**
31:2;47:17,18,18;
62:4;93:11,15;
114:22;130:23;131:9,
14;139:12;151:7;
152:8;173:15;216:6;

220:14;256:20
**court (83)**
5:5;6:10,19,20;7:3,
5,6;8:14;9:23;16:19,
20;17:23;30:5,6,7,12,
12;56:17;59:14;
60:16;61:7;62:20,24;
63:7,10,11,17,18,18,
19,20,21,22;64:2,6,7,
7,8,20,20,21;66:12;
102:4;17;109:5,12,14;
151:5,11;174:25;
191:9,10,20;198:23,
24;200:19;203:1;
205:23,25;207:9,13,
18,19;208:1;212:19,
24;221:24;222:3,25;
228:7;237:3,8,9,17;
238:1;239:16;240:13;
252:5;254:16,17,20,
22;257:15
**courthouse (8)**
54:5;56:5;63:19;
111:2;113:6,7;
130:12;239:6
**courtroom (30)**
35:14;99:21;102:6;
109:11;110:9;157:1;
167:2;170:7;208:6;
210:5,17,18,20;211:5,
16,21,23;212:3,10;
214:13,21;217:20;
220:21,22,25;221:16;
222:18;223:21,24;
224:12
**courtrooms (19)**
152:4;206:14,15,
21,23;207:5,21;
208:17,18;209:2,6,10;
210:2;212:23;218:6;
221:4;222:17;223:9;
226:24
**courts (10)**
63:14,17;64:12,19,
22,24;65:3;186:13;
204:13;205:17
**cover (2)**
48:25;230:21
**covered (4)**
85:2,5,14;87:16
**covering (1)**
87:12
**covers (3)**
91:9;174:6,6,6
**COVID (1)**
54:5
**crazy (1)**
227:4
**create (3)**
39:5;197:25;198:6
**created (14)**
75:22,25;153:16,
17;176:4;184:7;

197:16;198:14;
208:10,14;209:1;
253:10,17;254:5
**creating (4)**
154:22;171:6;
224:5;225:18
**credentials (1)**
216:19
**Crime (6)**
191:15,15;196:20;
218:25;225:17;
228:18
**crimes (10)**
32:20;35:21;61:10;
201:17;203:19;204:6;
207:20,21;219:3,5
**criminal (11)**
26:23,24;93:4;
96:13;99:6;162:25;
163:5;193:24;194:1;
195:7;197:20
**criteria (1)**
215:7
**critical (1)**
111:25
**criticize (2)**
162:23;163:5
**cross (1)**
224:4
**cross-examination (1)**
204:3
**Cruser (24)**
22:3,12;23:16,19;
25:21,22,25;26:13;
27:15;37:12,19,24;
39:25;40:15,19,22;
41:4,10,21;42:22,25;
43:13,17;44:10
**crying (1)**
99:9
**culmination (1)**
154:25
**current (3)**
28:15;182:7;250:24
**currently (5)**
16:24;183:13;
238:18,22,23
**Curry (2)**
179:15,17
**custodian (5)**
72:10,15,23;245:5,
11
**custodians (1)**
68:21
**custody (5)**
18:4,6;99:7;138:2,2
**custom (1)**
116:17
**customary (1)**
15:24
**customer (1)**
174:21

**D**

**DA (12)**
28:18;29:8;34:10;
37:9;48:1,5;52:15;
76:14;165:1;179:14;
198:22;256:5
**damages (1)**
243:1
**DAO (5)**
128:9,24;175:25;
176:7;253:5
**DAs (2)**
47:20;55:25
**DA's (27)**
28:5,15,24;31:19;
36:21;37:4,11;38:4;
57:14;82:23;83:4,9;
94:17;99:12;110:23;
149:11;180:2;184:11,
14;235:20;238:12,14,
17,21,22;245:9,12
**date (11)**
81:14;83:25;133:9;
177:10;181:8,21;
213:24;253:14,14,
254:6,11
**dated (3)**
233:14;234:7,22
**dates (1)**
191:10
**daughters (7)**
99:5;100:4;107:17;
129:7;137:7,20,25
**Davenport (1)**
16:12
**David (3)**
49:13;185:17;187:8
**day (12)**
51:4;52:9;97:20;
98:12;118:8;133:9;
156:3,18;172:8;
182:8;207:12;235:12
**days (10)**
156:2;158:12,12,
15,15,18,25;171:3,23;
246:23
**dead (1)**
173:21
**deal (1)**
155:4
**dealing (1)**
203:19
**Dear (1)**
234:22
**DeBlassis (6)**
101:8;108:2;
135:15;213:10,12,16
**December (5)**
5:3;52:18;53:15;
181:8,11
**decide (3)**

Case 4:23-cv-00111-RSB-CLR   Document 34   Filed 07/08/24   Page 267 of 413
Burton v.
Jones

Video Deposition

Shalena Cook Jones
December 18, 2023

210:16;211:4;
222:19
**decided (4)**
195:25;198:8;
207:19;210:4
**deciding (2)**
219:16;235:20
**decision (17)**
111:25;119:21;
122:9,10;181:8;
183:17;210:5,11;
211:11;212:7,17,18;
215:24;218:1,16;
225:1;226:16
**decisions (7)**
106:17;152:13,24;
211:13;227:6;235:7,
24
**declare (1)**
18:16
**declared (2)**
18:14,21
**decline (1)**
182:25
**declined (2)**
180:21;181:4
**de-complicate (1)**
214:10
**Deerfield (1)**
16:25
**defendant (1)**
173:16
**defendants (3)**
173:12,14;192:24
**defended (3)**
45:18,19,25
**defender (1)**
66:14
**defender's (6)**
66:15;102:5,15;
109:15,18;112:6
**defense (9)**
22:24;23:21,22;
24:23;44:20;66:8,17;
160:18;162:15
**Definitely (2)**
27:21;123:1
**DeFusco (28)**
95:4;96:7;97:17,21;
98:5;101:8,15,23;
103:3,23;104:2,6;
106:23;120:12;
123:14;131:6;133:8,
21;135:16,18,24;
136:9,21;137:4;
139:22;140:17;
143:11;155:15
**DeFusco's (3)**
98:1;101:20;119:20
**degree (3)**
103:25;185:21;
254:7
**delivered (1)**

77:21
**demands (1)**
207:23
**demonstrate (1)**
217:2
**demonstrated (1)**
219:8
**denied (1)**
52:25
**Department (7)**
23:24;147:6;
192:15;194:24;
241:16;244:5,17
**departments (5)**
23:25;40:13;59:13;
239:12;240:15
**departure (8)**
98:25;100:17;
107:6;108:13,14;
122:23;196:12;
247:19
**depend (1)**
207:15
**depending (1)**
244:21
**depends (1)**
63:13
**deposed (9)**
6:4;14:3,6,9,22,24,
25;15:12;16:22
**deposition (40)**
5:21;6:1,18;7:4,17,
18,19;8:17;9:19,23;
10:15,16,19,21;11:12;
12:19;13:10,12,14,18,
24;14:14;16:6;75:1;
79:6;90:22;97:1;
128:1;140:4,9;
167:17;175:13;
206:16,25;227:14;
230:13;233:11;
235:13;251:15;
257:23
**depositions (1)**
39:21
**derived (1)**
77:13
**derogatory (2)**
113:11,12
**describe (1)**
133:19
**describing (3)**
112:2;233:24;234:1
**designed (2)**
190:22;198:2
**designing (1)**
67:4
**desired (1)**
204:5
**desk (1)**
174:22
**desks (1)**
243:15

**destroyed (8)**
67:2,8,20,23;68:2,7,
10;72:4
**details (2)**
15:25;172:1
**determination (1)**
210:1
**determinations (2)**
207:12;215:7
**determine (3)**
95:11;195:21;207:2
**determined (2)**
210:19;211:2
**determining (3)**
207:4;214:6;217:11
**developed (3)**
80:7;160:9;170:5
**developing (1)**
48:22
**deviated (1)**
39:6
**devote (1)**
44:5
**devoted (2)**
31:3,3
**Diane (3)**
59:13;60:1;254:17
**dictate (1)**
163:10
**differ (1)**
86:11
**differed (1)**
88:2
**difference (5)**
216:15;231:23,23;
232:7,22
**different (42)**
23:16,17;27:5;
32:13;48:1;51:25;
61:9;63:14,15;64:13,
13;78:4;79:25;80:2;
81:1;86:13;96:10;
104:24;105:10;
121:14;133:14,17;
154:25;170:7;174:9,
10,16;177:25;178:4,
22;190:22,24;198:21;
199:9;202:9,22,23;
203:4;206:14;214:13;
226:6;231:15
**differential (1)**
31:7
**differently (2)**
125:14;175:7
**digital (2)**
257:19,22
**Dip (1)**
240:14
**direct (6)**
36:23;153:15,17;
154:8;196:13;203:13
**directed (7)**
86:23,24;140:20,

24,24;144:6;191:24
**directing (1)**
153:25
**direction (3)**
163:15,17;172:25
**directions (1)**
167:19
**directive (2)**
164:1;169:23
**directives (1)**
166:15
**directly (6)**
60:22;61:5;62:16;
125:8;162:18;218:14
**Director (5)**
178:25;179:3,6;
183:24;190:3
**directors (1)**
174:19
**directs (1)**
146:6
**disagree (3)**
105:3;162:22;163:3
**disciplinary (1)**
139:20
**discipline (2)**
114:9;138:18
**disciplined (2)**
114:5;138:16
**disclose (2)**
90:15;100:14
**disclosed (3)**
100:25;101:6;
103:22
**disclosing (1)**
89:23
**disclosure (9)**
7:24;8:3;9:8;42:5;
93:1;96:20;102:1;
135:6;142:6
**disclosures (3)**
94:13;95:17;96:15
**discoverable (7)**
164:7,12,14;165:5,
16,24;242:24
**discovered (1)**
236:23
**discovery (21)**
75:12;76:2,4,6;
80:3,10,12;81:20;
111:8;129:24;139:17;
164:10;167:15;
168:10,10,13,14;
170:6;172:21;242:18,
20
**discreet (1)**
40:15
**discretion (3)**
89:6;215:15;221:17
**discrimination (12)**
16:17;25:1,1;45:3,
5,8,11;46:6;47:10,13;
146:14;256:9

**discuss (12)**
58:25;78:9;85:1;
124:18;145:9,14,21;
152:14;154:14;237:2,
5;250:12
**discussed (10)**
59:1;124:5;130:9;
137:12;160:17;177:1,
4;211:11;237:22;
249:23
**discussing (11)**
95:14;107:8;
124:14;126:6;144:24;
145:4,16;147:14,23;
149:21;208:12
**discussion (11)**
106:5;124:10,16;
157:20;220:1;226:19;
229:1;236:25;237:13;
247:21;257:12
**discussions (1)**
238:6
**dismissed (2)**
15:11;16:8
**dispositive (2)**
217:6,13
**dispute (12)**
12:6;81:11;115:16,
17;132:9;231:2,6,9,
10;234:11,13,18
**disputes (1)**
130:17
**disrespect (2)**
155:9,10
**disrespectful (1)**
158:7
**disseminated (2)**
84:12;177:2
**dissemination (1)**
175:25
**distinction (3)**
31:6;32:2;207:20
**distracting (2)**
171:6;172:12
**distraction (3)**
153:12;172:9;173:4
**distributed (4)**
49:5,7;84:4;175:18
**distribution (2)**
202:13,19
**District (16)**
15:7;22:9;74:8;
79:24;105:21;146:11;
154:2;156:25;169:17;
174:15;175:6;185:16,
17;215:15;227:5;
228:17
**Diversity (4)**
179:6;183:23;
188:1,10
**divide (1)**
222:20
**divided (2)**

Case 4:23-cv-00111-RSB-CLR   Document 34   Filed 07/08/24   Page 268 of 413

Burton v.
Jones

Video Deposition

Shalena Cook Jones
December 18, 2023

63:9;250:20
**division (23)**
  63:12,14,14;173:8;
  174:24,25;176:25;
  178:24;190:1;195:8;
  197:21;199:2;200:6,
  19;201:7,11,14,17;
  202:21;203:19;
  205:17;219:5;239:15
**Divisions (10)**
  196:18,20,25;
  201:6;202:10,12,14,
  18,20;204:21
**divorce (4)**
  17:20;19:17,19,22
**divorced (1)**
  17:12
**docket (1)**
  221:18
**dockets (2)**
  63:25;215:2
**document (78)**
  11:16;21:8;54:9,12,
  16,18;55:4;67:2;
  73:18;75:4;76:17;
  79:17,20;80:11,23;
  81:8,21;82:12;84:1,4,
  13;88:22;92:13;97:4,
  11,12,15,19,22,23,24;
  106:2,5,9,11;122:15;
  123:10;132:12,17,18,
  20;133:6;140:12;
  142:2,16,18;143:13,
  21;144:3,7;146:16;
  150:6;151:13,16;
  153:5;175:20,22,25;
  176:4,16,21;177:2,6;
  178:8;197:19;227:17,
  21;228:9;230:16,17;
  231:16,18,24;233:21;
  245:6;253:4,15;
  254:12
**documentation (2)**
  218:19;251:6
**documented (1)**
  163:20
**documents (34)**
  10:18;13:7,11;53:9,
  12;65:16;66:25;67:8,
  13,23;68:2,6,9,22;
  72:2;74:1,12;79:25;
  80:8;94:14;133:11;
  139:20;164:15,21;
  208:14,15,21;209:1,5;
  237:20,24;244:23;
  245:24;250:23
**Doe (1)**
  210:4
**domestic (3)**
  29:5;30:8;35:23
**done (15)**
  25:15;45:13;46:20;
  74:19;87:5;118:7;

125:14;142:9,12;
  156:13;158:9;172:21;
  232:1;236:19;248:7
**Donna (4)**
  59:23,24,25;213:9
**Dowd (3)**
  179:9,25;181:15
**down (24)**
  12:11;22:18;63:9,
  12;74:14;83:20;
  84:21;90:20;96:24;
  118:9;122:5;140:7;
  143:19;144:2;159:25;
  161:10;169:21;
  170:13;177:19;
  198:19;230:20;
  233:10;234:20;
  238:10
**downstairs (1)**
  117:23
**drafting (1)**
  74:9
**drama (1)**
  169:19
**draw (1)**
  32:2
**Drevon (2)**
  17:16;26:19
**D-R-E-V-O-N (1)**
  17:18
**drive (2)**
  74:1,2
**drug (6)**
  27:2;63:18;64:7,20;
  203:10;243:24
**dual (1)**
  147:9
**DUI (1)**
  186:14
**duly (1)**
  5:8
**during (27)**
  10:20;13:10;28:18;
  30:19;37:20;50:11,
  19;62:7;77:24;78:7,
  20;82:16,18;98:15;
  115:8;116:19;134:25;
  135:1;142:19;191:12;
  208:12;209:12;
  211:12;235:12;
  237:14,21;256:16
**duties (6)**
  130:23;131:4,9,15;
  225:9;247:17
**duty (3)**
  91:17;130:20;
  183:22
**DV (1)**
  61:12

**E**

**earlier (7)**

64:15;74:4;85:18;
  136:4;138:1;198:8;
  256:4
**early (7)**
  112:22;113:2,10;
  155:3;182:17;187:13;
  202:4
**East (1)**
  23:23
**Eastern (1)**
  76:14
**Eaton (7)**
  69:14,15,16,17,19,
  22;72:6
**Eddie (1)**
  111:13
**education (1)**
  20:6
**Edward (1)**
  111:11
**Edwards (24)**
  65:19,21,23;78:13;
  85:5;101:7;107:25;
  135:14;139:3;151:25;
  176:8;178:18;199:18;
  200:1,8,14;204:14,25;
  205:7,18;236:19;
  247:23;249:14;
  254:10
**Edwards' (1)**
  13:17
**EEOC (4)**
  25:7;39:15;224:23;
  256:20
**effect (3)**
  157:9;173:15;
  222:22
**effective (4)**
  77:9;83:25;234:6,
  11
**effectively (1)**
  153:10
**effort (5)**
  73:14;87:24;154:7;
  223:15;224:11
**efforts (1)**
  155:4
**Eight (3)**
  200:25;201:2,3
**EIP (3)**
  201:14;202:3,6
**either (20)**
  28:1;53:14;56:3;
  57:11;78:21,24;86:7;
  110:7,7;117:21;
  148:21;149:1;154:14;
  163:22;235:15;244:4;
  245:8;249:9;255:25;
  256:18
**EI (1)**
  26:20
**elder (6)**
  30:25;31:3,14;

32:18;33:5;34:15
**elected (3)**
  29:18,22;52:7
**election (3)**
  52:9,13,20
**Elmore (1)**
  36:24
**else (36)**
  6:9;13:22;36:6;
  56:2,5;57:3;59:5,8;
  62:9;65:8;80:16;
  103:1;104:21;108:4;
  116:25;126:6,15;
  128:21;134:25;
  135:12;137:10;
  150:13;159:1;170:10,
  18;179:23;184:5,13;
  185:7;189:10;221:1;
  225:21;227:3;235:15;
  236:2;252:19
**email (9)**
  84:12;150:6;151:4;
  160:6;161:25;162:4,
  7;233:14;234:22
**emails (3)**
  150:20;161:20;
  172:20
**embarrassed (1)**
  109:2
**emphasis (4)**
  85:19;88:6,10,11
**employed (10)**
  28:23;49:14;65:12;
  73:4;134:7;154:2;
  174:2;175:5;180:2;
  236:8
**employee (23)**
  50:23;54:21;72:16,
  17;73:14;79:23,24;
  80:9;82:10;98:19,22,
  23;129:21;134:3;
  138:10;145:9;146:9;
  147:13;148:23;175:6;
  176:4;216:12;246:14
**employees (48)**
  27:20;37:18;53:13;
  54:17;68:15;72:11;
  76:8;78:3,19;81:22;
  82:4,9;84:4,12;85:14;
  89:5,15;92:19;93:10;
  95:3;110:18;128:10,
  11,24;130:10;139:21;
  140:21;144:6;145:24;
  147:22;148:20;149:1,
  4,11,13,21;170:15;
  171:8,13;172:16;
  174:2,13;175:3,4;
  194:23;195:1;205:6;
  253:19
**employee's (1)**
  143:2
**employment (26)**
  21:15;24:19,22,24;

25:20,21;27:13;
  28:11;34:12;35:16;
  37:6;38:18;39:6,18,
  22;40:13,15,25;44:24,
  25;46:5;47:10;73:6;
  140:22,24;256:16
**end (7)**
  26:17;29:11;73:23;
  88:9;173:21;181:9;
  257:11
**ended (11)**
  19:17;29:13,14;
  60:18;73:23;74:6;
  158:3;162:2;187:13;
  249:10,11
**enforcement (3)**
  92:1;225:19;244:17
**engage (2)**
  94:23;190:18
**engaged (1)**
  171:10
**engaging (1)**
  93:6
**enough (1)**
  102:16
**ensure (2)**
  92:19;93:2
**ensuring (1)**
  93:16
**entail (1)**
  172:15
**entailed (1)**
  139:6
**enter (1)**
  164:5
**enterprise (1)**
  244:3
**entertain (1)**
  157:16
**entire (10)**
  29:9;37:20;64:25;
  88:3;98:7;120:2;
  122:16,22;144:3;
  223:4
**entirely (1)**
  154:12
**entities (11)**
  39:25;40:3,23;41:1,
  7,13,15,20;43:9;
  45:19;46:13
**entitled (3)**
  32:7;225:23;243:2
**entity (5)**
  43:11,12;45:18,24;
  91:13
**entries (1)**
  104:20
**enumerate (1)**
  113:1
**environment (7)**
  145:20;146:25;
  148:21;171:7,7;
  172:10,12

Case 4:23-cv-00111-RSB-CLR   Document 34   Filed 07/08/24   Page 269 of 413

Burton v.
Jones

Video Deposition

Shalena Cook Jones
December 18, 2023

envision (1)
53:17
equal (1)
251:5
equity (2)
228:21,24
Erwin (6)
178:25;191:25,25;
192:9,22;200:7
especially (1)
34:14
essentially (1)
222:21
EST (1)
257:24
establish (3)
38:7;95:12;223:12
established (1)
80:24
estate (3)
17:2,6,7
estimation (1)
220:8
et (7)
25:1;50:11;53:7;
168:11;196:22;215:2;
223:7
ethical (3)
91:9;92:16,25
ethically (1)
95:13
evaluate (2)
165:15;237:21
evaluating (1)
255:16
evaluation (2)
214:5;250:14
even (23)
9:6;16:5;32:1;
56:10;90:3;102:10;
104:15;109:5;120:23;
124:11,17;125:7;
137:23;157:10;163:3;
166:25;167:1;171:25;
180:10;202:12,19;
203:3;215:9
events (3)
36:9;136:22;157:8
everybody (5)
55:25;65:11;
102:25;114:9;187:25
everyone (9)
56:2;57:3;79:1;
99:21;118:14;159:1;
175:5;203:13;216:16
evidence (2)
7:5;8:13
exact (1)
213:24
exacting (2)
153:25;154:17
exactly (11)
46:4,7;63:9;84:16;

134:23;136:13,16,21,
23;155:24;221:11
EXAMINATION (2)
5:10;255:8
examined (1)
5:9
example (15)
56:7;111:3;136:9;
142:25;143:1;163:16,
25;166:18;167:25;
168:19,22;169:2;
170:4,8;210:16
examples (11)
78:3;113:1;163:19;
164:25;165:13,19;
166:13;167:12,12,17;
168:17
except (4)
91:21,23;151:6;
200:6
exception (2)
143:14;203:18
exceptions (3)
42:6;142:21;144:7
excessive (2)
24:8,15
exchange (3)
98:4;12;161:21
exchanged (1)
97:17
exclusive (5)
146:22;147:13,22;
148:19;149:2
excuse (7)
20:8;43:19;112:10;
116:6;213:11;224:19;
238:19
executive (19)
36:11,14,16,16;
59:4;60:12;102:14;
110:24;152:23;
178:12,12,14;179:12,
14,16;188:5;211:12;
226:24;227:6
exercise (1)
207:6
exhausted (1)
149:23
Exhibit (49)
11:11,12;20:19;
74:24;75:1;79:4,6,14;
80:13;83:22,23;
84:21;88:16;90:21,
22;96:24,25;97:1;
105:13;119:14;120:7;
121:18;127:4,12,21;
128:1;129:20;132:22;
133:15,18,20;140:3,4,
8,9;150:4;159:24;
175:12,13;227:13,14;
230:12,13;232:9;
233:8,9,11;238:10;
253:6

exist (2)
184:6;192:6
existed (5)
85:24;192:6;198:5,
20;248:16
exists (3)
80:4,17;189:7
expect (1)
244:24
expectation (3)
85:3;141:7;224:7
expectations (10)
77:13;78:9;83:12;
84:25;86:3,10,13;
87:20,24;90:6
expected (1)
114:23
expenses (1)
250:21
experience (25)
33:17,20;66:16,17;
202:11,13,20,22,24;
203:2,7,8,10,12,14,14,
23;207:16;214:19;
216:22;219:9;220:3;
236:5,7;238:5
experienced (5)
162:13;202:17;
203:22;204:9;222:15
experiences (1)
40:19
expertise (1)
44:1
explain (3)
109:6;166:4;243:20
explained (12)
15:21;16:1;95:25;
99:8,14,18;102:2,22;
127:1;137:11;209:11;
221:23
explaining (3)
95:24;160:15;
162:10
explanation (1)
232:8
explore (1)
216:9
express (5)
128:12;149:3;
186:20;236:25,25
expressed (3)
161:17;219:4;
226:10
expressing (1)
149:12
expressly (1)
220:2
ex-spouse (1)
17:14
extensively (1)
60:13
extent (9)
48:3;53:3;87:15;

91:24;236:3;240:1;
242:23,24;243:4
external (1)
180:6
extrajudicial (1)
92:2
extreme (1)
152:8
extremely (1)
108:25

F

facilitate (1)
223:16
facilitator (2)
49:10,12
facing (1)
155:2
fact (11)
67:12;99:25;100:2;
106:20;129:11,14;
158:5;173:11;220:8;
230:2;232:10
factor (5)
216:24,24;217:12;
225:1;236:5
facts (2)
157:17,21
failed (1)
216:11
fair (15)
32:17,23;104:22;
105:1,2,9;114:13;
124:2,20;141:25;
142:6;198:17;234:2;
253:25;254:1
Fairly (1)
51:24
faith (2)
129:4,9
fall (2)
213:3;240:17
falls (1)
174:23
false (2)
86:22;112:5
familiar (14)
41:25;42:4,15;46:9,
23;51:18,22,24;
60:20;66:12,12;91:4;
92:15;94:5
familiarity (1)
51:25
far (7)
6:8,12;107:18;
108:25;113:3;133:2;
199:1
fast (1)
205:9
faster (1)
205:5
fat (1)

173:18
February (2)
182:8,14
federal (5)
5:22;6:19;7:3;8:12;
142:23
fee (1)
240:12
feel (4)
53:21;65:22;
152:10;155:9
fell (2)
64:4;194:23
fellow (1)
189:25
felonies (4)
196:18,21;203:20;
219:22
felony (9)
30:7;196:17;201:6;
203:6,8;218:17;
219:1,13;220:3
felt (7)
43:19,24,25;44:5;
65:24;102:16;152:10;
154:17;161:22;
162:11
female (2)
190:4,5
few (5)
62:2;74:12;100:15;
156:2;163:24
figure (2)
54:1,9
figuring (1)
100:16
File (16)
5:4;15:18,23;25:6,
12;70:9;71:19;78:23,
25;119:5;138:18;
172:21;215:23;216:6;
225:25;253:1
filed (7)
6:18;7:5;8:13;9:23;
28:10;244:20;248:10
files (2)
67:14;193:6
filing (2)
9:7;248:14
filings (1)
256:20
fill (1)
99:20
filled (4)
157:3;182:21;
231:24,25
final (2)
227:5;235:4
find (2)
102:24;173:16
fine (9)
8:24;9:21;34:6;
35:12;71:9;117:21,

Case 4:23-cv-00111-RSB-CLR Document 34 Filed 07/08/24 Page 270 of 413

Burton v.
Jones

Video Deposition

Shalena Cook Jones
December 18, 2023

21;146:21;254:3
**finish (11)**
57:21;69:9;72:14;
100:9;112:13;15;
117:14;125:23,23;
126:25,25
**finished (6)**
57:22;58:1;68:24,
25;112:12;156:12
**firearms (3)**
241:8,16,17
**fired (2)**
114:7;138:13
**firm (5)**
21:23;23:6,7,10;
24:11
**firms (1)**
38:6
**first (72)**
5:8;22:4;23:19;
24:3,7,10,13;25:16,
21;26:12;27:15;
34:22;35:9;37:4,4,7;
40:21;41:10,20;
42:20;50:23;51:10,
12,18;52:9;53:23;
55:23;56:9;58:2;61:1;
62:21;65:25;66:14;
85:6;89:3;101:13;
105:12;141:21;142:2,
14;146:16;150:25;
160:9;161:17;162:3,
23;163:4,7;164:9,15;
165:8,10;168:19,22;
169:2;178:18,19;
180:25;181:4;195:22,
24;207:17;213:3;
222:8,9,12;223:20;
231:13;234:19,21;
236:11;246:10
**firsthand (2)**
206:24;235:17
**fit (2)**
169:6;237:22
**Fite-Magyar (4)**
120:15,18;138:11;
139:10
**five (7)**
45:10;70:25;
193:10;252:9,12,14,
16
**flagship (1)**
38:12
**fleet (2)**
240:25;241:3
**flip (1)**
231:18
**fluid (1)**
221:4
**focus (3)**
63:3;108:14;153:11
**focused (1)**
186:14

**folks (3)**
59:8;117:10;195:25
**follow (9)**
6:22;113:22;
163:14,17;164:1;
166:15;168:2;171:15;
172:24
**followed (1)**
147:1
**following (6)**
71:23;99:16;119:9;
171:5;172:8;232:17
**follows (1)**
5:9
**follow-up (1)**
100:10
**food (1)**
117:23
**foray (1)**
243:10
**force (2)**
24:8,15
**forcing (1)**
166:3
**Forfeiture (21)**
243:20,21;244:10,
13,21,25;245:2,13,18;
246:4,15,21,25;
247:10,16,24;248:3;
249:2,6,9,20
**forfeitures (1)**
249:24
**Forgetting (1)**
32:6
**forgive (2)**
40:20;63:8
**form (5)**
32:25;86:17,20;
124:22;198:21
**formed (1)**
178:12,15
**former (8)**
17:15,15;26:18;
66:8;74:8;128:10;
185:17;186:23
**forth (1)**
162:7
**found (9)**
43:18;109:8,10;
133:22;134:1,5,9;
173:20;214:10
**four (6)**
45:23;117:4;203:5;
204:18;205:22;206:2
**fraction (1)**
217:4
**Frank (3)**
185:9,10,22
**frantic (1)**
99:3
**fraud (3)**
27:4,5;47:4
**Freesemann (1)**

152:23
**freeze (3)**
54:7;206:10;244:1
**frequently (1)**
250:9
**Friday (5)**
10:22;12:24,25;
13:1;118:10
**friend (3)**
15:21;111:14;115:4
**friends (6)**
15:17;97:18;
115:22;116:3,5,7
**friendship (2)**
115:11;224:14
**front (7)**
102:11;158:9;
165:4;169:16;174:22;
222:23,24
**frozen (1)**
243:24
**fruits (1)**
244:2
**fulfilling (1)**
131:15
**Fulford (3)**
185:14;186:16;
188:8
**full (3)**
23:10;97:23;106:14
**full-time (1)**
216:12
**functioning (2)**
40:24;214:25
**functions (1)**
191:19
**Fund (1)**
243:21
**furniture (1)**
243:17
**further (1)**
137:10

# G

**gang (1)**
228:11
**gangs (1)**
32:19
**Gaston (1)**
22:4
**gather (2)**
52:24;78:25
**gave (11)**
69:18;78:16;107:5;
110:10;120:3;164:2;
167:20;181:7;185:2;
229:3;236:24
**gay (4)**
116:11,14,23;117:1
**gears (2)**
139:25;238:13
**gender (1)**

25:1
**general (21)**
40:13,24,25;41:7,
13,19;43:9;44:14;
46:25;47:1;51:11;
52:4;120:4;199:8;
216:3;222:5;243:11;
249:25;250:5,9;253:7
**generally (12)**
33:21;35:10;47:6,
13;52:1,2;77:20;
162:24;188:11;212:8;
250:22;253:13
**generated (3)**
54:19;120:24;209:5
**generating (1)**
39:16
**Georgia (18)**
5:20;16:25;19:25;
20:15;23:5;40:5;
42:10,12,17;45:15,19;
46:2,10,24;76:15;
89:8;91:8;235:24
**gist (1)**
120:4
**given (8)**
34:13;65:14,16;
88:5;167:9,9;171:16;
185:16
**giving (3)**
69:7,10;237:9
**glad (2)**
118:11;178:16
**goal (1)**
169:16
**goals (1)**
184:20
**goes (1)**
207:13
**Good (18)**
5:12;31:5;38:9;
51:4;66:18;70:18;
113:4;129:4,9;152:9;
158:12,15,25;162:12;
193:5;225:13;234:23;
247:6
**gossip (3)**
114:11,25;152:14
**govern (1)**
9:3
**government (2)**
40:3,5
**governmental (1)**
43:9
**governments (1)**
23:25
**grab (2)**
118:12,17
**grade (8)**
31:10;32:5;55:1,3;
228:1,22;229:2;231:7
**grades (3)**
32:2,8,8

**graduate (1)**
20:16
**grain (1)**
113:8
**Grainger (1)**
46:6
**grandchild (1)**
101:11
**grandchildren (9)**
99:7;101:2;104:12,
19;106:6;107:1;
122:20;123:1;135:22
**granddaughters (3)**
137:21;138:4,5
**grandkids (1)**
136:7
**Grant (2)**
240:20;241:18
**Gray (8)**
55:19;58:18,21;
62:14,17;64:3;
104:21,25
**great (3)**
43:16;118:18;217:5
**greater (2)**
139:12;202:11
**Green (4)**
199:22,25;200:1,13
**greet (1)**
191:10
**Greg (13)**
36:15;37:1;55:14,
22;56:23,24;60:21;
66:3;201:5;218:20;
220:7;255:21,23
**Gresham (2)**
111:11,13
**grievance (7)**
147:1,11;148:18;
149:5,14,20,23
**Griffin (1)**
239:17
**grossly (1)**
229:6
**group (4)**
121:12;136:2;
215:1;243:23
**guess (45)**
28:22;29:21;32:13;
33:4;34:14;40:18;
41:18;64:16;66:2;
68:19;80:22;81:21;
92:11;94:7;113:17;
115:16,17;117:8;
119:17;120:9;129:22;
131:21;134:12;
137:19;147:11;159:1;
176:14;178:4,5;
180:5;184:22;190:12;
194:6,8;203:25;
204:10;206:12;
223:18;227:22;
233:24;236:3;240:1;

Case 4:23-cv-00111-RSB-CLR   Document 34   Filed 07/08/24   Page 271 of 413

Burton v.
Jones

Video Deposition

Shalena Cook Jones
December 18, 2023

243:9;246:23;247:10
**guessing (1)**
　69:5
**guest (1)**
　151:7
**guidance (8)**
　41:23;48:22;83:12;
　85:12;86:12;146:2,4;
　147:4
**guilty (1)**
　173:17
**gun (1)**
　228:11
**guns (5)**
　32:19;241:5,6,20,
　22
**guys (2)**
　157:9;243:14

# H

**half (3)**
　117:9;181:20,22
**Hammonds (5)**
　20:22,23;70:12,25;
　79:9
**handbook (67)**
　72:16,17,24;73:14,
　22,24;74:3,7,10,16;
　75:5,8,11;76:8,19;
　77:8,14;78:12,16;
　79:2,21,24,25;80:2,
　13;82:8,10,21,23,23;
　83:4,5,8,9;84:9;85:9,
　16,17;86:6,6,23,24;
　87:3,8,13,17;88:1,4,4,
　7,21;94:11,12,16,18;
　95:6;129:21;143:9;
　146:5,6,10,11,12;
　148:25;149:1,11,25
**handbooks (15)**
　67:15,18,20,25;
　68:4,6,12;72:10;80:9;
　81:24,25;129:23;
　146:19;147:8;148:19
**handle (11)**
　23:16,19;24:23;
　25:3;26:22,29:4;43:6;
　94:2;100:17;169:24;
　203:5
**handled (10)**
　24:25;39:12,15;
　46:5;63:24;64:12;
　163:11;168:14;
　217:10;223:8
**handles (1)**
　194:1
**handling (16)**
　22:22;24:6,6,27:23;
　30:6,7;46:15;63:6;
　64:18,19,22;65:1,6;
　203:2;222:9;249:19
**handouts (3)**

49:24;50:1;77:24
**handwriting (1)**
　232:1
**handwritten (1)**
　48:14
**Hang (1)**
　160:2
**happen (5)**
　30:11;37:22;38:2;
　166:5;169:22
**happened (9)**
　23:11;34:3;99:1,4;
　125:25;161:19;
　181:13;210:3;235:25
**happening (1)**
　233:25
**happy (4)**
　7:10;8:9;9:18;
　114:21
**harassment (2)**
　24:25;148:21
**hard (1)**
　84:8
**Hare (1)**
　190:4
**Hart (1)**
　16:12
**head (2)**
　50:6;178:23
**headquarters (1)**
　239:20
**Health (16)**
　63:18;64:7,20;99:5;
　100:3;101:2,12;
　104:12,19;106:7;
　107:2;122:21;129:7;
　135:22;136:8;137:6
**Heap (9)**
　29:18;30:15,24;
　35:17,18;36:3,12,20;
　76:14
**Heap's (1)**
　30:20
**hear (4)**
　62:2;79:12;95:22;
　113:3
**heard (6)**
　51:20;181:11;
　186:24;235:10,12;
　256:18
**hearing (4)**
　62:5;236:23;
　244:22,22
**heighten (1)**
　92:7
**heightening (1)**
　92:3
**held (4)**
　33:18;54:25;55:2,8
**helm (1)**
　66:9
**help (2)**
　99:11;153:7

**helpful (1)**
　199:11
**helps (3)**
　153:9,10;188:18
**herself (4)**
　155:7,23;156:21;
　191:1
**Hey (1)**
　102:7
**hierarchies (1)**
　178:4
**higher (1)**
　203:2
**highlighting (1)**
　231:25
**himself (1)**
　218:17
**hire (7)**
　65:21,22;66:3;73:3,
　5;180:3;181:16
**hired (9)**
　28:21,22;60:14;
　65:18;180:4;181:5;
　183:1,3;235:14
**hiring (2)**
　54:7;206:10
**history (2)**
　21:15;34:13
**HOA (1)**
　240:12
**Hodge-Wilder (10)**
　14:1,6,9;101:7;
　108:5;135:15;182:11,
　14;183:10;233:16
**hold (1)**
　233:8
**holds (1)**
　245:7
**home (2)**
　17:4;39:4
**Honda (1)**
　46:6
**honest (1)**
　11:25
**honestly (2)**
　34:24;224:20
**honor (1)**
　153:7
**hope (1)**
　102:8
**hostile (4)**
　114:19;145:20;
　171:7;172:16
**hot (1)**
　158:18
**hour (5)**
　13:5,5;50:25;117:9,
　9
**hours (6)**
　102:16;252:6,9,12,
　14,16
**house (1)**
　240:9

**housed (3)**
　239:7,18;245:24
**HR (8)**
　53:5,9;147:6;183:6;
　225:7;229:1;232:3;
　233:5
**hub (1)**
　38:7
**Hudson (7)**
　68:20;69:13,16,20,
　21;70:4;72:5
**Hudson's (1)**
　70:1
**hundred (2)**
　59:16;247:4
**hysterical (1)**
　99:10

# I

**IDENTIFICATION (12)**
　11:13;75:2;79:7;
　90:23;97:2;128:2;
　140:5,10;175:14;
　227:15;230:14;
　233:12
**identified (5)**
　56:19;212:23;
　213:3;253:7,9
**identifies (1)**
　120:9
**identify (2)**
　53:23;55:20
**identities (1)**
　121:17
**ignore (1)**
　114:25
**ill (2)**
　158:23,24
**illegal (1)**
　244:2
**imagine (4)**
　75:21;171:25;
　227:4;238:25
**immediate (1)**
　17:15
**Immediately (1)**
　100:19
**immunity (1)**
　16:6
**impact (1)**
　139:13
**impacted (1)**
　165:11
**impetus (1)**
　207:15
**implemented (4)**
　38:23;39:2,4,7
**implementing (1)**
　38:17
**implicated (2)**
　74:11,12
**import (1)**

139:12
**important (1)**
　235:22
**impression (5)**
　14:2,5,8,11;214:15
**inappropriate (3)**
　134:10;154:20;
　155:12
**Inaudible (2)**
　96:22;163:24
**inauguration (1)**
　52:19
**incident (3)**
　99:2;116:2;141:24
**inclined (1)**
　157:24
**include (3)**
　206:1;232:8;251:23
**included (3)**
　47:22;122:18;
　150:14
**includes (2)**
　67:25;174:25
**including (3)**
　162:11;220:4,5
**Inclusion (4)**
　179:7;183:23;
　188:1,10
**income (5)**
　245:2,16,17,25;
　246:25
**incoming (1)**
　249:6
**incomplete (2)**
　21:21;133:20
**incorrectly (1)**
　226:2
**increase (11)**
　31:21;32:15;
　225:12,24;228:1;
　229:5,21;231:7,7,14;
　232:12
**increased (2)**
　232:18,19
**independent (2)**
　132:24;239:9
**indicate (6)**
　56:22;79:1;87:4;
　116:21;186:3,8
**indicated (10)**
　12:16;40:22;
　102:18;103:23;
　104:25;120:13;
　123:16;139:15;
　154:19;161:25
**indicates (1)**
　89:4
**indicating (1)**
　234:1
**indication (1)**
　104:24
**indiscernible (1)**
　214:23

Case 4:23-cv-00111-RSB-CLR   Document 34   Filed 07/08/24   Page 272 of 413

Burton v.
Jones

Video Deposition

Shalena Cook Jones
December 18, 2023

**individual (1)**
5:19
**individually (2)**
154:15;214:16
**individuals (9)**
19:2;72:5;106:12;
135:23;189:13;
199:14;233:16,17;
236:22
**industry (1)**
38:8
**inform (2)**
91:24;93:25
**information (94)**
6:17;7:3,17;9:4,4;
12:6;47:22;52:24;
54:16,18;55:1,7;
67:10,15;85:2;89:15,
16,19,24;90:10,16;
93:1;98:18;100:21,
22;101:6;102:13,19,
23;103:14,16,17,21;
104:7;107:3,5;
109:22,23,25;110:5,6,
11,16,20,22;111:1,5;
112:6;123:13;124:19;
126:7,12;128:9,14,19,
22,24;129:5;130:8,13,
15,18;131:7,8,14;
132:8,14;133:1;
135:19;136:11;
141:18;142:4,5;
144:19,22;145:3,12;
152:12;153:2;160:17,
19,21,21;237:15,16,
18;243:3,8;244:15,
19;245:23;251:4,8;
254:15
**informed (3)**
108:11;168:4;
210:12
**inhibit (1)**
89:6
**initial (4)**
100:24;178:14;
198:15;235:2
**initially (5)**
26:25;98:22;
137:15;139:3;235:2
**initials (3)**
120:10,21,22
**initiative (2)**
217:3;226:11
**inner (4)**
151:23;153:8;
160:22;169:5
**input (1)**
215:19
**inquiry (3)**
53:10;236:14,17
**inserted (1)**
172:17
**insidious (1)**

113:9
**insisted (1)**
168:14
**instance (4)**
41:10;111:4;169:8;
226:13
**instances (3)**
41:19;95:1;168:8
**instead (1)**
148:13;195:20;
232:12
**instigated (1)**
99:7
**institutional (1)**
62:18
**instruct (3)**
85:14;90:2;237:5
**instructed (11)**
78:23;85:8;87:2;
93:25;145:24;155:5;
166:24;167:7,18;
172:18;236:12
**instructing (1)**
236:21
**instruction (9)**
86:5;88:6;89:15,23;
93:9,14;103:14;
107:10;236:25
**instructions (8)**
167:8;168:2;171:6,
15,16,18;172:9;
237:11
**insubordination (2)**
171:5,11
**insurance (5)**
22:24;23:3;41:6,16;
243:7
**intake (1)**
173:8
**intend (1)**
8:4
**intended (3)**
89:5,6;147:21
**intent (1)**
152:25
**intention (2)**
168:5,25
**intentions (1)**
38:4
**interactions (1)**
93:12
**interchangeably (1)**
174:8
**interest (6)**
185:21;186:1;
187:6;219:4,8;226:10
**interested (16)**
38:1,5,12;59:2,3;
170:2;184:14;186:4,
4,6,8,10,20,25;187:7,
19
**interesting (1)**
43:25

**interfered (1)**
165:13
**interferes (1)**
139:14
**interim (1)**
182:22
**internal (3)**
48:22;88:23;218:1
**internally (4)**
94:3;165:14;
175:17;215:9
**internet (2)**
20:25;179:10
**interoffice (1)**
176:6
**interposed (1)**
81:20
**interpret (4)**
82:21;83:14;92:24;
149:24
**interpretation (6)**
78:1;87:7;92:9,11;
94:24;96:8
**interpreted (1)**
142:17
**interrogatories (6)**
11:1,5,6,9;12:2,7
**Interrogatory (2)**
20:20;21:6
**interrupted (2)**
14:21;58:6
**Intervention (1)**
202:4
**interview (2)**
180:15;185:19
**interviewed (6)**
181:7;182:20;
183:1,12,17;195:25
**interviewing (1)**
183:9,15
**interviews (1)**
35:1
**intimate (1)**
15:25
**intimidating (1)**
173:18
**into (16)**
6:8;27:3;33:15;
34:7;44:4;53:1;
100:20;102:21;
114:18;165:23;
222:22;225:1;233:3;
244:4,14,16
**introducing (1)**
87:13
**investigate (1)**
109:17
**investigation (4)**
144:15,20;195:8;
197:21
**Investigative (1)**
178:24
**investigators (5)**

174:17;239:13,18;
240:10;241:7
**invitation (1)**
215:10
**invite (1)**
146:18
**involuntarily (2)**
23:14;28:8
**involuntary (1)**
43:15
**involved (6)**
15:24;100:3,4;
137:6;155:8;160:24
**involves (1)**
190:21
**involving (3)**
33:10;99:5;111:11
**irate (1)**
108:25
**issue (21)**
7:23;94:4;99:6,6;
100:3;101:2,12;
107:16;111:8;114:1;
137:6,21,24;138:2;
145:24;155:15;
163:15;165:8;219:10,
10;247:22
**issued (5)**
76:10;81:25;82:1,
11;212:20
**issues (14)**
135:22;136:8;
138:6;146:13,15;
152:2,14;153:22;
155:3,8;160:22;
162:24;167:2;239:8
**issuing (1)**
78:15
**items (2)**
113:14;250:17
**iterations (1)**
198:8

**J**

**J1 (2)**
213:11,14
**J2 (2)**
213:10,12
**J3 (2)**
213:9;223:13
**J4 (1)**
213:8
**J5 (1)**
213:8
**J6 (3)**
212:5;221:5;222:7
**Jacki (1)**
183:12
**Jamie (1)**
169:11
**Jamison (3)**
179:9,25;181:15

**January (17)**
37:9;52:10,11,12,
14;59:7;60:8;65:13;
66:20;84:1;115:19;
117:6;130:1;181:10;
182:17,17;236:1
**Jasmine (1)**
194:12
**Jenkins (4)**
178:23;195:9,14;
200:7
**Jennifer (2)**
16:12;190:3
**Jenny (18)**
60:10;101:8;
107:23;110:13;
135:15;178:22;196:9,
11;200:15;201:15;
202:1,6;213:8;
218:21;220:7;238:1;
255:24,24
**Jenny's (1)**
60:14
**job (13)**
16:1;26:15;93:17;
101:1;125:18;130:23;
131:4,15;180:16;
185:2;202:23;221:21,
23
**John (4)**
16:12;194:16,21;
210:4
**Johnson (3)**
185:15;187:2;188:8
**joint (1)**
18:6
**JONES (38)**
5:7,12,15,16,19,25;
10:14;11:16;17:16,
19,20;18:25;19:6,8;
21:5;26:19;43:5;
70:20;71:22;79:18;
81:2;90:25;97:5;
119:8,16;128:5;
140:13;165:1,9;
166:12;177:23;
189:12,19,20,20;
190:2;243:1;253:4
**Judge (52)**
19:10,12;52:18;
56:5,7;61:8,19,22;
63:23;102:6,10;
109:6,8,9,10;110:9;
111:8;150:20;152:22,
23;155:5,21;156:6,15,
20;158:23;159:17;
160:6,20;162:9;
163:4,22,23;165:1,6,
13;166:13;167:3,5,18,
21,22,25;168:20,20,
24,25;169:3;210:18;
211:15;214:23;
221:18

Case 4:23-cv-00111-RSB-CLR Document 34 Filed 07/08/24 Page 273 of 413

Burton v.
Jones

Video Deposition

Shalena Cook Jones
December 18, 2023

**judges (29)**
 61:25;62:1,6;63:23;
 111:1;151:4,5,6,7,8,8,
 13,16,17,18,21,21;
 152:6,10,11;153:23;
 154:3,6;159:16,20;
 160:18;170:2;222:4,
 23
**judge's (1)**
 222:16
**judgment (5)**
 25:12,16;242:12,
 14;243:4
**Judicial (1)**
 76:15
**Judith (6)**
 68:19;69:13,16,20,
 21;72:5
**July (1)**
 17:21
**jump (1)**
 209:22
**June (3)**
 115:20,21;130:1
**jurisdiction (2)**
 19:21;163:1
**jury (2)**
 173:16;217:9
**justice (1)**
 173:19
**justification (1)**
 229:4
**Juvenile (10)**
 59:14;63:21;64:7;
 174:25;198:24;
 205:25;239:16;
 240:13;254:16,17

**K**

**Kaitlyn (3)**
 109:21;110:7,11
**Katie (5)**
 109:21;110:8,11;
 120:15,17
**keep (4)**
 51:7,8;117:12;
 152:20
**keeping (2)**
 168:12;249:6
**keeps (1)**
 218:19
**Kelly (3)**
 109:21;110:8,11
**Kelvin (1)**
 196:25
**kept (2)**
 182:23;251:4
**K-E-Y-E-A-V-Y-A (1)**
 190:8
**KF (1)**
 120:15
**Kidnapping (1)**

196:22
**kids (1)**
 102:9
**Kim (2)**
 59:14;199:22
**kind (30)**
 7:24;15:10,13;
 16:16;22:21;23:18;
 26:21;30:2,15;43:5;
 44:19;47:25;53:12,
 18;63:5;65:10,14;
 92:25;145:11;155:14,
 16,16;191:4,6;
 194:25;195:1,2;
 196:23;203:7;244:12
**kinds (6)**
 24:22;44:7;51:14;
 63:24;64:1;219:11
**King (1)**
 183:13
**Kitty (1)**
 55:18
**knew (24)**
 15:16;53:21;56:3;
 57:5,12;58:9,12,17,
 19;59:24;99:21;
 103:25;109:19;
 114:19;115:21,24,24,
 25;116:5,7;154:9;
 180:13;182:6;185:1
**Knight (1)**
 194:13
**K-N-I-G-H-T (1)**
 194:14
**knowing (2)**
 10:2;58:11
**knowledge (18)**
 58:22;62:18;83:5;
 87:18;109:24;132:6,
 10,24;176:10;206:19,
 24;219:2,11,14;
 226:10;235:17;238:5;
 256:8
**known (5)**
 87:22;158:11,14;
 216:18;238:2
**Kristin (2)**
 185:14;186:16
**Kristjan (1)**
 249:15
**Kurtis (2)**
 105:16,20
**Kyle (2)**
 120:14,19

**L**

**laid (1)**
 215:7
**land (1)**
 54:9
**Lankhorst (2)**
 120:14,19

**Larry (1)**
 28:20
**last (3)**
 5:14;10:16;14:4;
 17:19;171:3,22;
 194:13;220:10;246:8,
 18,23;247:1;248:11
**late (2)**
 156:1;212:19
**later (10)**
 27:3;34:11;38:15;
 75:19;76:22,24;77:4;
 187:14;254:9,12
**latter (1)**
 185:3
**Laura (2)**
 221:7,8
**Laurie (1)**
 213:10
**law (22)**
 7:9;10:8;20:14;
 21:22,23;22:21;
 24:20,22,24;32:18;
 33:5;34:15;41:1;43:4;
 44:24;51:22;92:1;
 143:15;144:12;
 168:13;225:19;
 244:17
**laws (2)**
 41:14;142:24
**lawsuit (3)**
 164:7;216:14;
 218:13
**lawsuits (1)**
 24:1
**lawyer (4)**
 12:22;14:4,15;
 192:14
**lawyers (1)**
 203:9
**layout (1)**
 54:9
**lead (50)**
 30:1;93:7;188:24;
 212:2,5,7,9,22;213:2;
 214:1,7,8,20,20;
 217:11,17,19;218:6;
 219:17,23;221:15,20;
 222:7;223:2,11,15,19;
 224:6,10,16;225:2,5,
 10,13;226:15,22;
 227:22;228:6,20,22;
 229:10,15,18,24;
 235:21;237:23;
 253:17,20;255:12,17
**leader (4)**
 76:7;162:12;
 184:17;189:25
**leaders (3)**
 86:24;196:25;200:5
**Leadership (23)**
 48:8;49:22;50:17;
 52:16;53:21;98:16;

99:17;100:15;101:4;
 131:4;151:24;163:11;
 171:17;177:15;188:5,
 12;189:9,24;190:12;
 212:9;214:18;215:6;
 224:1
**leading (4)**
 66:9;114:20;
 165:22;186:13
**leaf (2)**
 11:24;12:5
**learn (2)**
 112:8,9
**learned (12)**
 112:19;113:2,5,10;
 130:15,18,22;131:7,
 14,16,17;247:23
**learning (1)**
 249:8
**lease (6)**
 239:4,5,20,21;
 240:14,21
**leases (1)**
 239:19
**leasing (1)**
 239:9
**least (8)**
 15:1;82:17;94:20;
 95:1;121:9;219:3;
 221:12;250:15
**leave (9)**
 23:14;28:7;43:13;
 44:10;101:1;108:20;
 118:17;159:11;
 187:21
**leaving (14)**
 32:6;38:4;53:24;
 102:8;106:20,25;
 107:11,14;108:8;
 136:6;137:5;152:15,
 15;159:10
**led (4)**
 33:15;136:22;
 155:14;157:8
**left (33)**
 23:11,15;24:10;
 30:3,4;31:19;36:3,21;
 38:9;44:9;53:25;72:1;
 73:21;102:23;105:21;
 111:19;115:23;117:5;
 158:3;159:4,8,16,21;
 181:24;196:9;213:23;
 220:16,17;221:6,8;
 248:24;249:10;
 252:19
**legal (15)**
 10:5;42:16;43:1;
 70:4;134:8;170:24;
 173:7;174:7,7,17;
 192:21;223:5;235:2,
 15;256:20
**legalities (1)**
 145:14

**legally (6)**
 43:25;142:22;
 144:8,23;145:10,16
**legitimate (1)**
 91:25
**Less (5)**
 13:5;45:10;102:15;
 114:15;196:18
**letter (14)**
 125:2;127:3,21;
 128:4;138:25;152:20;
 153:13,14,15,16;
 230:21,23;231:9,11
**letting (1)**
 112:15
**level (8)**
 28:22,25;202:11,
 14,20,22;204:1;
 253:22
**levels (3)**
 51:25;54:20;174:16
**liability (1)**
 24:9
**liaise (1)**
 221:23
**Liakakis (3)**
 239:15,21;240:5
**liberty (1)**
 152:14
**licensed (1)**
 235:23
**likelihood (1)**
 92:3
**Likely (9)**
 84:8;138:22,23;
 142:20;182:16;
 211:14,23,25;230:18
**limit (3)**
 242:4;243:6;251:21
**limited (2)**
 98:3,6
**limits (1)**
 143:12
**line (3)**
 70:14;164:6;257:12
**lines (5)**
 152:20;154:9,16;
 221:10;224:8
**list (14)**
 22:18;53:13,16,19,
 20;54:17,19;59:8,11;
 78:25;199:14;200:5,
 9;254:5
**listed (4)**
 59:19;69:13;146:4;
 254:8
**listen (2)**
 112:7;167:19
**listening (1)**
 62:3
**literally (1)**
 166:4
**literature (1)**

Case 4:23-cv-00111-RSB-CLR   Document 34   Filed 07/08/24   Page 274 of 413

Burton v.
Jones

Video Deposition

Shalena Cook Jones
December 18, 2023

66:5
litigating (1)
64:24
litigation (22)
22:24;23:21;39:18;
40:15;41:2,5,16;43:7;
44:17,21,25,25;46:25;
51:11;93:8,20;
190:19,21;191:18;
192:18;224:20;
256:21
litigations (2)
175:22;191:20
little (8)
32:1;34:11;44:22;
74:14;119:22,23;
158:12;243:2
load (8)
31:2;36:7;39:14;
61:9,11;64:25;
203:15;222:25
loads (3)
39:13;222:20;223:1
local (2)
43:10;44:14
locate (2)
73:14,17
located (6)
75:6,7;239:12,13,
15,17
long (14)
8:21;12:25;13:3;
19:5,14;24:5;40:11;
51:4;148:12;181:18;
213:13;218:14;236:8;
248:24
longer (2)
134:7;254:19
Long's (1)
213:20
look (23)
7:10;8:9;10:18;
13:9;80:23;88:16;
125:6;127:20;138:24;
175:10;199:13;
215:23;233:8,9;
235:19;236:6,7,13,15,
22;237:20,24;251:18
looked (10)
10:20;13:11;73:19;
133:6,23;180:10,11;
195:24;217:15,16
looking (10)
8:18;38:7;63:1;
66:11;89:1;175:10;
215:13;233:21;237:8;
253:5
looks (8)
28:3;97:16;150:6;
151:3;161:4;230:24;
231:13;233:14
lot (21)
23:21;27:1;38:6;

44:4;61:25;62:17;
114:20;152:21;
153:22;158:17,18;
171:24,24;173:4;
214:11;220:15;
225:19;226:11;227:7;
229:11;230:3
lower (3)
203:3;226:3;227:7
lunch (2)
117:10,18

M

ma'am (2)
79:11;254:24
Macon (1)
187:21
main (3)
63:19;172:18;239:6
mainly (1)
23:2
maintain (4)
154:16;159:7;
208:8;245:15
maintained (3)
48:16;244:7;250:4
maintains (1)
242:8
major (14)
64:18;196:19,20;
201:17;203:19;204:5;
207:20,21;218:25;
219:1,3,5,13,22
majority (2)
24:15;221:13
makes (1)
169:25
making (14)
92:1,6;93:4,5,19;
105:5;111:24,25;
127:9;154:7;214:24;
218:2;248:9;256:14
male (1)
116:22
man (3)
185:23;195:14;
199:19
managed (1)
64:6
management (18)
33:13;34:8;36:1,2;
47:11,12;48:7;50:17;
51:15;145:12,25;
146:7,16;149:13;
152:13,16;162:25;
163:5
manager (23)
14:1;39:12;72:24;
73:8,10;74:15;78:15,
21;85:7;179:12,21;
180:23;181:19;182:7,
22,23;230:19;232:3;

236:11;247:7;254:8,
9,13
managerial (1)
66:16
managers (3)
195:6;223:1,7
manager's (2)
73:20;84:10
managing (8)
27:19;36:5,8;37:13;
38:16,20;48:8;49:23
manner (1)
169:19
many (40)
14:24;18:2;37:18;
45:7,13,22;112:25;
174:2,5;183:7;
190:11,13;192:12;
200:23;201:10,10;
202:1,6;203:5;
204:16,16,20;205:1,6,
6,10,19,25;206:3;
212:25;216:19,22;
217:18,21;226:12;
236:15;239:10;
241:22;252:6,6
March (9)
141:25;150:7;
154:23,24;170:16;
182:1,1;194:8;209:3
Marcus (8)
78:14;85:6;179:13;
180:1,13;181:12;
182:5;236:19
Marella (7)
69:13,15,16,17,19,
22;72:6
Marie (17)
101:8;131:6,11,18,
19,24;133:8;134:13;
135:3,4,4,16,24;
136:4;141:24;142:10;
153:18
Marin (3)
170:20;172:5,6
mark (3)
229:11;246:5,11
MARKED (12)
11:13;75:2;79:7;
90:23;97:2;128:2;
140:5,10;175:14;
227:15;230:14;
233:12
Markeith (1)
17:16
M-A-R-K-E-I-T-H (1)
17:19
market (2)
43:25;44:3
marriages (1)
116:18
married (9)
17:10;18:23;19:3,5,

9,10,14;20:3;26:18
MARTIN (2)
255:6;257:20
Marvin (1)
16:4
Mary (1)
249:14
material (1)
56:9
materials (6)
48:11,21;49:5,6,9,
19
matter (11)
5:18,24;9:6;14:21;
15:3,5;124:16;
125:17;208:12;
215:15;232:13
matters (24)
16:21;22:22;26:21,
24;30:9;40:15;41:3,5,
16;43:6;44:16;63:9;
90:3;134:3,3,8;
142:14;143:1,10,11,
15;145:9;154:14;
172:17
may (16)
8:3,16;12:24;32:15;
42:6;49:1;59:12;76:3;
115:20,21;168:3;
178:2;193:24,24;
240:11;251:11
Maybe (16)
13:5;24:7;26:9;
32:13,14;37:21;
54:25;61:10;181:20;
195:25;220:17;
235:15;237:8;241:23;
250:13;252:3
McConnell (16)
36:15;37:1;55:14,
22;56:23,24;60:21;
66:3;201:5,8,11;
218:21;220:7;255:21,
21,23
MCD (9)
196:16,19;197:9;
198:23;201:14,17;
202:5;219:7,9
McLeod (5)
59:14;60:1,6;
205:25;254:18
mean (46)
6:22;8:8;9:2,11;
10:2;13:1;64:23;
66:24;68:19;69:4;
70:13;75:14;81:17;
91:18;104:23;112:17;
113:16;114:14;116:3,
7,15;117:2;118:16;
126:12;146:21;
157:15;158:14;166:3;
168:16;191:19;203:1,
25;204:7;205:5,8;

207:3;220:15;226:5,
6;232:1;235:5;
248:19,20;251:23;
255:15;256:16
meaning (4)
30:24;167:22;
168:25;178:19
meant (2)
27:12;64:17
measuring (1)
203:15
Media (6)
5:4;70:9;71:19;
119:5;193:6;253:1
meds (6)
122:25;123:3,11,
13,17;124:6
meet (18)
12:20;13:3;35:23;
37:8;55:10,11,21;
57:10;58:23;60:2;
61:19;62:1,15;187:5,
14;191:10;207:23;
208:1
meeting (26)
12:23;14:3;78:12;
85:4,8;98:16;100:24;
101:5,11,13,25;
102:14;112:22;135:1,
12,13;142:19;177:4;
187:11;210:3;211:9,
12;237:2,14,21;
250:11
meetings (9)
36:9;50:11;56:20;
163:22,23;172:22;
208:12;209:13;
210:11
Meg (5)
29:18;36:15;37:2;
76:14;157:11
Meg's (3)
55:23;61:1;186:24
member (9)
109:15,18;125:20;
145:25;147:6;196:6;
249:5,13;256:12
members (9)
67:11;100:15;
102:4;128:10;151:19;
168:24;172:23;
219:20;238:3
membership (1)
188:4
memo (4)
139:5;177:10,13,15
memorized (1)
146:19
men (1)
197:1
Mental (19)
63:18;64:6,20;99:5;
100:3;101:2,12;

Case 4:23-cv-00111-RSB-CLR Document 34 Filed 07/08/24 Page 275 of 413
Burton v.
Jones

Video Deposition

Shalena Cook Jones
December 18, 2023

104:12,19;106:6;
107:1,16;122:21;
129:6;135:22;136:8;
137:6,24;138:6
mentally (1)
129:6
mention (1)
116:25
mentioned (4)
56:6;68:4;72:5;
183:19
mentions (1)
104:11
merit (2)
31:20;32:6
mess (1)
223:9
message (16)
97:16;98:17;
104:10;106:14;
120:25;121:1;122:2;
132:16;134:9,14;
136:1;137:11,13;
161:7,7,14
messages (5)
106:19;119:18,19;
162:6,7
messaging (1)
227:7
met (6)
55:14,22;56:10,12;
62:6;99:17
method (2)
168:12;170:5
Michael (23)
13:17;65:18,21,22;
78:13;85:5;101:7;
107:25;135:14;139:3;
151:25;154:13;176:7;
178:18;199:18;200:1;
204:13,25;205:7,13,
18;236:19;255:25
mid (1)
250:13
Middle (2)
17:18;19:12
might (36)
26:8;32:21;34:24,
25;35:1,2,25;77:5;
86:11,13;88:1;89:17,
24;91:22;92:7;93:6,7;
109:20;119:18,22;
139:2,4,7,8,16;144:9;
151:8;187:19;198:7;
203:10,11;208:3;
235:14;237:10;243:8;
249:22
Mike (2)
197:1,10
military (1)
26:20
mill (3)
113:7;169:19;170:3

mine (4)
15:17,21;224:21;
254:2
minimize (1)
114:25
minor (1)
17:25
minus (3)
206:8,9,11
minute (3)
40:20;108:19;
220:11
minutes (11)
70:8,25,25;117:11;
118:12,18;193:10;
252:3,6,9,16
mirror (1)
89:3
misconduct (3)
15:10,14;147:8
misdemeanor (2)
29:5;30:6
missed (1)
234:25
missing (4)
67:14;247:20,23;
248:18
mistaken (2)
41:12;74:4
misunderstood (1)
188:3
Mitchell (24)
22:3,12;23:16,19;
25:21,22,25;26:13;
27:15;37:13,19,24;
39:25;40:16,20,22;
41:4,11,21;42:22,25;
43:14,17;44:10
mixed (1)
63:25
Mm-hmm (18)
19:13;22:11,15;
23:1,9,12;26:7;27:9;
55:15,17;56:16;
58:13;115:2;182:19;
194:11,15;196:2;
199:19
model (1)
224:2
mole (2)
110:21;111:5
moment (1)
12:11
Monday (4)
99:16,16;101:18;
118:11
money (11)
31:17;241:17;
244:4;245:8,11;
246:20,24;247:22;
248:3,6,22
moneys (2)
249:2,24

month (3)
77:19;111:16;182:9
months (1)
117:4
Moore (1)
23:8
more (40)
31:16;34:7;44:1,6;
59:17;83:21;88:7;
107:12;116:1;119:19;
120:5;121:15;126:11;
132:13,21;151:21;
153:10;155:20;
168:18;173:2;176:14;
182:24;202:17;203:2,
8,19,22,22;209:16;
219:3;222:14;225:14;
226:9,11;227:2;
229:11,22;230:3;
253:23;255:2
morning (2)
5:12,13
Morrell (1)
60:1
Morris's (1)
110:9
Morse (1)
102:7
most (12)
17:15;24:24;49:22;
50:16;53:22;75:21,
22,22;89:7;113:16;
151:20;222:23
mostly (1)
39:11
motion (1)
242:3
motions (2)
25:13,16
motor (1)
23:2
mouth (1)
114:5
move (5)
30:11;32:2,7;140:1;
166:10
moved (5)
17:4;26:14;30:5;
60:18;232:15;234:5
movements (1)
234:25
moving (5)
12:18;31:14;195:7;
224:1,2
Mrs (1)
145:17
much (9)
36:14;53:2;70:18,
24;106:22;114:25;
193:8;246:24;248:15
multipage (1)
146:16
Munis (1)

251:3
murder (1)
218:25
murders (3)
196:21;203:20;
218:18
Murphy (3)
197:1,10,18
Musson (14)
13:21;105:16;
117:4;120:13;155:6;
156:7,8;159:8,21;
221:6,6;224:14,19;
242:21
Musson's (2)
13:15;115:4
muted (1)
255:4
myself (9)
44:8,8;101:9;
135:14;151:25;
157:12;158:16;
236:18;237:24

### N

name (23)
5:14,17;16:4;17:17,
18,19;19:12;23:10;
49:13;59:11,22,22;
69:18;120:17;172:6;
185:15,18;187:9,10;
194:13;218:8;246:8,
10
named (6)
21:23;36:24;
111:11;228:6,11;
256:13
names (11)
54:20;68:17;69:6,
24;121:1;167:13;
217:23,23;223:11;
237:4,7
Nancy (3)
55:18;62:14,17
Narcotics (2)
201:21,24
narrative (1)
228:5
Nathanael (4)
179:8;183:18;
200:20;236:20
nation (1)
39:2
nationally (1)
44:3
nature (5)
91:24;96:16;
115:11;134:5;159:3
necessarily (4)
31:14;95:2;216:5;
229:2
necessary (3)

91:22,23;216:18
need (16)
20:20;21:12;51:2,5,
6;70:24;74:13;89:5;
160:19,20,21;162:21;
165:3;184:19;243:8;
244:14
needed (12)
53:23;62:4;63:2;
65:22;99:19;100:25;
160:13;203:16;216:9;
241:14,14;244:18
negative (1)
220:12
negotiated (1)
203:8
negotiations (1)
186:14
neither (2)
64:10,14
new (12)
33:9;78:15;79:2;
150:20;153:4;199:3,
5,5;222:22,23,25;
234:6
newly (2)
199:15,18
next (10)
32:5;69:18;73:24;
105:14;119:20;
136:22;161:10;170:4;
173:20;200:5
Nice (2)
158:23;159:18
non-custodial (3)
193:2,23,23
nondisclosure (1)
90:9
none (3)
6:16;45:17;190:17
nonresponsive (1)
210:15
Nope (2)
119:11;184:16
nor (1)
147:3
normal (4)
89:6;152:5;160:18;
247:17
note (3)
37:12;120:6;226:5
notes (6)
10:20;13:9;48:15;
49:24;139:8,8
notice (2)
10:9;14:14
noticed (2)
138:9;159:2
notify (2)
146:7;191:9
November (6)
52:7,8,13;79:22;
80:3;83:9

Case 4:23-cv-00111-RSB-CLR   Document 34   Filed 07/08/24   Page 276 of 413

Burton v.
Jones

Video Deposition

Shalena Cook Jones
December 18, 2023

Novitz (1)
  22:4
nuance (1)
  30:24
nuanced (1)
  209:16
Number (41)
  5:4;11:12;20:21;
  21:6;25:4;53:25;55:5;
  56:1;71:20;75:1;79:6;
  81:18;90:22;93:22;
  97:1;119:6;123:22;
  128:1;140:4,9;
  154:25;155:13;
  168:16;171:21;
  175:13;177:25;185:4;
  199:1,16;203:4;
  206:7;207:14;217:5,
  8,8,24;227:14;
  230:13;232:21;
  233:11;253:2
numbers (2)
  54:21,21

O

oath (2)
  5:25;12:14
Object (6)
  32:25;86:17,20;
  124:22;176:11,13
objection (4)
  127:9,17;164:5;
  166:3
objectionable (4)
  133:23;134:1,5,10
objections (1)
  127:16
obligations (1)
  92:16
observations (2)
  33:18;216:4
observe (1)
  62:20
observed (3)
  120:11;122:8;215:3
observing (1)
  168:5
obtained (2)
  242:14;243:5
Obviously (4)
  9:4;10:4;116:15;
  136:22
occasions (3)
  38:11;41:21;172:13
occupied (1)
  21:17
occupy (2)
  27:6;181:18
occurred (1)
  87:9
occurring (1)
  8:15

OCD (1)
  198:23
October (1)
  234:22
OFD (8)
  196:16,16,17;
  201:5,12;218:18,24;
  219:1
Off (23)
  50:6;59:11;71:13,
  15;72:1;108:21;
  118:25;119:1;143:12;
  193:5,14,15,16;
  239:14;251:13,14;
  252:21,22;255:22;
  257:6,9,12,14
offer (4)
  37:23,24;73:5;
  180:7
offered (11)
  47:15,16,17,18,24;
  48:5;60:11;82:18;
  180:24;181:3;182:22
offhanded (1)
  123:17
office (336)
  14:1;15:8;22:8,10;
  25:23;26:16,22;27:8,
  12,22;28:1,5,8,15,16,
  24;29:12;30:3,4,15,
  22;31:19;34:22,25;
  35:2,4,8,9;36:3,4,6,6,
  8,12,14,21,21;37:5,9,
  11,14,19,23,25;38:5,
  13,19,21,24,25;39:4,
  16;40:10;43:5;44:4;
  47:9;49:2;52:9,16,20,
  21,24;53:6;54:4;55:6,
  11,12;56:13;57:2,14;
  58:7;59:5,16,17;60:7;
  62:10,18,22;63:2,15;
  65:12,12,17;66:13,15;
  67:19,21,24;68:3,10;
  70:3;72:4,11,16,18,
  23,24;73:1,8,8,9,9,10,
  11,13,20,20;74:14,15,
  16,19;75:6;76:7,9;
  77:9,14;78:15,21;
  81:9,10,19,23;82:1,
  16,23;83:4,9;84:5,9,
  10,10,14,24;85:7;
  89:18,22;90:6,10,11,
  14,16;92:23;93:10,16,
  23,24;94:3,10,11;
  99:12,24;100:20;
  102:5,15;105:22;
  108:7;109:16,18;
  110:19,23;111:6,17,
  20;112:5,6,21,24,25;
  114:11,12,15,18;
  115:9,16,18;116:13,
  16,20;117:5,22;118:6,
  8,17;125:20;130:9;

131:24;134:7;138:10;
139:14;141:22;142:6;
143:4;144:25;145:5,
  10,21,24;147:9;
  151:23,24,25;152:2,3,
  7,24;153:9,10,23;
  154:2,21;155:9,10;
  158:6;159:5,8,16,21;
  160:17,23;162:10;
  163:6,11,13;164:16;
  166:14;168:9;169:6,
  18;170:1,5;171:15;
  173:4,12;174:3,11,13;
  175:2,6;176:9;178:5,
  11;179:11,20;180:2,3,
  22;181:19;182:7,22,
  23;184:1,10,11,14;
  187:13;188:13;
  191:19;194:1;197:4,
  7,10,13,25;198:2,16;
  199:15;200:17;206:4,
  5,7,9;207:7;214:2,12;
  215:4,21;216:4,12,16,
  23;217:1,24;218:10,
  15;220:11;221:25;
  226:12,21;227:2,8;
  228:25;230:19;231:3;
  233:1;235:20;236:9,
  11,16;238:13,14,18,
  22,23;239:3,6,11;
  240:20,22;241:5,10,
  11,12,25;242:8;243:4,
  12,17;244:9,16;245:9,
  12,15;246:2,6,7,15,
  20;247:7,11;248:7;
  250:23;253:13,18;
  254:7,9,13
offices (8)
  39:1,1;44:5;66:9;
  110:25;239:10,10;
  240:4
Office's (1)
  94:17
official (2)
  5:20;89:10
offsite (3)
  239:7,13;240:12
often (3)
  154:5;173:2,3
Once (10)
  15:1,1;41:8;51:20,
  21;70:15;196:8;
  211:13;250:12,15
one (81)
  6:9,16;9:13;24:7,
  13;26:1;31:10;32:5;
  35:21,21,22;36:6;
  45:14;46:16;47:17;
  50:19;51:5,6;54:3;
  59:22;61:6;62:6,21;
  75:13,13,14,16,19,20,
  21,22;76:7,10,12,14;
  77:6;80:4,7,25;81:5;

82:17;83:21;84:10;
  85:18;88:6,7,14;
  103:4,9;109:19;
  110:16;116:19;
  120:20;129:10;
  163:18;167:20;
  177:25;192:14,15,16;
  198:7,11,12;213:17;
  214:8;218:19;219:3;
  220:18;221:5,12;
  228:7;229:25;232:7;
  233:9;236:21;237:11;
  248:6,6;249:4;
  250:11;255:22
ones (5)
  59:19,19;159:1;
  183:16;200:5
only (21)
  46:12;56:25;62:10,
  12;99:19;100:14,15;
  108:14,16,11;111:12;
  114:22;132:8;135:20;
  136:5;183:16;200:4,
  8,9;203:18;220:17;
  224:3
onsite (1)
  67:18
open (21)
  41:22;42:1,10,12,
  17,18;43:2;50:22;
  52:23;62:4;89:8,16,
  17,24;90:4;109:5,11,
  14;154:10,16;214:1
opened (4)
  22:13;41:8;43:4;
  181:4
operate (1)
  169:18
operates (2)
  238:22,23
operating (4)
  249:25;250:5,9,20
operation (1)
  243:25
operations (4)
  92:22;165:14;
  191:9;238:2
opinion (4)
  62:24;113:18;
  158:17,23
opportunity (5)
  62:20;102:25;
  109:6;184:18;226:15
opposed (1)
  162:19
opposite (1)
  220:9
options (1)
  195:24
order (13)
  6:23;7:2,14;8:24;
  9:3,12,13;10:3;18:7;
  161:8;212:20;244:23;

248:15
ordered (1)
  87:3
orders (1)
  257:17
org (4)
  65:10,14;67:13;
  175:17
organization (11)
  39:7;66:21;176:1,8,
  18,24;177:7;225:16;
  241:1;253:6;254:21
organizational (23)
  35:10;54:12;65:11;
  66:22,23;67:2,4,13,
  23;68:2,9;72:2;74:1;
  177:24;184:19;
  197:16,22;198:1,6,15;
  207:22,25;208:13
organizations (2)
  48:1,2
organize (3)
  77:11;108:22;
  197:17
organized (3)
  35:8;225:17;228:18
orientation (1)
  256:5
original (1)
  230:25
others (9)
  61:23;106:11;
  107:9,20;128:11;
  151:22;181:5;202:18;
  240:6
Otherwise (1)
  51:6
out (53)
  7:15;21:1,22;22:7;
  36:8;38:11;43:20;
  52:21;54:1,10;56:2;
  57:5,6;58:11;59:20;
  64:13;70:12,16;71:5;
  78:16;100:16,22;
  102:13,24;107:5;
  109:9,10;125:14;
  141:22;142:3;158:6;
  159:12;160:14;161:8;
  162:24;165:7;172:20;
  173:2,20;180:10,14;
  181:12;215:8;227:7,
  9;231:24,25;234:16,
  17;240:2;248:16,23;
  255:11
outreach (2)
  174:19;240:19
outside (11)
  111:5;114:12;
  131:24;143:4;144:24;
  145:4,9;172:18;
  215:6;248:7;250:4
over (30)
  35:4;44:6;45:8;

Case 4:23-cv-00111-RSB-CLR   Document 34   Filed 07/08/24   Page 277 of 413

Burton v.
Jones

Video Deposition

Shalena Cook Jones
December 18, 2023

56:17;57:23,25;
63:22;64:8,11,16;
85:9;112:17;117:15;
142:19;172:13;
177:24;179:10;189:2,
6,12;195:9,16;
198:23;202:18;219:7;
225:16;237:11;247:9;
249:1;254:22
overexerted (1)
153:23
overextended (1)
153:24
overhaul (2)
207:23,25
overlap (1)
37:3
overly (2)
155:8;202:24
oversee (1)
247:9
overseeing (1)
247:16
overseen (1)
204:13
oversight (1)
249:1
overstepping (1)
154:6
own (21)
17:3,6;22:17;34:8;
39:5,14;41:8;63:25;
76:20;88:23;89:18;
92:15;129:12;130:4;
139:8;232:1;238:15;
240:22;241:5;243:9,
14
owned (5)
115:16;241:1;
243:3,11,18
owns (6)
238:14,17,21,23;
241:3,25

P

PAC (14)
47:19,24;48:5,12,
21,25;49:5,8,9,11,14;
50:13;91:13,17
PAC's (1)
48:25
page (27)
20:21,22;21:3;
88:17;97:7,14;
104:11,11,18;105:12,
14;119:20;129:20;
146:20;150:25;160:5;
161:2,11;178:17;
198:18,19;230:21;
231:13;232:17;
234:20,21;254:23
pages (3)

78:22,24;146:17
paid (8)
31:16;111:16;
175:7,8,8;230:1;
240:20;243:18
painful (1)
178:2
Painton (1)
185:10
paper (3)
53:14;257:19,21
par (2)
114:22;220:13
paragraph (3)
89:3,12;127:23
paralegal (4)
170:24;173:6;
174:8;235:3
paralegals (1)
174:16
paras (1)
223:6
parents (3)
193:2,23,24
Parker (27)
55:18;58:14,20,25;
59:1;60:10;101:8;
107:23;110:13,15;
135:15,17;136:8,14;
178:22;188:25;196:9;
200:7,15;201:15;
202:6;213:8;218:21;
220:7;238:1;255:24,
24
Parker's (1)
196:12
Parkway (1)
239:14
part (32)
14:3;15:11;21:20;
36:1,2,16;49:6;50:21;
88:7;92:25;97:12;
101:3;103:21;119:8;
121:9;123:15;124:9,
19;131:3;133:18;
136:1;142:4;188:12;
190:13;192:18;198:1,
6;218:9;219:25;
221:18;227:5;249:3
partial (1)
107:9
participant (1)
125:9
participated (2)
126:4,12
participating (2)
124:15;125:16
particular (17)
32:22;33:11;36:7;
50:11;91:13;94:6;
98:19;104:18;106:6,
12,13;151:20;154:4;
173:13;184:15;

218:23;219:25
particularly (4)
100:2;109:4;114:3;
152:22
parties (7)
144:18;145:22;
146:24;147:23;
149:22;162:20;239:9
partner (8)
37:13;38:16,20;
99:20;115:7;116:21,
21;224:24
partners (3)
115:22,25;117:3
part-time (1)
151:7
party (3)
6:2;126:5;147:15
Paso (1)
26:20
pass (1)
216:20
passed (1)
79:21
passing (1)
159:13
past (3)
13:1;17:5;252:18
pay (29)
31:10,20;32:2,5,5,8,
8;54:22;55:1,2;225:4,
24;228:1,21,22;229:2,
4,5,21;231:7,7;234:5;
239:3;240:3,7,9,9,11,
11
payments (3)
18:12;193:1;240:2
payroll (2)
53:14;183:14
PDF (1)
88:18
pending (6)
18:12;93:4,8,20,24;
96:13
Pennington (5)
185:9,11,12,22;
188:7
people (56)
53:23,25;55:21;
56:18;59:12,17;
62:21;69:3;93:22;
94:21;98:12;101:10;
102:21;108:6;110:17,
24,25;111:2,9,12,15;
112:22;113:7;114:16,
20;116:18;123:22;
124:14;134:6;141:22;
142:16;162:10,15,20;
174:20;178:13;
185:19;188:4,7,15;
190:11,13,19;192:12,
25;196:16;199:9;
200:23;202:6;205:10;

213:6;214:17;216:25;
217:2,24;243:23
people's (2)
78:23,25
per (1)
216:6
perfectly (1)
165:15
perform (2)
191:18;192:17
performance (3)
31:24;255:17,22
performed (2)
236:17,18
perhaps (4)
99:6;139:5;211:19;
219:3
period (5)
29:9;37:20;158:11;
192:7;235:1
permanent (1)
43:19
permission (2)
145:19;146:2
permitted (1)
5:23
perpetuating (1)
114:6
person (24)
15:9;62:11,12;
105:23;118:8;139:9;
173:18;178:20;179:3;
183:20;188:24;189:3,
5,25;192:2;199:6;
214:22,22;219:6;
234:17;246:1;249:10,
12;255:15
personal (10)
15:20;98:8;99:25;
103:18;109:24;
125:17;130:8;132:10;
241:24;242:25
personally (3)
124:17;130:14;
238:7
personnel (39)
38:18;47:10,12;
48:7,9;50:17;66:22;
67:14;78:23,25;
89:22;90:3,9,15;
96:20;124:16,18;
125:20;126:7;128:9;
134:3;138:18;142:14;
143:1,10,10,14;145:9;
146:15;152:1,14;
160:22;167:1,1;
205:14;215:23;216:3,
6;225:25
pertain (2)
36:9;167:2
pertained (1)
50:16
pertaining (1)

155:8
Pete (3)
239:15,21;240:5
Phillips (2)
194:16,21
phone (9)
98:1,8;101:20;
119:21;120:24;121:4,
13;187:19;245:23
phones (1)
174:22
physical (2)
74:16;84:15
physically (1)
68:11
pick (3)
22:7;57:9;117:23
picking (1)
56:10
piece (1)
17:2
PIO (1)
186:23
place (17)
6:24;10:3;35:3;
66:25;73:15,21;
85:16,18;88:6;
108:19;140:16;152:6;
168:12;198:9,13,22,
25
placed (4)
53:7;85:19;88:10,
11
plainly (1)
243:16
plaintiff (2)
11:22;16:15
plaintiffs (1)
44:24
plaintiff's (1)
44:20
plan (1)
108:15
platform (1)
16:2
pleadings (2)
248:9,15
please (29)
5:5;11:11;17:17;
20:19,22;21:3;40:17;
74:24;79:15;88:17;
90:1;96:25;112:12;
126:25;136:20;140:3,
8;142:1;143:20;
148:12;153:7;154:12;
159:25;163:2;166:23;
178:17;227:13;
257:16
pm (16)
118:25;119:1,2,5;
193:14,15,16,19;
251:16,20;252:21,22,
23;253:1;257:14,23

Case 4:23-cv-00111-RSB-CLR Document 34 Filed 07/08/24 Page 278 of 413

Burton v.
Jones

Video Deposition

Shalena Cook Jones
December 18, 2023

point (61)
  10:6;23:23;27:7;
  28:3;31:5;34:13,18;
  35:15;36:12,19;
  43:21;51:2;52:6;61:6;
  65:18;73:7;75:6;77:9;
  85:24;89:13;90:2;
  102:9;108:12;115:3,
  6,6,8;116:12,13,16,
  19;127:8;144:6;
  156:6,15;160:14;
  162:24;175:21;177:7;
  192:15;193:5;194:5;
  195:19;196:11,24;
  198:11,12;209:7;
  212:2,8;213:16,20;
  216:11;221:2,5;
  224:13;225:7;247:10,
  19;254:9;256:19
pointed (3)
  127:3;160:14;
  161:22
pointing (1)
  165:7
police (3)
  15:23;23:23;244:15
policies (19)
  27:18,19;38:18,23;
  39:6,8;48:23;78:1,4,
  5;82:3,7;86:15;87:8,
  25;88:24;94:9,12;
  168:2
policy (43)
  67:15;78:10;85:12,
  14,15;86:3;89:2,4,4,
  12;90:7;94:20,24;
  96:5;113:15;121:24;
  125:5,6;128:1;5;
  129:13,15,19,24;
  130:5;132:2,4;
  134:15,20;139:23;
  142:22;143:5,7;
  150:17,21;153:4;
  160:9;165:7,10;
  168:21;172:3;205:14;
  243:6,7
political (1)
  152:22
pool (1)
  185:8
portion (6)
  97:16;98:3,4,6;
  137:16,16
portions (1)
  97:22
position (67)
  7:22;8:9;23:13,14;
  25:6;27:7,17;29:25;
  30:3;31:13,16;32:19;
  33:5,23;54:14,21;
  55:5,6;60:11,17,18;
  63:4;70:1,2;157:3;
  170:23;180:6,8,22,22,

24;181:3;182:13,15,
  17,23;183:2,6,16;
  184:1,2,3,5,6,8;
  186:11;190:3;195:12,
  17,23;196:9;197:6,
  12;198:23;200:16;
  213:20;214:1,20;
  215:25;219:5;224:16;
  225:2,5;226:17;
  253:24;254:8,9
positions (29)
  21:17;33:10,18;
  54:25;55:2,8;174:6,
  13;175:1;197:15,19,
  25;198:5,13,20;
  199:16;212:25;
  213:17;214:7;215:12;
  217:17;229:19;
  235:19;237:23;253:9,
  13,17;254:4,23
possession (1)
  250:24
possibility (1)
  242:25
possible (4)
  50:18;117:15;
  157:4;227:8
possibly (1)
  139:22
post (3)
  180:5;183:2,6
posted (3)
  180:9,11;181:5
posting (1)
  180:12
potential (1)
  187:6
PR (2)
  111:10,16
practice (11)
  22:14,17,21;24:10,
  18;36:9;41:8;44:8,12;
  147:4;198:24
practiced (4)
  26:12,13;158:9;
  184:11
practices (1)
  34:9
practicing (4)
  217:4;232:14;
  235:23;236:15
practitioner (1)
  44:2
preceded (1)
  129:22
preclude (1)
  147:22
preexisting (1)
  57:13
prejudicial (1)
  93:7
pre-meeting (1)
  60:7

preparation (5)
  10:15,19;12:19;
  13:11,23
prepare (4)
  13:15;52:15;139:8;
  237:2
prepared (2)
  52:19;237:5
preparedness (1)
  222:5
presence (1)
  171:13
present (13)
  12:8;21:15;104:1,4;
  107:20,23;134:25;
  135:3,23;136:4,9,14;
  215:10
presentations (1)
  50:19
presented (3)
  105:12;106:10;
  145:12
presently (1)
  210:10
presided (1)
  63:22
pressing (1)
  152:11
pressure (4)
  152:8,18,22;154:17
prestige (1)
  32:15
presume (2)
  141:12;216:17
Pretorius (6)
  56:12,24;120:14;
  185:13;186:7;188:8
pretty (8)
  14:15;24:17;81:15;
  113:10,10;138:23;
  139:11;236:10
previous (5)
  78:17;86:1;87:1;
  94:17;198:18
previously (6)
  15:8;57:2;58:10;
  119:17;178:11;236:4
price (1)
  241:20
primarily (8)
  24:8;31:3;43:7;
  53:20;54:4;114:16;
  186:14;237:8
primary (2)
  183:22;224:21
printout (2)
  90:25;97:25
prior (43)
  6:17;8:15;9:22;
  13:18;19:8;21:16;
  27:11;28:11;52:12,
  20;55:11;58:7;59:15;
  62:10;67:1,7;68:3,5;

71:23;72:21;73:15;
  74:4;76:10;86:2,11,
  14;87:7,11,17,19;
  88:2;98:15;103:16;
  111:23;119:9;184:6;
  196:11;199:13;
  216:11,17;235:19;
  236:4,7
private (5)
  41:8;96:20;124:16,
  18;134:4
privy (1)
  126:16
pro (2)
  16:15,15
probably (18)
  29:22;56:11;
  105:10;114:9;115:19;
  171:25;187:18;201:2,
  3;203:5,7;216:2;
  221:3;229:8;232:18;
  233:3;237:1;245:23
probed (2)
  137:9,13
problem (3)
  69:25;161:24;162:1
problems (1)
  154:5
procedure (10)
  5:22;147:2,11;
  148:18;149:5,14,20,
  23;243:25,25
proceeded (2)
  27:13;158:13
proceeding (1)
  244:21
proceedings (1)
  18:11
process (4)
  27:2;184:24;207:3;
  214:5
produce (2)
  48:17;80:22
produced (14)
  49:10;75:12;80:5,
  19,25;81:10,19;
  129:23;138:23;
  139:17;164:16,21,24;
  175:21
product (2)
  113:25;114:2
products (1)
  24:9
professional (6)
  38:10;114:24;
  159:18;162:17;
  169:18,24
professionalism (1)
  114:17
professionals (2)
  195:1,3
proficiency (1)
  204:2

profit (1)
  245:16
Program (22)
  179:2;188:21,22;
  190:14,20,22;192:23;
  202:4;240:18;243:20;
  244:10;245:19;
  246:16,21,22;247:1,
  10,16;248:4;249:2,3,
  20
programs (4)
  63:20;192:5;
  205:14;240:19
prohibit (3)
  91:19,20;144:13
prohibited (7)
  93:1,3,19;94:13;
  95:14;149:12,21
prohibits (1)
  92:6
promote (1)
  31:23
promoted (6)
  30:20,22;31:18;
  32:8;33:23;232:24
promotion (10)
  30:23;31:8,11,15,
  23;32:4,11,14;33:7,8
proof (1)
  113:20
proper (1)
  248:9
properly (2)
  168:9;223:8
properties (1)
  244:4
property (6)
  238:15;241:9,24;
  243:15;248:16,21
proposal (1)
  34:21
prosecute (2)
  27:1;173:12
prosecuted (1)
  163:6
prosecuting (4)
  27:4,23;111:13;
  204:5
prosecution (1)
  66:11
prosecutions (1)
  194:1
prosecutor (8)
  31:1;66:8;88:13;
  91:5;92:16;93:2;
  228:6,12
prosecutorial (2)
  16:5;94:4
prosecutors (11)
  64:14;91:8,10,14,
  17;92:6;93:3;95:13;
  153:11;216:25;
  220:16

Case 4:23-cv-00111-RSB-CLR   Document 34   Filed 07/08/24   Page 279 of 413

Burton v.
Jones

Video Deposition

Shalena Cook Jones
December 18, 2023

prosecutor's (2)
66:9;91:25
protected (7)
142:23;143:15;
144:8,11,24;145:10,
16
protecting (1)
154:20
protective (9)
6:23;7:2,14;8:24;
9:3,12,12;10:3;171:9
protects (1)
47:3
proven (1)
244:2
provide (25)
40:13,25;41:6,23;
43:1;53:9;77:11,24;
78:3;82:6,20;83:2,11;
85:11;86:12;93:10,
15;166:13,17,17;
190:22,24;191:7;
232:3;237:16
provided (25)
11:5;12:6,14;14:18;
42:16;44:15;48:21;
49:21,24;50:13;
53:13;76:1,4,5;78:8;
80:10,12;81:16,18;
83:17;84:19,24;
168:23;169:2;170:4
provides (1)
91:14
providing (3)
41:13,19;49:18
provision (4)
83:3,7;87:17;146:6
provisions (4)
83:15;89:11;94:16;
95:6
proxy (1)
39:3
PTSD (4)
156:7,8,15,17
public (27)
9:7;39:24;40:3,23;
41:1,13;43:11,12;
46:13;66:14,15;
91:21,24;92:3,7,8;
93:4,20;96:12,19;
102:5,15;109:15,18;
112:6;128:10;162:24
publicized (1)
130:8
publicly (1)
112:1
published (1)
66:6
pull (25)
10:22;11:10;20:19;
74:23,23;79:4,14;
83:20,21;84:21;
90:20,21;96:24;

119:14;127:21,22;
140:3,7,7;143:19;
146:17;170:13;
177:19;227:13;
238:10
pulled (1)
13:8
punitive (1)
243:1
purchase (1)
241:20
purchased (3)
241:11,15,16
purpose (7)
88:8;92:1;100:16;
153:3,12;242:10;
255:16
purposes (3)
5:23;242:12;243:9
purse (1)
245:7
pursuant (3)
5:21;6:19;240:19
pursue (1)
15:22
put (14)
6:8;54:2;78:22,24;
138:18;140:16;
152:16;159:24;
168:12;184:8;198:8,
22;217:22;243:16
putting (5)
10:9;152:7,17;
154:17;204:9

## Q

qualified (2)
214:6;224:3
quick (4)
70:11;83:21;
117:23;251:10
quickly (1)
150:13
quiet (1)
162:9
quit (6)
109:1;115:19;
156:3;157:2;158:21;
180:20

## R

race (3)
45:11;171:12;173:9
Rachelle (5)
170:19,21;173:3,9,
22
racial (1)
25:1
rack (6)
15:19;115:12,13,
17;116:2;133:4

racketeering (2)
225:17;228:18
raised (1)
146:15
ran (2)
112:24;234:16
random (1)
172:20
rapes (1)
196:21
rate (1)
234:6
rated (1)
226:3
reach (2)
52:21;57:6
reached (6)
38:10;56:2;57:4;
180:10,14;181:12
reaching (2)
58:11;159:12
reacted (1)
150:20
read (17)
7:19;13:14,17,19;
21:9;49:21;50:8;
51:21;59:11;82:2,24;
83:7;91:22;129:17;
143:16;146:10;205:2
reading (3)
50:5;92:5;161:8
reads (1)
8:20
ready (4)
21:11;215:2;222:2;
237:10
real (6)
17:2,6,7;117:23;
161:24;162:1
realize (1)
221:3
realized (1)
247:22
really (13)
25:18;40:2,10;44:3;
53:24;54:20;59:19;
113:19,23;114:12;
183:22;218:18;227:5
re-ask (1)
89:21
reason (17)
34:5;108:13,16;
124:24;125:1;130:21;
144:21,21,23,24;
145:16,17;178:1;
218:23;224:15;
231:23;234:10
reasoning (1)
34:1
reasons (8)
56:2;62:2;144:16;
145:3;215:11;228:4,
8;229:25

recall (85)
11:1;16:14;19:23;
21:5;24:12;25:15,19;
28:25;30:13;35:2,7,
11,12;40:11;43:3;
46:4,15;48:20;49:3,
12,18;50:4,20;54:3;
59:10,22;68:19;
69:24;70:2;77:10,16,
20,23;82:19;85:7;
91:15;107:18,19;
109:19;119:25;
120:10;121:11;122:8,
13;128:4;134:16,22,
23;139:18;150:22;
160:5;161:5,6,13;
164:21;170:11;
171:20,23;172:1;
183:7,9;185:7;187:9,
10,18;188:17;189:11;
194:3,7;200:23;
206:6,6,16,17;212:2,
6;213:2,22,24;
226:25;227:20;229:6;
236:21;247:3,6
recalling (1)
76:21
receipt (1)
129:25
receive (4)
14:13;91:12;
244:15;249:25
received (16)
11:8;14:16;47:8,25;
48:12;51:9;67:10;
80:2;86:1;91:16;
110:6;131:8;183:7;
245:17,18;246:18
receives (1)
245:12
receiving (1)
183:3
recently (1)
75:22
recognize (9)
97:4;140:12;150:5,
8;175:22;227:18;
230:16,22,23
recollection (4)
21:10;69:10;77:3,8
recommend (7)
57:8,9,19;58:16;
61:22,24;62:9
recommendation (1)
187:8
recommendations (1)
62:5
recommended (8)
50:5,9;57:6,7;
61:19;62:11,13;218:7
record (35)
5:2;6:8,8;5;9:7;
24:2;71:13,15,16,18;

111:23,24;118:25;
119:1,2,4;136:24;
138:21;169:20;
191:20;193:6,14,15,
16,18;205:2;251:13,
13,14;252:21,22,23,
25;257:7,14,17
Recorder's (3)
30:5,12;60:16
recording (3)
6:9,16;71:6
records (26)
41:22;42:1,10,12,
17,18;43:2;50:22;
52:23;89:8,8,9,16,17,
25;90:4;138:17;
207:24;208:3,5,9,10,
14;244:7,12;245:10
recovering (1)
192:24
Recovery (3)
191:24;193:21;
199:6
recruitment (3)
183:23;188:1,9
redivisions (1)
177:15
refer (3)
21:12;130:11;
143:17
reference (8)
94:3;104:14;
122:24,25;123:2,4;
173:14;254:2
referenced (5)
10:23;50:11,18;
122:20;224:23
referencing (1)
104:18
referred (7)
57:11;123:10;
126:20;127:2;174:15;
178:11;249:13
referring (15)
35:15,16;40:3;75:5;
79:21;95:4;104:16;
106:8;115:15;129:15;
132:17;148:25;
161:21;208:4;232:9
reflect (9)
106:14;121:8;
207:25;208:5,15;
209:1,5;233:18;
250:24
reflected (14)
121:11,17;122:14;
133:7,18;162:4;
197:19;230:4;231:8;
245:3;246:24;249:24;
254:14,23
reflection (1)
230:2
reflects (2)

Case 4:23-cv-00111-RSB-CLR   Document 34   Filed 07/08/24   Page 280 of 413

Burton v.
Jones

Video Deposition

Shalena Cook Jones
December 18, 2023

133:16;177:6
**refrain (1)**
    92:1
**refresh (1)**
    21:9
**refreshed (1)**
    21:11
**refused (4)**
    98:6;141:1,3,11
**refusing (1)**
    141:14
**regarding (29)**
    6:20;13:7,20;25:10;
    41:14;42:16;43:1;
    47:9;77:12,25;78:8;
    84:24;85:12;86:2,10;
    90:9;101:24;104:6;
    139:22;144:16;
    161:19;162:25;
    175:25;176:8,18;
    221:17;235:25;
    237:16;246:3
**Regardless (2)**
    26:10;75:10
**regards (2)**
    15:6;40:19
**Reginald (2)**
    19:10;255:4
**region (1)**
    39:17
**regular (1)**
    25:7
**regularly (2)**
    25:3;35:23
**reiterate (1)**
    205:6
**rejected (1)**
    73:6
**relate (2)**
    50:14;144:9
**related (12)**
    25:16;34:8;50:22;
    109:3;110:2;116:1;
    136:7;146:8,13;
    153:21;155:6;191:6
**relates (5)**
    31:13;72:20;93:24;
    164:14,16
**relation (2)**
    90:7;244:20
**relationship (17)**
    15:16,20,25;38:10;
    43:17;49:17;57:13;
    58:10;95:16;111:9;
    113:5;115:25;152:9;
    155:11;158:20;159:4;
    224:18
**relationships (3)**
    110:24;116:18;
    159:15
**relative (1)**
    229:17
**relayed (1)**

110:6
**release (6)**
    7:3;8:13,22;9:3;
    10:4;130:13
**released (8)**
    6:17;7:13,18;8:15;
    9:6,22;134:4;145:13
**relevance (3)**
    164:10;166:4;242:2
**relevant (6)**
    33:22;106:17;
    131:4;137:22;164:7;
    192:7
**relied (4)**
    85:25;86:4;237:25;
    238:4
**relocated (1)**
    99:12
**reluctant (1)**
    137:14
**rely (1)**
    203:7
**relying (1)**
    218:20
**remaining (2)**
    53:6;70:9
**remains (1)**
    179:4
**remedy (5)**
    146:23;147:13,22;
    148:19;149:2
**remember (29)**
    24:6,6;34:17;36:13;
    40:2;46:7,15,16,21;
    69:11;106:15,18,19,
    21;110:8;137:23,24;
    169:11,20;183:14;
    185:18;187:11;
    194:13;212:4;217:21;
    225:22;227:1,10,10
**reminding (1)**
    154:1
**remotely (2)**
    26:15;187:20
**removal (1)**
    27:1
**Rene (1)**
    103:10
**Renee (42)**
    104:3,17;105:23,
    24;106:25;107:5,11,
    14;108:8,8,20;109:11,
    14;120:1,3;122:17,
    23;123:10,13;124:6,
    14;125:8;126:7;
    129:3,11;130:4,7;
    131:1,25;132:25;
    133:3;135:20,25;
    136:6,6;137:5;138:3;
    144:18,24;145:4;
    221:9,9
**Renee's (3)**
    104:12;106:6;

124:18
**rent (7)**
    17:4;239:3;240:3,7,
    9,9,11
**rental (1)**
    240:1
**re-org (2)**
    227:3;228:7
**reorganization (1)**
    53:18
**re-outfitted (1)**
    241:17
**repeat (8)**
    14:7;40:17;90:1,12;
    142:1;163:2;202:15;
    238:19
**repeated (1)**
    155:4
**repetitive (1)**
    84:18
**rephrase (1)**
    93:12
**replace (2)**
    99:20;108:15
**replaced (1)**
    249:15
**replacement (2)**
    60:15;182:7
**replacing (1)**
    249:11
**replica (1)**
    38:24
**report (16)**
    15:23;47:4;92:19;
    145:25;147:7;170:1;
    196:3,5,13;221:25;
    236:13;238:4;244:15;
    245:21;254:13,17
**reported (4)**
    98:22;143:3;
    173:24;199:1
**reporter (4)**
    5:5;6:10;252:6;
    257:15
**reporting (4)**
    54:4;143:8,14;
    197:19
**represent (4)**
    39:11,24;80:1;
    139:19
**represented (13)**
    16:12;23:22,23,24;
    39:14;40:9,23;44:14,
    16,23,24;45:7;120:7
**represents (1)**
    134:8
**reputation (5)**
    110:21;112:4,20;
    220:9,17
**request (5)**
    81:20;90:4;94:1;
    227:21;250:17
**requesting (1)**

227:25
**requests (4)**
    41:22;52:24;89:9;
    232:25
**required (1)**
    11:10
**requirements (1)**
    143:8
**requires (1)**
    202:22
**research (3)**
    87:9;232:2;236:7
**researched (3)**
    73:19;219:16,18
**reside (1)**
    16:24
**resign (1)**
    23:12
**resignation (1)**
    157:23
**resigned (2)**
    182:13,16
**Resolving (1)**
    220:10
**respect (7)**
    38:18;95:3;134:12;
    148:22,22;149:7,19
**respected (1)**
    62:24
**respectful (1)**
    159:18
**respond (2)**
    169:9;209:25
**responded (1)**
    58:2
**responding (2)**
    11:1;12:1
**response (12)**
    12:7;53:9;81:20;
    142:10;153:15,18;
    157:13;160:24;161:7;
    211:8,9,22
**responses (2)**
    11:5;12:14
**responsibilities (5)**
    91:10;93:17;
    221:21;228:12;
    247:12
**responsibility (9)**
    53:22;92:19;
    223:20;226:9;229:12;
    230:3;253:19,23;
    255:18
**responsible (22)**
    27:18;36:5,7,24;
    38:17;39:15;64:4;
    65:1,5,7;124:12;
    223:25;225:19;244:6;
    246:2,14;248:2,5,8,
    14;249:5;254:11
**responsive (1)**
    167:24
**rest (8)**

30:19;97:13;98:2;
107:4;122:1;132:15;
135:7;176:21
**restroom (1)**
    118:13
**restructuring (2)**
    208:2;227:2
**result (6)**
    32:15;116:1;
    141:23;173:5;223:10;
    228:6
**resulted (1)**
    95:18
**resume (1)**
    70:14
**résumé (1)**
    215:11
**retain (2)**
    48:11;49:25
**retained (4)**
    40:14;41:2,5,15
**retaliation (1)**
    24:3
**retired (1)**
    189:11
**retiring (1)**
    158:11
**revenue (4)**
    245:18;246:4,15,25
**review (15)**
    10:24;11:21;66:21,
    23;78:20,20;86:5,23,
    24;87:3;88:8,9;
    140:25;144:3;252:19
**reviewed (8)**
    10:21;13:8;42:3;
    79:1;88:22;176:22;
    216:5;250:10
**reviewing (1)**
    225:25
**reviews (2)**
    216:3;255:23
**revision (1)**
    160:13
**rid (1)**
    55:25
**right (76)**
    5:16;10:12;11:15;
    20:2,11;21:5,22;26:2;
    29:19,24;31:7,11;
    32:5,14;34:16;37:14;
    52:5;57:15;58:12,13;
    60:25;61:1;65:9,19;
    69:24;73:12;75:14;
    82:6;87:8;92:18;98:8;
    103:8,11;112:19;
    113:18,19;125:3;
    127:22;136:3;138:8;
    139:19;141:1,13;
    147:20;151:13;156:5;
    162:23;163:1,4,7,7,
    10;164:20;167:4,11;
    172:6;178:10,20;

Case 4:23-cv-00111-RSB-CLR   Document 34   Filed 07/08/24   Page 281 of 413

Burton v.
Jones

Video Deposition

Shalena Cook Jones
December 18, 2023

187:24;189:12;190:8;
194:18;200:11,21;
201:18;205:24;
213:12;228:7;232:13;
242:7,23;245:17;
255:13,23;256:3;
257:4
rights (4)
16:17;142:24;
191:14,16
Riverdale (1)
23:23
Road (1)
16:25
robberies (1)
196:22
Roberts (14)
98:23,24;99:3,18,
24;100:14,25;102:2,
18;123:16;131:2;
145:17;221:9,9
Roberts' (1)
101:11
ROCC (6)
225:16;226:8;
228:14,15,15,17
Rogers (5)
188:25;199:11,15;
191:1;200:6
Rogers' (1)
190:12
role (43)
27:6;30:16;31:19;
39:11,19;40:24;
42:20;51:15;52:15;
57:1;58:21;60:19;
66:4,19;76:6;180:20;
181:19;182:21;
184:15,20;186:23,25;
187:6,20;188:2,10;
189:3,5,6,6,7,13,24;
192:3;200:24;201:11;
202:7;204:17;205:10;
208:6;225:15;228:13;
229:25
roles (8)
54:11;55:9;94:4;
174:9,10;183:22;
221:20;253:6
room (4)
102:22,23;107:5;
135:24
round (1)
26:1
Rowden (1)
59:15
rubric (1)
33:25
Ruffini (6)
55:16;57:9,16;58:6;
61:4,14
rule (15)
7:8;8:8;11:10;91:1,

2,7,13,19,20;92:20,
25;94:9,13;95:17;
96:8
rules (11)
5:22,23;6:20,20;
8:12;9:6;91:18;95:8,
9;127:16;168:13
ruminating (2)
148:13,15
rumor (4)
113:7,22;169:19;
170:3
rumors (2)
114:6;162:19
run (6)
36:14;66:14;
139:13;153:9;170:2;
240:19
running (4)
38:20;66:13;93:16;
114:5
Rusheda (1)
234:21

S

salary (7)
228:2;231:14,16,
17,21;234:6;250:21
salt (1)
113:8
same (19)
55:5;60:5;61:7,15,
15;85:18;102:21;
121:8;168:15;172:7,
8;179:4;181:3;189:3;
199:6,7,12;222:16;
254:18
Sanchez (1)
22:4
sanctions (1)
9:24
Sanders (1)
170:20
Sapp (1)
61:8
satellite (2)
239:10;240:4
Saturday (1)
99:15
Savannah (15)
16:25;22:13;28:4;
37:14,18,23;38:7,13,
19,24;39:2;43:18,24;
111:10,16
saw (15)
11:4;97:20,22;98:1;
101:20;106:11;
119:17,20;120:1;
121:1,2,9,14,25;169:6
saying (39)
15:17;24:16;31:22,
25;80:4;81:17;96:14;

100:9;103:9;110:5;
112:3,3,4,20;113:11,
14;116:8;121:10;
123:8,8;125:23;
131:23;132:3;133:14;
145:18,23;163:14;
165:22;168:19;
169:12;172:1,5;
173:22;177:22;
198:12;211:22;
229:17,21;234:4
scale (1)
32:5
scandal (3)
115:12,13;133:4
Schiff (1)
170:20
school (2)
20:14;21:22
science (1)
66:6
screen (3)
43:20;121:7;233:19
screenshot (1)
97:25
screenshots (2)
98:5;137:15
scroll (19)
97:9;98:2;103:8;
122:5;123:6;143:20,
22,25;144:2;150:10,
12;159:25;160:1;
161:10;176:15;178:7;
230:20;231:12;233:9
scrolling (2)
234:19,21
se (3)
16:15,15;216:6
search (6)
73:25;74:1,18,19;
139:23;175:17
searched (1)
74:15
Second (18)
36:15;39:25;41:4;
42:24;83:22;88:14;
97:7;101:25;110:13;
170:8;219:2,12;
220:4,5;224:9;
230:21;233:9;257:7
secondhand (2)
109:22;113:17
secretaries (1)
174:17
secretary (2)
118:7;170:25
Section (2)
24:4;91:20
sections (1)
202:10
security (1)
27:2
seeing (6)

21:6;121:7,11;
141:16;161:5,6
seek (4)
7:14;9:11,12,24
seem (1)
157:23
seemed (4)
158:19,21;160:23;
234:17
seems (3)
69:23;89:3;104:16
seize (1)
248:15
seized (4)
244:8,9,18;249:3
select (3)
93:22;100:15;225:2
selected (5)
152:16;184:20;
185:6;219:7;226:23
selection (1)
184:23
selections (1)
215:14
send (4)
151:13,15,16;
172:20
sending (2)
153:6;161:13
seniority (2)
31:8;54:24
sense (1)
243:11
sensitive (1)
9:5
sent (9)
52:23;139:5;150:6;
151:3,18;153:14,15;
161:4;231:4
separate (11)
51:10;63:10,11;
79:25;82:7;103:6;
193:25;250:3,4,6,7
separately (1)
82:9
September (6)
207:18;209:4,4;
233:15;234:2,12
series (1)
234:24
serious (5)
139:11;196:19,21;
203:20;204:7
serve (5)
65:25;91:25;
168:10;174:20;214:6
served (4)
11:22;57:14;170:6;
183:21
service (12)
31:8;32:3,7,9;
47:23;168:11;174:21;
190:23,25;191:4,6;

195:17
serving (3)
59:3;168:10;170:6
session (2)
82:18;257:11
sessions (1)
62:3
set (6)
44:1;49:9;67:3;
72:22;157:16,20
setting (1)
27:18
seven (2)
206:9,11
seven-hour (1)
251:21
several (21)
38:11,25;39:1;
40:23;46:5;54:6;62:6;
66:6;74:12;75:7;84:8;
126:19;137:3;151:19;
161:20;163:19;167:9;
171:12;172:13;239:7;
251:24
Sex (2)
45:5,8
Sexual (5)
24:25;35:22;
203:11,20;256:4
SHALENA (8)
5:7,19;7:19;43:5;
68:25;118:20;166:20;
255:10
Shannon (4)
68:20;69:21;72:6;
179:22
shape (1)
198:21
share (2)
129:2;153:2
shared (13)
98:19;108:16;
110:16;123:14;
128:15,20,21;129:3,5;
131:11;135:19;
189:24;256:6
sharing (3)
128:8,23;130:3
sheriff's (2)
23:25;40:9
short (3)
102:7;117:18;
187:23
shortly (1)
35:4
show (10)
38:21;65:14;98:7;
122:1;132:15;135:4;
137:15;173:2;176:21;
230:12
showed (6)
98:5;113:24;
132:22;133:9;137:17;

Case 4:23-cv-00111-RSB-CLR   Document 34   Filed 07/08/24   Page 282 of 413
Burton v.
Jones
Video Deposition
Shalena Cook Jones
December 18, 2023

155:9
showing (2)
  121:7;137:17
shown (1)
  113:8
shows (3)
  132:13,21;232:2
side (6)
  23:22;24:23;44:20,
  20;82:2,2
sign (13)
  7:19;78:20,21;86:7;
  139:9;140:21,25;
  141:1,4,8,11,14;144:6
signature (4)
  78:22,24;230:24,25
signed (3)
  79:1;95:6;255:22
significant (1)
  25:3
signs (1)
  8:20
silos (2)
  214:10,11
similar (1)
  240:12
simpler (1)
  32:1
Sims (4)
  59:24,25;60:6;
  213:9
single (1)
  163:25
sit (2)
  151:9;233:2
sits (1)
  238:18
sitting (2)
  166:12;167:16
situation (6)
  99:9;108:18,22;
  141:6;142:10;153:18
six (7)
  37:21;201:2,3;
  207:21;212:23;213:1,
  6
skill (2)
  32:22;44:1
skills (3)
  204:3;214:18,19
skimmed (1)
  50:10
Skye (24)
  13:15;105:16;
  115:4,19,22;120:13;
  155:6;156:3,7,8,15;
  157:2,5,6,18;158:21;
  159:4,7,16,21;161:19;
  162:2;221:6,6
Skye's (3)
  157:7,22;224:23
slot (2)
  99:20;203:13

Smalls (2)
  74:7;233:17
smart (1)
  158:23
Smith (7)
  23:7;55:19;58:18,
  21;62:14,17;64:3
smuggling (2)
  27:2,3
snack (4)
  117:22,25;118:4,13
snide (1)
  161:22
Snidely (2)
  49:13,18
social (3)
  66:6;191:6;195:2
solely (1)
  65:7
solicit (2)
  237:14,18
somebody (20)
  57:8,18;58:15;
  66:11;98:24;104:21;
  105:4;112:16;123:24;
  126:6,15;131:23;
  143:2;167:25;189:10;
  215:5;217:5;222:14;
  235:4;236:2
somebody's (1)
  145:20
someone (5)
  15:16;56:5;139:7;
  198:23;243:22
sometimes (4)
  63:23;158:25,25;
  250:15
somewhere (2)
  48:15;173:21
soon (2)
  117:15;157:3
sophistication (1)
  204:2
Sorry (42)
  20:8;30:10;40:8;
  43:20;46:8,22;50:7;
  52:8;68:18;69:17;
  72:13;77:2;79:14;
  83:20,22;118:2;
  121:19;131:25;138:7;
  156:11;177:11,22;
  180:1;189:17;193:4;
  199:10,17;200:11,13;
  202:2;204:19;205:1;
  209:3;212:14;215:18;
  218:25;228:15;
  230:10;246:10;
  248:12;252:14;255:4
sort (18)
  33:10,19;35:7,9;
  54:13;65:14;67:16;
  141:16,22;171:11;
  176:24;197:15;

202:19;204:2,4;
206:13;253:8,9
sounds (1)
  227:4
space (3)
  239:8;240:20;
  243:17
speak (10)
  52:22;56:6;57:23;
  67:13;94:15,18;
  158:16;218:18;224:2,
  12
speaker (5)
  104:24;105:10;
  106:22;124:5,11
speakers (5)
  120:6,10;121:16;
  133:8,15
speaking (12)
  43:25;47:7;52:2;
  57:25;127:9,14,15;
  133:3;166:2;212:8;
  234:24;250:22
speaks (3)
  92:13;106:2;153:5
special (14)
  29:7;30:6,8;34:13;
  35:19,24;36:25;
  61:11;62:21;85:19;
  88:10,11;91:9;98:16
specialists (2)
  174:20;195:6
specialized (5)
  31:15;32:16,20;
  33:10,19
Specialty (2)
  204:13;205:17
specific (45)
  25:18;34:19;35:14;
  41:3,16;52:3;77:25;
  83:11,12;85:11;86:9;
  87:24;89:23;91:8,16;
  95:13;100:21;106:19,
  21;107:7;124:12;
  126:10,11,23;127:3;
  134:19;141:17;142:3;
  159:13;164:25;
  165:13,18;167:12;
  171:9,18;194:4;
  202:12;206:15,21,23;
  215:14;226:23;
  237:11,15,18
specifically (34)
  11:6;31:2;41:5;
  46:24;55:8;61:11,23;
  63:16;68:5;78:10;
  85:1,13;101:10;
  106:24;107:2,11;
  108:10,11;122:20;
  126:14;127:19;
  128:14,20;129:1;
  134:13;136:5,9;
  143:9;166:13;167:17;

176:15;188:9;205:15,
19
specified (1)
  88:5
specify (2)
  237:4,7
speculate (3)
  125:13,24;126:2
speculating (1)
  110:3
speech (1)
  50:23
spell (2)
  17:17;246:8
spelled (1)
  190:7
Spelman (2)
  20:7,11
spent (1)
  245:8
split (2)
  189:13;190:3
spoke (3)
  14:16;185:20;
  187:18
spoken (3)
  13:22,25;137:10
spokespersons (1)
  93:23
spouse (2)
  17:16;26:18
spread (1)
  99:25
spreading (5)
  110:20,22;111:5;
  112:5;162:19
staff (44)
  35:1;36:17;49:23;
  52:25;53:2;67:11;
  74:19;77:12;78:8,12;
  85:22;86:23,25;
  88:11;90:3;93:15,19;
  94:10,25;139:15;
  151:19;152:7;155:11;
  157:1;167:18;168:1,
  24;169:23;172:23;
  174:23;176:7,17;
  209:14;210:8;211:14;
  215:10;222:13;227:6,
  8;240:13;249:5,8,13;
  256:12
staffing (1)
  207:15
stamp (2)
  81:9;230:24
stamps (1)
  81:15
stand (3)
  59:20;201:23;
  228:16
standard (2)
  114:24;164:10
standing (1)

85:17
standout (1)
  218:22
stands (4)
  87:3;188:20;
  196:17,19
start (9)
  31:9;37:5,23,24;
  53:17;181:10;199:16;
  209:2,4
started (8)
  10:13;62:21;65:17;
  105:6;154:22;224:20;
  226:2;237:14
starting (2)
  38:12;194:7
starts (2)
  112:16;127:23
State (19)
  30:6;40:5;56:17;
  61:7;76:15;91:1,1,8;
  94:1;95:8;96:7;175:8;
  186:13;198:23;
  200:19;203:1;235:24;
  237:9;257:16
stated (6)
  57:11;60:24;125:2,
  4;220:2;228:5
statement (31)
  32:17,23;86:22;
  94:1;101:16;104:15,
  22;105:1,5,8,9;106:7;
  123:9;124:12;126:14,
  15;128:7;129:10,12;
  130:3,6;132:1,3;
  133:8,24,24;139:16;
  142:7,11;198:17;
  253:25
statements (23)
  25:6;91:21,23;92:7;
  93:4,5,20;96:12;
  106:15;111:24;
  119:25;120:11;
  121:21;122:8;126:5;
  127:4;133:22;134:13,
  14,19,22,23;173:13
states (1)
  152:20
stationed (1)
  26:19
statutorily (1)
  9:5
stay (6)
  43:18;55:24;
  180:20;186:10;
  251:13,14
stayed (1)
  211:15
staying (1)
  59:2
stemming (1)
  111:10
step (2)

Case 4:23-cv-00111-RSB-CLR   Document 34   Filed 07/08/24   Page 283 of 413
Burton v.
Jones
Video Deposition
Shalena Cook Jones
December 18, 2023

222:14;232:19
**still (22)**
　37:6;38:9;48:10;
　53:8,15;56:13;89:17;
　90:5;178:24;179:1;
　189:3,7;192:2,6;
　195:11,11,16;207:24;
　242:24;249:14,17;
　254:18
**stint (1)**
　37:4
**stirring (1)**
　173:4
**stole (1)**
　15:19
**Stolfe (24)**
　212:1,4;213:7;
　215:20,21;216:10;
　217:15;218:24;219:1;
　220:21,22;221:10,15;
　225:8,12;226:6,7,16;
　227:23;229:6;233:15,
　23;235:21;256:1
**Stolfe's (1)**
　236:6
**stop (1)**
　205:8
**stopping (1)**
　193:5
**straw (1)**
　155:17
**street (4)**
　66:15;102:15;
　239:18;240:10
**streets (1)**
　173:20
**strike (1)**
　230:11
**string (1)**
　150:19
**strings (1)**
　245:7
**structural (1)**
　212:20
**structure (19)**
　35:10;65:11;66:22,
　24;67:4;177:6;179:4;
　197:22;198:1,7,16;
　199:8,8,12;206:13;
　212:21;253:7;254:12,
　18
**stuck (1)**
　232:14
**studies (1)**
　66:7
**stuffed (1)**
　118:10
**subject (13)**
　42:5;49:2;89:8,9,
　16,17,24;90:4,5;
　98:23;141:2,5;142:5
**subjects (1)**
　42:4

**submit (1)**
　250:16
**submitted (3)**
　89:10;231:16;
　232:25
**submitting (1)**
　227:20
**subsection (1)**
　94:6
**subsequent (2)**
　80:2;177:14
**subsequently (1)**
　79:21
**substantial (1)**
　92:2
**substantive (1)**
　66:17
**successor (1)**
　189:18
**suck (1)**
　217:1
**sue (4)**
　155:7,22;156:21;
　157:12
**sued (2)**
　15:9;16:4
**suffice (1)**
　165:5
**suggested (2)**
　56:6;66:7
**suitable (1)**
　67:5
**suited (1)**
　184:19
**summary (2)**
　25:12,16
**Sunday (1)**
　99:15
**Superior (21)**
　16:20;17:22;30:7,
　12;63:22;64:2;151:5,
　11;207:9,13,18,19;
　208:1;212:24;222:3;
　228:7;237:3,8,17;
　254:20,22
**supervise (12)**
　131:1;179:17,21;
　190:13;192:13;
　200:24;201:11;202:2,
　7;204:17;205:19;
　253:19
**supervised (6)**
　179:22;204:20;
　205:1,7,10,25
**supervises (1)**
　192:20
**supervising (2)**
　64:23;65:8
**supervisor (25)**
　27:14,25;30:1,18;
　36:18,23;37:1;56:14,
　15;60:23;64:6,11;
　179:19;200:20;201:7,

12,15;202:5;205:17;
214:21;253:8;255:15,
16,20;256:10
**supervisors (12)**
　56:19,22,23;57:4;
　135:2,18;210:12;
　253:18;20;254:21;
　255:13;256:13
**supervisory (9)**
　27:6;30:2,16;57:1;
　58:21;253:13;254:1,
　4,10
**supplement (1)**
　167:15
**support (16)**
　18:8,12;174:23;
　179:1;191:24;192:24;
　193:1,21,22;194:24;
　195:6;199:2,6;
　239:14;249:5,13
**supports (2)**
　7:9;8:8
**supposed (9)**
　99:22;103:17;
　166:5;214:25;223:2,
　3,16;224:10;226:4
**supposedly (1)**
　248:23
**sure (53)**
　6:9,22;7:12;11:17,
　20,23;12:3;29:2;47:1,
　48:3;50:10;57:22;
　66:24;68:24;81:15;
　84:16;91:15;92:17;
　95:7,10;104:14;
　118:21;131:22;
　134:16,21;137:19;
　138:23;144:14;
　152:19;154:9;157:3;
　165:23;169:17;
　176:11,16;177:3;
　178:16;194:9;198:10;
　204:7,8;214:24;
　217:22;219:24;
　221:24;222:1,5,13;
　223:3,7;228:9;
　236:11;248:9
**surrounding (1)**
　157:22
**SVU (1)**
　63:11
**swear (1)**
　5:5
**switch (4)**
　70:12,16;71:5;
　139:25
**switching (2)**
　222:16;238:13
**sworn (2)**
　5:8;52:17
**system (3)**
　224:3;233:3;251:2
**systems (1)**

12,15;202:5;205:17;
214:21;253:8;255:15,
16,20;256:10
179:10

**T**

**table (6)**
　70:14;95:21;99:21;
　102:24;103:2;210:10
**talk (14)**
　9:18;33:4;53:23;
　62:9;110:1;111:1;
　154:8;166:25,25;
　187:1,5,12;214:23;
　247:13
**talked (5)**
　53:5;139:4,6;157:5;
　159:13
**talking (17)**
　7:15,16;42:9;
　110:19;112:17;137:8;
　152:1;154:18;156:23;
　164:25;165:6;172:24;
　187:14;195:3;207:9;
　212:25;241:22
**tandem (2)**
　192:22;249:9
**tape (1)**
　71:5
**target (1)**
　93:6
**teachable (1)**
　217:3
**team (54)**
　35:20;36:11,14;
　60:12;61:7;66:18;
　99:17;100:15,20;
　101:4,24;102:12,14;
　108:7;110:24;145:25;
　177:4;178:12,13,14;
　179:7,10,12,16;
　184:15;188:5,11;
　196:6;198:9;201:25;
　208:12;209:12;
　210:11;211:8,12,12;
　213:25;214:14,18,24;
　215:19;218:8;219:20;
　222:2,4;223:4,14;
　224:1,1,11;226:24;
　228:6;237:2,22
**teams (5)**
　35:13;214:12;
　224:5;238:3,3
**technically (1)**
　32:4
**telling (16)**
　104:8;107:7;111:9,
　12,15;120:25;131:23;
　137:4;152:11;153:1,
　3;163:16;166:14;
　168:4;210:10;211:11
**tells (1)**
　146:12
**tempered (2)**
　158:23,24

**temporarily (1)**
　151:9
**temporary (4)**
　235:4,5,10,16
**tend (1)**
　203:1
**tenure (8)**
　30:20;32:11;82:18;
　154:5;202:13;229:3;
　234:25;236:4
**term (12)**
　29:11,14,23;30:22,
　23;82:16;116:20;
　202:23;235:5,10;
　254:2;255:14
**terminate (2)**
　96:6;242:4
**terminated (32)**
　95:5;97:21;124:1,9,
　13,15,19;125:10,16,
　21;126:3,9;127:2,23;
　128:8,18,23;130:2;
　138:15;140:17;
　142:12;143:12;
　170:15,18,19;171:1,2,
　4;172:7;173:5;
　181:23;182:1
**terminating (1)**
　94:20
**termination (17)**
　95:19;106:17;
　111:24;119:21;122:9,
　10;124:7,25;125:1,2;
　127:3,20;133:10;
　141:2,5;181:22;
　182:10
**terms (15)**
　6:19;35:9;47:21;
　52:15;54:24;58:10;
　86:9;87:12;89:18;
　133:4;141:23;202:13,
　20;215:1;243:17
**testified (22)**
　5:9;61:18;64:15;
　88:20,21;119:17;
　135:2,13;136:4,12,18;
　137:3;138:1;165:12;
　198:4;200:21;206:18;
　221:22;236:4;253:21;
　255:12;256:3
**testify (1)**
　167:17
**testimony (22)**
　7:20;67:19;68:5;
　71:24;75:18;82:22;
　106:23;119:9;122:19;
　125:10;132:8;146:23;
　147:2,3;148:16,18;
　149:15;156:14,16;
　170:8;229:16;248:1
**Texas (5)**
　25:25;26:4,14,17,
　20

Case 4:23-cv-00111-RSB-CLR   Document 34   Filed 07/08/24   Page 284 of 413

Burton v.
Jones

Video Deposition

Shalena Cook Jones
December 18, 2023

texting (2)
98:25;104:21
texts (2)
106:19,21
Thanks (1)
119:12
thefts (1)
61:10
thereafter (1)
35:5
thinking (2)
69:3;242:3
third (9)
144:18;145:22;
146:24;147:15,23;
149:22;162:20;224:9;
239:9
Thompson (23)
55:18;56:7;57:8,12;
61:17,24;66:4;78:14;
85:6;179:13,20;
180:1,25;181:6,13,18,
24;182:5,13,16;
213:11,15;236:19
though (4)
16:5;56:11;146:22;
203:3
thought (13)
56:8;57:25;62:4;
63:2;67:5;158:7;
162:12,13;214:17;
215:11;216:7;228:25;
244:18
thoughts (1)
62:25
thousands (2)
247:4,5
thread (7)
103:7;106:14,16;
107:18;123:23;134:9;
137:12
threatened (2)
109:1;155:22
three (15)
45:23;50:19;65:2;
68:18;72:5;75:13;
76:2;183:21;203:5;
204:18,21;205:22;
206:2;220:17;239:12
three-series (3)
47:18;48:6;49:7
threw (1)
158:5
throughout (2)
192:6;195:17
tied (2)
31:24;202:11
Tim (12)
55:16;57:9;58:6;
61:4;103:9;129:3,11,
14;130:3,6;131:24,25
timeframe (1)
77:20

timer (1)
102:7
times (11)
14:25;43:20;45:7,
22;126:20;137:3;
163:24;169:10;203:5;
205:6;216:19
timing (1)
207:16
title (11)
17:7,8;24:25;25:4,
10,13,13;43:8;44:15;
50:14,18
Today (17)
5:2;10:15;12:19;
13:12,15,18,24;14:3,
6,9,14;138:1;148:18;
166:12;167:16;
170:11;233:2
Todd (6)
112:15;117:18;
127:7;165:16;166:3;
255:2
together (8)
58:7;60:15;181:10;
184:12;214:14;
221:12;222:4;223:22
told (56)
67:20,22;68:1,5,9,
14;72:3;87:18;98:21,
24;99:19;102:3,10;
103:1,1,5;104:2,6;
106:24;107:10;109:9,
17;110:4,10,15;
126:8;131:6,10,11;
132:25;133:2;136:5,
10;143:10;156:9,10,
15,20;157:6,18,22;
158:6;162:16;163:21;
164:1;167:25;168:21,
24;169:3,4,11;
186:22;211:2;226:14,
18;237:1
Tom (1)
52:18
Tonya (1)
170:20
took (56)
10:20;13:9;26:15;
30:15;35:3,9;36:12,
21;37:9;47:17;49:24;
50:20;52:6;60:17;
63:15;65:17;67:21;
68:10;72:11,17;73:1,
9,9,11,13;77:3,9;
117:5;119:10;120:6;
121:13;134:11;178:5,
11;180:2;182:15;
184:1,17;187:13;
189:12;195:21;197:4,
7,10,13;200:16;206:5,
8;207:6;215:21;
216:20;226:11;

241:12;248:21,22;
251:24
top (4)
50:6;120:8,20;
247:17
topic (1)
48:6
topics (9)
49:1;50:15;85:2,13;
87:16;95:13;140:1;
141:17;167:13
tossed (1)
217:23
total (1)
206:3
Tracey (3)
178:25;191:24;
200:7
track (1)
249:6
traditional (1)
64:1
train (1)
142:15
trained (4)
82:10;87:16;93:16;
94:4
trainer (1)
15:20
training (39)
41:7;43:8;44:15;
47:8,14,25;48:4,6,11,
13,19,20,25;49:6,7,9;
50:16,17,21;51:9;
77:12,16,22,25;82:7,
13,17,20,23;2:18;
84:18,23;86:1,10;
87:7;91:12,16;224:5;
225:20
trainings (5)
49:20;50:13;78:7;
91:14;93:11
transcript (2)
13:18;257:17
transcripts (2)
13:14,19
transition (3)
30:11;38:1;235:2
transitioned (3)
28:4,14;235:1
transitioning (1)
52:16
transpired (1)
252:7
treated (1)
113:23
treatment (8)
143:3;144:10;
145:20;146:25;147:7;
149:4,13;162:6
Trejo (2)
221:7,8
trial (13)

33:20;99:20;115:7,
22,24;117:3;191:12;
204:2;215:2;220:3;
222:2,6;224:23
trials (2)
217:9;219:13
tried (6)
114:24;218:17,24;
219:1,22;223:21
triggered (1)
138:2
trucking (1)
23:3
true (5)
12:15;30:22;64:14;
111:17;156:18
trust (1)
139:14
truth (1)
157:22
truthfully (1)
12:17
try (11)
48:18;53:17,22;
57:22;61:14;99:14;
169:19;203:13;
220:10;222:14;224:4
trying (30)
40:2;64:16;69:10;
80:23;92:12;94:7;
95:11,12,14,15;125:3,
22;144:14;147:12,20;
149:17;150:2;152:19;
165:14;177:5;184:23,
25;197:24;202:16;
205:18;209:19;214:9;
220:18;223:18;
243:10
Tuesday (2)
99:23;102:4
turn (2)
21:3;175:12
turned (2)
27:3;125:14
turns (1)
244:14
twice (3)
51:20,21;250:15
Two (27)
18:3;19:16;24:7,13;
40:10;56:25;79:25;
94:20;95:1,3;116:19;
129:22;153:20;156:3,
22;166:18;168:17;
174:9,10,20;182:24;
189:13;192:15;
220:24;222:11;
223:24;240:18
type (10)
22:22;23:16;31:11;
33:19;45:2;64:25;
190:22,24;203:15;
223:13

types (10)
23:17;24:19;27:5;
33:11;34:19;61:10;
94:12;144:13;173:25;
203:23
Typically (7)
55:24;63:24;139:2,
7;196:20;232:2;
245:20
typo (1)
26:9
Tyrah (15)
90:20;96:24;97:9;
122:5;123:6;144:2;
150:9,13;151:1;
159:24,25;170:13;
176:20;177:20;
238:10

U

U-C-A-L-O (1)
246:9
ultimate (1)
185:5
ultimately (5)
15:11;16:8;73:23;
74:6;180:21
umbrella (1)
64:5
unavailable (1)
186:20
uncomfortable (1)
169:25
under (34)
5:25;9:5;12:14;
14:2,5,8,11;24:3;
25:13;35:16,17;46:2;
54:6;64:4;78:4;86:1,
3,14;87:8,25;113:15;
142:23;143:8;144:12;
149:11;152:7;162:23;
163:7;174:23;178:20;
186:23;191:14;
196:16;240:17
undergraduate (2)
20:5,6
undermine (2)
163:11,13
undermining (2)
113:12;155:10
underpaid (3)
229:7,12,17
understandable (1)
154:12
understood (5)
139:9,16;144:5,12;
250:8
unfamiliar (1)
85:22
unique (3)
31:16;203:7,23
unit (13)

Case 4:23-cv-00111-RSB-CLR   Document 34   Filed 07/08/24   Page 285 of 413

Burton v.
Jones

Video Deposition

Shalena Cook Jones
December 18, 2023

26:25;29:7;35:20,
24;36:25;62:22;
191:24;192:18;
193:21;194:4,24;
195:4;203:24
**units (1)**
239:7
**universe (2)**
188:14;253:12
**University (1)**
20:15
**unless (5)**
110:1;147:1;
149:14,23;216:6
**unnecessary (1)**
92:7
**untrustworthy (1)**
158:10
**unusual (2)**
174:1;220:11
**up (67)**
11:10;20:9,19;
22:13;26:17;31:5,10;
32:8,8;33:15;40:20;
49:9;60:19;69:18;
72:22;73:23,23;74:6,
23,23;79:4,14;83:21;
85:24;90:21;98:14,
15;111:8;113:22;
117:23;119:14;123:6;
127:21,22,22;140:3,7;
146:17;155:14;
157:10;159:24;173:4,
21;176:20;180:1;
181:5;187:13;214:1;
217:23;218:8;219:10;
222:3,14;224:10;
225:8;227:13;231:12;
232:15,20;234:19,21;
236:22;247:22;
248:24;249:10,11;
256:19
**upcoming (1)**
215:2
**update (2)**
245:21,21
**updated (1)**
74:9
**updates (1)**
67:16
**upgraded (1)**
241:15
**upon (7)**
72:4;74:14;75:6;
77:14;84:24;197:25;
199:15
**upset (4)**
157:25;158:3,5;
161:18
**urgency (1)**
108:17
**use (7)**
30:22;48:21;76:19;

107:6;110:23;243:17;
255:14
**used (6)**
33:25;56:4;94:19;
96:6;105:20;116:20
**using (6)**
53:20;54:8;86:7;
87:14;174:7;202:24
**usually (9)**
60:18;63:25;
214:22;243:22;
244:15;245:20,21,23;
250:11
**utilize (1)**
149:14

### V

**vacancies (1)**
54:6
**vacancy (2)**
180:6,10
**vacant (1)**
203:16
**vacated (2)**
60:17,19
**vague (1)**
202:24
**Vaguely (2)**
46:11;97:6
**Valentine's (1)**
182:8
**value (1)**
203:3
**varied (1)**
24:17
**various (6)**
23:3,24;67:22;68:1,
9,15
**vastly (1)**
229:12
**vehicle (1)**
23:2
**vehicles (3)**
240:23;241:1,3
**verification (2)**
11:9;12:13
**verify (2)**
122:2,2
**verse (1)**
146:20
**version (25)**
74:9;75:8,9,10,13,
17,18,24;76:18,22,23,
25;77:4,4,5;78:16;
79:2,22;85:16,17,19,
23;88:6;157:7;198:15
**versions (5)**
74:5;75:11;76:1;
78:17;94:17
**versus (1)**
5:19
**veteran (1)**

220:16
**Veterans (3)**
63:17,19;64:6
**victim (14)**
111:11;174:18,18;
179:2;188:19,21,22;
189:13;190:14;191:5,
5,15;199:7;240:17
**victims (6)**
61:11;191:8,9,10,
14,15
**victim's (8)**
29:7;30:6,8;35:20,
24;36:25;62:22;
191:13
**video (10)**
5:2;71:6,13,18;
119:4;193:14,18;
252:21,25;257:9
**VIDEOGRAPHER (25)**
5:1;6:12;20:24;
70:6,8,17;71:1,12,17;
79:10;118:24;119:3;
143:23;193:3,4,9,13,
17;251:12;252:8,15,
20,24;257:8,13
**view (1)**
88:23
**VII (8)**
24:25;25:4,10,13;
43:8;44:15;50:14,18
**Vinson (4)**
178:23;195:9,14;
197:20
**violate (5)**
78:5;129:12;130:5;
132:1,4
**violated (5)**
121:23;125:4;
128:15;134:15,19
**violation (4)**
16:17;143:5,6;
172:2
**violence (3)**
29:5;30:8;35:23
**violent (2)**
196:21;203:20
**virtually (1)**
108:19
**voices (1)**
121:17
**volumes (1)**
203:2
**voluntarily (5)**
23:12,15;28:8,9;
44:9
**voluntary (3)**
43:14,16;157:23
**volunteered (4)**
226:7,8,8;247:8
**V-W (1)**
188:20
**VWAP (1)**

188:19

### W

**W-2 (3)**
175:3,6,9
**Walker (3)**
109:21;110:7,12
**Wallace (3)**
170:19,21;173:2
**wants (1)**
166:25
**warning (1)**
139:1
**waste (1)**
47:5
**way (20)**
15:24;36:17;
102:14;117:21;
133:19;153:25;154:1,
7,20;160:1;168:15;
170:7;197:17;198:20;
199:3;214:25;218:3;
220:13;223:23;224:4
**ways (1)**
177:25
**weapons (2)**
241:13,14
**Wednesday (1)**
163:23
**week (9)**
10:17;14:4;17:5;
34:22;77:19;117:22,
25;118:4,9
**weekend (2)**
99:2,8
**weeks (2)**
67:24;182:24
**welcome (6)**
10:3;11:25;12:5;
21:9;51:3;257:12
**Wendy (4)**
170:20;172:5;
173:2,6
**weren't (5)**
57:3;152:17;
154:18;222:1;247:15
**whatnot (1)**
70:13
**What's (7)**
70:21;119:23;
122:14;135:9;147:16;
201:23;233:25
**whenever (1)**
9:12
**whereas (5)**
61:10;196:19;
202:23;229:9;254:10
**Whereupon (1)**
257:23
**Whistleblower (5)**
45:16,20;46:2,10,
24

**whistleblowers (2)**
47:3,4
**whistlers (2)**
47:3,4
**Whiteway (1)**
249:16
**whole (4)**
134:1,9;164:6;
188:14
**Who's (1)**
105:24
**whose (8)**
59:22;120:11,24;
121:4,12,16;137:24;
185:15
**wide (4)**
24:10;39:7;226:21;
227:8
**widely (1)**
243:10
**Wilder (4)**
183:1,3,5,12
**willing (2)**
154:13;157:16
**willingness (1)**
55:24
**winning (1)**
52:20
**wish (3)**
71:24;119:9;162:16
**withdraw (2)**
89:19;200:11
**withdrawn (4)**
74:21;130:19;
131:12;202:2
**within (6)**
17:5;49:2;77:19;
171:2;194:23;246:23
**without (5)**
8:17;128:11,24;
153:11;168:11
**witness (13)**
5:6;135:18;165:4;
174:18,18;179:2;
188:19,21,22;189:14;
190:14;199:7;240:17
**witnesses (2)**
191:8,11
**woman (9)**
36:24;162:17;
185:15;186:17;187:3;
189:15,21;191:25;
194:18
**women (1)**
194:20
**won (1)**
52:8
**wondering (1)**
105:5
**word (3)**
32:14;218:20;
245:17
**words (3)**

Case 4:23-cv-00111-RSB-CLR Document 34 Filed 07/08/24 Page 286 of 413

Burton v.
Jones

Video Deposition

Shalena Cook Jones
December 18, 2023

61:8;107:7;187:21

**work (41)**
15:17;22:20;23:22;
31:2;34:19;35:13;
37:12;44:4,7;46:20;
56:4;60:20;61:15;
62:25;104:23;105:21;
110:2;111:17;113:25;
114:2,17,24;116:1;
145:20;146:25;
148:21;154:3;171:6,
7,14,24;172:9,12;
173:3;174:22;191:6;
192:21;214:14;
220:20;222:10;246:7

**worked (25)**
15:7;21:23,25;
26:15;37:6;40:21;
41:10,20;42:21,25;
53:2;57:1;58:6;60:10,
13,15,21;61:4;68:15;
111:15;114:14;173:7;
183:24;190:19;
214:16

**workers (1)**
195:2

**workers' (1)**
27:4

**working (11)**
44:8;55:12,13;59:9;
62:19;113:6;181:16;
183:25;216:16;226:2;
247:24

**workings (4)**
151:23;153:9;
160:22;169:6

**workplace (18)**
27:19;48:22;77:12;
78:8;84:25;88:24;
143:3;144:10;146:8,
25;147:7,8,15;
148:20;149:3,4,13,22

**works (3)**
183:13;243:21;
246:6

**worse (2)**
158:21,21

**worth (3)**
44:1;113:21;248:21

**Wright (9)**
179:8;183:19;
184:8,9;190:4,9;
200:20;204:19;
236:20

**write (3)**
118:9;139:7;169:21

**writing (1)**
128:4

**written (6)**
48:20;49:5,6,19;
88:1;234:7

**wrong (1)**
232:10

---

## Y

**y'all (2)**
207:5;219:22

**year (11)**
19:19;20:16;31:9;
50:20;155:19;181:10,
20,22;250:12,13,15

**years (13)**
19:7,16;20:8;31:8;
32:3,7,9;68:18;
216:22;217:1,5;
232:13;236:15

**Yep (2)**
24:5;234:9

**Yip (1)**
240:14

**Y-U-G-E-A-Y (1)**
190:7

**Yukeyveaya (3)**
190:4,7,9

---

## Z

**Zoe (1)**
199:22

---

## 0

**02 (1)**
28:12

**05 (4)**
22:20;23:19;41:11;
42:21

**08 (3)**
23:20;41:11;42:21

---

## 1

**1 (5)**
5:4;97:14;104:11;
129:20;210:5

**1:04 (2)**
119:2,5

**10 (7)**
45:9;70:8,25;
193:10;201:13;202:8;
204:20

**10:01 (1)**
5:3

**100 (1)**
59:17

**1099 (1)**
175:4

**10-minute (1)**
71:5

**11 (1)**
18:18

**11:29 (2)**
71:14,15

**11:38 (3)**
71:7,16,19

---

**12 (1)**
241:23

**12:41 (2)**
118:25;119:1

**12443 (1)**
16:25

**13 (9)**
96:25;97:1;119:14;
120:7;121:18;132:22;
133:16,18;234:22

**138 (2)**
174:4,13

**14 (4)**
42:25;127:21;
128:1;129:20

**14th (3)**
233:15;234:2,12

**15 (5)**
118:12;140:8,9;
190:15;241:23

**15th (3)**
13:1;181:8,11

**16 (2)**
19:7;160:5

**17 (2)**
42:25;161:2

**18 (3)**
20:22;21:3;161:11

**18th (1)**
5:3

**1983 (2)**
23:21;24:4

**1991 (1)**
20:7

**1995 (1)**
20:8

**1999 (1)**
20:8

**1st (2)**
52:10;84:1

---

## 2

**2 (12)**
11:11,12;20:19;
71:20;97:14;100:14;
178:17;198:19;
199:16;200:7;253:7;
254:5

**2:39 (2)**
193:14,15

**2:40 (2)**
193:16,19

**20 (8)**
21:6;45:9;118:16,
18;182:1;190:15;
217:1;233:8

**2001 (2)**
21:15;22:19

**2002 (3)**
20:17;21:25;22:20

**2003 (1)**
19:20

**24 (5)**

---

**2004 (1)**
26:9

**2005 (2)**
22:1,5

**2006 (1)**
129:21

**2008 (2)**
22:5,8

**2010 (8)**
22:8,10;28:12,23;
29:9;34:18;58:8;
60:15

**2012 (5)**
18:17;29:13,15,21,
22

**2013 (2)**
29:21,23

**2014 (13)**
22:10,13;26:5;29:9;
34:18;36:22;37:16;
58:8;75:8,17;76:3;
80:20;129:22

**2015 (2)**
130:1;218:11

**2016 (15)**
75:8,12,17,25;76:3,
12,23;77:4;79:22;
80:3,12,24;81:7;83:9;
130:1

**2017 (8)**
22:13,16;26:6,9;
37:16;43:5,14;44:13

**2018 (1)**
81:4

**2019 (6)**
76:3;77:5;80:4,7,
12;81:4

**2020 (7)**
22:16;43:5;52:8,8,
13;53:15;181:8

**2021 (24)**
37:10;52:7,10,11,
12,14;59:7;65:13,17;
66:20;84:1;115:20,
21;117:6;155:3;
156:4,5;187:13;
194:8;207:18;209:4;
212:19;213:4;236:1

**2022 (10)**
50:20;150:7;
170:16;182:2,8,14,18;
233:15;234:2,12

**2023 (2)**
5:3;17:21

**21 (1)**
209:4

**22 (1)**
20:20

**22nd (2)**
141:25;154:23

**23 (2)**
233:9,11

**24 (5)**

---

102:16;230:12,13;
252:9,16

**24th (1)**
130:1

**27 (3)**
175:12,13;253:6

**28 (4)**
88:17;227:13,14;
231:20

**28th (2)**
17:21;52:18

**29 (1)**
88:17

---

## 3

**3 (2)**
119:6;199:1

**3.8 (1)**
94:5

**3:30 (1)**
99:23

**3:58 (2)**
252:21,22

**30 (2)**
117:11;252:3

**30b (1)**
242:3

**30th (1)**
150:7

**31 (1)**
206:11

**31419 (1)**
17:1

**32 (2)**
90:21,22

**33 (1)**
11:10

**36 (2)**
252:12,14

**38 (2)**
206:8,10

**3A (1)**
200:12

---

## 4

**4 (6)**
79:4,6,14;83:23;
88:16;200:7

**4:04 (2)**
252:23;253:1

**4:10 (2)**
257:14,23

**4:30 (1)**
99:17

**42 (1)**
146:17

**4th (7)**
52:11,12,14;59:7;
60:8;65:13;66:20

**5**

**5 (5)**
74:24;75:1;80:13;
83:22;253:2
**5:00 (3)**
251:16,20;252:18
**50 (2)**
192:14;194:23
**50s (1)**
229:8

**6**

**6 (10)**
140:3,4;150:4;
159:24;210:17;
217:20;220:21,22;
253:8;254:5
**60 (3)**
171:3,22;246:23
**60s (1)**
229:9
**65 (2)**
232:5,20
**65,000 (1)**
231:22

**7**

**7 (2)**
18:18,19

**8**

**8/25 (2)**
234:7,7
**80 (1)**
232:5
**80,900 (2)**
231:15;232:18
**80s (1)**
229:10
**85 (2)**
229:10,11
**88 (1)**
232:18
**8th (1)**
130:1

**9**

**90 (3)**
171:3,23;246:23
**95 (1)**
20:10
**99 (1)**
20:10

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

PLAINTIFF'S EXHIBIT

2

| | |
|---|---|
| BURT ANTHONY BURTON, | * |
| | * |
| Plaintiff, | * |
| | * |
| v. | *   Case# 4:23-cv-00111-WTM-CLR |
| | * |
| SHALENA COOK JONES, in her | * |
| individual and official capacities; | * |
| and CHATHAM COUNTY, GEORGIA, | * |
| | * |
| Defendants | * |

---

**DEFENDANT SHALENA COOK JONES'
RESPONSES TO PLAINTIFF'S FIRST INTERROGATORIES
TO DEFENDANT SHALENA COOK JONES**

COMES NOW, Shalena Cook Jones, one of the Defendants in the above-styled matter, and

responds to Plaintiff's First Interrogatories to Defendant Shalena Cook Jones as follows:

**PRELIMINARY OBJECTIONS**

(a)     Defendant objects to each and every interrogatory to the extent that it would require

Defendant to respond by disclosing her attorney's or other representative's mental impressions,

conclusions, opinions, computations, calculations, projections, reasons, legal theories, other work

product or the like, on the ground that said interrogatories exceeds the permissible scope of discovery

under the applicable Rules of Civil Procedure.

(b)     Defendant objects to each and every interrogatory to the extent that it, whether

standing alone or taken in conjunction with any and all interrogatories, is calculated or would operate

to annoy, embarrass, oppress, unduly burden, or unduly cause expense to Defendant, or would be

unduly vexatious or unduly burdensome to respond to, or would require Defendant to engage in

investigative efforts burdensome to the point of oppression, on the ground that said interrogatories exceed the permissible scope of discovery under the applicable Rules of Civil Procedure.

(c)     Defendant objects to each and every interrogatory to the extent that it requires Defendant to respond by acquiring or supplying information which would be irrelevant to the subject matter or issues of this action, and not reasonably calculated to lead to the discovery of admissible evidence, on the ground that said interrogatories exceed the permissible scope of discovery under the applicable Rules of Civil Procedure.

(d)     Defendant objects to each and every interrogatory to the extent that it requires Defendant to respond by waiving her attorney-client privilege, on the ground that said interrogatories exceeds the permissible scope of discovery under the applicable Rules of Civil Procedure.

(e)     Defendant objects to each and every interrogatory to the extent that it is outside the scope of discovery set forth in Rule 33 of the Federal Rules of Civil Procedure.

(f)     Defendant objects to each and every interrogatory to the extent it requires the furnishing of information or materials obtained in anticipation of litigation or which constitutes work product of counsel and for which there has been no requisite showing that the plaintiff has substantial need and that plaintiff could not obtain the substantial equivalent by other means.

(g)     Defendant objects to the caption or preface to the interrogatories to the extent that Defendant is requested to file responses which exceed the scope of discovery of the applicable Rules of Civil Procedure or within a period of time which is less than that allowed Defendant to respond to interrogatories under the applicable Rules of Civil Procedure. Defendant's responses herein are made in compliance with the applicable Rules of Civil Procedure and not pursuant to the conditions sought to be imposed by the plaintiff in the caption or preface to the interrogatories.

(h)     Defendant objects to plaintiff's interrogatories to the extent that the interrogatories or preface thereto require supplemental responses not required by the applicable Rules of Civil Procedure.

(I)     After responding to plaintiff's interrogatories to Defendant, Defendant reserves the right to supplement all such responses, and to correct all errors or omissions attributable to human error.

(j)     Subject to and without waiving the above objections, on the basis of information now known to Defendant and without waiving any objection or admitting the relevance or materiality of any of the information sought, Defendant hereby responds to said interrogatories as follows:

## INTERROGATORIES

1.     Identify each individual who participated, either directly or indirectly, in preparing, reviewing, or approving these responses to Plaintiffs First Interrogatories and/or the responses to any of Plaintiff's First Requests for Production of Documents to Defendant.

**RESPONSE: This Defendant objects to Interrogatory No. 1 on the grounds that it is not reasonably calculated to lead to the discovery of admissible information. Subject to the foregoing objection,   the undersigned prepared these responses with the assistance of Defendant Jones.**

2.     Identify each individual who you know or believe possesses knowledge or information that supports, negates, or is otherwise relevant to any of the claims or defenses asserted in this action, and describe in full detail the knowledge or information you believe each such individual possesses. This list includes, but is not limited to, persons who will or may testify on behalf of Defendant. For each individual identified, provide contact information including home

addresses, e-mail addresses, and business, cellular and home telephone numbers.

**RESPONSE: This Defendant objects to Interrogatory No. 2 on the grounds that it is overly broad, unduly burdensome, and not reasonably limited in scope. Subject to and without waiving said objections, this Defendant identifies the following:**

      a.    Plaintiff, Burt Burton, has knowledge about the allegations in Plaintiff's Complaint. As Plaintiff is no longer employed with this office, his current address and telephone number are unknown.;

      b.    Defendant Shalena Cook Jones, who may be contacted through undersigned counsel, has knowledge about certain allegations in Plaintiff's Complaint, but not limited to, Plaintiff's employment and separation from the Chatham County District Attorney's Office;

      c.    Timothy Ruffini may have discoverable information about certain allegations in Plaintiff's Complaint. As Mr. Ruffini is no longer employed with this office, his current address and telephone number are unknown;

      d.    Christian Stolfe may have discoverable information about certain allegations in Plaintiff's Complaint. Address: 133 Montgomery Street, Suite #600, Savannah, Georgia 31401. Tel.: (912) 652-7308;

      e.    Jenny Parker may have discoverable information about certain allegations in Plaintiff's Complaint; As Ms. Parker is no longer employed with this office, her current address and telephone number are unknown;

      f.    Michael Edwards may have discoverable information about certain allegations in Plaintiff's Complaint; As Mr. Edwards is no longer employed with this office, his current address and telephone number are unknown;

<center>4</center>

g. Judge Louisa Abbot may have discoverable information about certain allegations in Plaintiff's Complaint. Judge Abbot may be contacted at Chatham County Superior Court;

h. Skye Musson may have discoverable information about certain allegations in Plaintiff's Complaint; As Ms. Musson is no longer employed with this office, her current address and telephone number are unknown;

I. Marie DeFusco may have discoverable information about certain allegations in Plaintiff's Complaint; As Ms. DeFusco is no longer employed with this office, her current address and telephone number are unknown;

j. Renee Roberts may have discoverable information about certain allegations in Plaintiff's Complaint; As Ms. Roberts is no longer employed with this office, her current address and telephone number are unknown;

k. Brian DeBlassis may have discoverable information about certain allegations in Plaintiff's Complaint; Address: 133 Montgomery Street, Suite #600, Savannah, Georgia 31401. Tel.: (912) 652-7308;

l. Anitra Hodge Wilder may have discoverable information about certain allegations in Plaintiff's Complaint; Address: 133 Montgomery Street, Suite #600, Savannah, Georgia 31401. Tel.: (912) 652-7308;

3. Identify any expert consulted or retained by you to opine in any manner on any aspect of this litigation including, but not limited to, Plaintiffs claims and any of Defendant's defenses, pursuant to the Federal Rules of Civil Procedure. For any such expert, state the subject matter(s) on which the expert is expected to testify, the substance of the facts and opinions to which the expert is expected to testify, and a summary of the grounds for each opinion.

**RESPONSE: This Defendant states that she has not yet made a decision about any expert witness that she intends to have testify at trial. To the extent this defendant intends to call an expert witness at trial, this defendant will promptly supplement her response as required by the Federal Rules and any Order of the Court.**

4.    Identify all statements, affidavits, transcripts, videos, and tape or audio recordings in your possession, custody or control, or which you have made, obtained or secured from any person or entity having, or claiming to have, knowledge of facts or circumstances relevant to the subject matter of this litigation. Your response should include, but not be limited to:

(a)    The identity of the individual from whom the statement, affidavit, transcript or recording was secured;

(b)    The date the statement, affidavit, transcript or recording was made;

(c)    The form of the statement, affidavit, transcript or recording (e.g., a written statement, audio recording, etc.);

(d)    A summary of the contents of the statement or recording; and

(e)    The current location of the statement, affidavit, transcript or recording.

**RESPONSE: This Defendant objects to Interrogatory No. 4 to the extent that it seeks to invade the attorney-client privilege and work product doctrine and seeks non discoverable information and materials prepared in anticipation of litigation. Subject to and without waiving said objections, and in lieu of further response as permitted by Fed.R.Civ.P. 33(d), this defendant refers plaintiff to the witness statements that will be produced to Plaintiff at a mutually agreeable time and place.**

5.    Describe in full detail the facts supporting each every one of your affirmative

6

defenses, identify all witnesses whom you believe support each affirmative defense, and provide a full description of the knowledge you believe each responsive witness possesses.

**RESPONSE: This Defendant objects to Interrogatory No. 5 to the extent that it seeks to invade the attorney-client privilege and work product doctrine. This Defendant further objects to the extent that Interrogatory No. 5 calls for a legal conclusion. Subject to and without waiving said objections, this Defendant states discovery in this matter has only just begun and at this time this Defendant cannot identify all facts that she may rely upon in support of her defenses. Nevertheless, this Defendant states that the affirmative defenses set forth in its Answer speak for themselves and require no further elaboration. In lieu of further response as permitted by Fed.R.Civ.P. 33(d), this Defendant refers plaintiff to the documents that will be produced to Plaintiff at a mutually agreeable time and place.**

6.   Identify all correspondence, conversations, or other communications (whether oral, written, or by electronic data transfer on any device or e-mail account, whether intended for business or private use) that you or any of your employees, representatives, or agents have had in which Plaintiff, Plaintiff's job performance, Plaintiff's association with Skye Musson, complaints of any violation of law or fraud, waste, or abuse, Plaintiff's complaints of retaliation, and/or the allegations of Plaintiff's allegations in this lawsuit, were discussed in any capacity (including but not limited to, correspondence, conversations, or other communications with Plaintiff himself), between November 1, 2020 and the present, including for each:

(a)   The date of the communication;

(b)   The names of the persons in attendance or participating in the communication;

(c)   A detailed description of the substance of the correspondence, conversation or other

7

communication, including a privilege log for any communications that are withheld due to privilege;

(d)     The action, if any, taken by you or your employees, representatives, or agents as a result; and,

(e)     The identity of all documents that are evidence of or which contain any reference to or record of such communication.

**RESPONSE: This Defendant objects to Interrogatory No. 6 to the extent that it seeks to invade the attorney client privilege and work product doctrine. This Defendant further objects to Interrogatory No. 6 on the grounds that it is overly broad, unduly burdensome and not reasonably limited in time, manner or scope. Subject to and without waiving said objections, this defendant states that any conversations that this Defendant would have had about plaintiff would have been with the County Human Resources Department or would have otherwise been investigatory conversations made in connection with and in preparation of litigation and/or plaintiff's EEOC charge. Plaintiff on multiple occasions indicated he and Musson were best friends and Plaintiff has hired Skye Musson to work on his current campaign. In lieu of further response as permitted by Fed.R.Civ.P. 33(d), this Defendant refers plaintiff to the documents that will be produced to Plaintiff at a mutually agreeable time and place.**

7.     State and describe in full the reasons(s) for the termination of Plaintiff's employment, including the identity of each individual who made, participated in, reviewed, approved, or was otherwise involved in the decision to terminate Plaintiff, and, separately for each individual, describe in full detail that individual's role with respect to the decision. This includes, without limitation, the decision maker(s), the human resources personnel involved, counsel consulted (if any), and all individuals who received, investigated, or were involved (e.g., witnesses) in any investigation of any

conduct which you contend caused Plaintiff's termination in whole or in part, and any documentation on which you relied in the decision to terminate Plaintiff.

**RESPONSE: Please see the termination letter, which speaks for itself, that will be produced at a mutually agreeable place and time in response to Plaintiff's production requests.**

  8.  Identify Plaintiff's replacement in the position from which he was removed; state her or his sex (of all individuals who assumed Plaintiff's caseload); state whether or not she or he made any form of grievance or complaint (formal or informal, internal or external) asserting a claim of discrimination based on a protected characteristic or retaliation, and state whether or not she or he made any form of grievance or complaint (formal or informal, internal or external) asserting fraud, waste, abuse, or a violation of law, rule, regulation, or policy against any government agency within twelve months of replacing Plaintiff. If you contend that Plaintiff was not replaced, identify the individual(s) in the position(s) that assumed some or all the job duties (including assumption of his caseload) formerly held by Plaintiff; state such individual(s) sex; state whether or not such individual(s) made any form of grievance or complaint (formal or informal, internal or external) asserting discrimination or retaliation within twelve months of the termination of Plaintiff's employment; and state whether or not such individual(s) made any form of grievance or complaint (formal or informal, internal or external) asserting fraud, waste, abuse, or a violation of law, rule, regulation, or policy against any government agency within twelve months of the termination of Plaintiff's employment.

**RESPONSE: This Defendant objects to Interrogatory No. 8 on the grounds that it is overly broad, unduly burdensome, and not reasonably limited in time, manner or scope. This Defendant further objects to Interrogatory No. 8 to the extent that it seeks information that**

9

is neither relevant, material, nor reasonably calculated to lead to the discovery of admissible evidence in this case. Subject to and without waiving said objections, a response to this Interrogatory will be provided by way of supplemental response.

9.   Identify and describe in detail any formal or informal complaint, lawsuit, or charge of discrimination or retaliation concerning any alleged violation of Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (as amended), the First Amendment to the United States Constitution, the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, or the Georgia Whistleblower Act (O.C.G.A. §45-1-4) received by or made against Defendant in the last ten (10) years by any individual, and for each such complaint or charge, state:

(a)   The date of the complaint or grievance;

(b)   Docket number and court, if applicable;

(c)   The name of the complaining or charging party;

(d)   The nature of the complaint (e.g., harassment, retaliation);

(e)   The forum of the complaint or grievance (e.g., federal district court, internal complaint to human resources, correspondence to the Chief Executive Officer, charge of discrimination filed with EEOC, etc.);

(f)   The name and position of the employee(s) accused of committing the discriminatory or retaliatory act(s);

(g)   The outcome of the complaint or charge;

(h)   The employment status of the complaining or charging party with Defendant; and,

(I)   The identity of all documents concerning, constituting, or reflecting in any way any of the foregoing subparts.

10

**RESPONSE:** This Defendant objects to Interrogatory No. 9 on the grounds that it is overly broad, unduly burdensome, and not reasonably limited in time, manner or scope. This Defendant further objects to Interrogatory No. 9 to the extent that it seeks information that is neither relevant, material, nor reasonably calculated to lead to the discovery of admissible evidence in this case. Subject to and without waiving said objections, this Defendant states that other than the instant action and EEOC Charge filed by Plaintiff's trial partner and personal friend Skye Musson, there have been no other allegations or complaints of discrimination, harassment or retaliation against this Defendant or the Chatham County District Attorney's since assuming office on January 4, 2021 and the present. To the extent that such allegations or claims were made prior to this Defendant's tenure, this Defendant is not in possession of any information or documents that would be responsive to Interrogatory No. 9.

10.    Identify and describe in detail any grievances or complaints of any kind (whether formal or informal, internal or external), asserting fraud, waste, abuse, or a violation of law, rule, regulation, or policy against Defendant Shalena Cook Jones or Office of the District Attorney after she assumed office, received in the last ten (10) years by any individual, and for each such complaint or charge, state:

(a)    The date of the complaint or grievance;

(b)    The name of the complaining individual;

(c)    The nature of the complaint or grievance;

(d)    The substance of the complaint or grievance;

(e)    The employment status of the individual(s) who made the complaint or grievance (whether still employed in the same position, employed in a new position for Defendant, terminated,

or resigned);

(f)     Whether Defendant, or any other entity or individual, conducted an investigation into the complaint or grievance, the date the investigation began, and the date the investigation concluded;

(g)     The individual(s) who participated in any investigation of the complaint or grievance;

(h)     The individual(s) interviewed or questioned as part of any investigation of the complaint or grievance, including the date(s) of such interviews or conversations;

(I)     The resolution of the complaint or grievance;

(j)     All actions taken by Defendant in response to the complaint or grievance; and

(k)     The identity of all documents concerning, constituting, or reflecting in any way any of the foregoing subparts.

**RESPONSE: This Defendant objects to Interrogatory No. 10 on the grounds that it is overly broad, unduly burdensome, and not reasonably limited in time, manner or scope. This Defendant further objects to Interrogatory No. 10 to the extent that it seeks information about waste, fraud, abuse or any other violation of law that is not related to the claims asserted in Plaintiff's Complaint, said information is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving said objections, this Defendant refers Plaintiff to her response to Interrogatory No. 9.**

11.     Identify the name, gender, and contact information for every employee of Defendant Cook Jones since she was first elected District Attorney of the Eastern Judicial Circuit of Georgia, who has been disciplined (including a verbal or written warning, performance improvement plan, demotion, or termination) in any way for conduct or any other reason Defendant contends Plaintiff

was terminated. For each responsive employee, state his or her dates of employment, job title, supervisor, the date and form of discipline, the details surrounding the discipline, the individual(s) who decided to discipline the employee, and if the employee made allegations of any form of discrimination or retaliation or any form of fraud, waste, abuse, or violation of law, rule, regulation or policy.

**RESPONSE: This Defendant objects to Interrogatory No. 11 on the grounds that it is overly broad, unduly burdensome and not reasonably limited in time, manner or scope. This Defendant further objects to Interrogatory No. 11 on the grounds that it seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. As such, this Defendant has no documents, material, or information responsive to Interrogatory No. 11.**

12.     If Defendant contends that her office terminated Plaintiff for violating a policy, identify the specific policy that Defendant contends Plaintiff violated (title and prohibited conduct), the location of that policy (if in writing), and how and when Defendant communicated that policy to Plaintiff during his employment.

**RESPONSE: Please see the termination letter, which speaks for itself, that will be produced at a mutually agreeable place and time in response to Plaintiff's production requests.**

13.     State the date on which Defendant received notice and a copy of Skye Musson's charge of discrimination with the U.S. Equal Employment Opportunity Commission, charge number 415-2021-01082.

**RESPONSE: Defendant received notice of Skye Musson's charge of discrimination on or about August 10, 2021.**

13

14.     Identity and list all investigations conducted by or at the behest of any government agency, into the actions of Defendant Cook Jones individually or in her official capacity, or against the Office of the District Attorney for the Eastern Judicial Circuit of Georgia during Defendant Cook Jones' service as D.A., in connection with the operations of Defendant's Office. Include in your response:

    a.     The name or identity of the complaining party;

    b.     The specific allegations made by the complaining party;

    c.     The identity of the agency and investigators conducting the investigation;

    d.     The outcome of the investigation; and

    e.     Any documents that were generated or arose in connection with the investigation.

**RESPONSE: This Defendant objects to Interrogatory No. 14 on the grounds that it seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. Further responding, upon information and belief, Defendant believes that the United States Equal Employment Opportunity Commission investigated plaintiff's allegations and the allegations of Skye Musson. Defendant has no specific knowledge of any other investigations.**

15.     State the name, last known address, and last known telephone number for each person, agency, entity, or organization that has conducted any investigation or inquiry into any of the facts alleged or mentioned in Plaintiffs Complaint, or in Defendant's Answer. Please also state the results of each inquiry or investigation.

**RESPONSE: See response to Interrogatory No. 14.**

16.     State in full detail the nature of the organizational relationship between the Office of

District Attorney Shalena Cook Jones and Chatham County, Georgia from November 1, 2020 to the present. Your answer should include, but not be limited to, identification and a full description of: any budgetary control or contributions by Chatham County to the D.A.'s Office; any policies, practices, or procedures of Chatham County with which the D.A.'s Office must comply; any involvement of Chatham County in substantive personnel decisions of the D.A.'s Office (apart from setting salaries and compensation); any involvement of Chatham County in the operation of the D.A.'s Office; any pay or benefits provided by Chatham County to employees in the D.A.'s Office; any human resources services or functions provided by Chatham County to the D.A.'s Office or its agents or employees; any other services provided by Chatham County to the D.A.'s Office or by the D.A.'s Office to Chatham County; any contracts between or among Chatham County and the D.A.'s Office that relate to employees, personnel management, or employee performance in any way; and any other compensation paid by the D.A.'s Office to Chatham County or vice-versa.

**RESPONSE: Defendant objects to Interrogatory No. 16 on the grounds that it is vague in that it seeks information related to a purported "organizational relationship" between the District Attorney's Office and Chatham County, Georgia, but fails to define that term. Further responding, based upon knowledge and information currently available, Defendant Jones is a duly sworn elected official and State Constitutional Officer. All employees who are selected, employed by, or otherwise assigned to the District Attorney's Office serve at the discretion of the District Attorney and their relationship is one of employment "at-will." The District Attorney's Office controls and evaluates Plaintiff's day-to-day functions, duties and performance as a prosecutor.**

17.     Identify all of Defendant's employment handbooks, policies, practices, procedures,

15

or training materials, whether written or unwritten, that are or have been applicable to employees of

the D.A.'s Office at any time since November 1, 2020, including in your response the identity of all

handbooks, policies, practices, or procedures written or unwritten including but not limited to those

which detail policies regarding employee discipline, harassment, retaliation, discrimination, bullying;

the procedures for complaining about such unlawful conduct; and, the procedure for investigation

of complaints by employees against other employees.

**RESPONSE: In lieu of further response as permitted by Fed.R.Civ.P. 33(d), this Defendant refers plaintiff to the documents that will be produced at a mutually agreeable place and time in response to Plaintiff's production requests.**

18.     Please state the amount that you contend Plaintiff was earning, whether paid by

Defendant, Chatham County, or PAC, at the time of the termination of his employment in the D.A.'s

Office and the value of any benefits to which he was entitled, including but not limited to insurance

benefits, fringe benefits, and bonuses. Please include in your answer identification of all documents

that are evidence of or which contain any reference to or record of such earnings or value.

**RESPONSE: In lieu of further response as permitted by Fed.R.Civ.P. 33(d), this Defendant refers plaintiff to the documents that will be produced at a mutually agreeable place and time in response to Plaintiff's production requests.**

19.     Identify all grievances and complaints of any kind received by Defendant, whether

formal or informal and whether internal or external, made by or against Shalena Cook Jones,

Michael Lanier Edwards, or Jenny Parker and for each such complaint or grievance state:

(a)     The date of the complaint or grievance;

(b)     The individual(s) who made the complaint or grievance;

16

(c)     The substance of the complaint or grievance;

(d)     The person or department to whom the grievance was directed for review/investigation;

(e)     Whether Defendant conducted an investigation into the complaint or grievance, the date the investigation began, and the date the investigation concluded;

(f)     The individual(s) who participated in any investigation of the complaint or grievance;

(g)     The individual(s) interviewed or questioned as part of any investigation of the complaint or grievance, including the date(s) of such interviews or conversations;

(h)     The resolution of the complaint or grievance;

(I)     All actions taken by Defendant in response thereto; and

(j)     The identity of all documents concerning, constituting, or reflecting in any way any of the foregoing subparts.

**RESPONSE: This Defendant objects to Interrogatory No. 19 on the grounds that it seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving said objections, this Defendant states that other than the instant action and subsequent EEOC Charge filed by Plaintiff's trial partner and personal friend Skye Musson, she is not aware of any other grievances or complaints of any kind made by or against this Defendant or Jenny Parker since assuming office on January 4, 2021 and the present. Defendant is aware of one complaint against Edwards that was resolved by the State Bar in his favor. To the extent that such allegations, grievances or complaints were made prior to this Defendant's tenure, this Defendant is not in possession of any information or documents that would be responsive to Interrogatory No. 19.**

20.     Identify all of your employment from 2001 to the present, including but not limited to the names of any employer(s), the employer(s) contact information, your dates of employment, title held, compensation, disciplinary actions against or concerning you, and the reason(s) you separated from employment.

**RESPONSE:  This Defendant objects to Interrogatory No. 20 on the grounds that it is overly broad, unduly burdensome and not reasonably limited in time, manner or scope. This Defendant further objects to Interrogatory No. 20 to the extent that it seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence insofar as this Defendant is not and cannot be held personally liable for any purported damages set forth in plaintiff's Complaint. Subject to and without waiving said objections, this Defendant identifies the following:**

   **• Law Office of Shalena Jones, LLC (2017- 2020), Solo Practitioner;**

   **• Cruser, Mitchell, Novitz, Sanchez, & Gaston (2014-2017), Managing Partner;**

   **• Chatham County District Attorney's Office (2010-2014), Assistant District Attorney; and**

   **• United States Attorney's Office – Western District of Texas (2008-2010), Assistant United States Attorney.**

21.     State Shalena Cook Jones' full legal name (if different from Shalena Cook Jones), home address, telephone number(s), cellular phone providers (business and personal), cell phone numbers (business and personal), and your date of birth.

**RESPONSE:  This Defendant objects to Interrogatory No. 21 to the extent that it seeks private and confidential information from a member of law enforcement. This Defendant further**

18

**objects to Interrogatory No. 21 to the extent that it seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. Finally, this Defendant objects to Interrogatory No. 21 to the extent that it seeks to harass insofar as Plaintiff propounds this request for use in connection with plaintiff and her partner's political campaign against this Defendant announced in or around November 2022. Subject to and without waiving said objections, this Defendant states that her full name is Shalena Cook Jones, her business phone number is 912-652-7308 and her County-issued cellular phone number is (912) 547-7683.   The cellular service for her County-issued cellular phone is provided by Verizon.**

22.     Separately, for each year from January 1, 2015 through the date of the trial, identify all of your assets, salary information, liabilities, accounts, profits, losses, and source(s) of income, including but not limited to every bank, credit union, or other financial institution you had an account or other relationship with.

**RESPONSE: This Defendant objects to Interrogatory No. 22 on the grounds that it is overly broad, unduly burdensome and not reasonably limited in time, manner or scope. This Defendant further objects to Interrogatory No. 22 to the extent that it seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.**

23.     List all of the personal email addresses, personal websites, social networking sites (e.g., Facebook, Twitter, Instagram, Snapchat) blogs, and internet providers you have created and/or used within the past five (5) years, including the screennames, handles, or other user id you have used with respect to any social media accounts, and the dates of such use.

**RESPONSE: This Defendant objects to Interrogatory No. 23 on the grounds that it is overly**

19

broad, unduly burdensome and not reasonably limited in time, manner or scope. This Defendant further objects to Interrogatory No. 23 to the extent that it seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

24.     Identify each occasion during your tenure as District Attorney in which you were involved in the decision to hire, fire, demote, promote, or discipline an employee, and for each such occasion and individual, state:

(a)     Whether and when the individual was hired, fired, disciplined, promoted, or demoted;

(b)     The person ultimately responsible for the aforementioned decision;

(c)     The name, sex, and dates of employment of each person identified;

(d)     Whether each person identified suffered from a known disability;

(e)     Whether each person identified complained of fraud, waste, abuse, or a violation of law, rule, regulation or policy by a government entity;

(f)     Names and titles of all individuals who contributed any input in the decision to discipline the employee;

(g)     The reason(s) the employee was selected, promoted, fired, demoted, or disciplined; and

(h)     Identify all documents concerning, constituting, or reflecting the decision.

RESPONSE: This Defendant objects to Interrogatory No. 24 on the grounds that it is vague, overly broad, unduly burdensome and not reasonably limited in time, manner or scope. This defendant further objects to Interrogatory No. 24 to the extent that it seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving said objections, this Defendant states that she is the final

20

decision maker of all employment decisions that are made by the District Attorneys' Office as each employee serves at the discretion of the sitting District Attorney. This Defendant has hired approximately 25 employees from the date she assumed office in January 2021 through the present. Between January 2021 and the present, this Defendant has terminated only two employees. This Defendant has not demoted or promoted any employees within the stated time frame unless they were entitled to a promotion in accordance with County procedures and tenure.

25.    If any documents, including but not limited to electronic data, relevant to any aspect of or issues in this lawsuit have been lost, misplaced, or destroyed, please identify fully each such document and describe how it was lost, misplaced, or destroyed, whether pursuant to a document retention policy or otherwise, and identify all document retention policies in place.

RESPONSE: This Defendant states that she is not aware of any material or relevant documents having been lost, misplaced or destroyed.

This the 24th day of August, 2023.

BROWN, READDICK, BUMGARTNER,
CARTER, STRICKLAND & WATKINS, LLP


/s/ G. Todd Carter
G. Todd Carter
Georgia Bar Number: 113601
Attorney for Defendant Shalena Cook Jones

5 Glynn Avenue
Post Office Box 220
Brunswick, GA 31521
(912) 264-8544
(912) 264-9667 FAX
tcarter@brbcsw.com

## CERTIFICATE OF SERVICE

This is to certify that I have this day served all parties with a copy of the foregoing pleading,

via email, addressed as follows:

Anita K. Balasubramanian, Esq.
abala@bbwmlaw.com
J. Kyle Brooks, Esq.
kbrooks@bbwmlaw.com
Buckley Bala Wilson Mew LLP
Bank of America Plaza, Suite 3900
600 Peachtree Street, NE
Atlanta, GA  30308
Attorneys for Plaintiff

R. Jonathan Hart, Esq.
Reginald Martin, Esq.
Chatham County Attorney's Office
P. O. Box 8161
Savannah, GA  31412
Attorneys for Defendant
Chatham County, GA
rjhart@chathamcounty.org
rmartin@chathamcounty.org

This 24th day of August, 2023.

BROWN, READDICK, BUMGARTNER
CARTER, STRICKLAND & WATKINS, LLP

/s/ G. Todd Carter
G. Todd Carter
Georgia Bar Number: 113601
Special Assistant Attorney
General for Defendant
**SHALENA COOK JONES**
5 Glynn Avenue
Post Office Box 220
Brunswick, GA 31521
(912) 264-8544
(912) 264-9667 FAX

22

PLAINTIFF'S EXHIBIT

4

exhibitsticker.com


# Chatham County
# Employee Handbook



Effective January 1, 2021

SCJ 000202

Chatham County Government                                          **Employee Handbook**

# Table of Contents

FOREWORD ................................................................................................................4

I. County Government Organization ...........................................................................5

  A. Statutory Authority ...............................................................................................5

  B. Governing Authority .............................................................................................5

II. EMPLOYMENT .......................................................................................................7

  A. Recruitment and Selection ....................................................................................7

    1.    New Hire Procedure.........................................................................................7

    2.    Probationary Period .........................................................................................7

    3.    Internal Transfers, Demotions and Promotions ..............................................8

  B. Official Personnel Files .........................................................................................8

  C. Employee Status Categories ..................................................................................8

  D. Nepotism, Employment of Relatives, and Personal Relationships .......................9

  E. Progressive Discipline .........................................................................................10

  F. Separation of Employment ...................................................................................13

    1. Reasons for Separation ...................................................................................13

    2. Return and Recoupment of County Property and Assets ................................14

    3. Final Pay.........................................................................................................14

    4. Rehire after Separation ..................................................................................15

III. Equal Employment Opportunity Statement .........................................................16

IV. Harassment Policy and Complaint Procedure ......................................................16

V. GRIEVANCE PROCEDURE .................................................................................18

VI. WORKPLACE SAFETY AND CONDUCT ..........................................................20

  A. Drug-Free Workplace..........................................................................................20

  B. Safety ..................................................................................................................24

  C. Violence in the Workplace ..................................................................................24

  D. Weapons in the Workplace ..................................................................................25

  E. Smoke-Free Workplace........................................................................................26

VII. WORKPLACE EXPECTATIONS ........................................................................26

  A. Attendance and Punctuality .................................................................................26

  B. Workplace Attire/Uniforms .................................................................................27

  C. Outside/Dual Employment ..................................................................................27

SCJ 000203

**Chatham County Government**                                    **Employee Handbook**

D. Confidentiality ...................................................................................................... 28

E. Conflicts of Interest ............................................................................................... 28

F. Gifts and Gratuities ............................................................................................... 29

G. Political Activity ................................................................................................... 29

H. Electronic Communication and Internet Use .......................................................... 31

I. Social Media Acceptable Use ................................................................................. 31

VIII. WORK HOURS AND COMPENSATION ................................................................. **32**

A. Work Week and Work Period ................................................................................. 32

B. Meal and Break Periods ......................................................................................... 33

C. Attendance Records ............................................................................................... 33

D. Payment of Wages ................................................................................................. 33

E. Classification and Pay Plan and Compensation Administration ............................... 34

F. Overtime and Compensatory Time ......................................................................... 36

G. Deductions from Pay/Safe Harbor ......................................................................... 37

H. Disaster Compensation Policy ................................................................................ 38

I. Performance Appraisals and Merit Pay Increases .................................................... 38

J. Longevity Pay ........................................................................................................ 39

IX. TIME OFF AND LEAVES OF ABSENCE ................................................................... **41**

A. Holiday Pay ........................................................................................................... 41

B. Vacation ................................................................................................................ 41

C. Sick Leave ............................................................................................................. 42

D. Family and Medical Leave (FMLA) ....................................................................... 43

E. Funeral Leave ........................................................................................................ 47

F. Jury Duty Leave ..................................................................................................... 48

G. Voting Leave ......................................................................................................... 48

H. Blood Donation Leave ........................................................................................... 48

I. Military Leave ........................................................................................................ 48

J. Donated Leave ....................................................................................................... 50

K. Administrative Leave ............................................................................................. 52

L. Leave of Absence Without Pay .............................................................................. 52

X. EMPLOYEE BENEFITS ............................................................................................. **53**

A. Open Enrollment .................................................................................................... 53

B. Retirement Plan ..................................................................................................... 53

C. Workers' Compensation Leave ............................................................................... 53

SCJ 000204

**Chatham County Government**                                   **Employee Handbook**

D. Employee Assistance Program (EAP)......................................................................................53

E. Wellness Program .................................................................................................................54

F. Recognition and Service Awards ...........................................................................................54

SCJ 000205

**Chatham County Government**                                    **Employee Handbook**

# FOREWORD

This handbook has been written to serve as a guide for your employment with Chatham County Government. Unless otherwise indicated in a specific policy, this handbook applies to all employees of Chatham County who are subject to the Personnel Ordinance. It supersedes all office policies, employee handbooks, or administrative decisions made by prior administrations concerning the subjects in this handbook.  The handbook contains only general information and guidelines, and is not intended to be exhaustive or to address all the possible applications of, or exceptions to, the general policies and procedures described.  For that reason, if you have any questions concerning the applicability of a policy or practice to you, please address your specific questions to appropriate management staff in your department or to the Human Resources Department.

Neither this handbook nor any other document confers any contractual right, either express or implied to continued employment, nor does it guarantee any fixed terms and conditions of your employment. County employees who are covered by the Personnel Ordinance are afforded due process rights related to discipline and termination.  However, your employment is considered "at will" and may be terminated by Chatham County at any time.  Likewise, you may resign your employment for any reason at any time.  However, it is the intention of Chatham County to practice principles of due process with regard to performance issues by following a progressive discipline process that will provide employees with notice and a fair opportunity to improve their performance prior to a termination decision.

The County Manager is responsible for administering the provisions in the Handbook, and may delegate this authority to appropriate persons.

The procedures, practices, and policies described herein may be modified or discontinued, at the discretion of the County Manager.  The County Manager or designee may, from time to time, issue memoranda of guidance and/or interpretation of provisions contained in this handbook. The policies and practices contained in this handbook may not be changed by any employee, including management staff, except the County Manager. Any statements, representations, or promises made to any employee that conflict with any provision in this handbook are without effect.

SCJ 000206

# I. County Government Organization

## A. Statutory Authority

This Employee Handbook is promulgated under the authority of the Chatham County Personnel Ordinance, as authorized by the Georgia Constitution, Article 9, Section I, paragraph IV, Sections 36-1-21 and the County's Enabling Act, Georgia Laws of 1984, Vol. II, pp. 5050-5076, as amended.

## B. Governing Authority

The County Board of Commissioners retains overall responsibility for approving the Personnel Ordinance. The County Manager is responsible to the Board of Commissioners for the general administration of the personnel program. The County Manager has the authority to amend the provisions contained within this Employee Handbook. However, changes to the Employee Handbook that would materially affect the adopted budget or that would result in recurring expenses for future budgets must be approved by the Board of Commissioners.

Constitutional Officers are empowered by the provisions of the State Constitution or Official Code of Georgia to administer a County department, office, agency or other administrative unit of County government. The powers and duties of these positions are determined by general law and not on a county-by county basis. Many of the provisions of this Employee Handbook do not apply to Constitutional Officers. Constitutional Officers and County Officials may not be subject to the provision of the Employee Handbook related to Separations, Disciplinary Action, Grievance Procedures or Appeals.

The Constitutional Officers are:

Clerk of Superior Court
Probate Court Judge
Sheriff
Tax Commissioner

SCJ 000207

The elected County Officials are:

Coroner
District Attorney
Chief Magistrate Court Judge
State Court Judges
Superior Court Clerk
Superior Court Judges

County Officials appointed to their position by a governing board or elected official are:

Chief Appraiser
Clerk of Commission
County Attorney
County Manager
Elections Supervisor
Juvenile Court Judges
Voter Registration Director

For purposes of this Handbook, Constitutional Officers are included in the term "County Official."

SCJ 000208

# II. EMPLOYMENT

## A. Recruitment and Selection

### 1.    New Hire Procedure

It is the policy of the County to hire qualified candidates for available positions based on the candidate's qualifications for the position.  Decisions regarding the recruitment, selection and placement of employees are made on the basis of job-related criteria.

When positions become available, qualified current employees are encouraged and welcome to apply.  As openings occur, Human Resources will advertise vacant positions and manage the recruitment process.  Human Resources will be responsible for receiving job applications, screening job applicants and referring qualified candidates to the department manager for consideration and interviews.  To be advertised, positions must be funded or pending funding approval by the Board of Commissioners.

Positions may be posted within a department or County government before being advertised to external candidates if the department believes that internal candidates are available to fill the position.

Department Heads and County Officials, or their selected designees are responsible for managing the interview process and selecting job candidates.  Department managers are expected to adhere to the selection and hiring process outlined in the New Hire Handbook.

### 2.    Probationary Period

All new hires are subject to a probationary period of six (6) months.  A probationary period of more than six (6) months may be established for job classes requiring a longer period of time to assess satisfactory performance.  Law enforcement job classes require a probationary period of twelve months.  The length of the probationary period depends on the job classification, and the new employee will be notified of the length of the probationary period upon hire.

The probationary period may be extended prior to its expiration by notifying the employee in writing that the probationary period will be extended.  The notice must include the reasons for the extension and the duration.  The probationary period may not be extended for more than 90 days.

SCJ 000209

During the probationary period, the employee's job performance and conduct will be assessed to determine if continued employment is recommended.  A probationary employee who is terminated during the probationary period is not entitled to appeal the termination decision or file a grievance.

Employees who are promoted, demoted, or transferred to a new job classification will serve a new probationary period. Employees who fail to successfully complete the new probationary period may be placed in another position or may be terminated, at the discretion of the Department Head or County Official.

### 3.      Internal Transfers, Demotions and Promotions

A current employee who is selected to fill a vacant position by promotion, demotion, or lateral transfer will serve a probationary period in the new position.  The salary of the employee upon promotion will be the minimum salary of the new paygrade or 10% above the employee's current salary, whichever is greater.  An increase greater than 10% may be authorized by the Human Resources Director based on the employee's qualifications.  An employee who transfers laterally to a position on the same paygrade may not receive an increase in pay.  The salary of an employee who accepts a demotion to a position on a lower paygrade may be subjected to a pay decrease of up to 10% of the current salary or hourly rate.

## B.  Official Personnel Files

The Human Resources Department maintains the only official personnel record on each employee.  Personnel files are subject to inspection and may be disclosed only as provided by applicable law in accordance with County procedure.  Current employees are permitted to review their personnel file during normal business hours by contacting the Human Resources Department. The Human Resources Department is responsible for developing guidelines regarding documents that are contained in the official personnel file.

## C.  Employee Status Categories

Employees may be classified into one of the following employment categories:

1.      *Appointed* – Employees who are hired by direct appointment of an elected official or governing board and who serve at the pleasure of the hiring official.

SCJ 000210

2.  *Full-time Regular* – Employees who are regularly scheduled to work 30 or more hours per week for indefinite duration and who are not in a temporary status. Full-time regular employees are eligible for the full benefits package, subject to the terms, conditions and limitations of each benefits program.

3.  *Part-time Regular* – Employees who are regularly scheduled to work less than 30 hours per week and who are not in a temporary status. Regular, part-time employees are eligible for some benefits subject to the terms, conditions and limitations of each benefits program.

4.  *Seasonal* – Employees who are hired to perform work during a peak workload period, generally occurring at the same time each year, not exceeding 1300 hours per year. Seasonal employees are not entitled to leave accrual or benefits unless specifically stated otherwise in policy or are deemed eligible according to plan documents.

5.  *Temporary* – Employees who are hired as interim replacements to temporarily supplement the workforce or to assist in the completion of a specific project. Temporary employees are not eligible for leave accrual or benefits unless specifically stated otherwise in policy or are deemed eligible according to plan documents.

6.  *Acting -* An employee may be appointed to an acting or interim position during periods when the job incumbent is unavailable to fulfill his or her duties or pending selection of a replacement for the previous incumbent.  An employee in an acting or interim position must meet the qualifications for the position and perform the full range of job duties. The salary paid to the employee selected to serve in an acting or interim position shall be adjusted to the minimum salary of the new pay grade or 10% above the employee's current salary, whichever is greater.

## D.  Nepotism, Employment of Relatives, and Personal Relationships

Chatham County wants to ensure that its employment practices do not create conflicts of interest or favoritism. Close relatives, partners, those in a dating relationship or members of the same household are not permitted to be in positions that have a reporting relationship, either direct or indirect, to each other. Close relatives are defined as spouse, domestic partner, parents, siblings, children, grandchildren, grandparents or spouse of any of these; or any other relative whom it can be demonstrated is a member of the individual's household.   This policy applies to promotions, demotions, and transfers into another department or into another line of supervision where a relative would have influence over the employee's terms and conditions

SCJ 000211

of employment.

If employees begin a dating relationship or become relatives, partners or members of the same household and if one party is in a supervisory position, that person is required to inform management or Human Resources of the relationship. Resolution of such conflicts will be addressed on a case-by-case basis in an effort to resolve the conflict, which may include, but not limited to, reassignment, transfer, or separation.

Chatham County reserves the right to apply this policy to situations where there is a conflict or the potential for conflict because of the relationship between employees, even if there is no direct-reporting relationship or authority involved.

## E. Progressive Discipline

Every employee has the duty and the responsibility to be aware of and abide by existing rules and policies. Employees also have the responsibility to perform their duties according to established standards and expectations.  Employees are also responsible for ensuring that their workplace conduct and behavior are appropriate for the workplace.

Employees may be disciplined for the following reasons:

(1) Negligence or inadequate performance of assigned duties;

(2) Inability or unfitness to perform assigned duties;

(3) Insubordination;

(4) Misconduct;

(5) Conduct reflecting discredit on the County or the department;

(6) Conviction of a felony or other crime involving moral turpitude;

(7) Frequent unexcused tardiness or absenteeism; or

(8) Failure to report for or remain at work without justifiable cause.

SCJ 000212

Chatham County supports the use of progressive discipline to address issues such as poor work performance or misconduct. The progressive discipline policy is designed to provide a corrective action process to improve and prevent a recurrence of undesirable behavior and/or performance issues. The progressive discipline policy has been designed consistent with our organizational values, HR best practices and employment laws.

Outlined below are the steps of the progressive discipline policy and procedure. Chatham County reserves the right to combine or skip steps in this process depending on the facts of each situation and the nature of the offense. The level of disciplinary intervention may also vary. Some of the factors that will be considered are whether the offense is repeated despite coaching, counseling and/or training; the employee's work record; and the impact the conduct and performance issues have on the organization.

The following outlines Chatham County's progressive discipline process:

- **Counseling:** A supervisor orally counsels an employee about an issue of concern, and a written record of the discussion is maintained by the supervisor.

- **Written warning:** Written warnings are used for behavior or violations that a supervisor considers serious or in situations when a counseling has not helped change unacceptable performance or behavior. Written warnings are placed in an employee's personnel file. Employees should recognize the serious nature of the written warning, including the warning that failure to correct the performance or conduct deficiency may result in further disciplinary action, up to and including dismissal from employment.

- **Performance improvement plan:** Whenever an employee has been involved in a disciplinary situation that has not been readily resolved or when he/she has demonstrated an inability to perform assigned work responsibilities efficiently, the employee may be placed on a performance improvement plan (PIP). PIP status will last for a predetermined amount of time not to exceed 90 days. Within this time period, the employee must demonstrate a willingness and ability to meet and maintain the conduct and/or work requirements as specified by the supervisor and the organization. At the end of the performance improvement period, the performance improvement plan may be closed, or if established goals are not met, dismissal may occur.

- **Disciplinary suspension without pay**: An employee may be suspended without pay when he or she commits a serious violation of an employment policy or practice, or when prior discipline for the same or similar offense has not corrected the performance or conduct deficiency.  The duration of the suspension without pay should be

SCJ 000213

commensurate with the level of offense and consistent with discipline given other employees in the same or similar situation.

- **Demotion:** A demotion to a job at a lower classification level is appropriate when it is demonstrated that an employee lacks the knowledge, skills, abilities, judgment, or other relevant factors to perform the duties of his or her current job.

- **Termination:** Employees may be terminated for poor job performance or inappropriate workplace conduct.

Chatham County reserves the right to determine the appropriate level of discipline for any performance issues or inappropriate conduct, including oral and written warnings, suspension without pay, demotion and termination. These steps are usually taken in sequence when an employee exhibits behavior or performance issues. However, depending on the situation, any step may be repeated, omitted, or taken out of sequence. The County reserves the right to effect immediate termination when warranted by the circumstances of the case.

## 1. Authority to Issue Discipline

An employee's immediate supervisor has the authority to issue oral and written warnings and to place employees on a Performance Improvement Plan. Any discipline involving a loss in pay, including suspensions without pay, demotions, or termination, require the approval of the Department Head or County Official and approval of the Human Resources Director.

## 2. Appeal of Disciplinary Action

Non-probationary full-time and part-time regular employees may appeal a disciplinary demotion, suspension or termination of employment. The employee must submit a written appeal to the Human Resources Director within ten (10) working days of receipt of the disciplinary notice.

The appeal will be heard by a neutral panel of impartial parties. The Human Resources Director will be responsible for developing a roster of qualified individuals to serve as hearing officers. When an appeal is filed, the parties will be provided with a roster of qualified hearing officers, and each party may select an individual to serve on the panel for their hearing. The Human Resources Director will select a third hearing officer for the panel. After conducting the hearing, the panel will submit their findings and recommendation to the County Manager or appropriate County Official, who will make the final decision regarding whether to uphold or overturn the panel's recommendation.

SCJ 000214

## 3. Investigatory Suspensions

An investigatory suspension is not a disciplinary action, but is an appropriate measure to remove an employee from the workplace in order to properly conduct an investigation involving allegations of an employee's misconduct where it is deemed necessary to avoid disruptions of work or to protect the safety of persons or property. An investigatory suspension should be with pay. However, in unusual circumstances, at the discretion of the Department Head or County Official, an investigatory suspension may be without pay, which may not exceed 30 calendar days.

An investigatory suspension requires approval of the Department Head or County Official in consultation with the Human Resources Director. An employee must be notified in writing of the investigatory suspension, including any conditions of the suspension, how the employee will be notified of the status of the investigation, and return to work provisions.

# F. Separation of Employment

## 1. Reasons for Separation

Separation of employment from Chatham County can occur in the following ways:

- **Resignation:** Although we hope your employment with us will be a mutually rewarding experience, we understand that varying circumstances cause employees to voluntarily resign employment. Resigning employees are encouraged to provide at least two weeks' notice, preferably in writing, to facilitate a smooth transition out of the organization. The Department Head or County Official reserves the right to provide an employee with pay in lieu of notice in situations where job or business needs warrant such action. If an employee provides less notice than requested, the Department Head or County Official may deem the individual to be ineligible for rehire depending on the circumstances regarding the notice given.

- **Job abandonment:** Employees who fail to report to work or contact their supervisor for three (3) consecutive workdays shall be considered to have abandoned the job without notice, effective at the end of their normal shift on the third day. The supervisor should notify the Human Resources Department at the expiration of the third workday and initiate the process to terminate the employee.
- **Retirement:** Employees who wish to retire are requested to notify their Department Head or County Official and the Human Resources Department in writing at least one (1)

SCJ 000215

month before the planned retirement date. Employees should consult the County's Pension Plan for details concerning the County's retirement program.

- **Reduction-in-Force:** In the event that business or economic necessity requires Chatham County to reduce its workforce in one or more classifications or one or more departments, consideration will be given to the needs of the organization and each employee's job performance in determining those employees to be laid off. Reductions-in-force will be conducted fairly, equitably, and without unlawful discrimination. While years of service may be considered in determining layoffs, seniority will not be the prevailing factor in making layoff determinations.

- **Termination:** Employees may be terminated for poor job performance or inappropriate workplace conduct. Chatham County is committed to the use of progressive discipline to address performance and conduct issues. However, employees are employed on an at-will basis, and Chatham County retains the right to terminate an employee with or without notice for any reason consistent with federal, state, and local laws.

- **Death:** In the event of an employee's death, all compensation due will be paid to the estate or designated beneficiary of the deceased employee. Final pay to the employee's estate or designated beneficiary will include one full month's salary at the employee's final rate of pay. The date of death should be recorded as the separation date for computing compensation due.

## 2. Return and Recoupment of County Property and Assets

Separating employees must return all County property at the time of separation, including uniforms, keys, electronic devices, and identification cards. The County reserves the right to recover the value of all assigned property from the employee's final paycheck, terminal leave payout, or pension benefit. The County reserves the right to recoup any County funds or assets from an employee resulting from the employee's fraud, embezzlement or other unlawful act.

## 3. Final Pay

Employees separating from County employment will be paid all remaining compensation due. Employees will be paid for accrued vacation leave up to a maximum of 480 hours. Employees with at least three years of service will be paid for one-half of accrued sick leave up to a maximum of 240 hours.

SCJ 000216

Employees who leave employment with the County giving less than two (2) weeks' notice or who have been dismissed for failure of performance or personal conduct may be paid upon separation for accrued vacation leave or sick leave at the discretion of the County Manager or appropriate County Official.  Each employee's case will be considered based upon the related circumstances.

Non-Exempt employees will be paid for all accrued compensatory leave. Separating employees who are not vested in the Pension Plan will receive a refund of their contributions made into the Pension Plan.  Employees who are vested in the Pension Plan and who have not attained retirement age may choose to leave their pension contributions and draw their retirement at a later date (i.e., Deferred Vested Retirement).

## 4. Rehire after Separation

Employees who separate from employment with the County may be considered for reinstatement or reemployment.  Former employees who are eligible for rehire are encouraged to apply for job vacancies that suit their qualifications and interests.  Employees who are discharged from the County may be considered for rehire based on a careful consideration of the reasons for their separation.

*Reinstatement* – a regular employee who is rehired within one year of separation from the County may be reinstated.  An employee who is reinstated will be required to serve a new probationary period. A reinstated employee will be credited with prior years of service for purposes of service award recognition, leave accrual rates and longevity payment.

An employee who was separated from County employment through a reduction-in-force will be automatically reinstated to a position in the same job class when it becomes available within twelve (12) months of the reduction-in-force.

*Re-employment* – a regular employee who is rehired after one year of separation from the County may be re-employed. An individual who is re-employed will not be credited with prior years of service for the purpose of calculating leave accrual rates and longevity payments. However, if an individual remains re-employed for a period of at least five consecutive years, the employee may receive credit for the prior years of service, upon request to the Human Resources Department.  The prior years of service may then be used to calculate the employee's service award date, leave accrual rate, and longevity payment.  These benefits become effective upon request of the employee and approval by the Human Resources Director and are not retroactive.

SCJ 000217

# III. Equal Employment Opportunity Statement

Chatham County provides equal employment opportunities to all employees and applicants for employment without regard to race, color, national origin, sex, sexual orientation, gender identity, religion, age, physical or mental disability, genetic information, marital status, or military/veteran status in accordance with applicable federal, state and local laws. This policy applies to all terms and conditions of employment, including hiring, placement, promotion, performance evaluation, termination, layoff, leaves of absence, compensation and training, and all other terms and conditions of employment.

Chatham County expressly prohibits any form of unlawful harassment based on race, color, religion, sex, sexual orientation, gender identity, national origin, age, genetic information, disability or military/veteran status.

# IV. Harassment Policy and Complaint Procedure

Chatham County is committed to a work environment in which all individuals are treated with respect and dignity. Each individual has the right to work in a professional atmosphere that promotes equal employment opportunities and prohibits unlawful discriminatory practices, including harassment. Therefore, Chatham County expects that all working relationships among team members will be business-like and free of bias, prejudice and harassment.

Conduct prohibited by these policies is unacceptable in the workplace and in any work-related setting outside the workplace, such as during business trips, business meetings and business-related social events.

Chatham County prohibits all forms of harassment of employees by managers, co-workers, employees of outside vendors, customers, or visitors. Chatham County will not tolerate harassment of its employees. Any form of harassment related to an employee's race, color, sex, sexual orientation, religion, national origin, age, physical or mental disability, or military/veteran status is a violation of this policy and will be treated as a disciplinary matter.

The term "harassment" includes, but is not necessarily limited to, slurs, jokes, or other verbal, graphic, or physical conduct related to an individual's race, color, sex, religion, national origin, sexual orientation, age, physical or mental disability, or military/veteran status.

SCJ 000218

Harassment also includes unwelcome sexual advances, requests for sexual favors, and other verbal, graphic, or physical conduct of a sexual nature.

Violation of this policy by an employee will subject him or her to disciplinary action, up to and including termination of employment.

Chatham County encourages reporting of all perceived incidents of discrimination or harassment. It is our policy to promptly and thoroughly investigate such reports. This policy also prohibits retaliation against any employee who rejects, protests, or complains about harassment or participates in a harassment investigation.

## Complaint Procedure

Individuals who believe they have been the victims of conduct prohibited by this policy statement or who believe they have witnessed such conduct should discuss their concerns with their immediate supervisor, Human Resources or any member of management.

When possible, individuals who believe they are being subjected to such conduct should promptly advise the offender that his or her behavior is unwelcome and request that it be discontinued. Often this action alone will resolve the problem. If the employee finds it difficult to do so or the first objections do not produce results, the employee should report the problem to his or her supervisor, or if appropriate, the Human Resources Department. If the target for reporting is the person who is harassing the employee, the employee may report the harassment to any management employee or to the Human Resources Department.

Chatham County encourages the prompt reporting of complaints or concerns so that rapid and constructive action can be taken.  Any reported allegations of harassment, discrimination or retaliation will be investigated promptly. The investigation may include individual interviews with the parties involved, and where necessary, with individuals who may have observed the alleged conduct or may have other relevant knowledge.

Confidentiality will be maintained throughout the investigatory process to the extent consistent with adequate investigation and appropriate corrective action.

Retaliation against an individual for reporting harassment or discrimination or for participating in an investigation of a claim of harassment or discrimination is a serious violation of this policy, and like harassment or discrimination itself, will be subject to disciplinary action. Acts of retaliation should be reported immediately and will be promptly investigated and addressed.

SCJ 000219

Misconduct constituting harassment, discrimination or retaliation will be dealt with appropriately.

False and malicious complaints of harassment, discrimination or retaliation may be the subject of appropriate disciplinary action.

# V. GRIEVANCE PROCEDURE

**A.  Purpose**

It is the purpose of the Grievance Procedure to:

- Facilitate the airing and resolving of employee grievances fairly and swiftly;
- Promote a better understanding of policies, practices, and procedures affecting employees; and
- Improve employee/supervisor communications and relations.

**B.  Issues That May Be Grieved**

An employee may file a grievance related to:

1) Erroneous, arbitrary or capricious interpretation or application of policies, procedures, rules, regulations, ordinances or statutes that affect the employee,

2) Discipline issued to the employee that does not affect the employee's pay, including verbal warnings and written reprimands,

3) Unsafe or unhealthy working conditions.

The Grievance procedure may not be used to address:

1) Disciplinary actions that result in loss of pay, including suspension, demotion, or termination,

2) Allegations of unlawful discrimination or harassment,

3) Performance evaluations and merit increases,

SCJ 000220

4) Selection of an individual to fill a position, unless an allegation is made that the selection violates the Personnel Ordinance, or an applicable policy, law, or regulation.

5) Permanent changes in work hours or duties and responsibilities, unless a change is alleged to be unsafe or unlawful,

6) Budget and organizational structure, including the number or assignment of positions in any organizational unit.

7) Actions implementing a Reduction in Force or furlough plan.

8) Settlements of disputes with coworkers.

**C. Grievance Filing and Resolution**

**1. Step 1**
An employee desiring to file a grievance regarding a policy, procedure, or practice affecting his or her employment should first present the grievance in writing to the immediate supervisor within fifteen (15) working days after the cause for the grievance occurred or became known to the employee. The employee's immediate supervisor must respond in writing to the employee within five (5) complete working days after the receipt of the grievance. The employee will sign a copy of the determination to acknowledge receipt and date of the response. The supervisor should and is encouraged to consult with any employee or supervisor deemed necessary to reach a correct, impartial, and equitable determination concerning the grievance.

**2. Step 2**
If the grievance is not settled with the immediate supervisor, the employee may contact the next level manager within five (5) complete working days after receipt of the determination. Within five (5) complete working days, the manager will advise the employee in writing of the determination. The employee will sign a copy of the determination indicating receipt. If the employee refuses to sign, a witness will sign to acknowledge that the employee received the determination.

**3. Step 3**
If the grievance is not settled with the department manager, the employee may present the grievance to the Department Head or County Official. The employee may give written notice to the Department Head or County Official within five (5) complete working days after receipt of

SCJ 000221

the manager's determination.  Within five (5) complete working days, the Department Head or appropriate County Official will advise the employee in writing of the determination.  The determination by the Department Head or County Official is final.  The employee will sign a copy of the determination indicating receipt.  If the employee refuses to sign, a witness will sign to acknowledge that the employee received the determination.

If the manager at Step 2 of the grievance process is the Department Head or County Official, the Step 2 determination will be the final step.

Employees who are within the County Manager's chain of command may appeal a grievance decision by a Department Head to the County Manager within five (5) complete working days after receipt of the Department Head's determination.  Within five (5) complete working days of receiving the grievance, the County Manager will issue a determination in writing to the employee.  The determination of the County Manager is final.

# VI. WORKPLACE SAFETY AND CONDUCT

## A. Drug-Free Workplace

Chatham County has a longstanding commitment to provide a safe and productive work environment. Alcohol and drug abuse pose a threat to the health and safety of employees and to the security of our equipment and facilities. For these reasons, Chatham County is committed to the elimination of drug and/or alcohol use and abuse in the workplace.

This policy outlines the practice and procedure designed to correct instances of identified alcohol and/or drug use in the workplace. This policy applies to all employees and all applicants for employment. The Human Resources department is responsible for policy administration.

SCJ 000222

**Chatham County Government**                                    **Employee Handbook**

## 1. Employee Assistance

Illegal drug use and alcohol misuse have a number of adverse health and safety consequences. Chatham County will assist and support employees who voluntarily seek help for problems before becoming subject to discipline and/or termination under this or other policies. Such employees may be allowed to use accrued leave, placed on leaves of absence, referred to treatment providers and otherwise accommodated as required by law. Employees may be required to document that they are successfully following prescribed treatment and to take and pass follow-up tests if they hold jobs that are safety sensitive or that require driving or if they have violated this policy previously. The Human Resources Department can assist in referring employees to appropriate sources of assistance.

## 2. Fitness for Duty

Employees should report to work fit for duty and free of any adverse effects of illegal drugs or alcohol. This policy does not prohibit employees from the lawful use and possession of prescribed medications. Employees must consult with their medical provider about the medications' effect on their fitness for duty and ability to work safely.  Any work restrictions should be promptly disclosed to their supervisor. Employees should not disclose underlying medical conditions unless directed to do so.

## 3. Drug-Free Awareness

As a condition of employment, new employees will be required to sign a certification that they will not engage in the unlawful manufacture, distribution, dispensing, possession, or use of a controlled substance in the Chatham County workplace. All employees will be advised and educated about the requirements of the Drug Free Workplace Act of 1988, the Georgia Controlled Substances Act, and the responsibilities of each employee.

## 4. Drug and Alcohol Use

Chatham County prohibits all employees from manufacturing, distributing, dispensing, possessing or using an illegal drug or being under the influence of alcohol in or on County premises or while conducting County business. Employees are also prohibited from misusing legally prescribed or over-the-counter (OTC) drugs. Law enforcement personnel shall be notified, as appropriate, when criminal activity is suspected.

SCJ 000223

## 5. Work Rules

The following work rules apply to all employees:

- Whenever employees are working, are operating any County vehicle, are present on County premises, or are conducting related work off-site, they are prohibited from:
    - Using, possessing, buying, selling, manufacturing or dispensing an illegal drug (to include possession of drug paraphernalia).
    - Being under the influence of alcohol or an illegal drug as defined in this policy.

- The presence of any detectable amount of alcohol or any illegal drug or illegal controlled substance in an employee's body while performing County business or while in a County facility is prohibited.
- Chatham County will not permit any employee to perform his or her duties while taking prescribed drugs that are adversely affecting the employee's ability to safely and effectively perform their job duties. Employees taking a prescribed medication must carry it in the container labeled by a licensed pharmacist or be prepared to produce it if asked.

- Any illegal drugs or drug paraphernalia will be turned over to an appropriate law enforcement agency and may result in criminal prosecution.

## 6. Required Testing

The County retains the right to require the following tests:

- **Pre-employment:** All applicants must pass a drug test after receiving a conditional offer of employment and before beginning work. Refusal to submit to testing will result in disqualification of further employment consideration.

- **Reasonable suspicion:** Employees are subject to testing based on observations by a supervisor of apparent workplace use, possession or impairment. Human Resources must be consulted before sending an employee for reasonable suspicion testing.

- **Post-accident:** Employees are subject to testing when they are involved in an accident involving a County vehicle, machinery, equipment or property and/or result in an injury to themselves or another employee requiring off-site medical attention. In any of these instances, the investigation and subsequent testing must take place within two (2) hours following the accident, if not sooner.

SCJ 000224

- **Random:** Employees who possess a Commercial Driver's License (CDL) or who work in jobs that are deemed high risk or safety sensitive are subject to random drug testing. The Human Resources Department is responsible for administering the random drug testing program.

- **Follow-up**: Employees who have tested positive, or otherwise violated this policy, are subject to discipline up to and including discharge. Depending on the circumstances and the employee's work history/record, Chatham County may offer an employee who violates this policy or tests positive the opportunity to return to work on a last-chance basis pursuant to mutually agreeable terms, which could include follow-up drug testing at times and frequencies for a minimum of one (1) year but not more than two (2) years. If the employee either does not complete his/her rehabilitation program or tests positive after completing the rehabilitation program, he/she will be subject to immediate discharge from employment.

## 7. Consequences
Applicants who refuse to cooperate in a drug test or who test positive for illegal substances will not be hired. Employees who refuse to cooperate in required tests or who use, possess, buy, sell, manufacture or dispense an illegal drug or who test positive for alcohol or illegal drug use under this policy will be disciplined up to and including termination of employment.

## 8. Confidentiality
Information and records relating to positive test results, drug and alcohol dependencies and legitimate medical explanations provided to the Medical Review Officer (MRO) shall be kept confidential to the extent required by law and maintained in secure files separate from normal personnel files.

## 9. Inspections
Chatham County reserves the right to inspect all portions of its premises for drugs, alcohol or other contraband. All employees, contract employees and visitors may be asked to cooperate in inspections of their persons, work areas and property that might conceal a drug, alcohol or other contraband. Employees who possess such contraband or refuse to cooperate in such inspections are subject to appropriate discipline up to and including discharge.

## 10. Crimes Involving Drugs
Each employee shall notify the County Manager, County Official, or Human Resources Director within five days of any criminal drug statute conviction for a violation in the workplace.

SCJ 000225

# B. Safety

Chatham County is responsible for providing a safe workplace for its employees.  The County's Occupational Safety & Risk Management Department is responsible for establishing, implementing, and issuing guidelines, procedures, programs and practices related to creating and maintaining a safe work environment for employees.  All employees are required to adhere to the Safety Policy.  The Safety Policy applies to the operation of County vehicles.

It is the responsibility of each employee to conduct all tasks in a safe and efficient manner, complying with all federal, state and local safety and health regulations and program standards.  Employees who identify safety or health hazards or concerns in their work area, or believe that any aspect of their working conditions is unsafe or unhealthy, should notify their department management and/or the Director of Occupational Safety & Risk Management.

# C. Violence in the Workplace

All employees, customers, vendors and business associates must be treated with courtesy and respect at all times. Employees are expected to refrain from conduct that may be dangerous to others.

Conduct that threatens, intimidates or coerces another employee, customer, vendor or business associate will not be tolerated. Chatham County resources may not be used to threaten, stalk or harass anyone at the workplace or outside the workplace.

Indirect or direct threats of violence, incidents of actual violence and suspicious individuals or activities should be reported as soon as possible to a supervisor, security personnel, Human Resources, or any member of management. When reporting a threat or incident of violence, the employee should be as specific and detailed as possible. Employees should not place themselves in peril, nor should they attempt to intercede during an incident.

Employees must promptly inform the Human Resources Department of any protective or restraining order that they have obtained that lists the workplace as a protected area.

Employees are encouraged to report safety concerns with regard to domestic situations that may impact the workplace.

Chatham County encourages employees to bring their disputes to the attention of their supervisors or Human Resources before the situation escalates. Chatham County will promptly

SCJ 000226

and thoroughly investigate all reports of threats of violence or incidents of actual violence and of suspicious individuals or activities in the workplace. The identity of the individual making a report will be protected as much as possible. Chatham County will not retaliate against employees making good-faith reports of violence, threats or suspicious individuals or activities. In order to maintain workplace safety and the integrity of its investigation, Chatham County may suspend employees suspected of workplace violence or threats of violence, either with or without pay, pending investigation.

Anyone found to be responsible for threats of or actual violence or other conduct that is in violation of these guidelines will be subject to prompt disciplinary action, up to and including termination of employment.

# D. Weapons in the Workplace

To ensure that Chatham County maintains a workplace safe and free of violence for all employees, the County prohibits the possession or use of dangerous weapons on County property.

All County employees are subject to this provision, including contract workers and temporary employees, as well as visitors and customers on County property. A license to carry the weapon on County property does not supersede County policy. Any employee in violation of this policy will be subject to disciplinary action, up to and including termination.

"County property" is defined as all County-owned or leased buildings and surrounding areas such as sidewalks, walkways, driveways and parking lots under the County's ownership or control. This policy applies to all County-owned or leased vehicles and all vehicles that come onto County property.  This policy does not apply to licensed firearms in an employee's personal vehicle while parked on County property.

"Dangerous weapons" include firearms, explosives, knives and other weapons that might be considered dangerous or that could cause harm. Employees are responsible for making sure that any item possessed by the employee is not prohibited by this policy.

This policy does not apply to employees or other individuals who are authorized and required to possess and carry firearms or other weapons as part of their job responsibilities.  This includes POST certified Peace Officers, Police, Sheriff's Deputies, Criminal Investigators, security guards employed by the County, Probation Officers, and specially deputized citizens or employees of the County.

SCJ 000227

Chatham County reserves the right at any time and at its discretion to search all County-owned or leased vehicles and all vehicles, plus packages, containers, briefcases, purses, lockers, desks, enclosures and persons entering its property, for the purpose of determining whether any weapon is being, or has been, brought onto its property or premises in violation of this policy.

## E. Smoke-Free Workplace

Smoking is not allowed at any time in Chatham County buildings and facilities, including owned and leased facilities, except in designated outside smoking areas. Designated smoking areas must not be within 25 feet of a building entrance. Persons using these designated smoking areas are expected to dispose of any smoking debris safely and properly. Smoking is also prohibited in Chatham County owned or leased vehicles and equipment.

"Smoking" includes the use of any tobacco products, electronic smoking devices, e-cigarettes, and any other similar devices or product.

This policy applies to all employees, volunteers, contractors and visitors who use office areas, meeting rooms and other public locations in Chatham County buildings, facilities and County-owned and leased vehicles.

Employees found in violation of this policy will be disciplined, up to and including termination of employment.

# VII. WORKPLACE EXPECTATIONS

## A. Attendance and Punctuality

Regular attendance at work is essential to the effectiveness and efficiency of County operations. Employees are expected to come to work as scheduled and to be on time, and adhere to departmental procedures regarding attendance.

If an employee must be absent or late for work, the employee is responsible for notifying the supervisor prior to the absence or tardiness. Unauthorized and unreported absences may result in appropriate disciplinary action.

An employee who is absent without notification and authorization for three consecutive days may be considered to have resigned from employment. In such cases, the employee may be terminated.

SCJ 000228

## B. Workplace Attire/Uniforms

Each Department Head and County Official is responsible for setting standards and guidelines about appropriate workplace attire or uniforms for employees in consideration of the type of work performed, working conditions, interaction with the public, and other appropriate factors. It is important for all employees to project a professional image while at work by being appropriately attired.  All employees are expected to be neat, clean and well-groomed while on the job. Clothing should be clean and free from holes, tears, and stains.  Clothing must be consistent with the standards for a business environment and must be appropriate to the type of work being performed.

Any employee who is improperly dressed may be counseled and/or required to change into appropriate workplace attire. Continued disregard of this policy may be cause for disciplinary action, up to and including termination.

## C. Outside/Dual Employment

Employees are permitted to engage in outside work or to hold other jobs, subject to certain restrictions as outlined below.

All outside employment for salaries, wages, or commission and all self-employment must be reported to the employee's supervisor. The appropriate Department Head or County Official will review such employment to determine the County's liability for conflict of interest. Secondary employment by another County department is prohibited. This policy does not apply to County employees receiving training for and serving as Poll Workers on an election day.

Activities and conduct away from the job must not compete with, conflict with or compromise the County's interests or adversely affect job performance and the ability to fulfill all job responsibilities. Employees are prohibited from performing any services for citizens on nonworking time that are normally performed for citizens by the County. This policy also extends to the unauthorized use of any County tools or equipment and the unauthorized use or application of any confidential information. In addition, employees are not to solicit or conduct any outside business during paid working time.

Employees are cautioned to carefully consider the demands that additional work activity will create before accepting outside employment. Outside employment will not be considered an excuse for poor job performance, absenteeism, tardiness, leaving early, refusal to travel or

SCJ 000229

refusal to work overtime or different hours. If the employee's manager determines that an employee's outside work interferes with performance, the employee may be asked to terminate the outside employment.

Employees who have accepted outside employment may not use paid sick leave to work on the outside job. Fraudulent use of sick leave will result in disciplinary action up to and including termination.

Sworn personnel in the Police Department, Sheriff's Office, CNT, the District Attorney's Office and Marine Patrol are governed by the Secondary Employment Policy contained in their respective Standard Operating Procedures (SOP).

## D.  Confidentiality

Our constituents and other parties with whom we do business entrust the County with important information relating to their issues and concerns. It is our policy that all information considered confidential will not be disclosed to external parties or to employees without a "need to know." If an employee questions whether certain information is considered confidential, he or she should first check with his or her immediate supervisor.

This policy is intended to alert employees to the need for discretion at all times and is not intended to inhibit normal business communications.  Most County business records are subject to the Georgia Open Records Act, and requests for records subject to the Act should be submitted to the appropriate official in accordance with the provisions of the Act.

## E.  Conflicts of Interest

Employees must avoid any relationship or activity that might impair, or even appear to impair, their ability to make objective and fair decisions when performing their jobs. At times, an employee may be faced with situations in which business actions taken on behalf of the County may conflict with the employee's own personal interests. County property, information or business opportunities may not be used for personal gain.

Employees with a conflict-of-interest question should seek advice from their appropriate management staff. Before engaging in any activity, transaction or relationship that might give rise to a conflict of interest, employees must seek review from their Department Head or County Official.

SCJ 000230

# F. Gifts and Gratuities

An employee or County Official is expressly prohibited from accepting any gift, favor, or thing of more than nominal value that may tend to influence the discharge of duties. Nominal value means less than $100.

An official or employee of the County shall not grant to anyone any improper favor, service, or thing of value in the discharge of official duties.

These limitations are not intended to prohibit the acceptance of articles of negligible value which are distributed generally, nor to prohibit employees from accepting social courtesies which promote good public relations, nor to prohibit employees from obtaining loans from regular lending institutions.

# G. Political Activity

All employees are free to engage in political activity to the widest extent consistent with the restrictions imposed by law.  An employee may participate in all political activity not specifically restricted by law, including candidacy for office in nonpartisan elections and candidacy for political party office.  However, no employee shall:

1.  use official authority or influence for the purpose of interfering with or affecting the result of an election or a nomination for office;

2.  use official authority or influence in the conduct of their employment responsibilities with the County;

3.  directly or indirectly coerce, attempt to command or advise any other employee of the governmental unit to pay, lend or contribute anything of value to a political party, committee, organization, agency or person for political purposes;

4.  be a candidate for elective public office in a partisan election while on active pay status (except an incumbent candidate for the office of Tax Commissioner, Clerk of Superior Court, Judge, Coroner, Sheriff or District Attorney).

5.  be required as a duty of office or as a condition of County employment, promotion, or tenure of office, to contribute funds for political or partisan purposes or participate in political activities;

29

SCJ 000231

6.   post, or cause to be posted, signs, notices, or other materials related to any national, state or local political party or candidate, in or on property owned, leased, or used by the County in the conduct of its official business;

7.   wear or display badges, buttons, or other emblems related to a national, state, or local political party or candidate while on duty or during the performance of services for the county; or

8.   use any resources, assets, time, supplies or equipment of the County for political purposes.

An employee, regardless of employment status, shall give written notice of candidacy for partisan elective office, or appointment to a vacancy in a partisan elective office on or before the filing deadline or acceptance of partisan appointment.

Except for incumbent candidates for the office of Tax Commissioner, Clerk of Superior Court, Coroner, Judge, Sheriff, or District Attorney, an employee who files for an elective partisan office shall be placed on leave without pay effective the following workday. If elected or appointed to partisan office, the employee shall resign from employment with the County before the start of the term of office.

In the event that placing an employee on leave without pay conflicts with federal law, such leave shall not be granted. In order to seek office, the employee would need to resign. The County shall make the determination at the time the employee requests the leave.

Any violation of this section shall be deemed improper conduct and the employee shall be subject to disciplinary action or dismissal by the appointing authority.

SCJ 000232

# H.  Electronic Communication and Internet Use

The Information and Communication Services (ICS) Department has adopted an Acceptable Use Policy that governs the use of computer equipment at Chatham County.  The Acceptable Use Policy is incorporated into this Employee Handbook by reference, and all employees are expected to adhere to the provisions in that Policy.  A complete copy of the Acceptable Use Policy may be found on the ICS Home Page on the Intranet, by requesting a copy from your supervisor, or by contacting the ICS Help Desk at 652-7343 or HelpDesk@chathamcounty.org.

# I.  Social Media Acceptable Use

Chatham County encourages employees to share information with co-workers and with those outside County Government for the purposes of gathering information, generating new ideas, and learning from the work of others. Social media provide inexpensive, informal, and timely ways to participate in an exchange of ideas and information. However, because information posted on a website is available to the public, the County has established the following guidelines for employee participation in social media.

*Note:* As used in this policy, "social media" refers to websites and applications that enable users to create and share content or to participate in social networking, including blogs, forums, and social networking sites, such as Twitter, Facebook, LinkedIn, YouTube, Snapchat, Instagram, among others.

1.      **Off-duty use of social media.** Employees may maintain personal websites or web logs on their own time using their own facilities. Employees must ensure that social media activity does not interfere with their work. In general, the County considers social media activities to be personal endeavors, and employees may use them to express their thoughts or promote their ideas.

Employees may not post confidential or sensitive information about the County. Employees may not post obscenities, slurs or personal attacks that can damage the reputation of the County or County employees.

If an employee identifies himself or herself as a Chatham County employee or discusses matters related to the County on a social media site, the site must include a disclaimer on the front page stating that it does not express the views of Chatham County and that the employee is expressing only his or her personal views. For example: "The views expressed on this website/Web log are mine alone and do not necessarily reflect the views of Chatham County

SCJ 000233

Government." Place the disclaimer in a prominent position and repeat it for each posting expressing an opinion related to Chatham County or Chatham County's business.

Employees must keep in mind that if they post information on a social media site that is in violation of County policy and/or federal, state, or local law, the disclaimer will not shield them from disciplinary action.

**2.** **On-duty use of social media.** Employees may engage in social media activity during work time provided it is directly related to their work, approved by their manager, and does not identify or reference citizens, customers, or vendors without express permission. The County monitors employee use of County computers and the Internet, including employee blogging and social networking activity.

# VIII. WORK HOURS AND COMPENSATION

## A. Work Week and Work Period

The County's standard work week is from 12:01 a.m. Saturday until 12:00 midnight the following Friday, a time span of seven (7) consecutive twenty-four (24) hour periods (168 hours). The County Manager or appropriate County official may designate a different work week for a department, division, or unit. Such designation must be communicated in advance in writing to affected employees. The work week is used to calculate overtime or compensatory time eligibility for non-exempt employees.

In accordance with Fair Labor Standards Act regulations, designated sworn law enforcement personnel may work a standard work period of 14 consecutive days. This work period is used to calculate overtime or compensatory time eligibility for non-exempt law enforcement employees.

The core work hours for County administrative offices are 8:00 a.m. until 5:00 p.m., Monday through Friday, and all County offices are expected to be open to the public during those hours. However, core work hours and work schedules for law enforcement, emergency management, public works, animal services, parks and recreation services and other services with non-standard hours of operation will be established by the respective Department Head and approved by the County Manager or appropriate County Official.

When the activities of a particular department require a different schedule to meet work needs, the Department Head or appropriate County Official may authorize a deviation from the normal

SCJ 000234

work schedule.

## B.  Meal and Break Periods

Employee meal periods are important to productivity and employee health.  Departments have discretion to schedule the time and length of meal periods; however, a meal period must be at least 30 minutes.  The meal period will not be included in the total hours of work per day and is not compensable.  Non-exempt employees must be completely relieved of all job duties while on meal breaks.

When the workload permits, non-exempt employees may be allowed two fifteen (15) minute break periods during a regular eight-hour work schedule: the first at mid-morning and the second at mid-afternoon.  The employee's supervisor will schedule break periods according to the needs of the department.  An employee cannot elect to use a break period to extend a lunch hour or to shorten the workday.  Break periods cannot be used as "leave" or to offset absences during scheduled work time.  Break periods are considered as "hours worked" when completing the employee time reports.  Break periods are discretionary and require the supervisor's approval.

## C.  Attendance Records

Each employee is responsible for keeping an accurate record of hours worked and for submitting accurate time records to their supervisor or manager on a biweekly basis.

Departments are responsible for maintaining time records on each employee and for properly recording and submitting any required time and attendance reports to Payroll for processing.  The Fair Labor Standard Act requires employers to maintain records on the work hours of employees for a period of three years.

## D.  Payment of Wages

Employees are paid on a bi-weekly basis, except that certain County Officials are paid on a monthly basis as provided by law.  If the normal payday falls on a County holiday, the payday will be the day before the holiday.  No salary advances will be made.

SCJ 000235

# E. Classification and Pay Plan and Compensation Administration

## 1.    The Classification and Pay Plan

Under the direction of the County Manager, the Human Resources Director will be responsible for maintaining the County's Classification and Pay Plan. The Classification and Pay Plan consists of a series of pay grades with each pay grade having a minimum and maximum salary range. Each job classification is assigned to a pay grade on the Plan.   The Classification and Pay Plan also includes separate Modular Pay Plans that establish the salary ranges for certain job classifications that are not included on the general Pay Plan. All employees covered by the Pay Plan shall be paid at a rate within the established salary range. An employee's salary may not exceed the maximum of the pay range.

Revisions to the Classification and Pay Plan, including any Modular Pay Plan, may be made by the County Manager. Increases in salary ranges on any pay plan must be approved by the Board of Commissioners. Creation of new positions and the abolishment of existing positions require approval by the Board of Commissioners.

Human Resources is also responsible for salary administration of jobs in the unclassified service. These positions are appointed by the Board of Commissioners, the County Manager, an elected official, or others duly authorized to appoint positions.  The salaries of employees in the unclassified service are not on the Classification and Pay Plan and are set by the appointing authority.

## 2.    Compensation Administration

a.    Salary upon Hire:  Newly hired employees will be appointed at the minimum salary or hourly rate of the pay range established for the job classification. Job candidates who possess exceptional educational or experience qualifications may be appointed at a salary up to 10% above the range minimum at the discretion of the Department Head or County Official.  Starting salaries above 10% of the range minimum require the approval of the Human Resources Director. A higher initial salary may also be authorized by the Human Resources Director to recruit and hire candidates in hard-to-fill positions or when market considerations and competition warrant a higher salary.

b.    Salary upon Promotion:  An employee promoted to a position in a job class having a higher pay grade and pay range may receive an increase of 10% above the current salary or an increase to the minimum of the new salary range, whichever is greater.  In exceptional cases, upon approval of the Human Resources Director, a greater increase may be awarded.  In no case may the salary exceed the maximum of the pay range.

SCJ 000236

c.   Salary upon Demotion: An employee who voluntarily chooses to accept a position on a lower pay grade and lower salary range may receive a salary reduction. The amount of the reduction will be determined by the Department Head or appropriate County Official, in consultation with the Human Resources Director, and will take into consideration the employee's salary history. The salary reduction must not exceed 10% of the employee's salary or the maximum of the range of the lower paygrade.

An employee who receives a disciplinary demotion will receive a salary reduction of 10%. If a 10% reduction would place the employee's salary above the maximum of the range of the new pay grade, the employee's salary will be reduced to the maximum of the new pay range. In no case will the salary be reduced below the pay range minimum.

d.   Salary of Reclassified Employees: An employee whose position is reclassified to a job class on a higher pay grade and pay range will receive an increase of 5% or an increase to the minimum of the new salary range, whichever is greater. If the Human Resources Director determines that a filled position should be reclassified to a job class on a lower pay grade, the position will not be reclassified until the incumbent vacates the position. The misclassified position will be "red flagged" and cannot be filled with another incumbent until the position is reclassified to the appropriate pay grade. The incumbent employee will be grandfathered to the job classification's current minimum and maximum salary range until the employee vacates the position. Once the position is vacated, it will be reclassified to the appropriate pay grade before it can be filled with a new incumbent.

e.   Salary upon Lateral Transfer: An employee who transfers to a position in the same job class or to a position in a different job class on the same pay grade or with a comparable pay range will not be entitled to a salary increase.

f.   Salary of an Employee in an Acting Position: The salary paid to an employee selected to serve in an acting or interim position will be adjusted to the minimum salary of the new pay grade and pay range or a 10% increase above the current salary, whichever is greater. The salary increase will become effective on the first day of the appointment. If the employee is subsequently selected for regular appointment to the position, the employee will not receive an additional salary adjustment. If the employee is not selected for regular appointment to the position and returns to the previous position, the employee's salary will be reduced to the rate held prior to the acting appointment, plus any merit pay or pay range adjustments that may have occurred during the acting status.

SCJ 000237

Chatham County Government                                    Employee Handbook

g.   Salary of an Employee Temporarily Performing Duties of a Higher Classification:  The salary of an employee who has been assigned to perform the primary job duties of a position in a higher paygrade will be adjusted by 5% above the employee's salary or hourly rate.  This provision does not apply to the occasional assignment to perform isolated job duties of other employees or to assist with the work of employees on higher pay grades.  At the end of the temporary assignment, the employee's pay will be adjusted back to the prior level.

## F. Overtime and Compensatory Time

Under the direction of the County Manager, the Human Resources Director will be responsible for determining the proper exempt status of employees under the Fair Labor Standards Act (FLSA), and for reporting the exempt status to the appropriate Department Head or County Official.

Non-exempt employees will be entitled to overtime or compensatory time at a rate of one and one-half times their regular rate of pay for all hours worked over 40 in a workweek.  Non-exempt law enforcement personnel will be entitled to overtime or compensatory time for all hours worked over 86 in a 14-day work period.  Employees may accumulate a maximum of 240 hours of compensatory time; however, non-exempt law enforcement personnel may accumulate a maximum of 480 hours of compensatory time.

It is within the Department Head's or County Official's discretion to grant compensatory time in lieu of paid overtime.

Exempt employees are not to be paid overtime or accrue compensatory time as a matter of course.  However, the Department Head or County Official may grant exempt employees straight time compensatory time for hours worked over 40 in a workweek (or over 86 hours in a 14-day work period for law enforcement personnel) for extraordinary assignments or events causing unusual work hours in excess of four hours worked over the regular 80 or 86 hours in a pay period.  Exempt employees may not carry an accrual balance of more than 80 hours of compensatory time.

Employees must use accrued compensatory time before using accrued vacation leave.  Non-exempt employees will be paid for any accrued, unused compensatory time upon separation from employment.  Exempt employees will not be paid for unused compensatory time.

SCJ 000238

# G. Deductions from Pay/Safe Harbor

Chatham County will not make improper deductions from the salaries of exempt employees and complies with the salary basis requirements of the Fair Labor Standards Act (FLSA). Employees classified as exempt from the overtime pay requirements of the FLSA will be notified of this classification at the time of hire or change in position.

**Permitted deductions.** The FLSA limits the types of deductions that may be made from the pay of an exempt employee.  Deductions that are permitted include:

- Deductions that are required or permitted by law, e.g., income taxes;
- Deductions for employee benefits when authorized by the employee;
- Absence from work for one or more full days for personal reasons other than sickness or disability;
- Absence from work for one or more full days due to sickness or disability if the deduction is made in accordance with a bona fide plan, policy or practice of providing compensation for salary lost due to illness;
- Unpaid leave under the Family and Medical Leave Act (FMLA);
- Pay during the initial and terminal weeks of employment;
- Offset for amounts received as witness or jury fees, or for military pay; or
- Unpaid disciplinary suspensions of one or more full days imposed in good faith for workplace conduct rule infractions.

During the week an exempt employee begins employment with the County or during the last week of employment, the employee may be paid for actual hours worked.

**Improper deductions.** If an employee classified as exempt believes that an improper deduction has been taken from his or her pay, the employee should immediately report the deduction to the Human Resources Department. The report will be promptly investigated and if it is found that an improper deduction has been made, the County will reimburse the employee for the improper deduction.

SCJ 000239

# H. Disaster Compensation Policy

Chatham County has adopted a policy regarding compensation for exempt and non-exempt employees during periods of locally declared emergencies.  A copy of the Disaster Compensation Policy may be found on the Human Resources Intranet, or by contacting Human Resources at (912) 652-7964.

# I. Performance Appraisals and Merit Pay Increases

## 1. Performance Appraisal Process

a.      The purpose of the Employee Performance Appraisal Program is to create a formal mechanism for dialog between managers and employees regarding performance and work issues; to provide a consistent, fair, and uniform approach to reviewing and rating the work performed by employees; and to recognize and reward high achievement.

b.      The employee performance appraisal program is one aspect of a comprehensive performance management system.  Performance management is an annual cycle that begins with setting performance goals and expectations, continues with monitoring and documenting performance, and culminates with planning and conducting the performance appraisal.

c.      Performance appraisals must be conducted at least annually and may be conducted on a more frequent basis.  Annual performance appraisals will be conducted using a common anniversary date established by the County Manager. Managers are encouraged to conduct performance appraisals during and at the end of an employee's probationary period, when employees are placed on a performance improvement plan, or at any time that an evaluation is needed to assist the employee with achieving goals and improving performance.

## 2. Merit Pay Increases

Funds to grant merit pay increases are subject to the budgetary authority of the Board of Commissioners.

a.      <u>Eligibility for a Merit Increase</u>
Regular full-time and regular part-time employees will be eligible to receive a merit increase.  Employees who have completed their initial six month probationary period by

SCJ 000240

the end of the established evaluation period will be eligible for a merit increase. Employees who serve an initial 12-month probationary period are eligible for a merit increase if they have been employed six months at the end of the established evaluation period. Employees serving a probationary period following promotion, transfer, or demotion to a position in the same or different department will be eligible to be considered for a merit increase. Employees must receive an overall rating on their performance evaluation of Meets Job Requirements or above to be eligible for a merit increase.

b.  Merit Increase Awards
The amount or percentage of a pay increase awarded to an individual employee shall be based on the employee's performance as reflected in the overall rating on the Performance Appraisal instrument.

c.  Salary Range Maximum
When an employee reaches the maximum rate of the salary range for his or her position, no further adjustments may be made to the employee's base salary unless (1) the position is reclassified to a higher pay range; (2) the employee is promoted to a position with a higher pay grade and range, or (3) the pay grade and range for the position is increased. If a merit increase would result in the employee's base salary exceeding the pay range maximum, the amount of the merit pay increase above the range maximum will be paid as a one-time lump sum payment. The lump-sum payment will not be used to increase the employee's base pay but will be used in any calculation under the County's retirement plan.

## J. Longevity Pay

Full-time and part-time regular employees and non-elected County Officials (except Juvenile Court Judges and the County Attorney), who regularly work at least 20 hours per week and who have completed at least five years of continuous County service are eligible to receive longevity pay. Longevity pay is awarded annually as a one-time lump sum payment. Longevity pay is not considered part of an employee's base pay for purposes of retirement calculations or leave payout.

SCJ 000241

**Chatham  County Government**                                        **Employee Handbook**

Longevity pay is awarded based on the following years of service:

| | |
|---|---|
| 5 to 9 years | $500 |
| 10 to 14 years | $600 |
| 15 to 19 years | $700 |
| 20 years and over | $800 |

Employees must be in active employment status on the date that longevity pay is issued.  An employee who is entitled to longevity pay and is on approved leave without pay when longevity pay is issued will receive their longevity pay upon return to active pay status.

SCJ 000242

# IX. TIME OFF AND LEAVES OF ABSENCE

## A. Holiday Pay

The Board of Commissioners approves a holiday schedule annually.  The approved holiday schedule will be published annually to departments and made available to the public.

If a holiday falls on a weekend, the holiday will be observed on the preceding Friday or following Monday.

Full-time regular, part-time regular, seasonal employees, and non-elected County Officials will receive regular compensation for a holiday.  Part-time regular employees are eligible for holiday pay if the holiday falls on a regularly scheduled work day.  Seasonal employees are eligible for holiday pay only for holidays that are observed during their seasonal period of employment. Temporary employees are not eligible for holiday pay.

Employees who are required to work on a holiday will receive compensation at their regular rate of pay for the time worked on the holiday in addition to receiving the holiday pay.  Holiday time may not be accrued.

An employee's absence for approved annual or sick leave that occurs on a holiday will not be charged as annual or sick leave for such days off.

## B. Vacation

All full-time regular and part-time regular employees and non-elected County Officials (except Juvenile Court judges and the County Attorney) are eligible to accrue vacation leave.  Vacation leave accrual rates for employees working a standard 80-hour bi-weekly pay period are as follows:

| | |
|---|---|
| Under 2 Years of Service | 8 hours per month = 12 days per year |
| 2 – 4 Years of Service | 10 hours per month = 15 days per year |
| 5 – 9 Years of Service | 12 hours per month = 18 days per year |
| 10 – 14 Years of Service | 13 hours per month = 19.5 days per year |
| 15 – 19 Years of Service | 14 hours per month = 21 days per year |
| 20+ Years of Service | 16 hours per month = 24 days per year |

Regular employees who work less than an 80-hour pay period earn vacation leave on a

SCJ 000243

prorated basis based on the number of scheduled hours.  Vacation leave is earned during any pay period in which the employee is in active pay status at least 50% of their scheduled bi-weekly work hours. Employees may accumulate a maximum of sixty (60) days or 480 hours of vacation leave.

Use of vacation leave is a privilege, and must be requested and approved in advance by the appropriate department manager or supervisor. Vacation leave may be used for any purpose, and may be used by an employee in lieu of sick leave.  Employees may not take vacation leave in excess of the amount earned.   Leave without pay should not be routinely used as a substitute for paid vacation leave.  Any absence that is not approved is considered unauthorized and will subject the employee to disciplinary action.

Vacation leave will not be advanced before it is earned. Employees who separate from service with the County will be paid for unused, accrued vacation leave up to a maximum of sixty (60) days or 480 hours.

## C. Sick Leave

All regular full-time and regular part-time employees are eligible to accrue sick leave, except for elected County Officials, Juvenile Court Judges, and the County Attorney.

Eligible full-time employees who work a standard 80-hour bi-weekly pay period accrue sick leave at a rate of 10 hours per month (15 days per year). Eligible employees who work less than an 80-hour pay period earn sick leave on a prorated basis based on the number of scheduled hours.  Sick leave is earned during any pay period in which the employee is on active pay status at least 50% of their scheduled bi-weekly work hours.

Whenever possible, sick leave usage should be requested in advance and approved by the appropriate department manager or supervisor.  For unforeseen absences due to illness or injury, employees must inform their supervisor or manager at the beginning of the workday on the day of the illness or injury.

Sick leave may be used for an employee's personal illness, well-care, and medical and dental appointments.  Sick leave may also be used for illness of the employee's spouse, child, grandchild, grandparent, parent, or other member of the employee's immediate family living in the same household, or any dependent that the employee claimed on their most recent tax return.   Employees may use up to five days of sick leave in a calendar year for the illness of an immediate family member.  Employees may be required to provide appropriate documentation

SCJ 000244

to justify the usage of five days of sick leave for this purpose. Managers may approve or deny sick leave usage, subject to compliance with provisions of the Family and Medical Leave Act (FMLA) and the Americans with Disabilities Act (ADA).

The County may require a doctor's note concerning the nature of the illness and the employee's fitness for duty each time an employee uses more than three consecutive days of sick leave.  The employee's department management will be responsible for the application of this provision so that there will be no abuse of sick leave privileges.  If department management determines sick leave misuse or abuse is occurring, a doctor's note may be required for each instance of sick leave used.

Sick leave may not be advanced before it is earned.  Employees who are absent after exhausting their sick leave balance will be placed on leave without pay until additional sick leave is earned.  Leave without pay should not be routinely used as a substitute for paid sick leave.  Any absence that is not approved is considered unauthorized and will subject the employee to disciplinary action.

There is no maximum hours of accumulation of sick leave.  However, upon separation from County service, employees with at least three years of service may be paid for one-half of their accrued sick leave up to a maximum of 30 days (240 hours).

## D.  Family and Medical Leave (FMLA)

The Family and Medical Leave Act (FMLA) policy provides employees with a general description of their FMLA rights and responsibilities.  In the event of any conflict between this policy and applicable law, employees will be afforded all rights required by law.

### General Provisions

Chatham County will grant up to 12 weeks of unpaid, job-protected leave during a 12-month period to eligible employees for types of leave covered by the FMLA, or up to 26 weeks of unpaid leave during a 12-month period to care for a covered service member with a serious injury or illness.

SCJ 000245

1.  **Eligibility**

    An employee is entitled to family or medical leave under this policy if the employee meets all of the following conditions:

    a)  The employee must have been employed by Chatham County for a total of 12 months.  Twelve non-consecutive months of employment may be counted as long as the employee's break in service did not exceed seven years.

    b)  The employee must have worked at least 1,250 hours during the 12-month period immediately preceding the start date of the leave.  Time spent on paid or unpaid leave is not counted toward the 1,250 hours worked.

2.  **Types of Leave Covered**

    a)  An eligible employee may take a total of up to 12 weeks of unpaid leave:

        i.  For the birth of a child and to care for that child, up to one year after the child's birth;

        ii.  For the placement of a child with the employee for adoption or foster care and to care for the newly placed child;

        iii.  To care for a spouse, minor child, adult disabled child, or parent with a serious health condition. Certification from the medical provider of the employee's family member with a serious health condition is required for leave under this provision.

        iv.  For the serious health condition of the employee that makes the employee unable to perform the functions of the employee's position. Certification from the employee's medical provider is required to determine if the employee's health condition qualifies for leave under this provision.

        v.  For a "qualifying exigency" related to the call-up or active-duty deployment to a foreign country of the employee's spouse, son, daughter, or parent who is a military serviceperson (National Guard, Reserves, or regular component of the Armed Forces).  A qualifying exigency may be:

            1.  A short-notice deployment
            2.  Military events and activities
            3.  Child care and school activities
            4.  Financial and legal arrangements
            5.  Counseling
            6.  Rest and recuperation
            7.  Post-deployment activities
            8.  Additional activities that arise out of active duty provided that the employer and employee agree, including agreement on timing and duration of the leave.

SCJ 000246

b)   An eligible employee may take up to 26 weeks of unpaid military caregiver leave in a single 12-month period to care for a son, daughter, parent, or next of kin who is:

i) a member of the Armed Forces who is undergoing medical treatment, recuperation, or therapy, is otherwise in outpatient status or is otherwise on the temporary disability retired list, for a serious injury or illness; or

ii) A veteran who is undergoing medical treatment, recuperation, or therapy for a serious injury or illness and who was a member of the Armed Forces (including a member of the National Guard or Reserves) at any time during the period of five (5) years preceding the date on which the veteran undergoes that medical treatment, recuperation or therapy.

3.   **Definitions**

a)   Son or daughter is defined as the employee's biological, adopted, or foster child, stepchild, legal ward, or a child for whom the employee stood *in loco parentis*.

b)   Next of kin is defined as the closest blood relative of the injured or recovering service member.

c)   The term "serious injury or illness" means:
   i. In the case of a member of the Armed Forces (including a member of the National Guard or Reserves), an injury or illness that was incurred by the member in line of duty on active duty in the Armed Forces (or existed before the beginning of the member's active duty and was aggravated by service in line of duty on active duty in the Armed Forces) and that may render the member medically unfit to perform the duties of the member's office, grade, rank or rating; and
   ii. In the case of a veteran who was a member of the Armed Forces (including a member of the National Guard or Reserves) at any time during a period when the person was a covered service member, a qualifying injury or illness that was incurred by the member in the line of duty on active duty in the Armed Forces (or existed before the beginning of the member's active duty and was aggravated by service in line of duty on active duty in the Armed Forces) and that manifested itself before or after the member became a veteran.

4.   **Use of Paid Leave**
Generally, family or medical leave under the FMLA is unpaid leave.  An employee on FMLA leave will be required to use appropriate paid leave, including donated leave,

SCJ 000247

prior to being eligible for unpaid leave. All leave that qualifies for FMLA leave will be designated as such and will count toward the employee's 12-week or 26-week entitlement. Disability leave for the birth of a child and workers' compensation leave will be designated as FMLA leave and will run concurrently with FMLA.

5.   **Intermittent Leave or Reduced Work Schedule**
An employee may take FMLA leave in 12 consecutive weeks, may use the leave intermittently (take leave in separate blocks of time for a single illness or injury) or, under certain circumstances, may use the leave to reduce the workweek or workday, resulting in a reduced hour schedule. In all cases, the leave may not exceed a total of 12 workweeks (or 26 workweeks for military caregiver leave) over a 12-month period.

An employee may be temporarily transferred to an available alternative position with equivalent pay and benefits if the alternative position would better accommodate the intermittent or reduced schedule, in instances when leave for the employee or employee's family member is foreseeable and for planned medical treatment, including recovery from a serious health condition or to care for a child after birth or placement for adoption or foster care.

6.   **Calculation of Leave**

a)   An eligible employee may take up to 12 weeks for the FMLA circumstances described above during a 12-month period. The 12-month period is calculated as a rolling 12-month period measured backward from the date an employee uses any leave under this policy. Each time an employee takes leave, the amount of leave the employee has taken under this policy in the last 12 months is computed and subtracted from the 12 weeks of available leave and the balance remaining is the amount the employee is entitled to take at that time.

b)   An eligible employee may take up to 26 weeks of military caregiver leave during a single 12-month period. The single 12-month period is calculated from the first date the employee begins the leave and ends 12 months after that date. Any unused military caregiver leave not used during the single 12-month period is forfeited. FMLA leave taken for other FMLA circumstances will be deducted from the total of 26 weeks of leave.

c)   If both of the child's parents work for Chatham County and each wishes to take leave for the birth of a child, adoption or placement of a child in foster care, or to care for a child with a serious health condition, each parent may only take a combined total of 12 weeks leave. If spouses both work for Chatham County and each wishes to take leave to care for a covered injured or ill service

SCJ 000248

member, the spouses may only take a combined total of 26 weeks of leave.

**7.    Employee Status and Benefits During Leave**

Employees' health insurance benefits continue during periods of FMLA leave.  Employees who are on paid leave will continue to have their premium(s) deducted from their paycheck. Employees on unpaid leave are responsible for making timely premium payments to avoid an interruption in health insurance coverage.  Contact the Human Resources Department for information and instructions regarding premium payments during periods of unpaid leave.

**8.    Employee Status After Leave**

An employee who takes leave for his or her own serious health condition may be asked to provide certification from a health care provider stating that the employee is fit to perform his or her job duties before returning to work.

An employee who takes FMLA leave will be reinstated to the same position or a position with equivalent status, pay, benefits and other employment terms upon return to work.

Employees who fail to return to work at the conclusion of the 12-week or 26-week entitlement, whichever applies, may be terminated from employment, subject to the provisions of the Americans with Disabilities Act or other applicable laws, rules, and regulations.

# E. Funeral Leave

All non-elected full-time regular and part-time regular employees may use up to three consecutive scheduled work days of Funeral Leave for the death of an immediate family member.  For purposes of this policy, immediate family member is defined as the employee's spouse, parents, siblings, children (including step children), mother-in-law, father-in-law, son-in-law, daughter-in-law, and grandparents, and any other relative who is a member of the employee's household.  An employee who wishes to take time off due to the death of an immediate family member should notify his or her supervisor immediately.

Funeral Leave in excess of the allowed three days may be taken from vacation leave. Employees may use vacation leave for absences related to the death of family members not included in this policy.

SCJ 000249

## F. Jury Duty Leave

All employees, including temporary and seasonal employees and County Officials, are eligible for jury duty leave with pay during regularly scheduled work hours.

Upon receipt of notification from a court of an obligation to serve on a jury, employees must notify their supervisor and provide the supervisor with a copy of the jury summons. An employee called for jury duty will be paid for regularly scheduled work time, and any fees received from the court for this duty shall be remitted to the County. If an employee is released from jury service during the work day, the employee will report to work for the remainder of the work day.

## G. Voting Leave

Employees are encouraged to exercise their right to vote. To the extent possible, employees should take advantage of opportunities to vote during the early voting period of elections. Employees who choose to vote on Election Day should be able to vote either before or after regular work hours. However, when this is not possible due to work schedules, managers and supervisors may allow employees up to two hours during the work day to vote. Managers and supervisors may exercise discretion in determining the best time of day to grant voting leave to accommodate staffing, scheduling, and workloads. Voting time should be charged to annual leave or be taken as unpaid leave.

## H. Blood Donation Leave

All employees who earn leave accruals will be awarded two hours of annual leave each time the employee makes a donation of whole blood. A maximum of 14 hours of annual leave may be awarded in a 12-month period. The leave accruals will be reported by the Department to Human Resources and added to the employee's official annual leave balance.

## I. Military Leave

Chatham County supports the military obligations of all employees and grants leaves for uniformed service in accordance with applicable federal and state laws.

An employee who receives orders for active military duty shall be entitled to a leave of absence with pay for the period of such ordered military duty, and while going to and returning from such duty, not to exceed 30 calendar days in a calendar year.

SCJ 000250

In the event the Governor declares an emergency and orders any public officer or employee to ordered military duty as a member of the National Guard, employees will be paid their salary for a period not exceeding 30 calendar days in a calendar year.

Upon receiving military orders, an employee must immediately advise the employer. Unless precluded by military necessity, advance notice must be provided. Employees are encouraged to provide documentation of military duty prior to activation.

Upon re-employment, an employee will be required to present the County with a copy of the completion of military assignment orders that specify the dates/duration of ordered military service.

After an employee has exhausted paid military leave, the employee may use accumulated annual leave or be placed on military leave without pay.

Employees are also entitled to a leave of absence as a member of the organized militia, any reserve force, or reserve component of the armed forces of the United States while in attendance as a member of such force or reserve component at any service school(s) for a period up to and including six months.

Time away during such leaves of absence will not constitute an interruption in the employee's longevity or service with Chatham County.  Employees' participation in any benefits in which they are enrolled, and participation in the County's Pension Plan will continue during periods of military leaves of absence.  If the military leave is without pay, employees will be required to make appropriate contributions to the benefits and Pension Plan in accordance with Federal and/or State law.

Employees on a military leave of absence will be reinstated to the same or equivalent position consistent with the provisions of the Uniformed Services Employment and Reemployment Rights Act (USERRA).

SCJ 000251

## J. Donated Leave

Non-probationary regular employees may receive donations into their sick leave bank from other employees in the event of the employee's illness, injury, or temporary disability, or to care for a seriously ill member of the employee's immediate family or household.  The leave donation program does not cover time off due to an illness or injury covered by Workers' Compensation.

### 1. Eligibility to Receive Donated Leave

Any employee requesting participation in the leave donation program must have:

a) Completed twelve consecutive months of employment.

b) Absences due to an illness, injury, or temporary disability or to care for a seriously ill member of the employee's immediate family or household.

c) Exhausted all sick, vacation, compensatory leave.

d)  Medical documentation that includes the diagnosis, prognosis, and expected return to work date (medical documentation must be provided at the time donations are requested and at any time thereafter as required).

e)  No counseling statements, disciplinary action, or unsatisfactory performance evaluations related to attendance in the twelve months prior to requesting the donation of leave.

### 2. Procedures for Requesting Donated Leave

An employee who meets the above requirements may request donated leave by submitting the request in writing to the appropriate department official.  The request must be made prior to the exhaustion of paid leave. The employee should sign a release of information form authorizing the release of medical documentation from the attending physician to the Department Head or County Official.

The Department Head or County Official approves the request for donated leave, and submits a written request to the Human Resources Director. A copy of the employee's request and medical documentation must be included. This request must indicate whether donations will be solicited from within the department only or County-wide.  The Human Resources Director will

SCJ 000252

approve or disapprove the request based on the information submitted, or may request additional information.

The employee may continue to receive a paycheck as long as sufficient donated leave is received from fellow county employees. If an employee has exhausted all donations and is still unable to return to work, the employee will be placed in a leave without pay status. Once an employee is placed in a leave without pay status, no further donations will be considered.

Employees receiving donated leave may reduce the number of hours being used in each pay period to no less than 64. This enables the employee to extend the number of donated hours received over a longer period of time and also be able to continue benefits such as insurance, pension, etc. However, the hours reported to Payroll shall be consistent each pay period. While on donated leave, employees continue to earn sick and vacation leave. With each submittal of the payroll, any vacation balances will be used first, sick leave next, and donated leave last.

Employees may not request less than 80 hours of leave and no more than 480 hours of leave. Employees may not be granted more than 480 hours of donated leave.

**3. Procedures for Donating Leave**

Employees may donate, in full hour increments, a portion of their accrued balance of vacation leave.

An employee may elect to donate some portion of his or her accrued vacation leave to another employee under the following conditions:

a) Requests to donate vacation leave should be made in writing to the Human Resources Director.

b) Employees may not donate vacation leave in an amount that would cause their vacation leave balance to fall below 100 hours.

c) Vacation leave must be transferred at the same or at a lesser cost (e.g., at the same or lower pay rate as the donor).

d) Vacation leave, once donated, may not be given back to the donor.

e) Leave may not be sold or traded.

SCJ 000253

# K. Administrative Leave

Administrative leave may be granted when County offices are officially closed due to inclement weather or other situations that make it hazardous for employees to travel to work or remain in the workplace, at the discretion of the County Manager.  Administrative leave may also be granted to individual employees under certain conditions that do not warrant the use of other types of leave, at the determination of the Department Head or County Official, in consultation with the Human Resources Director.

# L. Leave of Absence Without Pay

Regular, non-probationary full-time and part-time employees may be granted a leave of absence without pay for up to six months at the discretion of the Department Head or County Official.  Any leave of absence without pay that qualifies for coverage under the Family and Medical Leave Act (FMLA) will be governed by that provision.  Employees may request a leave of absence without pay when FMLA leave is not available because the employee has exhausted FMLA leave or is not yet eligible.  Employees may also request a leave of absence without pay for any personal reason.  An employee desiring a leave of absence for a non-FMLA qualifying reason must submit a request in writing to the appropriate Department Head or County Official stating the reason and the requested duration of the leave.

In approving or denying the leave request, Department Heads and County Officials will consider the overall impact of the employee's absence on the work unit and the availability of other resources to perform the absent employee's job duties.

Employees will not earn vacation or sick leave while on leave without pay.  An employee on leave without pay may continue health insurance coverage by paying the applicable premium.

The employee must return to duty within or at the end of the approved leave without pay.  Failure to report at the expiration of the approved leave, unless an extension has been requested and approved, will be considered a resignation.

Employees who return to work at the end of the approved leave without pay will be returned to the previous position or to a position of like classification and pay within the same department, unless such a position does not exist or is no longer available due to budgetary reductions.

SCJ 000254

# X. EMPLOYEE BENEFITS

Chatham County offers a full range of benefits to eligible employees.   Complete details regarding specific benefits are available from the Human Resources Department.  The Board of Commissioners may use its authority to change the County's benefits at any time, including during the budget process.

## A.  Open Enrollment

Chatham County offers an Open Enrollment period each year to allow employees to add or change their benefits coverage. Changes, additions and other elections made during Open Enrollment will take effect on January 1 of the following year.  Once employees have made a change, they generally cannot change that selection until the next Open Enrollment period, unless they have a Qualifying Event (e.g., marriage, divorce, birth of a child) that allows them to make a change during the enrollment year.

## B.  Retirement Plan

Membership in the Chatham County Retirement Plan is mandatory for full-time regular employees and part-time regular employees who are regularly scheduled to work at least 30 hours per week.

The Chatham County Employees' Retirement Plan governs the administration of the Plan. More information about the Retirement Plan is available on the Human Resources Intranet Page or from the Human Resources Department.

## C.  Workers' Compensation Leave

Employees and County Officials who are injured in the course of performing job-related duties or suffers a work-related illness are entitled to benefits under the Georgia Workers' Compensation Act.  Information about the Workers' Compensation program may be obtained from the Occupational Safety and Risk Management Department.

## D.  Employee Assistance Program (EAP)

Chatham County provides a free, confidential service for employees and individuals residing in their household to address problems that can compromise their personal satisfaction, such as

SCJ 000255

marital problems, death of a family member, and career or work difficulties.  The EAP is staffed with licensed professionals with clinical training to address and resolve various issues.

## E. Wellness Program

Chatham County offers a comprehensive wellness program to assist employees and their families in maintaining a healthy lifestyle. Because specific wellness initiatives change over time, each specific wellness activity will not be included in this Handbook.  However, wellness initiatives include access to an employee health center and reimbursements for participating in various health, fitness and wellness activities.  Full details on current wellness offerings are published by the Human Resources Department, or may be obtained by contacting the County's Employee Wellness Coordinator in the Human Resources Department.

## F. Recognition and Service Awards

Chatham County values its team members and strives to recognize its employees for their services. The County provides service awards to employees who reach service milestones at each 5-year service increment (i.e., 5, 10, 15, 20, etc.).

It is the practice of Chatham County to give special recognition to employees at the time of their retirement. The specific retirement award given depends on the employee's length of service at retirement.

SCJ 000256

## Shalena Jones

| | |
|---|---|
| **From:** | Shalena Jones |
| **Sent:** | Wednesday, March 30, 2022 6:09 PM |
| **To:** | Penny Freesemann; Benjamin Karpf; Timothy Walmsley; Lisa Colbert; John Morse; Louisa Abbot |
| **Cc:** | Michael Edwards |
| **Subject:** | Judicial Assignments |
| **Attachments:** | DAO Confidentiality Agreement.pdf |
| **Importance:** | High |

PLAINTIFF'S EXHIBIT

6

exhibitsticker.com

| **Tracking:** | **Recipient** | **Read** |
|---|---|---|
| | Penny Freesemann | |
| | Benjamin Karpf | |
| | Timothy Walmsley | |
| | Lisa Colbert | Read: 3/30/2022 6:09 PM |
| | John Morse | |
| | Louisa Abbot | Read: 3/30/2022 6:13 PM |
| | Michael Edwards | Read: 3/30/2022 6:16 PM |

Hello,

I am glad to report that we have a working solution to fill the trial spots in J6!! In a short while, you will receive an email from Chief Edwards outlining those details.

I realize that many of you are concerned about the vacancies in the DA's Office and what that means for trial assignments. I appreciate those of you who have pulled me aside privately to discuss these matters and how they might impact your courtroom. Your insight has been invaluable.

Some of you have questioned ADAs directly, which may be intuitive, but is not helpful. In most instances, the ADA does not know and even if they do they are not at liberty to discuss trial assignments, personnel moves and changes in the office because they are not the ones responsible for making such decisions. I have attached a copy of the Confidentiality Agreement they've been asked to sign which describes the kinds of matters they are prohibited from discussing. Please help them honor this agreement by not asking them questions about the inner workings of this office. This helps us to run our office more effectively and helps our prosecutors to focus on their cases without distraction.

If you do have questions, which is entirely understandable, please know that Michael and I are available and willing to discuss these matters with you at any time- either collectively or individually. As I stated when we came on board last year, I want to do everything I can to ensure that the lines of communication between the bench and the DA's office remain open. I have also offered to attend your Wednesday meetings so that we could discuss upcoming changes and hear your concerns. I realize your time is limited and other matters take priority so that has not always been possible, but I remain open to hearing your thoughts and preferences on the best means and methods for us to communicate with you.

Thank you for the tireless work you put in to serve our citizens each and every day. As always, we are here to serve and assist the Court in any way we can.

Most respectfully,

1

*Shalena C. Jones, Esq.*
Chatham County District Attorney
Eastern Judicial Circuit of Georgia
133 Montgomery Street, 6<sup>th</sup> Floor
Savannah, Georgia 31401
Tel.: (912) 652-7308
Fax: (912) 652-7328
Direct: (912) 652-8009
Email: scjones@chathamcounty.org
Web: www.chathamcountyDA.org

**CONFIDENTIALITY NOTICE**: This e-mail message and its attachments, if any, is for the sole use of the intended recipient(s) and may contain confidential, proprietary, and/or privileged information that is protected by law. If you are not the intended recipient, you may not use, copy, or distribute this e-mail message, its contents or attachments. If you believe you have received this e-mail message in error, please notify the sender immediately and destroy all copies of the original message.



**OFFICE OF THE DISTRICT ATTORNEY**
EASTERN JUDICIAL CIRCUIT OF GEORGIA

## CONFIDENTIALITY AGREEMENT

This agreement is made between _____ ("Employee") and the District Attorney's Office for the Eastern Judicial Circuit of Georgia ("DAO") on _____ 2022.

Employee will perform services for DAO that may require DAO to disclose confidential, governmental, inter-agency and proprietary information ("Confidential Information") to Employee. Confidential Information is information and data of any kind concerning any matters affecting or relating to DAO, the business or operations of DAO, or any prosecutorial information derived, developed or obtained by Employee during the course and scope of their employment therewith.

The information covered by this agreement includes, but is not limited to, the following:

- Any and all personnel matters
- The hiring, transfer, placement or termination of employees and potential candidates
- Trial assignments
- All financial matters including budget, accounts payable/receivable, payroll, vendors and contractors and other financial affairs of the office
- Information and details pertaining to any pending criminal case
- All information about past, present and potential jurors
- Information pertaining to conflicts of interest, office disqualifications and reassignments
- Information that is the subject of and/or is protected by inter-governmental agreements between the DAO and other law enforcement agencies
- The plans, processes, or other data of DAO not generally known to the public or otherwise made available outside of DAO
- Any and all such matters designated by the elected District Attorney as Confidential Information

Accordingly, to protect the Confidential Information that will be disclosed during employment, Employee agrees as follows:

**A.    USE OF CONFIDENTIAL INFORMATION**

1. Employee will hold the Confidential Information received from DAO in strict confidence and will exercise all reasonable and due care to prevent the disclosure of information to those who do not have a legitimate business interest, case-specific or court related need to know.

2. Employee will not disclose or divulge either directly or indirectly the Confidential Information to others unless first authorized to do so by DAO management. For the purposes of this agreement, DAO management shall be defined as the elected District Attorney or the Chief Assistant District Attorney.

3. Employee will not reproduce the Confidential Information nor use this information for any purpose other than the performance of their duties for DAO.

**B.    OWNERSHIP OF CONFIDENTIAL INFORMATION**

All Confidential Information described above shall be considered the property of DAO. Employee further agrees as follows:

1. By signing this agreement, Employee acknowledges that all Confidential Information in their possession, that is not otherwise maintained in their case files, shall remain with DAO at termination.

2. Employee acknowledges that he or she is prohibited from downloading, maintaining, or transferring Confidential Information and/or work-related material to any external hard drive, cell phone, computer or personal electronic device.

3. Employee acknowledges that all work files and attorney work product, data, statistics or information developed for the benefit of, or in the course and scope of, their employment with DAO is and shall remain the property of DAO at all times.

4. Employee also acknowledges that they have no right of privacy to information stored on government issued devices and that said material may be viewed, removed and produced by DAO in response to a properly tailored Open Records Request, discovery request or other provisions of law.

**C.    DUTY TO REPORT**

1. If Employee *in a supervisory role* becomes aware of a subordinate employee within their chain of command gaining knowledge of and disclosing Confidential Information, Employee shall immediately inform their subordinate employee to cease and desist further disclosure. Employee will immediately report to DAO management the nature and circumstances of the disclosure.

2. If Employee *not in a supervisory role* becomes aware of a co-employee gaining knowledge of and disclosing Confidential Information, Employee will immediately report such disclosure to their direct supervisor.

3. If Employee becomes aware of someone outside DAO gaining knowledge of and disclosing Confidential Information, Employee will immediately report such disclosure to their direct supervisor.

## D.    RETURN OF MATERIALS/VIOLATIONS

As stated, Employee will, upon request or upon termination of their relationship with DAO, deliver to DAO any notes, documents, equipment, and materials received from DAO or originating from employment with DAO. Such delivery will be made to either Employee's direct supervisor or DAO Criminal Investigation Division Chief, as designated by DAO management.

## E.    PENALTIES

DAO reserves the right to take disciplinary action, up to and including termination, for violations of this agreement in addition to pursuing civil or criminal penalties.

## F.    CHOICE OF LAW

This agreement will be interpreted under and governed by the laws of the state of Georgia.

## G.    SEVERABILITY CLAUSE

1. This Confidentiality Agreement shall supercede every other confidentiality agreement you either did or may have signed in the course of your employment with DAO.

2. All provisions of this agreement will be applicable only to the extent that they do not violate any applicable law and are intended to be limited to the extent necessary so that they will not render this agreement invalid, illegal or unenforceable. If any provision of this agreement or any application thereof will be held to be invalid, illegal or unenforceable, the validity, legality and enforceability of other provisions of this agreement or of any other application of such provision will in no way be affected thereby.

## H.    EMPLOYEE WARRANTY

Employee represents and warrants that they are not under any pre-existing obligations inconsistent with the provisions of this agreement.

Signing below signifies that Employee agrees to the terms and conditions of the agreement stated above.

_____          _____
**Employee Signature**                              **Employee Title**


_____          _____
**Employee Name Printed**                         **Date**

**Shalena Jones**

| | |
|---|---|
| **From:** | Louisa Abbot |
| **Sent:** | Wednesday, March 30, 2022 6:26 PM |
| **To:** | Shalena Jones; Penny Freesemann; Benjamin Karpf; Timothy Walmsley; Lisa Colbert; John Morse |
| **Cc:** | Michael Edwards |
| **Subject:** | RE: Judicial Assignments |
| **Attachments:** | Judicial Assignments |
| | |
| **Expires:** | Thursday, March 30, 2023 12:00 AM |

Did the First Amendment get thrown out?  "• Information and details pertaining to any pending criminal case" is confidential?  I thought what we did up here was public record.

I will look forward to hearing from Chief Edwards but I already heard . . . .

**Shalena Jones**

| | |
|---|---|
| **From:** | Shalena Jones |
| **Sent:** | Wednesday, March 30, 2022 9:39 PM |
| **To:** | Louisa Abbot; Penny Freesemann; Benjamin Karpf; Timothy Walmsley; Lisa Colbert; John Morse |
| **Cc:** | Michael Edwards |
| **Subject:** | RE: Judicial Assignments |

Is that a rhetorical question?

*Shalena C. Jones, Esq.*
Chatham County District Attorney
Eastern Judicial Circuit of Georgia
133 Montgomery Street, 6th Floor
Savannah, Georgia 31401
Tel.: (912) 652-7308
Fax: (912) 652-7328
Email: scjones@chathamcounty.org
Web: www.chathamcountyDA.com

**From:** Louisa Abbot <LAbbot@chathamcounty.org>
**Sent:** Wednesday, March 30, 2022 6:26 PM
**To:** Shalena Jones <scjones@chathamcounty.org>; Penny Freesemann <PHFreese@chathamcounty.org>; Benjamin Karpf <bwkarpf@chathamcounty.org>; Timothy Walmsley <trwalmsley@chathamcounty.org>; Lisa Colbert <lgcolbert@chathamcounty.org>; John Morse <JEMorse@chathamcounty.org>
**Cc:** Michael Edwards <medwards@chathamcounty.org>
**Subject:** RE: Judicial Assignments

Did the First Amendment get thrown out?  "• Information and details pertaining to any pending criminal case"  is confidential?  I thought what we did up here was public record.

I will look forward to hearing from Chief Edwards but I already heard . . . .

**Shalena Jones**

| | |
|---|---|
| **From:** | Louisa Abbot |
| **Sent:** | Wednesday, March 30, 2022 10:26 PM |
| **To:** | Shalena Jones; Penny Freesemann; Benjamin Karpf; Timothy Walmsley; Lisa Colbert; John Morse |
| **Cc:** | Michael Edwards |
| **Subject:** | Re: Judicial Assignments |

More confused than anything, I guess. It's an internal policy which doesn't seem to apply with respect to the courts.

Get Outlook for iOS

**From:** Shalena Jones <scjones@chathamcounty.org>
**Sent:** Wednesday, March 30, 2022 9:39:00 PM
**To:** Louisa Abbot <LAbbot@chathamcounty.org>; Penny Freesemann <PHFreese@chathamcounty.org>; Benjamin Karpf <bwkarpf@chathamcounty.org>; Timothy Walmsley <trwalmsley@chathamcounty.org>; Lisa Colbert <lgcolbert@chathamcounty.org>; John Morse <JEMorse@chathamcounty.org>
**Cc:** Michael Edwards <medwards@chathamcounty.org>
**Subject:** RE: Judicial Assignments

Is that a rhetorical question?

*Shalena C. Jones, Esq.*
Chatham County District Attorney
Eastern Judicial Circuit of Georgia
133 Montgomery Street, 6th Floor
Savannah, Georgia 31401
Tel.: (912) 652-7308
Fax: (912) 652-7328
Email: scjones@chathamcounty.org
Web: www.chathamcountyDA.com

**From:** Louisa Abbot <LAbbot@chathamcounty.org>
**Sent:** Wednesday, March 30, 2022 6:26 PM
**To:** Shalena Jones <scjones@chathamcounty.org>; Penny Freesemann <PHFreese@chathamcounty.org>; Benjamin Karpf <bwkarpf@chathamcounty.org>; Timothy Walmsley <trwalmsley@chathamcounty.org>; Lisa Colbert <lgcolbert@chathamcounty.org>; John Morse <JEMorse@chathamcounty.org>
**Cc:** Michael Edwards <medwards@chathamcounty.org>
**Subject:** RE: Judicial Assignments

Did the First Amendment get thrown out?  "• Information and details pertaining to any pending criminal case" is confidential?  I thought what we did up here was public record.

I will look forward to hearing from Chief Edwards but I already heard . . . .

## Shalena Jones

| | |
|---|---|
| **From:** | Shalena Jones |
| **Sent:** | Thursday, March 31, 2022 9:15 AM |
| **To:** | Louisa Abbot |
| **Subject:** | RE: Judicial Assignments |

Judge,

Glad to discuss this if you like. As you know, our prosecutors are bound by Ga. R. of Prof. Conduct, Rule 3.8 not to make extra-judicial statements about pending cases. Of course, that <u>does not</u> apply to any conversations they would have with you or any other person who has a "legitimate business interest" in the information. They are free to comment on cases that are closed. But, in the end, commentary to/about pending cases to those without a need-to-know is prohibited.

Of course, we would not and could not restrict seek to restrict the court in any way. I am just making the court aware that this exists and redirecting folks to talk to management if they have questions. It cuts down on the speculation and the scuttlebutt and keeps everybody safe.

I hope that makes sense.

Carpe diem,

*Shalena C. Jones, Esq.*
Chatham County District Attorney
Eastern Judicial Circuit of Georgia
133 Montgomery Street, 6th Floor
Savannah, Georgia 31401
Tel.: (912) 652-7308
Fax: (912) 652-7328
Email: scjones@chathamcounty.org
Web: www.chathamcountyDA.com

**From:** Louisa Abbot <LAbbot@chathamcounty.org>
**Sent:** Wednesday, March 30, 2022 10:26 PM
**To:** Shalena Jones <scjones@chathamcounty.org>; Penny Freesemann <PHFreese@chathamcounty.org>; Benjamin Karpf <bwkarpf@chathamcounty.org>; Timothy Walmsley <trwalmsley@chathamcounty.org>; Lisa Colbert <lgcolbert@chathamcounty.org>; John Morse <JEMorse@chathamcounty.org>
**Cc:** Michael Edwards <medwards@chathamcounty.org>
**Subject:** Re: Judicial Assignments

More confused than anything, I guess. It's an internal policy which doesn't seem to apply with respect to the courts.

Get Outlook for iOS

**From:** Shalena Jones <scjones@chathamcounty.org>
**Sent:** Wednesday, March 30, 2022 9:39:00 PM
**To:** Louisa Abbot <LAbbot@chathamcounty.org>; Penny Freesemann <PHFreese@chathamcounty.org>; Benjamin Karpf <bwkarpf@chathamcounty.org>; Timothy Walmsley <trwalmsley@chathamcounty.org>; Lisa Colbert <lgcolbert@chathamcounty.org>; John Morse <JEMorse@chathamcounty.org>
**Cc:** Michael Edwards <medwards@chathamcounty.org>
**Subject:** RE: Judicial Assignments

Is that a rhetorical question?

## Shalena C. Jones, Esq.
Chatham County District Attorney
Eastern Judicial Circuit of Georgia
133 Montgomery Street, 6th Floor
Savannah, Georgia 31401
Tel.: (912) 652-7308
Fax: (912) 652-7328
Email: scjones@chathamcounty.org
Web: www.chathamcountyDA.com

**From:** Louisa Abbot <LAbbot@chathamcounty.org>
**Sent:** Wednesday, March 30, 2022 6:26 PM
**To:** Shalena Jones <scjones@chathamcounty.org>; Penny Freesemann <PHFreese@chathamcounty.org>; Benjamin Karpf <bwkarpf@chathamcounty.org>; Timothy Walmsley <trwalmsley@chathamcounty.org>; Lisa Colbert <lgcolbert@chathamcounty.org>; John Morse <JEMorse@chathamcounty.org>
**Cc:** Michael Edwards <medwards@chathamcounty.org>
**Subject:** RE: Judicial Assignments

Did the First Amendment get thrown out?  "• Information and details pertaining to any pending criminal case"  is confidential?  I thought what we did up here was public record.

I will look forward to hearing from Chief Edwards but I already heard . . . .

**Shalena Jones**

| | |
|---|---|
| **From:** | Louisa Abbot |
| **Sent:** | Thursday, March 31, 2022 9:38 AM |
| **To:** | Shalena Jones |
| **Subject:** | Re: Judicial Assignments |

Frankly, my first thought was what is she trying to hide. Optics are terrible.

Get Outlook for iOS

**From:** Shalena Jones <scjones@chathamcounty.org>
**Sent:** Thursday, March 31, 2022 9:14:30 AM
**To:** Louisa Abbot <LAbbot@chathamcounty.org>
**Subject:** RE: Judicial Assignments

Judge,

Glad to discuss this if you like. As you know, our prosecutors are bound by Ga. R. of Prof. Conduct, Rule 3.8 not to make extra-judicial statements about pending cases. Of course, that does not apply to any conversations they would have with you or any other person who has a "legitimate business interest" in the information. They are free to comment on cases that are closed. But, in the end, commentary to/about pending cases to those without a need-to-know is prohibited.

Of course, we would not and could not restrict seek to restrict the court in any way. I am just making the court aware that this exists and redirecting folks to talk to management if they have questions. It cuts down on the speculation and the scuttlebutt and keeps everybody safe.

I hope that makes sense.

Carpe diem,

*Shalena C. Jones, Esq.*
Chatham County District Attorney
Eastern Judicial Circuit of Georgia
133 Montgomery Street, 6th Floor
Savannah, Georgia 31401
Tel.: (912) 652-7308
Fax: (912) 652-7328
Email: scjones@chathamcounty.org
Web: www.chathamcountyDA.com

**From:** Louisa Abbot <LAbbot@chathamcounty.org>
**Sent:** Wednesday, March 30, 2022 10:26 PM
**To:** Shalena Jones <scjones@chathamcounty.org>; Penny Freesemann <PHFreese@chathamcounty.org>; Benjamin Karpf <bwkarpf@chathamcounty.org>; Timothy Walmsley <trwalmsley@chathamcounty.org>; Lisa Colbert <lgcolbert@chathamcounty.org>; John Morse <JEMorse@chathamcounty.org>
**Cc:** Michael Edwards <medwards@chathamcounty.org>
**Subject:** Re: Judicial Assignments

More confused than anything, I guess. It's an internal policy which doesn't seem to apply with respect to the courts.

Get Outlook for iOS

**From:** Shalena Jones <scjones@chathamcounty.org>
**Sent:** Wednesday, March 30, 2022 9:39:00 PM
**To:** Louisa Abbot <LAbbot@chathamcounty.org>; Penny Freesemann <PHFreese@chathamcounty.org>; Benjamin Karpf
<bwkarpf@chathamcounty.org>; Timothy Walmsley <trwalmsley@chathamcounty.org>; Lisa Colbert
<lgcolbert@chathamcounty.org>; John Morse <JEMorse@chathamcounty.org>
**Cc:** Michael Edwards <medwards@chathamcounty.org>
**Subject:** RE: Judicial Assignments

Is that a rhetorical question?

*Shalena C. Jones, Esq.*
Chatham County District Attorney
Eastern Judicial Circuit of Georgia
133 Montgomery Street, 6th Floor
Savannah, Georgia 31401
Tel.: (912) 652-7308
Fax: (912) 652-7328
Email: scjones@chathamcounty.org
Web: www.chathamcountyDA.com

**From:** Louisa Abbot <LAbbot@chathamcounty.org>
**Sent:** Wednesday, March 30, 2022 6:26 PM
**To:** Shalena Jones <scjones@chathamcounty.org>; Penny Freesemann <PHFreese@chathamcounty.org>; Benjamin
Karpf <bwkarpf@chathamcounty.org>; Timothy Walmsley <trwalmsley@chathamcounty.org>; Lisa Colbert
<lgcolbert@chathamcounty.org>; John Morse <JEMorse@chathamcounty.org>
**Cc:** Michael Edwards <medwards@chathamcounty.org>
**Subject:** RE: Judicial Assignments

Did the First Amendment get thrown out?  "• Information and details pertaining to any pending
criminal case"  is confidential?  I thought what we did up here was public record.

I will look forward to hearing from Chief Edwards but I already heard . . . .

## Shalena Jones

**From:** Shalena Jones
**Sent:** Thursday, March 31, 2022 11:58 AM
**To:** Louisa Abbot
**Subject:** RE: Judicial Assignments

I don't care about optics. Bottom line is, people talk too much. Always have.

Respectfully,
*SCJ.*

**CONFIDENTIALITY NOTICE:** This e-mail message and its attachments, if any, is for the sole use of the intended recipient(s) and may contain confidential, proprietary, and/or privileged information that is protected by law. If you are not the intended recipient, you may not use, copy, or distribute this e-mail message, its contents or attachments. If you believe you have received this e-mail message in error, please notify the sender immediately and destroy all copies of the original message.

**From:** Louisa Abbot <LAbbot@chathamcounty.org>
**Sent:** Thursday, March 31, 2022 9:38 AM
**To:** Shalena Jones <scjones@chathamcounty.org>
**Subject:** Re: Judicial Assignments

Frankly, my first thought was what is she trying to hide. Optics are terrible.

Get Outlook for iOS

**From:** Shalena Jones <scjones@chathamcounty.org>
**Sent:** Thursday, March 31, 2022 9:14:30 AM
**To:** Louisa Abbot <LAbbot@chathamcounty.org>
**Subject:** RE: Judicial Assignments

Judge,

Glad to discuss this if you like. As you know, our prosecutors are bound by Ga. R. of Prof. Conduct, Rule 3.8 not to make extra-judicial statements about pending cases. Of course, that does not apply to any conversations they would have with you or any other person who has a "legitimate business interest" in the information. They are free to comment on cases that are closed. But, in the end, commentary to/about pending cases to those without a need-to-know is prohibited.

Of course, we would not and could not restrict seek to restrict the court in any way. I am just making the court aware that this exists and redirecting folks to talk to management if they have questions. It cuts down on the speculation and the scuttlebutt and keeps everybody safe.

I hope that makes sense.

Carpe diem,
*Shalena C. Jones, Esq.*
Chatham County District Attorney
Eastern Judicial Circuit of Georgia

1

133 Montgomery Street, 6th Floor
Savannah, Georgia 31401
Tel.: (912) 652-7308
Fax: (912) 652-7328
Email: scjones@chathamcounty.org
Web: www.chathamcountyDA.com

**From:** Louisa Abbot <LAbbot@chathamcounty.org>
**Sent:** Wednesday, March 30, 2022 10:26 PM
**To:** Shalena Jones <scjones@chathamcounty.org>; Penny Freesemann <PHFreese@chathamcounty.org>; Benjamin Karpf <bwkarpf@chathamcounty.org>; Timothy Walmsley <trwalmsley@chathamcounty.org>; Lisa Colbert <lgcolbert@chathamcounty.org>; John Morse <JEMorse@chathamcounty.org>
**Cc:** Michael Edwards <medwards@chathamcounty.org>
**Subject:** Re: Judicial Assignments

More confused than anything, I guess. It's an internal policy which doesn't seem to apply with respect to the courts.

Get Outlook for iOS

**From:** Shalena Jones <scjones@chathamcounty.org>
**Sent:** Wednesday, March 30, 2022 9:39:00 PM
**To:** Louisa Abbot <LAbbot@chathamcounty.org>; Penny Freesemann <PHFreese@chathamcounty.org>; Benjamin Karpf <bwkarpf@chathamcounty.org>; Timothy Walmsley <trwalmsley@chathamcounty.org>; Lisa Colbert <lgcolbert@chathamcounty.org>; John Morse <JEMorse@chathamcounty.org>
**Cc:** Michael Edwards <medwards@chathamcounty.org>
**Subject:** RE: Judicial Assignments

Is that a rhetorical question?

*Shalena C. Jones, Esq.*
Chatham County District Attorney
Eastern Judicial Circuit of Georgia
133 Montgomery Street, 6th Floor
Savannah, Georgia 31401
Tel.: (912) 652-7308
Fax: (912) 652-7328
Email: scjones@chathamcounty.org
Web: www.chathamcountyDA.com

**From:** Louisa Abbot <LAbbot@chathamcounty.org>
**Sent:** Wednesday, March 30, 2022 6:26 PM
**To:** Shalena Jones <scjones@chathamcounty.org>; Penny Freesemann <PHFreese@chathamcounty.org>; Benjamin Karpf <bwkarpf@chathamcounty.org>; Timothy Walmsley <trwalmsley@chathamcounty.org>; Lisa Colbert <lgcolbert@chathamcounty.org>; John Morse <JEMorse@chathamcounty.org>

**Cc:** Michael Edwards <medwards@chathamcounty.org>
**Subject:** RE: Judicial Assignments

Did the First Amendment get thrown out?  "• Information and details pertaining to any pending criminal case" is confidential?  I thought what we did up here was public record.

I will look forward to hearing from Chief Edwards but I already heard . . . .

**Shalena Jones**

| | |
|---|---|
| **From:** | Louisa Abbot |
| **Sent:** | Thursday, March 31, 2022 1:14 PM |
| **To:** | Shalena Jones |
| **Subject:** | RE: Judicial Assignments |
| **Attachments:** | RE: Judicial Assignments |
| | |
| **Expires:** | Friday, March 31, 2023 12:00 AM |

I gather that you do not.  Good luck with it.

**Shalena Jones**

| | |
|---|---|
| **From:** | Shalena Jones |
| **Sent:** | Thursday, March 31, 2022 1:33 PM |
| **To:** | Louisa Abbot |
| **Subject:** | RE: Judicial Assignments |

Is there something you want to say to me? Do we have a problem? I've been sensing pointed hostility from you ever since Skye left and I am becoming increasingly concerned that you are taking your angst out on my staff.

Respectfully,
*SCJ.*

**CONFIDENTIALITY NOTICE:** This e-mail message and its attachments, if any, is for the sole use of the intended recipient(s) and may contain confidential, proprietary, and/or privileged information that is protected by law. If you are not the intended recipient, you may not use, copy, or distribute this e-mail message, its contents or attachments. If you believe you have received this e-mail message in error, please notify the sender immediately and destroy all copies of the original message.

**From:** Louisa Abbot <LAbbot@chathamcounty.org>
**Sent:** Thursday, March 31, 2022 1:14 PM
**To:** Shalena Jones <scjones@chathamcounty.org>
**Subject:** RE: Judicial Assignments

I gather that you do not.  Good luck with it.

**Shalena Jones**

| | |
|---|---|
| **From:** | Louisa Abbot |
| **Sent:** | Thursday, March 31, 2022 3:11 PM |
| **To:** | Shalena Jones |
| **Subject:** | RE: Judicial Assignments |
| **Attachments:** | RE: Judicial Assignments |
| | |
| **Expires:** | Friday, March 31, 2023 12:00 AM |

On Shalena, I love your staff!  They are great.  I have been very pleased with each of my ADAs so far.  (Mr. Barrow will have to get up to speed on the law in Georgia but that is not unusual; I am a good teacher if he will listen.  He just can't seem to understand the issue about the lack of credit for time served on a straight probated sentence but the other lawyers who have appeared before me do.  It was weird that he called the Chief Probation Officer about it and got the Chief Judge all involved, but I think he will get straight on that.  He is inexperienced and will learn.)

If anyone has said I have been ugly in any way, please let me know.  I have long established relationships with many of them – far before you arrived – and have enormous respect for their work.  I am puzzled by the accusation.

Nothing in this position is personal.  We just don't share the same taste in people and I have been sorry to lose some fine prosecutors but otherwise all is fine.  Change is change and one has to roll with it as I have done with all the DAs and PDs etc, over the years.

I do want to have everything in great shape for Tammie Stokes who will begin hearing cases once she is judge-elect so that the transition will go smoothly.  Having a permanent team will make that easier.

As to NDA, I think in general they are a tool for those who have to demand loyalty when they haven't earned it.  Like Trump.  I was shocked that you would require such a thing.  You seem like such a broad-minded person with respect for civil liberties.  It truly took me aback.  But that is your business and not mine.

I had heard from a deputy clerk and a PD about the new J6 team earlier this week.  No document is going to stop talk,  so I worry you are creating a situation you will constantly have to monitor – who leaked – who talked – and that you will set up an uneasy relationship with your staff because it looks like you don't trust them to be ethical.  I wish you had a seasoned DA you could talk to about matters like this so that you could attract and retain good lawyers.  This kind of thing will deter people from wanting to work for you.  I just think it hurts you as the DA and that is why I responded as I did.

Optics may not matter to you but they do to the rest of the world.  The optic I want to convey by my smiling, patient, inquisitive manner in court is that what is happening matters very much and that everyone will be received with grace and consideration.  I think that particular optic matters a lot.  My staff conveys a helpful and happy demeanor because we are in the work of customer service and that optic matters very much.  I want you to convey an optic of being a wonderful employer who can attract and retain the very best.

What can we do to help you with that? You need salaries increased to attract? Then let's all get together and tell the County that you have to offer more. You, the Clerk and the Sheriff are terribly affected by the Great Resignation and must have better resources than you are getting from the county. Your ADAs who are county paid should get a $5000 raise like the State paid ones.

I truly believe that if put together a package to take to the County for you, Tammie and the Sheriff that we can convince them based on the fact that people are leaving for better salaries, that judges cannot dispose of cases without your office, Tammie's office and the Sheriff. I have been begging to have some kind of process like this started. Have you heard from Judge Freesemann about it?

Lastly, I have to walk a tightrope not to appear bent in one direction or the other which is why I could not be involved overly much in setting up the PD's office or in addressing the miserable transition between Meg and you. But you should know I just say what I mean. Of course, I hated losing Anthony and Sky and many others along the way but that's life and not my concern. My concern is getting this court – my part of it – moving steadily in the direction of fair and expedient resolutions as much as possible. What matters to me is the people we serve and doing the best I can. Anything you can to help me, I will take and anything I can do to help you, I will do.

**Shalena Jones**

| | |
|---|---|
| **From:** | Shalena Jones |
| **Sent:** | Thursday, March 31, 2022 5:17 PM |
| **To:** | Louisa Abbot |
| **Subject:** | RE: Judicial Assignments |

That was very helpful, as always. Thanks.

Respectfully,

*SCJ.*

**CONFIDENTIALITY NOTICE:** This e-mail message and its attachments, if any, is for the sole use of the intended recipient(s) and may contain confidential, proprietary, and/or privileged information that is protected by law. If you are not the intended recipient, you may not use, copy, or distribute this e-mail message, its contents or attachments. If you believe you have received this e-mail message in error, please notify the sender immediately and destroy all copies of the original message.

**From:** Louisa Abbot <LAbbot@chathamcounty.org>
**Sent:** Thursday, March 31, 2022 3:11 PM
**To:** Shalena Jones <scjones@chathamcounty.org>
**Subject:** RE: Judicial Assignments

On Shalena, I love your staff!  They are great.  I have been very pleased with each of my ADAs so far.  (Mr. Barrow will have to get up to speed on the law in Georgia but that is not unusual; I am a good teacher if he will listen.  He just can't seem to understand the issue about the lack of credit for time served on a straight probated sentence but the other lawyers who have appeared before me do.  It was weird that he called the Chief Probation Officer about it and got the Chief Judge all involved, but I think he will get straight on that.  He is inexperienced and will learn.)

If anyone has said I have been ugly in any way, please let me know.  I have long established relationships with many of them – far before you arrived – and have enormous respect for their work.  I am puzzled by the accusation.

Nothing in this position is personal.  We just don't share the same taste in people and I have been sorry to lose some fine prosecutors but otherwise all is fine.  Change is change and one has to roll with it as I have done with all the DAs and PDs etc, over the years.

I do want to have everything in great shape for Tammie Stokes who will begin hearing cases once she is judge-elect so that the transition will go smoothly.  Having a permanent team will make that easier.

As to NDA, I think in general they are a tool for those who have to demand loyalty when they haven't earned it.  Like Trump.  I was shocked that you would require such a thing.  You seem like such a broad-minded person with respect to civil liberties.  It truly took me aback.  But that is your business and not mine.

I had heard from a deputy clerk and a PD about the new J6 team earlier this week.  No document is going to stop talk,  so I worry you are creating a situation you will constantly have to monitor – who

leaked – who talked – and that you will set up an uneasy relationship with your staff because it looks like you don't trust them to be ethical. I wish you had a seasoned DA you could talk to about matters like this so that you could attract and retain good lawyers. This kind of thing will deter people from wanting to work for you. I just think it hurts you as the DA and that is why I responded as I did.

Optics may not matter to you but they do to the rest of the world. The optic I want to convey by my smiling, patient, inquisitive manner in court is that what is happening matters very much and that everyone will be received with grace and consideration. I think that particular optic matters a lot. My staff conveys a helpful and happy demeanor because we are in the work of customer service and that optic matters very much. I want you to convey an optic of being a wonderful employer who can attract and retain the very best.

What can we do to help you with that? You need salaries increased to attract? Then let's all get together and tell the County that you have to offer more. You, the Clerk and the Sheriff are terribly affected by the Great Resignation and must have better resources than you are getting from the county. Your ADAs who are county paid should get a $5000 raise like the State paid ones.

I truly believe that if put together a package to take to the County for you, Tammie and the Sheriff that we can convince them based on the fact that people are leaving for better salaries, that judges cannot dispose of cases without your office, Tammie's office and the Sheriff. I have been begging to have some kind of process like this started. Have you heard from Judge Freesemann about it?

Lastly, I have to walk a tightrope not to appear bent in one direction or the other which is why I could not be involved overly much in setting up the PD's office or in addressing the miserable transition between Meg and you. But you should know I just say what I mean. Of course, I hated losing Anthony and Sky and many others along the way but that's life and not my concern. My concern is getting this court – my part of it – moving steadily in the direction of fair and expedient resolutions as much as possible. What matters to me is the people we serve and doing the best I can. Anything you can to help me, I will take and anything I can do to help you, I will do.

## Shalena Jones

| | |
|---|---|
| **From:** | Louisa Abbot |
| **Sent:** | Wednesday, April 6, 2022 2:09 PM |
| **To:** | Michael Edwards |
| **Cc:** | Shalena Jones |
| **Subject:** | RE: Visit |
| **Attachments:** | RE: Visit |

| | |
|---|---|
| **Expires:** | Thursday, April 6, 2023 12:00 AM |

Sure thing. I really don't want anything to come of this but respect for the court, not me. Heck, I don't need personal respect, unlike Aretha Franklin. And this is not like the incident a while back with another ADA loudly cursing about a judge in public [overheard by another judge and staff attorney and reported as everything is to all the judges]. It is difficult for my staff however when a member of your office is publicly commenting on the judge negatively in a personal way. I don't want any taint from such to linger. We are all working so darn hard. Adding this kind of drama really isn't necessary.

Of course, negative comments about rulings etc are to be expected and encouraged in house. I would expect nothing less than a lot of bitching about judges. Judges complain about lawyers just as much and all that is totally fair and fine.

You have never been anything but exquisitely professional in the many matters you have had before me, stretching back 22 years now. I think some inexperienced attorneys aren't quite as humble as we all used to be, perhaps.

1

**Shalena Jones**

| | |
|---|---|
| **From:** | Shalena Jones |
| **Sent:** | Wednesday, April 6, 2022 2:41 PM |
| **To:** | Louisa Abbot; Michael Edwards |
| **Subject:** | Re: Visit |

Your Honor,

Your response was more directed to Michael than to me, but I feel comfortable saying that we agree with you 100%.

Respect and decorum for the court and other members of our shared courthouse community have been one of our highest priorities since we arrived this year. This is part of the reason we rolled out that agreement last week - not to chill conversations but to create a sense of mindfulness around what is and is not appropriate conversation.

Unfortunately, one of the side effects of Covid and quarantine is that we've lost our sensitivity to such things. We will do our very best to make sure we refresh collective recollections as we all return to live court sessions.

Thank you for your patience, guidance and support.

Best,
SCJ.


Sent from my Verizon, Samsung Galaxy smartphone
Get Outlook for Android

**From:** Louisa Abbot <LAbbot@chathamcounty.org>
**Sent:** Wednesday, April 6, 2022 2:08:49 PM
**To:** Michael Edwards <medwards@chathamcounty.org>
**Cc:** Shalena Jones <scjones@chathamcounty.org>
**Subject:** RE: Visit




Sure thing.  I really don't want anything to come of this but respect for the court, not me.  Heck, I don't need personal respect, unlike Aretha Franklin.  And this is not like the incident a while back with another ADA loudly cursing about a judge in public [overheard by another judge and staff attorney and reported as everything is to all the judges].  It is difficult for my staff however when a member of your office is publicly commenting on the judge negatively in a personal way. I don't want any taint from such to linger.  We are all working so darn hard.  Adding this kind of drama really isn't necessary.

1

Of course, negative comments about rulings etc are to be expected and encouraged in house.  I would expect nothing less than a lot of bitching about judges.  Judges complain about lawyers just as much and all that is totally fair and fine.

You have never been anything but exquisitely professional in the many matters you have had before me, stretching back 22 years now.  I think some inexperienced attorneys aren't quite as humble as we all used to be, perhaps.

**Shalena Jones**

| | |
|---|---|
| **From:** | Louisa Abbot |
| **Sent:** | Wednesday, April 6, 2022 5:20 PM |
| **To:** | Shalena Jones; Michael Edwards |
| **Subject:** | Jamie |
| | |
| **Expires:** | Thursday, April 6, 2023 12:00 AM |

We had a great meeting.  Thanks.  I appreciate everyone's attention to my concerns which are all gone.

**Shalena Jones**

| | |
|---|---|
| **From:** | Louisa Abbot |
| **Sent:** | Wednesday, April 6, 2022 6:40 PM |
| **To:** | Michael Edwards; Shalena Jones |
| **Subject:** | Re: Jamie |

He and I have much in common and found lots to share. It really is about the relationship.  After the email about the confidentiality matter, I certainly will include you in my communications. They are all very professional and Mr. DrBlasiis is a treasure of a lawyer.  They are so dedicated.

As Judge Stokes and I have discussed, the transition will begin sooner than later, after election. She will handle jury and much of the criminal caseload. I will handle her dockets. Think on the prospect of a really early eip on prelim dockets since I can take felony pleas!

Best to both of you and again thanks for helping the Court so promptly.

LA.

Get Outlook for iOS

**From:** Michael Edwards <medwards@chathamcounty.org>
**Sent:** Wednesday, April 6, 2022 5:28:58 PM
**To:** Louisa Abbot <LAbbot@chathamcounty.org>; Shalena Jones <scjones@chathamcounty.org>
**Subject:** RE: Jamie

Judge,

I am delighted to hear. ADA Barrow is truly excited to be in your courtroom. I am glad the air is cleared.

Sincerely,

*Michael L. Edwards, Esq.*

Chief Assistant District Attorney
Eastern Judicial Circuit of Georgia
133 Montgomery St., Ste. 600
Savannah, GA 31401
Main: 912.652.7308
Direct: 912.652.8040
Fax: 912.652.7328
Email: medwards@chathamcounty.org
Website: www.chathamcountyda.com

Legal Notice: The information contained in this e-mail message is intended only for the personal and confidential use of the intended recipient(s). The message may contain privileged communications and/or confidential information and as such is privileged and confidential in its entirety. If the reader of this message is not the intended recipient or an agent responsible for delivery of it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

**From:** Louisa Abbot <LAbbot@chathamcounty.org>
**Sent:** Wednesday, April 6, 2022 5:20 PM
**To:** Shalena Jones <scjones@chathamcounty.org>; Michael Edwards <medwards@chathamcounty.org>
**Subject:** Jamie

We had a great meeting.  Thanks.  I appreciate everyone's attention to my concerns which are all gone.

**Shalena Jones**

| | |
|---|---|
| **From:** | Shalena Jones |
| **Sent:** | Monday, May 9, 2022 4:24 PM |
| **To:** | Penny Freesemann |
| **Subject:** | Confidentiality Agreement |

And, this is why a Confidentiality Agreement was necessary.



**Shalena C. Jones, Esq.**
Chatham County District Attorney
Eastern Judicial Circuit of Georgia
133 Montgomery Street, 6th Floor
Savannah, Georgia 31401
Tel.: (912) 652-7308

Fax: (912) 652-7328
Direct: (912) 652-8009
Email: scjones@chathamcounty.org
Web: www.chathamcountyDA.org

**CONFIDENTIALITY NOTICE**: This e-mail message and its attachments, if any, is for the sole use of the intended recipient(s) and may contain confidential, proprietary, and/or privileged information that is protected by law. If you are not the intended recipient, you may not use, copy, or distribute this e-mail message, its contents or attachments. If you believe you have received this e-mail message in error, please notify the sender immediately and destroy all copies of the original message.

**Shalena Jones**

| | |
|---|---|
| **From:** | Shalena Jones |
| **Sent:** | Monday, May 9, 2022 4:28 PM |
| **To:** | District Attorney Distribution Group |
| **Subject:** | For Those of You Who Wondered.... |

why a more substantial Confidentiality Agreement was necessary. Here it is: Exhibit A.  Mr. Burton is not concerned with Free Speech. He is concerned with winning his campaign by any means necessary.



*Shalena C. Jones, Esq.*
Chatham County District Attorney
Eastern Judicial Circuit of Georgia
133 Montgomery Street, 6th Floor
Savannah, Georgia 31401
Tel.: (912) 652-7308
Fax: (912) 652-7328
Direct: (912) 652-8009

Email: scjones@chathamcounty.org
Web: www.chathamcountyDA.org

**CONFIDENTIALITY NOTICE**: This e-mail message and its attachments, if any, is for the sole use of the intended recipient(s) and may contain confidential, proprietary, and/or privileged information that is protected by law. If you are not the intended recipient, you may not use, copy, or distribute this e-mail message, its contents or attachments. If you believe you have received this e-mail message in error, please notify the sender immediately and destroy all copies of the original message.







Chatham County Courthouse
133 Montgomery Street
Suite 600
Post Office Box 2309
Savannah, Georgia 31402

**DISTRICT ATTORNEY**
EASTERN JUDICIAL CIRCUIT OF GEORGIA
**SHALENA COOK JONES**

Telephone (912) 652-7308
Fax (912) 652-7328
www.districtattorney.chathamcounty.org



PLAINTIFF'S EXHIBIT

14

March 30, 2022

*Via Email to burtburton9@gmail.com and*
*U.S. Certified Mail Return Receipt Requested*
*Article No.: 7020-1290-0000-1066-4859*
Mr. Burt Anthony Burton, Esq.
2244 E. 42nd Street
Savannah, Georgia 31404

     Re:    Termination of Employment

Dear Mr. Burton,

     This letter shall serve as written documentation of my recent decision to terminate your employment with this office effective Tuesday, March 22, 2022.

     As you know, all employees who work in this office serve at the discretion of the sitting District Attorney. Also, yours was an employment "at-will" meaning that you could be terminated at any time with or without cause.

     You were terminated for sharing the confidential personnel information of DAO employees with members of the public, former employees, a county attorney and others without having express authorization to do so. As stated in the Chatham County District Attorney's Handbook at page 5:

> **Confidentiality**
>
> Our constituents and the legal community entrust us with important information relating to the prosecution of cases. It is our policy that all information considered confidential will not be disclosed to external parties or to employees without a "need to know." If an employee questions whether certain information is considered confidential, the employee should first check with his or her immediate supervisor.
>
> This policy is intended to alert employees to the need for discretion at all times and is not intended to inhibit normal business communications.

The employee handbook containing this and other provisions was issued to and received by you on June 8, 2015 and January 24, 2016, as indicated by the signature pages attached hereto.

Mr. Burt Burton
March 30, 2022
Pg. 2

As you were not on the premises at the time of your termination, you were permitted to return to the office the following day to retrieve your personal items and belongings. According to our files, you did not return your official law enforcement badge. Please return the item to our office as soon as possible. Failure to do so could result in withholding of the terminal payout of your accrued sick and vacation pay.

Your effective termination date is March 22, 2022 and you were paid up to and including that date. Your final paycheck, including all forms of compensation due to you will be sent to you in accordance with the laws of this state. You may be entitled to extended medical coverage or benefits following your termination. Any questions you may have about final payments, extended medical coverage, accrued leave payouts or other benefits should be directed to Chatham County's Department of Human Resources.

Respectfully,

Shalena Cook Jones, Esq.
Chatham County District Attorney
Eastern Judicial Circuit of Georgia

SCJ/ahw
Encls:

Employee Handbook Acknowledgement Statements
Burton Personnel Action Form
Statement of Missing Items

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Mr. Burt Anthony Burton, Esq.
2244 East 42nd Street
Savannah, Georgia 31401

9590 9402 6870 1104 1967 20

2. Article Number (Transfer from service label)

7020 1290 0000 1066 4859

PS Form 3811, July 2020 PSN 7530-02-000-9053

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X A.R.   ☐ Agent   ☐ Addressee

B. Received by (Printed Name)   C. Date of Delivery

D. Is delivery address different from item 1?   ☐ Yes
If YES, enter delivery address below:   ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☑ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
   Insured Mail Restricted Delivery
   (over $500)
☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

Domestic Return Receipt





PLAINTIFF'S EXHIBIT

**15**

### OFFICE OF THE DISTRICT ATTORNEY
EASTERN JUDICIAL CIRCUIT OF GEORGIA

## CONFIDENTIALITY AGREEMENT

This agreement is made between _____ ("Employee")

and the District Attorney's Office for the Eastern Judicial Circuit of Georgia ("DAO") on

_____ 2022.

Employee will perform services for DAO that may require DAO to disclose confidential, governmental, inter-agency and proprietary information ("Confidential Information") to Employee. Confidential Information is information and data of any kind concerning any matters affecting or relating to DAO, the business or operations of DAO, or any prosecutorial information derived, developed or obtained by Employee during the course and scope of their employment therewith.

The information covered by this agreement includes, but is not limited to, the following:

- Any and all personnel matters
- The hiring, transfer, placement or termination of employees and potential candidates
- Trial assignments
- All financial matters including budget, accounts payable/receivable, payroll, vendors and contractors and other financial affairs of the office
- Information and details pertaining to any pending criminal case
- All information about past, present and potential jurors
- Information pertaining to conflicts of interest, office disqualifications and reassignments
- Information that is the subject of and/or is protected by inter-governmental agreements between the DAO and other law enforcement agencies
- The plans, processes, or other data of DAO not generally known to the public or otherwise made available outside of DAO
- Any and all such matters designated by the elected District Attorney as Confidential Information

Accordingly, to protect the Confidential Information that will be disclosed during employment, Employee agrees as follows:

## A.   USE OF CONFIDENTIAL INFORMATION

1.  Employee will hold the Confidential Information received from DAO in strict confidence and will exercise all reasonable and due care to prevent the disclosure of information to those who do not have a legitimate business interest, case-specific or court related need to know.

2.  Employee will not disclose or divulge either directly or indirectly the Confidential Information to others unless first authorized to do so by DAO management. For the purposes of this agreement, DAO management shall be defined as the elected District Attorney or the Chief Assistant District Attorney.

3.  Employee will not reproduce the Confidential Information nor use this information for any purpose other than the performance of their duties for DAO.

## B.   OWNERSHIP OF CONFIDENTIAL INFORMATION

All Confidential Information described above shall be considered the property of DAO. Employee further agrees as follows:

1.  By signing this agreement, Employee acknowledges that all Confidential Information in their possession, that is not otherwise maintained in their case files, shall remain with DAO at termination.

2.  Employee acknowledges that he or she is prohibited from downloading, maintaining, or transferring Confidential Information and/or work-related material to any external hard drive, cell phone, computer or personal electronic device.

3.  Employee acknowledges that all work files and attorney work product, data, statistics or information developed for the benefit of, or in the course and scope of, their employment with DAO is and shall remain the property of DAO at all times.

4.  Employee also acknowledges that they have no right of privacy to information stored on government issued devices and that said material may be viewed, removed and produced by DAO in response to a properly tailored Open Records Request, discovery request or other provisions of law.

## C.   DUTY TO REPORT

1.  If Employee *in a supervisory role* becomes aware of a subordinate employee within their chain of command gaining knowledge of and disclosing Confidential Information, Employee shall immediately inform their subordinate employee to cease and desist further disclosure. Employee will immediately report to DAO management the nature and circumstances of the disclosure.

2.  If Employee *not in a supervisory role* becomes aware of a co-employee gaining knowledge of and disclosing Confidential Information, Employee will immediately report such disclosure to their direct supervisor.

3. If Employee becomes aware of someone outside DAO gaining knowledge of and disclosing Confidential Information, Employee will immediately report such disclosure to their direct supervisor.

## D.  RETURN OF MATERIALS/VIOLATIONS

As stated, Employee will, upon request or upon termination of their relationship with DAO, deliver to DAO any notes, documents, equipment, and materials received from DAO or originating from employment with DAO. Such delivery will be made to either Employee's direct supervisor or DAO Criminal Investigation Division Chief, as designated by DAO management.

## E.  PENALTIES

DAO reserves the right to take disciplinary action, up to and including termination, for violations of this agreement in addition to pursuing civil or criminal penalties.

## F.  CHOICE OF LAW

This agreement will be interpreted under and governed by the laws of the state of Georgia.

## G.  SEVERABILITY CLAUSE

1. This Confidentiality Agreement shall supercede every other confidentiality agreement you either did or may have signed in the course of your employment with DAO.

2. All provisions of this agreement will be applicable only to the extent that they do not violate any applicable law and are intended to be limited to the extent necessary so that they will not render this agreement invalid, illegal or unenforceable. If any provision of this agreement or any application thereof will be held to be invalid, illegal or unenforceable, the validity, legality and enforceability of other provisions of this agreement or of any other application of such provision will in no way be affected thereby.

## H.  EMPLOYEE WARRANTY

Employee represents and warrants that they are not under any pre-existing obligations inconsistent with the provisions of this agreement.

Signing below signifies that Employee agrees to the terms and conditions of the agreement stated above.

_____          _____
**Employee Signature**                                    **Employee Title**

_____          _____
**Employee Name Printed**                              **Date**

**Shannon Williams**

| | |
|---|---|
| **From:** | Rusheda Adeshina |
| **Sent:** | Thursday, October 13, 2022 3:58 PM |
| **To:** | Jacki King |
| **Cc:** | Carolyn Smalls; Shannon Williams; Christian Stolfe; Anitra Hodge-Wilder |
| **Subject:** | RE: Christian Stolfe's Salary Adjustment |
| **Attachments:** | CHRISTIAN STOLFE 07012022_09302022.xlsx |
| | |
| **Importance:** | High |

PLAINTIFF'S EXHIBIT

23

Good afternoon, Jacki,

I have attached a retro payment for Mr. Stolfe. Please let me know if you have any questions.

Thanks,

*Rusheda E. Adeshina*
Compensation and Compliance Manager
Chatham County Government
123 Abercorn Street
Savannah, Ga 31401
Office #: (912)652-7926

**From:** Rusheda Adeshina
**Sent:** Thursday, October 13, 2022 1:34 PM
**To:** Christian Stolfe <cstolfe@chathamcounty.org>; Anitra Hodge-Wilder <ahwilder@chathamcounty.org>
**Cc:** Carolyn Smalls <csmalls@chathamcounty.org>; Shannon Williams <shawilliams@chathamcounty.org>; Jacki King <jking@chathamcounty.org>
**Subject:** RE: Christian Stolfe's Salary Adjustment
**Importance:** High

Good afternoon, Christian,

Thank you for speaking with me today and working through the progression in your employment record. Unfortunately, because of the series of movements associated with your tenure, I missed the brief period you transitioned after your initial transition from Legal Assistant to Paralegal and finally to a temporary ADA I. I have checked your pay records, and you were actively employed as such prior to September 23, 2019 . On which date, you transitioned to a full-time regular position as an ADA I.

Again, I apologize, and I thank you for your understanding, stepping with me through your employment history, and patience in this process. The Compensation and Compliance Team will revisit the adjustment you received this pay cycle and recalculate your retro payment and final annual salary. If possible, I will attempt to obtain a manual check for the difference tomorrow, but if not, we will make sure the change is reflected within the next pay period.

Sincerely,

*Rusheda E. Adeshina*
Compensation and Compliance Manager
Chatham County Government
123 Abercorn Street
Savannah, Ga 31401
Office #: (912)652-7926


**From:** Christian Stolfe <cstolfe@chathamcounty.org>
**Sent:** Wednesday, September 14, 2022 1:01 PM
**To:** Anitra Hodge-Wilder <ahwilder@chathamcounty.org>; Rusheda Adeshina <readeshina@chathamcounty.org>; Shannon Williams <shawilliams@chathamcounty.org>; Carolyn Smalls <csmalls@chathamcounty.org>
**Subject:** RE: Christian Stolfe's Salary Adjustment

Good Afternoon,

There is an additional problem besides not getting the pay increase as per my signed agreement on 8/25. I have just received an inter-office correspondence that my salary has been increased 4.6% due to the pay plan revision. However, the 4.6% pay increase is being based off my OLD salary not the one I was entitled to 7/1/2022.

I would like confirmation that the following things have been done:
1. My classification and pay has been moved from ADA II to ADA III,
2. My new salary is at the rate that was on the written contract dated 8/25/2022,
3. That the classification is back dated to 7/1/2022 as is required because that was the date it became effective,
4. That I will receive the missing back pay on the pay check dated 9/30/2022,
5. The 4.6% increase will be based off my new ADA III salary as it should be.

Thank you,

Christian L. Stolfe
Lead Assistant District Attorney
Chatham County Counter Narcotics Team
Eastern Judicial Circuit of Georgia



133 Montgomery St., Ste. 600
Savannah, GA 31401
Direct Office: (912) 652-3935
Cell Phone: (912) 235-1779
Fax: (912) 652-7328
Email: CStolfe@chathamcounty.org
Website: www.chathamcountyda.com

# Personnel Action and Payroll Request Form



Chatham County, GA

DEPARTMENT NAME: CCDAO          DEPARTMENT NUMBER: 1002200

EMPLOYEE NAME: Christian Stolfe          EMPLOYEE NUMBER: ▮

EFFECTIVE DATE: July 01, 2022

LAST DAY WORKED:

ACTION CODES: S800 - SALARY CHANGE          REASON CODES: S813 - SALARY ADJUSTMENT

SUPPORTING ACTION (REASON CODES L306 and L307):

| CATEGORY | CURRENT | REQUESTED |
|---|---|---|
| CLASSIFICATION/ TITLE | ADA-II | ADA-III |
| PAY GRADE | 61 | 62 |
| DEPT # | 1002200 | 1002200 |
| CLASSIFICATION # | 3104 | 3106 |
| POSITION # | 1000546 | 1000546 |
| ANNUAL SALARY | $80,900.94 | $88,991.03 |
| HOURLY RATE (4 DECIMAL Ex. $10.0675) | $38.8946 | $42.7841 |
| HOURS PER WORK WEEK | 40, Salaried | 40, Salaried |

Special Pay Codes Required? ☐Yes ■ No   If yes, identify below:

| | | |
|---|---|---|
| ☐ 310 Funeral Leave | ☐ 335 Donated Leave Used | ☐ 344 Disciplinary Suspension with Pay |
| ☐315 Military Leave | ☐ 336 Donated Leave Used Variable | ☐345 Disciplinary Suspension Without Pay |
| ☐ 317 Administrative Leave Other | ☐ 340 Leave Without Pay Authorized | ☐346 Investigatory Suspension Without Pay |
| ☐ 325 Comp Time Used | ☐ 341 Leave Without Pay Unauthorized | ☐ 350-355 FMLA |
| ☐ 326 Comp Time Used Variable | ☐ 342 Leave Without Pay Exhausted LV | ☐356-358 FMLA Military Caregiver |

Special Instructions:
This lawyer was licensed on May 24, 2019 and an ADA effective July 1, 2019. As of July 1, 2022, he hit 3 years of being an ADA and should now be classified as an ADA-III.

When applicable, funding availability signoff must be received prior to submitting to Human Resources for final approval.

AH

Department Head/          *Andria Hodge-Wilder*
Elected Official

PLAINTIFF'S EXHIBIT

24

Chatham County Courthouse
133 Montgomery Street
Post Office Box 2309
Suite 600
Savannah, Georgia 31402



Telephone (912) 652-7308
Fax (912) 652-7328
www.districtattorney.chathamcounty.org

### OFFICE OF THE DISTRICT ATTORNEY
### THE EASTERN JUDICIAL CIRCUIT OF GEORGIA
### SHALENA COOK JONES

August 25, 2022

Dear Mr. Stolfe,

I am pleased to extend a promotion to you from your current position of Assistant District Attorney II to Assistant District Attorney III with the Chatham County District Attorney's Office for the Eastern Judicial Circuit. We are grateful for your contribution to this office in your current role as an Assistant District Attorney II and are so glad to offer you this promotion.

You will be paid an annual salary of $88, 991.03. Your benefits and all other terms and conditions of your employment remain unchanged.

Your official start date in your new position will be July 01, 2022.  If the terms and conditions outlined above are acceptable to you, please sign and return the agreement to me.

Respectfully,

**Shalena Cook Jones, Esq.**
Chatham County District Attorney
Eastern Judicial Circuit of Georgia

Accepted by: _____          Date: _____

## EASTERN JUDICIAL CIRCUIT DISTRICT ATTORNEY'S OFFICE
### INTEROFFICE MEMORANDUM

**TO:**   ALL DAO STAFF

**FROM:**   MICHAEL L. EDWARDS, CHIEF ASST. D.A.

**RE:**   DAO ORGANIZATION

**DATE:**   MARCH 17, 2021

**CC:**



PLAINTIFF'S EXHIBIT

27

Team,

There have been a few questions recently concerning the office organization. Your E-Team appreciates your understanding and patience as we navigate through these first ninety days, assessing and evaluating the office we inherited on January 4, 2021, working to fill critical vacancies and reassigning people, and other organizational activities which remain ongoing. While we understand from some perspectives it may seem chaotic, we are pleased to know that for others, it is a refreshing process of necessary change.

We produced a preliminary organization chart during week one. It changed by week two; it has changed several times since. Consequently, we are not producing a new organization chart with each change - that seems more likely to generate confusion than assistance. However, we do intend to produce an organization chart once we begin phase two of the transition, shortly after April 1, 2021.

In the meantime, I have attached the current Court Operations Teams. Not indicated on the attached are Shalena and Michael. Shalena is self-explanatory. Michael is Chief Assistant and Director of Personnel, Policy and Programs. Jenny is on the attached but for any needed clarity, she is Chief Assistant and Director of Court Operations.

Some general and hopefully helpful comments: First, if at any point you have ANY questions about organization or if in reviewing this memo you remain uncertain on ANY point, see me. My door is always open. If you have administrative personnel issues beyond the level of team, see Marcus Thompson.

1. It is always our preference that if you have an issue, <u>any issue</u>, you seek to first resolve it within your team. That is a principal value of working in teams. If your team level supervisor is unable to assist you, she or he knows to escalate the issue to the division supervisor, and so forth. If your issue is one that you feel needs to be immediately escalated beyond team (that is, needs to be resolved outside of the team), if it is court operations related, see Jenny. If it is other than court operations, see me.

2. **Assistant DA (ADA)** – Chief Jenny Parker
   a. If you are in State Court, your division supervisor is Nathanael Wright.
   b. If you are in OFD, your division supervisor is Greg McConnell.
   c. If you are in MCD, CNT or EIP, your division supervisor is Jenny Parker.
   d. If you are in Accountability/Specialty Courts, your division supervisor is Michael Edwards.
   e. If you are in Juvenile Court, your division supervisor is Diane McLeod.

3. **Administrative Support Division (ASD)** – Chief Michael Edwards
   a. If you are in State Court, your division supervisor is Kim Coles.
   b. If you are in Superior Court, your division supervisor is Zoe Green.
   c. If you are in other assignments, your division supervisor is Bridget Browne.

4. **Criminal Investigation Division (CID)** – Acting Chief Vinson Jenkins: *reports to Jenny Parker*
   a. If you are in OFD, your division supervisor is Kelvin Bryant.
   b. If you are in MCD, your division supervisor is Mike Murphy.

5. **Child Support Recovery Unit (CSRU)** - Director Tracey Erwin
   (please see Tracey for any division leadership)

6. **Victim Witness Assistance Program (VWAP)** - Director Cheryl Rogers: *reports to Michael Edwards*
   (please see Cheryl for any division leadership)

Again, if you have ANY questions, see me. Thank you everyone.

SCJ 000163



# Personnel Action and Payroll Request Form

**Chatham County, GA**

DEPARTMENT NAME: CCDAO     DEPARTMENT NUMBER: 2200

EMPLOYEE NAME: Christian Stolfe     EMPLOYEE NUMBER: ▓▓▓▓

EFFECTIVE DATE: 03.21.2022

LAST DAY WORKED: N/A

ACTION CODES: 0500     REASON CODES: 0512



PLAINTIFF'S EXHIBIT 28

SUPPORTING ACTION (REASON CODES L306 and L307):

| CATEGORY | CURRENT | REQUESTED |
|---|---|---|
| CLASSIFICATION/ TITLE | ADA II | ADA IV |
| PAY GRADE | 61 | 63 |
| DEPT # | 2200 | 2200 |
| CLASSIFICATION # | 3106 | 3107 |
| POSITION # | 1000546 | 1000547 |
| ANNUAL SALARY | $65,031.12 | $80,900.44 |
| HOURLY RATE (4 DECIMAL Ex. $10.0675) | $31.2649 | $38.8942 |
| HOURS PER WORK WEEK | | |

Special Pay Codes Required? ☐ Yes ☒ No    If yes, identify below:

| | | |
|---|---|---|
| ☐ 310 Funeral Leave | ☐ 335 Donated Leave Used | ☐ 344 Disciplinary Suspension with Pay |
| ☐ 315 Military Leave | ☐ 336 Donated Leave Used Variable | ☐ 345 Disciplinary Suspension Without Pay |
| ☐ 317 Administrative Leave Other | ☐ 340 Leave Without Pay Authorized | ☐ 346 Investigatory Suspension Without Pay |
| ☐ 325 Comp Time Used | ☐ 341 Leave Without Pay Unauthorized | ☐ 350-355 FMLA |
| ☐ 326 Comp Time Used Variable | ☐ 342 Leave Without Pay Exhausted LV | ☐ 356-358 FMLA Military Caregiver |

Special Instructions: ADA was named a Team lead prosecutor as a result of the Superior Court Reorg. He was also named Gun Team Prosecutor and has added responsibilities with the RICC. All lead ADAs should have pay equity.

When applicable, funding availability signoff must be received prior to submitting to Human Resources for final approval.

Department Head/
Elected Official _____

SCJ001992



State Bar
of Georgia

PLAINTIFF'S EXHIBIT

32

**RULE 3.8 SPECIAL RESPONSIBILITIES OF A PROSECUTOR**

The prosecutor in a criminal case shall:

(a) refrain from prosecuting a charge that the prosecutor knows is not supported by probable cause;
(b) refrain from making any effort to prevent the accused from exercising a reasonable effort to obtain counsel;
(c) comply with Rule 4.2;
(d) make timely disclosure to the defense of all evidence or information known to the prosecutor that tends to negate the guilt of the accused or that mitigates the offense;
(e) exercise reasonable care to prevent persons who are under the direct supervision of the prosecutor from making an extrajudicial statement that the prosecutor would be prohibited from making under subsection (g) of this Rule;
(f) not subpoena a lawyer in a grand jury or other criminal proceeding to present evidence about a past or present client unless the prosecutor reasonably believes:

(1) the information sought is not protected from disclosure by any applicable privilege;
(2) the evidence sought is essential to the successful completion of an ongoing investigation or prosecution; and
(3) there is no other feasible alternative to obtain the information.

(g) except for statements that are necessary to inform the public of the nature and extent of the prosecutor's action and that serve a legitimate law enforcement purpose, refrain from making extrajudicial comments that have a substantial likelihood of heightening public condemnation of the accused;
(h) promptly disclose new, credible, and material evidence creating a reasonable likelihood that a convicted defendant did not commit an offense of which the defendant was convicted to an appropriate court or authority. If the conviction was obtained in the prosecutor's jurisdiction, the prosecutor shall promptly disclose that evidence to the defendant unless a court authorizes delay and undertake further investigation, or make reasonable efforts to cause an investigation, to determine whether the defendant was convicted of an offense that the defendant did not commit;
(i) seek to remedy a conviction obtained in the prosecutor's jurisdiction when the prosecutor knows of clear and convincing evidence establishing that a defendant did not commit the offense.

The maximum penalty for a violation of this Rule is disbarment.

Comment

[1] A prosecutor has the responsibility of a minister of justice and not simply that of an advocate. This responsibility carries with it specific obligations to see that the defendant is accorded procedural justice and that guilt is decided upon the basis of sufficient evidence. Precisely how far the prosecutor is required to go in this direction is a matter of debate and varies in different jurisdictions. Many jurisdictions have adopted the ABA Standards of Criminal Justice Relating to the Prosecution Function, which in turn are the product of prolonged and careful deliberation by lawyers experienced in both criminal prosecution and defense. Applicable law may require other measures by the prosecutor and knowing disregard of those obligations or a systematic abuse of prosecutorial discretion could constitute a violation of Rule 8.4: Misconduct.

[2] Reserved.

[3] Reserved.

[4] Paragraph (f) is intended to limit the issuance of lawyer subpoenas in grand jury and other criminal proceedings to those situations in which there is a genuine need to intrude into the client-lawyer relationship.

[5] Paragraph (g) supplements Rule 3.6: Trial Publicity, which prohibits extrajudicial statements that have a substantial likelihood of prejudicing an adjudicatory proceeding. In the context of a criminal prosecution, a prosecutor's extrajudicial statement can create the additional problem of increasing public condemnation of the accused. Although the announcement of an indictment, for example, will necessarily have severe consequences for the accused, a prosecutor can, and should, avoid comments which have no legitimate law enforcement purpose and have a substantial likelihood of increasing public opprobrium of the accused. Nothing in this Comment is intended to restrict the statements which a prosecutor may make which comply with Rule 3.6 (b) or 3.6 (c): Trial Publicity.

[6]   Reserved.

[7]   When a prosecutor knows of new, credible and material evidence creating a reasonable likelihood that a person outside the prosecutor's jurisdiction was convicted of a crime that the person did not commit, paragraph (h) requires prompt disclosure to the court or other appropriate authority, such as the chief prosecutor of the jurisdiction where the conviction occurred. If the conviction was obtained in the prosecutor's jurisdiction, paragraph (h) requires the prosecutor to examine the evidence and undertake further investigation to determine whether the defendant is in fact innocent or make reasonable efforts to cause another appropriate authority to undertake the necessary investigation, and to promptly disclose the evidence to the court and, absent court authorized delay, to the defendant. Consistent with the objectives of Rules 4.2 and 4.3, disclosure to a represented defendant must be made through the defendant's counsel, and, in the case of an unrepresented defendant,  would  ordinarily be accompanied by a request to a court for the appointment of counsel to assist the defendant in taking such legal measures as may be appropriate.

[8]   Under paragraph (i), once the prosecutor knows of clear and convincing evidence that the defendant was convicted of an offense that the defendant did not commit, the prosecutor must seek to remedy the conviction. Necessary steps may include disclosure of the evidence to the defendant, requesting that the court appoint counsel for an unrepresented indigent defendant and, where appropriate, notifying the court that the prosecutor has knowledge that the defendant did not commit the offense of which the defendant was convicted.

[9]   A prosecutor's independent judgment, made in good faith, that the new evidence is not of such nature as to trigger the obligations of paragraphs (h) and (i), though subsequently determined to have been erroneous, does not constitute a violation of this Rule.